**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| **The Michelin Retirement Plan and the Investment Committee of the Michelin Retirement Plan,**<br><br>    **Plaintiffs,**<br><br>  **v.**<br><br>**Dilworth Paxson, LLP, BFG Socially Responsible Investments, Ltd., Burnham Financial Group, Inc., Burnham Securities, Inc., COR Fund Advisors, LLC, GMT Duncan, LLC, Greenberg Traurig, LLP, Thorsdale Fiduciary and Guaranty Company Ltd., U.S. Bank National Association, Valor Group Ltd., Wakpamni Lake Community Corp., Wealth-Assurance AG, Wealth Assurance Private Client Corporation, Timothy B. Anderson, Jon Michael Burnham, Devon D. Archer, Bevan T. Cooney, Hugh Dunkerley, Jason W. Galanis, John P. Galanis, Gary T. Hirst, Frankie D. Hughes, and Michelle A. Morton,**<br><br>    **Defendants.** | **Case No.**<br><br><br>**Civil Action No.**<br><br><br>**COMPLAINT<br>(JURY TRIAL DEMANDED)** |

Plaintiffs, the Investment Committee of the Michelin Retirement Plan and the Michelin Retirement Plan (together, "**Michelin**") allege the following facts and principles of law.

<u>**PRELIMINARY STATEMENT**</u>

The Defendants, acting in concert and separately in contravention of their individual duties, carried out and enabled a fraudulent conspiracy to raid the retirement funds of Michelin and other similarly situated victims. The fraudulent scheme involved:

- **Deceived Issuer** – Defendants convinced representatives of the Wakpamni Lake Community of the Oglala Sioux Tribe  to issue bonds with promises of free community improvement projects for the Tribe;

- **Fake Investment** – Defendants set up that bond transaction to supposedly invest the proceeds in an "annuity" that was entirely fake;

- **Network of Collusive Actors** – Defendants placed co-conspirators in control of each entity involved with every aspect of the bond transaction and carried out their conspiracy with those persons;

- **Retirement Plans as Targeted Victims** – Defendants acquired ownership and control of investment management companies in order to steal retirement funds entrusted to those companies by "investing" those funds in the fraudulent bonds;

- **Forced Buyers** – Defendants used their conspiratorial cooperation to force retirement fund client funds into the purchase of the issued tribal bonds; and

- **Slush Fund Proceeds** – Defendants immediately raided the proceeds from closing the bonds in order to create a "slush fund" that would pay certain Defendants, directly and indirectly, to support their lifestyles, legal fees, and speculative ventures.

This scheme was accomplished with the purposeful, deceptive, and reprehensible acts of the co-conspirator Defendants, combined with the negligent, derelict, and careless lapses of duty by certain other Defendants.  This case is about not only an unconscionable abuse of the goodwill associated with what is known as "socially responsible investing" (e.g., in community projects aiding issuers like the Tribe), but also an utter disregard for the vital protections of employee retirement funds.

The factual allegations contained in this Complaint are based in large part on the initial filings in three separate actions brought by the Securities and Exchange Commission and the United States Department of Justice, respectively. *See SEC v. AAM,* 15 Civ. 9764 (WHP) (S.D.N.Y.); *United States v. Jason Galanis, et al.*, 15 Cr. 0643 (PKC) (S.D.N.Y.); *SEC v. Devon D. Archer et al.*, 16 Civ. 3505 (WHP) (S.D.N.Y.).

## PARTIES

1.      Plaintiff Michelin Retirement Plan ("**the Plan**") is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") 29 U.S.C. §1001, et seq. The Plan was established and is maintained by Michelin North America, Inc., a corporation with its principal place of business in Greenville, South Carolina.

2.      Plaintiff, the Investment Committee of the Michelin Retirement Plan ("**Investment Committee**") is a fiduciary of the Plan and as such is a proper Plaintiff with standing to bring this action against Defendants.

3.      Atlantic Asset Management, LLC ("**AAM**") was during the times relevant to this Complaint an SEC-registered investment adviser. AAM was purchased by GMT Duncan, LLC in April 2015 and is the surviving entity of a merger involving Hughes Capital. It is a Virginia corporation with its principal place of business in Stamford, Connecticut. In December 2015, AAM was the subject of an action by the Securities Exchange Commission for investor fraud in connection with its investment of client funds in bonds issued by the Wakpamni Lake Community Corporation, and is now in receivership and in the process of winding down. *See SEC v. AAM,* 15 Civ. 9764 (WHP) (S.D.N.Y.). In light of the fact that AAM is in receivership and in accordance with the terms of the Order approving the plan of Distribution of AAM's assets, AAM is not named as a Defendant in this Complaint. However, given their role as the gatekeeper of the Plan's funds, AAM is centrally featured in the facts of this Complaint.

4.      Hughes Capital Management, LLC ("**Hughes Capital**") was located at 916 Prince Street, Third Floor, Alexandria, Virginia 22314. It was organized and duly authorized to conduct business under the laws of Virginia. Hughes Capital has since merged into Atlantic Asset Management, LLC. Hughes Capital is not named in this complaint for the reasons set forth in

paragraph three. Like AAM, Hughes Capital served in a "gatekeeping" capacity, and will be centrally featured in the facts of this complaint.

5.      Defendant Wakpamni Lake Community Corporation ("**WLCC**") is a tribally-chartered corporation, wholly-owned by the Wakpamni Lake Community, a subdivision of the Wakpamni Lake District, each a subordinate governmental unit of the Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota ("**the Tribe**"). The Tribe is a federally recognized Indian tribe organized and operating in accordance with Section 16 of the Indian Reorganization Act of 1934 and under a federally-approved Constitution and By-laws. WLLC is the issuer of the bonds ("**Wakpamni Lake Bond(s)**" or the "**Bond(s)**") that are the subject of this Complaint.

6.      Defendant Greenberg Traurig, L.L.P. ("**Greenberg**") served as legal counsel for WLCC in its issuance of the Wakpamni Lake Bonds. Greenberg is organized under the laws of Florida and has offices throughout the United States and internationally, including, at the times relevant to this Complaint, at 1200 17th Street, Denver, Colorado 80202.

7.      Defendant U.S. Bank National Association ("**US Bank**") is a corporation organized under the laws of Minnesota. Its registered address is 220 East 3rd Street, Crookston, Minnesota, 56716. US Bank maintains a corporate trust office in Phoenix, Arizona. U.S. Bank served as the trustee under the indenture (the "**Bond Indenture**") with WLCC, pursuant to which WLCC issued the Wakpamni Lake Bonds.

8.      Defendant Valor Group Ltd. ("**Valor Group**") was incorporated as Wealth Assurance Holdings Ltd. in the British Virgin Islands in 2013, and changed its name to Valor Group Ltd. in December 2014.

9.     Defendant Wealth-Assurance AG ("**Wealth-Assurance**") and Valorlife Lebensversicherungs AG ("**Valorlife**") were wholly-owned subsidiaries of Wealth Assurance Holdings Ltd/Valor Group.

10.     Defendant BFG Socially Responsible Investments, Ltd. ("**BFG**") was incorporated in Nevada in August 2014. When GMT acquired Hughes Capital, BFG became the sole Preferred Member of GMT, holding all of its Class B interests.

11.     Defendant COR Fund Advisors, LLC ("**CORFA**") is a Delaware-registered limited liability company. CORFA is owned directly or indirectly by Jason Galanis, Devon Archer, and Bevan Cooney. Upon information and belief, at the times relevant to this Complaint, CORFA exercised effective control over Burnham Financial Group, Inc., which owns Burnham Securities, Inc.

12.     Defendant Thorsdale Fiduciary and Guaranty Company Ltd. ("**Thorsdale**") is a Nevada limited liability company. Thorsdale was established on June 23, 2011, as a family trust company for members of the Berger Family and its family affiliates. Jason Galanis's wife's maiden name is Berger. Jason Galanis had signature authority over the bank account associated with Thorsdale (the "**Thorsdale Account**"), and upon information and belief unilaterally controlled Thorsdale. Thorsdale owns a large portion of Valor Group. Thorsdale received the greatest portion of the misappropriated funds from the Wealth Assurance Private Client Corporation account in Florida.

13.     Defendant Burnham Financial Group, Inc. ("**Burnham Financial Group**") is the holding company for Defendant Burnham Securities, Inc. ("**Burnham Securities**"). Burnham Financial Group is a Delaware corporation with a principal place of business in New York, New

York. Upon information and belief, at the times relevant to this Complaint, Burnham Financial Group wholly owned Defendant Burnham Securities.

14.     Defendant Burnham Securities was, at the times relevant to this Complaint, an SEC-registered broker dealer based in New York, New York, and served as the placement agent for the Wakpamni Lake Bonds.

15.     Upon information and belief, at the times relevant to this Complaint, Defendant Jon Michael Burnham ("**Jon Burnham**") served as the Chief Executive Officer, Chairman, and Director of Burnham Securities; was the owner, directly or indirectly through Burnham Financial Group, of more than 50% of Burnham Securities; and directed the policies and management of Burnham Securities. Upon information and belief Jon Burnham is the person referred to in the documents publicly filed by the Securities and Exchange Commission as President of Burnham Financial Group.

16.     Defendant Dilworth Paxson, LLP ("**Dilworth**") served as legal counsel for the placement agent, Burnham Securities. Dilworth is organized under the laws of Pennsylvania and has offices throughout the Middle Atlantic States, including, at the times relevant to this Complaint, at 1500 Market Street, Philadelphia, Pennsylvania 19103. Dilworth's engagement agreement with Burnham Securities was addressed to and executed by Hugh Dunkerley on behalf of Burnham Securities. Dilworth represented in the engagement agreement that it was undertaking the representation upon waiver of a conflict of interest arising from its representation of the Wakpamni Lake Community. In the engagement agreement, Dilworth undertook responsibility for preparing and examining the "documents necessary to financing" WLCC's project.

17.    Defendant Timothy B. Anderson ("**Tim Anderson**") served as the lead attorney from Dilworth in its representation of Burnham Securities in matters related to this Complaint. Tim Anderson is no longer with Dilworth, and has since joined Dinsmore & Shohl, LLP in Philadelphia.

18.    Defendant GMT Duncan, LLC ("**GMT**"), upon information and belief, is a limited liability company formed pursuant to the laws of Delaware in December 2013. It is apparently dissolved, but upon information and belief, its registered agent was United States Corporation Agents, Inc. GMT purchased Hughes Capital with financing from Wealth-Assurance and/or, now Valorlife.

19.    Defendant Wealth Assurance Private Client Corporation ("**WAPCC**") was supposedly to serve as the annuity provider under the terms of an annuity contract between it and WLCC. WAPCC exists as two distinct, separately formed entities, with one entity located in the British Virgin Islands (**"WAPCC-BVI"**) and the other entity located in Florida (**"WAPCC-Florida"**) (but collectively, WAPCC). Both entities are deceptively named WAPCC. WAPCC-BVI and WAPCC-Florida were incorporated by Hugh Dunkerley. WAPCC-Florida held the bank account where all of the portion of the Bond proceeds intended for the purchase of an Annuity Investment (as defined in the Bond Indenture (defined below)) were sent by US Bank and subsequently misappropriated in accordance with the fraudulent scheme.

20.    Defendant Jason Galanis resides in Los Angeles, California. He is one of the primary architects of the scheme to use the fraudulent Bonds to defraud the bond holders of their retirement funds while creating a "slush" fund providing liquid capital for himself and his associates, the co-conspirator Defendants in this Complaint.

21.     Defendant John Galanis resides in Oceanside, California. John Galanis is the father of Jason Galanis.

22.     Devon Archer ("**Archer**") resides in Brooklyn, New York. Archer was, at the times relevant to this Complaint, a director, officer, and direct or indirect owner of and/or investor in various entities connected to the Wakpamni Lake Bond scheme including Valor Group; Valorlife; CORFA; Burnham Financial Group;  BAM Holdings, LLC, the holding company for investment management companies operating under the Burnham name, including Burnham Asset Management Corporation ("**BAM**"); and Rosemont Seneca Bohai, LLC ("**RSB**"), a Delaware limited liability company that he wholly owned.

23.     Bevan Cooney ("**Cooney**") resides in Incline Village, Nevada. At the times relevant to this Complaint, Cooney was a direct or indirect owner of CORFA, through which he owned an interest in Burnham Securities.

24.     Hugh Dunkerley ("**Dunkerley**") resides in Paris, France and Huntington Beach, California. At times relevant to this Complaint, he served as the Director, President, Executive Vice President and Secretary of Valor Group; Director of Wealth-Assurance; Director of Valorlife; Managing Director of Burnham Securities; Sole Director and President of WAPCC; and Managing Member of BFG. He was installed in each of the latter two management positions by Jason Galanis.

25.     Gary Hirst ("**Hirst**") resides in Lake Mary, Florida. He served as Hughes Capital's Chief Investment Officer ("**CIO**") in August 2014 (when the Wakpamni Lake Bonds were issued) and directed the investment of over $27 million of Hughes Capital's client's' funds into Wakpamni Lake Bonds. Hirst is the assistant secretary of WAPCC-Florida and the signatory on its bank account.

26.     Michelle Morton ("**Morton**") resides in Colonia, New Jersey. She served as the Chief Executive Officer ("**CEO**") of Hughes Capital and AAM, and owned an interest in Hughes Capital's and AAM's parent company, GMT. In her capacity as CEO of Hughes Capital and AAM, Morton oversaw the investment of over $43 million of her clients' retirement funds into Wakpamni Lake Bonds.

27.     Defendant Frankie Hughes founded Hughes Capital and served as its President and CIO prior to Hughes Capital's sale to GMT in August 2014. She remained aboard Hughes Capital for a short time following the sale as a special advisor to Michelle Morton.

## JURISDICTION AND VENUE

28.     Plaintiff incorporates all allegations set forth above.

29.     Pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 1132(e)(1) of "ERISA" , and 18 U.S.C. § 1965 of the Racketeer Influenced Corrupt Organizations Act ("**RICO**"), this Court has federal question jurisdiction as to the claims arising under ERISA and RICO. This Court has supplemental jurisdiction over all other claims asserted in this complaint pursuant to 28 U.S.C. § 1367.

30.     Pursuant to S.C. Code Ann. § 36-2-803(d) and (g) this Court has personal jurisdiction over the Defendants since part of the contract was to be performed in South Carolina and the Defendants knew the identity of Plaintiff whose location is a matter of public record.

31.     Venue lies in this District pursuant to ERISA, 28 U.S.C. § 1391(b)(2) and 29 U.S.C. § 1132(e)(2), because the injury associated with the misappropriation of funds takes effect in Greenville, South Carolina where Michelin is located.

32.     Venue lies in this district pursuant to RICO, 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(b).

33.     Venue lies in this district pursuant to S.C. Code Ann. § 15-7-20.

## FACTUAL ALLEGATIONS

34.     Plaintiff incorporates all allegations set forth above.

**A.     Michelin's Employee Retirement Funds Are Invested in a Fraudulent and Unmarketable Bond Without Michelin's Knowledge or Consent.**

35.     Michelin North America, Inc. established and maintains one or more pension and/or retirement programs, including the Plan, for certain employees.  Under the terms of the Plan, its Investment Committee retains the power to control and manage the assets of the Plan to the extent of its power of appointment of investment managers, as that term is defined in Section 3(38) of ERISA.

36.     The Investment Committee entered an Investment Management Agreement with Hughes Capital on January 19, 1999 ("**Investment Management Agreement**"), appointing Hughes Capital as investment manager for certain assets held by the Plan.  That appointment was and is specifically intended to meet any and all requirements under Section 402(c)(3), 403(a)(2), and 405(d)(1) of ERISA.

37.     Pursuant to that appointment, Hughes Capital was to manage and invest certain Plan funds in accordance with the Investment Management Agreement.

38.     By letter dated August 22, 2014, Hughes Capital notified the Investment Committee that it had been acquired by GMT, a company founded by Morton. Hughes Capital stated in the letter that there were no plans to change the name of the company nor to change the portfolio management team. In the letter, the Investment Committee was notified that Morton would be the new CEO and Chairperson of Hughes Capital.

39.     Between August 22, 2014 and August 26, 2014, Hughes Capital raided $8,102,154 of employee retirement funds from the Plan to purchase a Wakpamni Lake Bond.

10

40.     By letter dated September 2, 2014, Hughes Capital notified the Investment Committee that part of the Plan's portfolio had been used to purchase one of the Wakpamni Lake Bonds). Pursuant the Investment Management Agreement between Hughes Capital and Michelin, Hughes Capital was to notify the Investment Committee by written report of "any potential conflicts of interest known by the managers involving the assets, or brokerage arrangements by the manger or any affiliate of the manager." The Investment Committee received no such notice of the multiple conflicts of interest involving the purchase of the Wakpamni Lake Bonds.

41.     In a letter dated October 10, 2014, the Investment Committee notified Hughes Capital of the Investment Committee's termination of the Investment Management Agreement. The Investment Committee directed Hughes Capital to transfer the Plan's portfolio, except for the Wakpamni Lake Bond to Northern Trust Investments, Inc. Michelin directed Hughes Capital to dispose of the Wakpamni Lake Bond in the most efficient way possible.

42.     For over a year and a month, Hughes Capital deceived Michelin into thinking that fruitful efforts were ongoing to sell the bond. On or about January 14, 2016, Michelin learned of the SEC's filing of its December 15, 2015 complaint against AAM. Through that complaint, Michelin first began to suspect that its funds may have been fraudulently misappropriated.

**B.     Defendants' Creation of the Fraudulent Bond Scheme.**

43.     Jason Galanis's ultimate goal was to procure funds to dump into a slush fund for himself and his conspirators. The goal was to be achieved in four parts: 1) locating a bond issuer; 2) engineering the bond issuance to give Jason Galanis and his associates undisclosed control over the bond proceeds; 3) identifying victims whose assets could be taken over to force a purchase of the bonds; and 4) misappropriating the bond proceeds for the benefit of Jason Galanis and his associates.

44.     To effectuate his scheme, Jason Galanis engaged his father, John Galanis, Archer, Cooney, Dunkerley, Hirst, and Morton.

45.     Jason Galanis and John Galanis began the scheme in March 2014, when they convinced a Native American tribal corporation, the WLCC, to issue bonds. In total, WLCC issued three tranches of bonds: 1) $27,077,436 in two parts in August 2014; 2) $20,000,000 in two parts in September 2014; and 3) $16,200,000 in April 2015.

46.     WLCC was falsely led to believe by Jason Galanis and John Galanis that **most** of the proceeds of the relatively low-interest bonds would be invested into a higher-yielding annuity contract (the "**Annuity Contract**") that would generate sufficient income to pay the principal and interest on **all** of the bonds, leaving WLCC with free use of the remaining uninvested proceeds (and excess Annuity Contract income) to pay for a tribal economic development project – in other words, free money.

47.     Burnham Securities, a wholly owned subsidiary of Burnham Financial Group, served as the Placement Agent for the bond issuance. Burnham Financial Group was controlled by CORFA, a Delaware limited liability company in which Jason Galanis, Archer, and Cooney held direct or indirect ownership interests at relevant times throughout the scheme.

48.     In June 2014, Dilworth and Tim Anderson, as Burnham Securities' counsel, provided WLCC with a summary of the bond program that listed Wealth-Assurance as the annuity issuer and an independent investment management company as the portfolio manager.

49.     In May 2013, Jason Galanis had arranged Valor Group's purchase of Wealth-Assurance, purportedly a Liechtenstein-based life insurance and annuity provider, and soon after installed Dunkerley on its Board of Directors. Wealth-Assurance ultimately provided no services with regard to the Annuity Contracts purchased by WLCC with bond proceeds.

50.    The investment of bond proceeds under the Annuity Contract was supposedly to be managed by an independent investment management company. That independent investment management company was also supposedly to be in charge of selecting an Annuity Contract provider. However, no independent investment management company was ever put in place. An associate of Jason Galanis, purporting to be an investment manager on behalf of a fictitious investment management company called "Private Equity Management Limited," signed the investment management agreement (the "**Annuity Management Agreement**") with WLCC with respect to the bond proceeds "invested" in the Annuity Contract. The investment management company was fictitious and part of a series of fraudulent misrepresentations that formed the basis of a massive fraudulent scheme.

51.    The Annuity Contract and the Annuity Management Agreement were in irreconcilable conflict over the management of invested funds, to an extent that put any reasonable participant in the transaction on notice that the transaction was unworkable and likely fraudulent. For example, the Annuity Contract provided that WLCC was to have absolutely no input, directly or indirectly, in the selection, identification, or recommendation of investments under the Annuity Contract. The Annuity Management Agreement, however, included investment guidelines approved by WLCC and provided that WLCC could modify the guidelines at any time and could give the manager instructions to buy, sell, or make any investment. The structure under which WAPCC-BVI was supposed to be guaranteeing investment results to WLCC, but abdicating the selection of investments to a manager that WAPCC-BVI did not select or control (regardless of whether WLCC itself could select or control that manager) was a sufficient red flag to put any competent transaction participant on notice that the proposed transaction was neither normal nor legitimate.

52.     The Annuity Contract provider was in fact not chosen by the associate of Jason Galanis, but by Jason Galanis himself. Instead of selecting Wealth-Assurance, Jason Galanis selected WAPCC-BVI. The Annuity Contract between WLCC and WAPCC-BVI identifies WAPCC as a British Virgin Islands incorporated entity that is "part of the Wealth-Assurance Group of Companies." The last-minute substitution of Defendant WAPCC-Florida, a Florida limited liability company, for a similarly-named British Virgin Islands entity was an act in furtherance of Defendants' fraudulent scheme, and was a material element in concealing Defendants' misappropriation of funds.

53.     Dunkerley is the sole shareholder of WAPCC-BVI and it has no other known ownership relationship with Wealth-Assurance. At Jason Galanis's instructions, or with his knowledge, Dunkerley incorporated the identically named British Virgin Islands entity on August 22, 2014, just four days before Jason Galanis selected WAPCC-BVI as the Annuity Contract provider for the first issuance of the Bonds (that first issuance being the Wakpamni Lake Bonds purchased with the retirement funds belonging to Michelin and others). WAPCC-BVI's unaudited financial statement reflects that through the end of December 2014, WLCC was WAPCC-BVI's only annuity "counterparty."

54.     Contrary to the Annuity Contract between WAPCC-BVI and WLCC, the bond proceeds were not directed to a WAPCC-BVI account at a bank "without any offices and/or branches in the United States." Instead, Dilworth, the counsel to placement agent Burnham Securities, forwarded email instructions from "jason galanos" [*sic*] (using a "burnhamequitypartners.com" email address) to the indenture trustee (US Bank), to send the Annuity Contract purchase price from the bond proceeds to a bank account at a Beverly Hills, California branch of JPMorgan Chase Bank, in the name of an identically named company

WAPCC-Florida that had been incorporated by Dunkerley in Florida on July 7, 2014. The email from Dilworth to US Bank containing the instructions also forwarded a signed copy of the Annuity Contract. That Annuity Contract identified Dunkerley as the president and director of WAPCC-BVI. US Bank, through the distribution list that it held for the key participants in the bond transaction, knew Dunkerley was the representative of Burnham Securities, the placement agent for the bond issuance. US Bank followed the instructions from "jason galanos" of "burnhamequitypartners.com," apparently without questioning them, which was in contravention of the Bond Indenture, the Annuity Contract, and the Annuity Management Agreement. That is, without corroborating instructions from either the bond issuer WLCC or its designated investment manager who was authorized to select an Annuity Contract provider, US Bank wired over $22 million of WLCC's bond proceeds, including over $8 million of Michelin retirement funds, intended for the Annuity Contract, solely on instructions from the placement agent Burnham Securities and its counsel Dilworth, to an otherwise unknown entity whose only known officer (Dunkerley) was also known to US Bank to be an insider of the placement agent Burnham Securities, and to a bank that, because of its U.S. location, was expressly forbidden from participating by the very Annuity Contract that accompanied the instructions. That grossly negligent wire by US Bank in breach of its fiduciary responsibilities as trustee under the Bond Indenture and the Wakpamni Lake Bonds went directly into the hands of the criminal conspirators who have not made and who may never make full restitution to Michelin and the other victims.

55.    In its Florida incorporation documents, WAPCC-Florida listed Dunkerley as its sole officer, and gave its mailing address as a post office box in Florida used by Hirst. All of the

misappropriation of Michelin bond proceeds was effectuated through the instrumentality of the WAPCC-Florida account.

### C. Defendants Acquire Ownership of Investment Management Companies to Use as Purchasers for the Fraudulent Bonds.

56.    In order for Jason Galanis's scheme to work, he needed victims to purchase the bonds. He and his associates arranged to obtain control over two investment adviser/management companies, thereby gaining access to captive client funds. In August 2014, Jason Galanis, Archer, Cooney, and Dunkerley obtained control over Hughes Capital; and Jason Galanis, Morton and Hirst arranged for Hughes Capital to invest $27 million of its clients' funds in Wakpamni Lake Bonds. Michelin's funds were part of this $27 million.

57.    In May 2014, Jason Galanis was introduced to Morton, the half-owner of GMT, which had the stated business purpose of providing socially responsible fixed income investment management and advisory services as a minority business enterprise. Together, Jason Galanis and Morton began negotiating to purchase Hughes Capital, an investment adviser/manager with approximately $900 million under management, based in Alexandria, Virginia.

58.    On June 3, 2014, Jason Galanis gave Morton a document to provide to Hughes Capital's then owner, Frankie Hughes, to "demonstrate who [Morton's] financial sponsors are." The document described CORFA as a private equity control investor that owned several businesses, including Wealth-Assurance and Burnham Securities. On June 5, 2014, Jason Galanis sent Morton a term sheet outlining the terms by which CORFA—a corporation owned in part by Jason Galanis, Archer, and Cooney—would directly or indirectly (through a subsidiary) finance GMT's purchase of Hughes Capital. Archer and Cooney knew that their agreement to finance the acquisition of Hughes Capital with CORFA funds was a necessary part of the plan to secure buyers for the Wakpamni Lake Bonds.

16

59.    On August 1, 2014, Jason Galanis sent Morton a text message stating that he would form BFG—the entity through which the funding of the acquisition would be channeled— the next day. On August 5, 2014, at the direction of Jason Galanis, Dunkerley formed BFG and became its managing member. BFG was supposedly a subsidiary of Wealth-Assurance.

60.    One week later, GMT entered into an amended and restated operating agreement with its members, pursuant to which BFG became a "Preferred Member." The agreement was signed by Dunkerley on behalf of BFG, and stated that notices to BFG were to be sent to Archer. After the acquisition of Hughes Capital by GMT, Hughes Capital became GMT's subsidiary; and Morton and her business partner became officers of Hughes Capital.

61.    On August 12, 2014, Jason Galanis arranged for Wealth-Assurance to fund BFG's initial capital contribution of $2,660,618 to GMT, which GMT used to finance its purchase of Hughes Capital. Valor Group provided the money to Wealth-Assurance to give to BFG. Jason Galanis holds a significant ownership interest in Valor Group through Thorsdale. BFG, by virtue of its ownership interest in GMT, was an indirect owner of Hughes Capital.

62.    As Morton knew, Jason Galanis's, Archer's, Cooney's and Dunkerley's agreement to finance the acquisition of Hughes Capital was contingent on her agreement to invest the funds of clients of Hughes Capital, including the Plan, in Wakpamni Lake Bonds. In July 2014, even before the purchase of Hughes Capital was complete, Morton e-mailed Jason Galanis "an update on how we will place the bonds in a portfolio" and promised him via text message, "I will make sure you make a TON of money and smile all the way to the bank." On August 12, 2014, Morton sent Jason Galanis a text message noting, "You invested because of the bonds not me," to which he responded: "The bonds are only possible because of you my dear."

63.    Pursuant to GMT's amended operating agreement, BFG was accorded certain privileges, including the right to approve the CIO for GMT and Hughes Capital, and to appoint members to the board of Hughes Capital.

64.    Before GMT completed its purchase of Hughes Capital, Jason Galanis introduced Morton to Hirst as a potential CIO. On August 12, 2014, Hirst sent Morton a draft employment contract. Hirst and Morton executed the contract and related paperwork that same day.

65.    A few days later, Hirst informed Morton that he did not want Hughes to disclose his name in its form ADV, a form that investment advisers registered with the Securities Exchange Commission are required to file upon registration and annually thereafter. For that reason, Hirst decided to resign as CIO of Hughes Capital and agreed to act as a paid investment consultant instead, a position that he understood would not require disclosure on Hughes Capital's form ADV. As Morton told Jason Galanis, "In regard to Hirst, he opted to be a consultant because as an employee he would have been required to make certain disclosures for our ADV . . . . If we want to follow the contract which has him as CIO it [is] no problem, we just have to change the title, but he has to make the disclosures per regulations."

**D.    Defendants Purchase the Fraudulent Bonds with Unsuspecting Clients' Funds.**

66.    By August 14, 2014, just two days after the purchase of Hughes Capital was complete, Jason Galanis and Hirst worked to invest client funds held by Hughes Capital in the Wakpamni Lake Bonds. Hirst quickly undertook an analysis of the accounts and investments of clients belonging to Hughes Capital to determine what could be liquidated to generate funds to purchase Wakpamni Lake Bonds.

67.    Morton asked the compliance officer at Hughes Capital to conduct an analysis of the investment guidelines of seven of Hughes Capital's clients to determine whether the

guidelines allowed for the purchase of the Wakpamni Lake Bonds. The compliance officer concluded that most of the clients' guidelines prohibited privately-placed, unrated bonds like the Wakpamni Lake Bonds, and that in no case could the investment be made without consulting the client first.

68.     On August 17, 2014, Jason Galanis, using an apparently Burnham-affiliated e-mail address (burnhamequitypartners.com), e-mailed Morton a copy of the draft indenture for the Wakpamni Lake Bonds. It provided that the bond proceeds would be invested in an annuity that would be issued and managed by Wealth-Assurance. In addition, pursuant to a Placement Agency Agreement for the Wakpamni Lake Bonds, Burnham Securities was entitled to a $250,000 fee from the bond sale proceeds. The agreement stated that notices to Burnham Securities should be sent to Jason Galanis (spelled "Galanos" in the agreement) and was signed by Dunkerley. Morton knew that Burnham Securities would be acting as the Placement Agent for the Wakpamni Lake Bonds.

69.     On August 17, 2014, Morton e-mailed Jason Galanis, acknowledging the conflicts of interest presented by her investment of client funds, including the Plan, in a transaction in which affiliated companies—Wealth-Assurance and Burnham Securities—stood to benefit. She complained that she was spending much time performing due diligence regarding the Wakpamni Lake Bonds "because of the multiple reviews I had to take." She explained, "For instance, since many of the accounts are ERISA funds, I had to consider those guidelines and regulations, I have a fiduciary duty to Burnham, and a fiduciary duty to the clients."

70.     In another e-mail dated August 17, 2014, Morton sent Jason Galanis a memo articulating concerns regarding the Wakpamni Lake Bonds. Among other things, Morton's memo questioned whether the tribe affiliated with the issuer—a tribal corporation operating in an

impoverished region—would be legally or financially accountable for the Wakpamni Lake Bonds and whether institutional clients would fire Hughes Capital if they were dissatisfied with the investment.

71.    In her e-mail transmitting the memo to Jason Galanis, Morton wrote, in reference to BFG's investment in Hughes Capital: "The decision regarding what should be done is yours, not mine . . . . To be fair to both of us, if you made the investment with this in mind, I do not have the moral right to stand in the way and everything is in place to move forward . . . ." She reiterated in a text message to Jason Galanis: "Let's be clear, if you want the bonds to go in, I have no say. I am not sitting in the position of making judgement [*sic*]. If you invested in Hughes Capital for this sole purpose than [*sic*] it is your call not mine . . . If you're thinking that I can or would stop this then I totally screwed up my communication." Jason Galanis told Morton to let Hirst "make the decision."

72.    Between August 22 and 26, 2014, Hirst signed trade tickets purchasing $27,077,436 of Wakpamni Lake Bonds on behalf of nine of Hughes Capital's clients, including the Plan. The funds were sent to a trust account at US Bank for the benefit of WLCC. The Plan's funds were a part of this purchase. The closing documents for these transactions included an investment letter dated August 21, 2014, from Hughes Capital to the bond issuer WLCC identifying the Hughes Capital clients who were purchasing the bonds (including Michelin) and purportedly making representations, warranties, and covenants on their behalf. On information and belief, the investment letter was prepared by Dilworth and Tim Anderson and was provided to, among others, the WLCC, Burnham Securities, Greenberg, and US Bank.

73.    Neither Morton nor Hirst informed Michelin about the investments beforehand. As one of the costs of issuance associated with the bonds, WLCC paid Burnham Securities a

$250,000 placement agent fee out of the bond proceeds, of which $125,000 was then paid to Dunkerley as his share of the fee.

74.    Morton and Hirst knew that Morton's "financial sponsors," including Jason Galanis and Dunkerley, were associated with Wealth-Assurance and Burnham Securities, which had been described to her as the annuity provider and placement agent, respectively—entities that would financially benefit from Hughes Capital's clients' purchases of the Wakpamni Lake Bonds. Nevertheless, neither she nor Hirst disclosed to Michelin that Hughes Capital was investing Plan funds in investments that would financially benefit its undisclosed part owners and financiers.

75.    Upon considering the investment in the Wakpamni Lake Bonds, Michelin expressed concerns regarding the Bonds' valuation and suitability and demanded that the Bond imposed upon it by Hughes Capital be sold. Morton assured Michelin that Burnham Securities had other clients interested in the Bonds and was in the process of arranging purchases. However, despite repeated promises, Burnham Securities never produced buyers for the Bond, and none of the clients of Hughes Capital was able to liquidate its position in the Bonds. Upon information and belief, all assurances and representations Hughes Capital would reimburse the Plan and take the Bond into its own account or that a third-party buyer could be found were false and had no factual basis.

76.    Morton falsely assured Michelin via multiple communications between February and June 2015 that a sale of its Wakpamni Lake Bond was nearing completion. For example:

(a)    In response to a question from Michelin regarding the status of the sale of Michelin's Bond, on February 27, 2015, Morton wrote, "As I mentioned in my last email, the portfolio management team is working on this and they are aware

that it is a time sensitive issue. The good news is that there is more interest in the secondary market than we knew. I have instructed them to get back to me with an update by the end of the day. I relay there [*sic*] progress to you as soon as I get it. Thank you for your patience."

(b)    In April 2015, Morton responded to Michelin's multiple requests for status updates by scheduling phone calls to discuss the matter.

(c)    On May 11, 2015, Michelin had its corporate counsel reach out to Morton, and instructed her to complete the repurchase of the Bond by the end of May 2015.

(d)    On May 27, 2015, Michelin asked Morton, why AAM (Hughes Capital had merged with AAM at this point) was not going to purchase the Bond as it stated it would, but was now apparently looking for an third-party buyer. Morton responded with, "That was our plan prior to the acquisition (referencing AAM's acquisition of Hughes Capital), however, once the sale was completed we found that we were not given accurate information. Consequently, pursuing that course may have taken more time than we thought we had. I recall having that conversation with you but I am still dealing with 'deal exhaustion'. We met with our board who helped us identify a firm that has a particular acumen in this area. As our board's interests are aligned with ours in terms of providing you with a satisfactory outcome, I am confident in our approach."

(e)    On June 10, 2015, AAM, on behalf of Morton, assured Michelin that "we have been working on multiple avenues for removal [of the Bond from the portfolio], with the primary driver being speed."

**E.     At the Same Time, Defendants Acquire AAM to Provide Additional Funds to Fraudulently Purchase More Bonds.**

77.     Back during the fall of 2014, Jason Galanis and his associates needed more unsuspecting victims to provide more capital to be misappropriated. Morton identified AAM, an investment manager with $11 billion in assets under management, as a potential target for Hughes Capital.

78.     With the backing of Jason Galanis, Archer, Cooney, and Dunkerley, Morton negotiated to acquire AAM. Morton e-mailed Jason Galanis that she had a conversation with AAM's Chief Strategist "about our SRI [Socially Responsible Investing]/ Native American Initiative" and that "he is so on board with this." According to Morton, AAM's Chief Strategist told her that if she made him aware of the details of the Bonds ahead of time, he would do his "damndest [*sic*] to get it place within a day after the acquisition."

79.     On December 1, 2014, at Jason Galanis's direction or with his knowledge, Dunkerley provided AAM's General Counsel a letter on behalf of the Core Group of Companies, Inc., a CORFA affiliate, confirming its agreement to provide financing to capitalize the purchase of AAM. On February 2, 2015, Jason Galanis sent Archer and Cooney a "consultant report" directed to the "Board of Valorlife" regarding the financing of the proposed acquisition of AAM. Valorlife was a foreign insurer that Valor Group had acquired in November 2014.

80.     On April 2, 2015, at the direction of Jason Galanis, Valorlife financed the purchase of AAM through BFG. The financing was guaranteed by Valor Group and the guaranty was signed by Dunkerley as Valor Group's President.

81.     On March 30, 2015, Jason Galanis forwarded copies of the executed copies of the AAM acquisition documents to Cooney, Archer, and Burnham Financial Group's President (on information and belief, Defendant Jon Burnham). The terms of the purchase were memorialized

in an Amended and Restated Liability Company Agreement for GMT, entered into as of April 2, 2015. Dunkerley signed the agreement on behalf of BFG as its Managing Member.

82.    Pursuant to the Amended and Restated Liability Company Agreement for GMT, AAM became GMT's wholly owned subsidiary. The agreement provided that AAM's Board of Managers was to consist of four persons, comprised of two Class A Holders (Morton and her business partner) and two persons selected by BFG as the Class B Holder. Together, the Board of Managers was granted the exclusive right to control AAM. In addition, GMT was required to appoint a CIO that was acceptable to BFG.

83.    Immediately after the acquisition of AAM was completed, and in furtherance of his pledge to Archer and Cooney to obtain more "liquidity" for their "various projects," Jason Galanis instructed Morton to identify investors to purchase additional Wakpamni Lake Bonds. By that point, Morton was aware that there was no active market for the Bonds. Since at least November 2014, she had been dealing with client complaints regarding the original Bond investments, and had been unsuccessful in her efforts to arrange for Burnham Securities to find buyers or purchase them itself. Indeed, in January 2015, she e-mailed Jason Galanis: "I thought that if necessary B[urnham] would bid on the bonds if the clients wished. It appears not to be the case. We have received one formal communication and I expect we will receive others in the coming days."

84.    Morton and AAM struggled to find buyers for a third tranche of Wakpamni Lake Bonds (the second tranche is described below in paragraphs 98–100 of this Complaint). To appease her backers, including Jason Galanis, Morton arranged for AAM to use funds maintained in in one of its managed high-yielding funds (the "HY Fund") for the bond purchase. HY Fund implements a strategy of making diverse, high yielding, liquid investments through

designated investment managers. HY Fund's only investor was a single pension fund, an existing client of AAM's for which AAM managed other investments in addition to its investment in the HY Fund.

85.     In the same way that Hughes Capital failed to properly notify Michelin, AAM did not notify the owners of the pension fund in the HY Fund prior to making the purchase of the Bonds. Morton also failed to notify the owners of the pension fund contained in the HY Fund that the individuals that owned and controlled the annuity provider and the placement agent were also AAM's financiers. Morton did not tell the owners of the pension fund that those same individuals were also AAM's part-owners, and the largest source of AAM's capital. Nor did Morton disclose that Jason Galanis had promised her additional funding for AAM in connection with her approval of the Bond purchase. Her actions in the deal between AAM and the owners of the pension fund in the HY Fund are similar to her actions with regards to Hughes Capital's use of the funds of the Plan to purchase Wakpamni Lake Bonds in the first (August 2014) tranche (which included the purchase imposed upon Michelin).

86.     Like Michelin, the owners of the employee retirement fund contained in the HY Fund demanded its Bond be liquidated at once. No such liquidation ever occurred.

87.     As set out in the Annuity Contract "purchased" with August 2014 Bond proceeds (signed by Dunkerley on WAPCC-BVI's behalf), WAPCC-BVI promised that the Annuity Contract purchase price would be kept in a "segregated asset account" that would be "unique to this Contract" and would be "segregated from the Company's other assets." The Annuity Contract 'also explicitly provided that the Annuity Contract purchase price was to be paid by wire transfer to "a bank without any offices and/or branches in the United States."

88.    Contrary to the Annuity Contract, the bond proceeds were never sent to a separate account held by WAPCC-BVI in the British Virgin Islands, nor managed by an independent investment management company, but, in accordance with the scheme, were instead sent to the separately incorporated WAPCC-Florida in Florida and misappropriated from there.

**F.    Defendants Misappropriate the Bond Proceeds from the WAPCC-Florida Account and Dispense the Proceeds to Themselves, and Recycle Proceeds into More Bond Issuances.**

89.    Contrary to the transaction closing documents, the Bond proceeds designated for the Annuity Contract purchase were sent by US Bank to the WAPCC-Florida account and held in the name of an identically named entity incorporated and based in Florida (rather than in the British Virgin Islands). The bond proceeds used for the Annuity Contract "purchase" price were never managed by the supposed independent investment management company, nor indeed by any investment management company.

90.    In furtherance of the scheme, with Jason Galanis's knowledge, Dunkerley misappropriated the Wakpamni Lake Bond proceeds from the WAPCC-Florida account by authorizing wires to a number of other entities, at least on some occasions doing so based on written instructions he received from Jason Galanis.

91.    Between August 27, 2014 through on or about October 30, 2015, Dunkerley wired the largest portion of the proceeds (more than $38,000,000) to Thorsdale, an entity Jason Galanis controlled, from which proceeds were further misappropriated by Jason Galanis for his own benefit and that of his associates.

92.    Morton's decision to invest Plan funds in Wakpamni Lake Bonds was driven in part by her expectation that Jason Galanis would continue to arrange financial backing for Hughes Capital and were a breach of her fiduciary duties as well as Hughes Capital's fiduciary

duties under ERISA. Her expectations were met by Hughes Capital's receipt of a portion of the very proceeds that WAPCC-BVI was supposed to be investing on behalf of the bond issuance and for the ultimate benefit of the clients of Hughes Capital and Morton.

93.     At the direction of Jason Galanis, Hughes Capital and AAM received at least $655,000 of Wakpamni Lake Bond proceeds: 1) a $350,000 payment on September 8, 2014, that Jason Galanis had Dunkerley wire from WAPCC-Florida account to Thorsdale and then to Valor Group, which then wired it to Hughes Capital; and 2) a $305,000 payment (matching the amount that Jason Galanis had expressly promised to Morton the day before she effected the April 2015 bond purchase by a pension plan in the HY Fund) that Dunkerley wired to AAM directly from the WAPCC-Florida account on April 23, 2015.

94.     The closing documents for the sale of the first issuance of Wakpamni Lake Bonds in August 2014 did not disclose any payments to John Galanis (Jason Galanis's Father) for the work he did in presenting the transaction to WLCC and securing its participation as issuer. Nor was WLCC informed by John Galanis, or anyone else, that John Galanis would earn any fees in connection with the Wakpamni Lake Bonds, although John Galanis knew that proceeds from the issuance would be directed to him by his son. At Jason Galanis's direction, Dunkerley sent $2.35 million from WAPCC-Florida to an entity controlled by John Galanis called Sovereign Nations Development Corp. From Sovereign Nations Development Corporation's bank account, John Galanis directed several further distributions to another account in his name.

95.     Jason Galanis arranged to have WAPCC-Florida and Thorsdale transfer over $3 million to lenders and others for the mortgage on and maintenance of his estate in Los Angeles, California. He also arranged to have money wired from WAPCC-Florida and Thorsdale to his

criminal defense attorneys ($497,210) and to his mother, wife, and father-in-law (totaling $214,000).

96.    In addition, Jason Galanis used his Thorsdale debit card to spend thousands more at restaurants and luxury retailers.

97.    Dunkerley, Hirst, Cooney, and Archer all benefited from their participation in the scheme as well through transfers directed by Jason Galanis out of the Thorsdale Account that they received individually or through entities that they controlled, including, but not limited to: a) $700,513 transfer to Archer between November 2014 and April 2015; b) $4,370,000 transfer to Cooney between August 2014 and April 2015; c) $20,485 to Dunkerley in September 2014; and d) $1,300,000 transfer to Hirst in August 2014.

98.    On October 1, 2014, Jason Galanis caused WLCC to issue an additional $15 million of Bonds, the second tranche of Wakpamni Lake Bonds. This second tranche was purchased by RSB, an entity wholly owned by Archer. RSB received financing for this purchase from Galanis and his controlled entities, who used $15 million that they had stolen from the August 2014 Bond "investors." WLCC used the $15 million to "purchase" another fraudulent annuity contract, thus putting the money right back under Galanis's control. As a result, Galanis and his co-conspirators still had the cash and, now, also had Bonds with a face amount of approximately $15 million. The point of this recycling scheme was to allow Jason Galanis to use the new Bonds as currency in various transactions, including bolstering Burnham Securities' net capital. WLCC, on the other hand, had just incurred an additional $15 million in debt with only a fraudulent new annuity contract as the promised source of repayment.

99.    To coordinate Archer's purchase of the $15 million Wakpamni Lake Bonds, Jason Galanis arranged for $15 million to be sent from Thorsdale to RSB. To purchase the newly

issued Wakpamni Lake Bonds, RSB then wired $15 million to US Bank as the indenture trustee for the benefit of WLCC. Most of the funds received in this issuance were sent again to WAPCC-Florida as purchase money supposedly for a new annuity. Prior to receiving these funds, RSB's account balance was about $2 million. In the course of paying for the Wakpamni Lake Bonds, Archer's bank asked him to identify the source of the funds. Archer facilitated the recycling of the Bond proceeds by telling his bank in a client representation letter he signed on October 20, 2014: "The funds used to purchase the bonds were from real estate sales through my business, Rosemont Seneca Bohai, LLC," a statement Archer knew was untrue when he made it.

100.    Jason Galanis then recycled a portion of the funds again, this time to fund the acquisition of a new $5 million issuance of Wakpamni Lake Bonds (part two of the second tranche) by Cooney. Between October 2 and 6, 2014, Dunkerley, at Jason Galanis's direction or with his knowledge, sent back to Thorsdale a large portion of the funds WAPCC-Florida had received from WLCC in connection with the $15 million sale of Wakpamni Lake Bonds to RSB. On October 8, 2014, Jason Galanis sent $5 million of the money that Thorsdale received to Cooney, who used it to purchase Wakpamni Lake Bonds. By twice recycling a portion of the proceeds from the initial bond issuance, Jason Galanis and his cohorts caused WLCC to issue three tranches of Wakpamni Lake Bonds with a face amount of approximately $47 million in exchange for approximately $27 million (minus transaction related fees) in proceeds, which proceeds were then looted by Jason Galanis and his co-conspirators through the fraudulent annuity contracts.

101.    Archer and Cooney used their illegitimate Wakpamni Lake Bonds to benefit Burnham Securities, an entity in which they each held an ownership interest. In April 2015, Archer used RSB's Wakpamni Lake Bonds to purchase shares of Valor Group with Dunkerley

signing the documents on Valor Group's behalf. In May 2015, one of Valor Group's wholly-owned subsidiaries transferred $2.6 million of the Wakpamni Lake Bonds to Burnham Securities to boost its net capital in order to meet regulatory requirements.

102.    Similarly, in May 2015, Cooney transferred his $5 million Wakpamni Lake Bonds to Burnham Securities in a transaction devised by Jason Galanis "to get Cooney some reliable income while getting Burnham Net Cap it can commercialize." In an e-mail dated April 24, 2015, to Cooney, Archer and Burnham Financial Group's President (on information and belief, Defendant Jon Burnham), Jason Galanis instructed them: "if we hustle, we can get the $5 mm on to Burnham's balance sheet this month. This would require Bevan [Cooney] getting the physical bond delivered to US Bank for transfer into Burnham's name."

103.    Eventually, on May 29, 2015, Cooney directly transferred the $5 million Wakpamni Lake Bonds, on Burnham Securities' behalf, to a broker-dealer in partial consideration of Burnham Securities' purchase of an interest in the broker-dealer. Cooney received nothing in exchange from Burnham Securities for transferring the Wakpamni Lake Bonds to the broker-dealer on Burnham Securities' behalf, and no documents evidence the contribution by Cooney as either an investment in or loan to Burnham Securities. In response to inquiries from the Financial Industry Regulatory Authority ("**FINRA**") regarding the specifics of the Bonds and Cooney's contribution of them, Jason Galanis told the acquired broker-dealer's President to tell FINRA that Cooney had been an investor in Burnham Securities since 2013 and "agreed to make a follow-on investment in 2015 in support of Burnham's business plan to diversify."

104.    The Wakpamni Lake Bond proceeds were further misappropriated to support an initial public offering ("IPO") of a technology company underwritten by Burnham Securities, with Dunkerley taking a lead on the deal.

105.    At the direction of Jason Galanis and Hirst, WAPCC-Florida used a significant portion of the proceeds from the sale of the April 2015 (third tranche) Wakpamni Lake Bonds to support the successful initial public offering of a technology company, in which Jason Galanis, Hirst, Archer, Cooney, and Dunkerley all held shares, and for which Jason Galanis served as an "advisor."

106.    In May 2015, Jason Galanis and Hirst coordinated the technology company IPO. The technology company's stock was initially offered on the NASDAQ on May 19, 2015 at $5 per share.

107.    Between April 29th and May 18th, 2015, Dunkerley, acting at Jason Galanis's direction or with his knowledge, authorized wires totaling $4,336,000 from the WAPCC-Florida account to two brokerage accounts at Burnham Securities, in the names of two IPO participants. Both accounts were opened by a Galanis associate, at the direction of Hirst.

108.    105.    The two IPO participants used $4,335,000 of the funds that they received from WAPCC-Florida to purchase 867,000 shares of the technology company during the IPO. The shares purchased by the two IPO participants represented 87% of the shares offered during the technology company's IPO. The remaining 13% was also sold to friendly accounts, including accounts controlled by Hirst.

109.    The two IPO participants liquidated at least a portion of the shares immediately on the open market at prices ranging from $14 to $36 per share, above the IPO purchase price of

$5 per share. As of October 15, 2015, the two IPO participants liquidated 324,120 shares of the technology company for proceeds of $4,523,312.

110.    Despite the two IPO participants' profitable trading with money furnished by WAPCC-Florida, WAPCC-Florida did not recoup the $4.3 million it had sent to their accounts. Instead, two IPO participants, acting at Jason Galanis's direction, sent millions of dollars to a variety of other transferees, including Jason Galanis's criminal defense attorneys, Burnham Financial Group and RSB.

**G.    Defendants Scramble to Make Interest Payments Due to the Bond Holders so as to Allow Their Fraudulent Scheme to Remain Undiscovered.**

111.    Pursuant to the annuity contracts in connection with the August 2014 issuances of Wakpamni Lake Bonds, WAPCC-BVI was obligated to make respective interest payments in September 2015 and in October 2015. Since WAPCC-Florida had misappropriated the proceeds from the Wakpamni Lake Bonds instead of investing them in annuities, Jason Galanis scrambled to ensure that WAPCC-Florida had sufficient funds from other sources to pay the interest payments that were due in order to protect the Wakpamni Lake Bond scheme from exposure. To acquire the necessary funds, he called on associates for contributions as needed.

112.    In September 2015, Dunkerley authorized WAPCC-Florida to forward $1.5 million to US Bank as the indenture trustee as interest due on the August 2014 bonds. That amount covered the interest payments due to investors, but failed to cover an additional $277,182.87 in annual income that WAPCC-BVI was obligated to pay WLCC. Based on the sources of funds held in WAPCC-Florida's bank account at the time, the $1.5 million payment that it made was funded by a small portion of the sale proceeds of the technology company's stock received from the two IPO participants acting on the directions of Jason Galanis ($1.3

million), amounts contributed by Archer ($250,000), and/or amounts received from another associate of Jason Galanis ($250,000).

113.    After he had been arrested in a separate matter, (*see SEC v. Galanis, et al*, 15 Civ. 7547 (VSB) (S.D.N.Y.); *United States v. Jason Galanis, et al.*, 15 Cr. 0643 (PKC) (S.D.N.Y.)) and using his new legal@colarisventures.com e-mail address, Jason Galanis orchestrated the $1,197,311 interest payment due on the October 2014 Wakpamni Lake Bonds-bonds that Archer and Cooney had "bought" using recycled proceeds from the first Wakpamni Lake Bond issuance, and at least a portion of which Burnham Securities now held after they had been contributed by Valor Group's subsidiary in May 2015. First, on September 30, 2015, Jason Galanis instructed Dunkerley to tell Burnham Financial Group's President (on information and belief, Jon Burnham) to have Burnham Financial Group wire $903,000 to the indenture trustee. That same day, in order to make that payment, Burnham Financial Group received the necessary funds from a wholly-owned subsidiary of Valor Group in a transaction Archer coordinated. The next day, RSB sent Burnham Financial Group an additional $1,098,000, a portion of which Burnham Financial Group used to send an additional $294,311.11 interest payment to the indenture trustee. In summary, Burnham Financial Group (through funds provided by Valor Group's subsidiary and RSB) ended up directly paying for the interest on the Wakpamni Lake Bonds. But as with the August 2014 Wakpamni Lake Bonds, WAPCC-BVI failed to make the additional income payment ($250,000) due to WLCC under the annuity contract.

114.    On October 8, 2015, WLCC sent Dunkerley a letter expressing concern regarding information it had recently learned about Burnham Securities and the ongoing difficulty it was experiencing in receiving funds due it under the annuity contracts. In the letter, WLCC requested that Dunkerley immediately provide valuations on all three annuity contracts.

115.    On October 15, 2015, at Jason Galanis's direction or with his knowledge, Dunkerley responded to WLCC's letter and attached fabricated annual account statements on WAPCC-BVI letterhead (reflecting a false address in the British Virgin Islands) for the annuity contracts purportedly purchased in connection with the August 2014 and September 2014 Wakpamni Lake Bonds. On November 5, 2015, also at Jason Galanis's direction or with his knowledge, Dunkerley provided a similar fabricated annual account statement for the annuity contract purportedly purchased in connection with the April 2015 Wakpamni Lake Bonds. None of the statements contained any information regarding the underlying investments and each indicated that the value of the accounts had not changed one penny from the initial amount of money that had purportedly been invested in the annuities.

116.    On February 17, 2016, after the Commission filed its complaint in *SEC v. AAM*, 15-Civ. 9764 (WHP), S.D.N.Y., charging securities fraud in connection with the Wakpamni Lake Bonds), Jason Galanis sent WLCC a letter on behalf of Thorsdale to rebut the Commission's allegations and to assure WLCC of the Wakpamni Lake Bonds' validity and WAPCC-BVI's appropriate investment of the Bonds' proceeds. In the letter, Jason Galanis pointed to the timely payment of interest on the Bonds as evidence of their legitimacy, noting, "WLCC bond interest of over $2.72 million was already paid by these distributions precisely as contemplated in the Indenture and related agreements," and falsely stated: "These annuity distributions will continue from the assets owned in the annuities. Therefore, the WLCC bonds will continue to be paid." Among other things, Jason Galanis concealed the fact that the two interest payments had been funded by sources other than annuity investments.

117.    More recently, and with an interest payment due date for the April 2016 bond issuance fast approaching, Jason Galanis changed tactics. In an April 4, 2016 letter to WLCC,

Dunkerley, writing on behalf of WAPCC-BVI, declared that WAPCC-BVI had suspended its interest payments on the Wakpamni Lake Bonds. In his letter, written at the direction or with the knowledge of Jason Galanis, Dunkerley notified WLCC that WAPCC-BVI would "withhold Annuity distribution payment to WLCC until such time as WLCC provides a satisfactory financial surety" to indemnify WAPCC-BVI for the costs it and its "agents" incurred in defense of the Commission's investigation, among other matters. The Annuity Contract does not provide to WAPCC-BVI any right of indemnity against, nor any right to suspend payment on account of, the cost of defending against government investigations or prosecutions.

## CAUSES OF ACTION

**A.    Claims Relating to the Wrongful Investment on Michelin's Behalf into the Wakpamni Lake Bond**

**FOR A FIRST CAUSE OF ACTION AGAINST FRANKIE HUGHES, MORTON, AND HIRST**
**(ERISA-29 U.S.C. § 1132(a)(3))**

118.    Plaintiff incorporates the allegations set forth above.

119.    Morton, and Hirst are fiduciaries pursuant to Section 3(21)(A) of ERISA [29 U.S.C. § 1002(21)(A)].

120.    Upon information and belief, Frankie Hughes served as a special advisor to Morton following the sale of Hughes Capital to GMT. Given her role as a special advisor, Frankie Hughes would have had knowledge or been complicit in the plan of Morton and Hirst to invest the Plan's funds in the Wakpamni Lake Bonds. Frankie Hughes is a fiduciary under Section 3(21)(A) of ERISA [29 U.S.C. § 1002(21)(A)].

121.    Morton, Hirst, and Frankie Hughes breached their fiduciary duties owed to Michelin by not following the Plan's documents as defined by 29 U.S.C. § 1104(a)(1)(D).

122.    Morton and Hirst breached their fiduciary duties owed to the Plan by not acting with care, skill, prudence, and diligence that a prudent person or entity in similar circumstances would have acted with under 29 U.S.C. § 1104(a)(1)(B).

123.    Frankie Hughes failed to act with care, skill, prudence, and diligence under the circumstances by not preventing or alerting Michelin of the investment of Michelin funds in the Wakpamni Lake Bond prior to the investment. Indeed, by the time Michelin learned of GMT's acquisition of Hughes Capital, the Plan's funds had already been misappropriated.

124.    Morton never disclosed to Michelin that she had an ownership interest in GMT, which stood to profit from the fees associated with the investment in the Wakpamni Lake Bond. Additionally, Valor Group's (then Wealth-Assurance) interest in the annuity provider, WAPCC-BVI, allowed it to profit from the fees associated from the sale. The conflict of interest created by Wealth-Assurance through its funding of GMT's acquisition of Hughes Capital was also never disclosed.

125.    Morton further breached their duties as a fiduciary by investing the Plan's funds in the Wakpamni Lake Bond, because Defendants invested the Plan's funds not because the bond was a prudent investment, but due to a quid pro quo with Jason Galanis, Archer, Cooney, and Dunkerley agreeing to finance GMT's acquisition of Hughes Capital through funding from Wealth-Assurance.

126.    In connection to breaches of their ERISA duties, Defendants engaged in actual, purposeful fraud, with the intent to deceive and to induce reliance, such fraud resulting in reasonable reliance causing damages.

127.    Through Defendants' breach, Michelin has suffered damages to its employee retirement investment portfolio, including interest that this money could have accrued if invested with due care, and consequential damages.

128.    Michelin, under the equitable powers of the Court as defined in Section 29 U.S.C. § 1132, is entitled to all damages, including the return of the Plan's funds and all consequential damages incurred due to Defendant's breach of fiduciary duties.

129.    Michelin is entitled to all costs and attorney's fees of Michelin associated with this litigation pursuant to 29 U.S.C. § 1132(g)(1).

**FOR A SECOND CAUSE OF ACTION AGAINST GMT, BFG, WEALTH-ASSURANCE, VALOR GROUP, BURNHAM SECURITIES, BURNHAM FINANCIAL, CORFA, THORSDALE, WAPCC, JASON GALANIS, ARCHER, COONEY, DUNKERLEY, JOHN GALANIS, TIM ANDERSON, JON BURNHAM, GREENBERG, DILWORTH, AND US BANK**
**((ERISA-29 U.S.C. § 1132(a)(3) for knowingly taking part in a prohibited transaction under ERISA)**

130.    Plaintiff incorporates the relevant and consistent allegations set forth above.

131.    GMT is a party in interest pursuant to Section 29 U.S.C. § 1002(14)(G) because Morton is the half-owner of GMT.

132.    BFG and Dunkerley are a party in interest pursuant to Section 29 U.S.C. § 1002(14)(H). BFG is a party in interest because it is the sole preferred member of GMT and thus a "10 percent or more shareholder" of a person described in subparagraph (G) of Section 29 U.S.C. § 1002(14). Dunkerley, as the managing member of BFG, would also qualify as a party in interest under the same section.

133.    AAM/Hughes Capital, Morton, and Hirst participated in prohibited transactions contained in Section 406 of ERISA [29 U.S.C. § 1106]. In particular, AAM/Hughes Capital, Morton, and Hirst violated 29 U.S.C. § 1006(a)(1)(D) by causing the Plan to engage in a

transaction that constituted direct or indirect use of the Plan's assets for the benefit of parties in interest. By investing the Plan's funds in a Wakpamni Lake Bond, and knowing that the funds would be misappropriated by Jason Galanis and his associates, AAM/Hughes Capital, Morton, and Hirst used the Plan's funds for benefit of GMT and Dunkerley, which are both parties in interest.

134.    Defendants contained in this cause of action either had actual knowledge or constructive knowledge that the Plan fiduciaries planned to misappropriate the funds through this prohibited and self-dealing transaction.

135.    Defendants, either directly or through their relationship to the named entities knowingly participated in this prohibited transaction.

136.    Through Defendants' participation in the prohibited transaction, Michelin has suffered damages to its employee retirement investment portfolio, interest that this money could have accrued if invested with due care, and consequential damages.

137.    Michelin, under the equitable powers of the Court, as defined in Section 29 U.S.C. § 1132, is entitled to all damages, including the return of the Plan's funds and all consequential damages incurred due to Defendant's breach of fiduciary duties.

138.    Michelin is entitled to all costs and attorney's fees of Michelin associated with this litigation pursuant to 29 U.S.C. § 1132(g)(1).

139.    All of the remaining causes of action against Defendants included in this second cause of action are plead in the alternative.

## FOR A THIRD CAUSE OF ACTION AGAINST FRANKIE HUGHES
### (Negligence)

140.    Plaintiff incorporates the relevant and consistent allegations set forth above.

141.    Frankie Hughes owed a fiduciary duty to Michelin as the President and CIO of Hughes Capital.

142.    Given Frankie Hughes' position a financial advisor and retirement and pension funds manager, she was vested with a great amount of trust and confidence to manage, protect, and grow the investments of her clients.

143.    Frankie Hughes failed to use reasonable care and perform adequate due diligence in the sale of her company to GMT.

144.    Frankie Hughes breached her fiduciary duty by failing to properly investigate the potential buyers of her company before handing over to them possession of the retirement funds.

145.    Frankie Hughes further breached her fiduciary duty by failing to notify Michelin of the sale of Hughes Capital to GMT as required by the Investment Management Agreement. A 2002 Amendment to the Investment Guidelines of the Investment Management Agreement requires, "immediate communication from a manager if changes in the firm's key personnel, ownership, management structure, etc. occur."

146.    Frankie Hughes' failure to observe due care led to the resulting damage to Michelin.

147.    Frankie Hughes acted willfully, wantonly, and recklessly in failing to perform due diligence in the sale of her company.

148.    Michelin is entitled to recover damages to its employee retirement investment portfolio, interest that this money could have accrued if invested with due care, and consequential damages.

### **FOR A FOURTH CAUSE OF ACTION AGAINST MORTON AND HIRST**
**(Civil Conspiracy)**

149.    Plaintiff incorporates the relevant and consistent allegations set forth above.

150.     Defendants acted in concert to invest Michelin funds in the Wakpamni Lake Bonds, even though such an investment was in contravention of the Investment Management Agreement between the Defendants and Michelin.

151.     Defendants acted willfully, wantonly, and recklessly in defrauding Michelin.

152.     The concerted actions of Defendants caused substantial and special damages to Michelin.

153.     Michelin is entitled to recover actual damages, special damages, and punitive damages.

**B.     Claims Relating to the Criminal/Fraudulent Conspiracy to Acquire Hughes Capital and Force Michelin Investment into the Wakpamni Lake Bond**

**FOR A FIFTH CAUSE OF ACTION AGAINST BFG, GMT, WEALTH-ASSURANCE, WAPCC, VALOR GROUP, BURNHAM SECURITIES, BURNHAM FINANCIAL, CORFA, THORSDALE, MORTON, HIRST, DUNKERLEY, JASON GALANIS, JOHN GALANIS, ARCHER, COONEY, AND JON BURNHAM**
**(Civil Conspiracy)**

154.     Plaintiff incorporates the relevant and consistent allegations set forth above.

155.     Defendants acted in concert to use their positions in the various entities, which they controlled, to acquire the pieces necessary to misappropriate funds for their own personal gain.

156.     Defendants located WLCC to serve as the bond issuer for their scheme.

157.     Defendants put into place the fictitious annuity provider (WAPCC-BVI) and placement agency (Burnham Securities) to facilitate the transaction. In accordance with the fraudulent scheme, once purchasers for the bonds were found, Defendants made sure the revenue would be diverted to the WAPCC-Florida account in accordance with the fraudulent scheme.

158.     Defendants used Valor Group (then Wealth-Assurance) to fund GMT's acquisition of Hughes Capital. In return for future capital contributions from Jason Galanis and

Galanis controlled entities, Morton promised to invest Hughes Capital's clients' funds in the Wakpamni Lake Bonds once GMT's acquisition of Hughes Capital was complete.

159.    AAM/Hughes Capital purchased Wakpamni Lake Bonds on behalf of many clients. Instead of the bond revenue being placed in an annuity as required by the bond indenture, the bond revenue was sent to an account owned by WAPCC-Florida. From here the money was misappropriated at the direction of Defendants, particularly Jason Galanis.

160.    The purpose of Defendants was to create a reserve of capital, while depleting the accounts of the clients (like Michelin) of AAM/Hughes Capital.

161.    Defendants acted willfully, wantonly, and recklessly in carrying out their fraudulent conspiracy.

162.    The concerted actions of Defendants caused substantial and special damages to Michelin.

163.    Michelin is entitled to recover actual damages, special damages, and punitive damages.

**FOR A SIXTH CAUSE OF ACTION AGAINST BFG, GMT, WEALTH-ASSURANCE, WAPCC, VALOR GROUP, BURNHAM SECURITIES, BURNHAM FINANCIAL, CORFA, THORSDALE, MORTON, HIRST, DUNKERLEY, JASON GALANIS, JOHN GALANIS, ARCHER, COONEY, AND JON BURNHAM**
**(Civil RICO- 18 U.S.C. § 1962)**

164.    Plaintiff incorporates the relevant and consistent allegations set forth above.

165.    Defendants BFG, GMT, Wealth-Assurance, WAPCC, Valor Group, Burnham Securities, Burnham Financial, Thorsdale, and CORFA are corporations that constitute enterprises within the meaning of 18 U.S.C. § 1961(4), and that engages in activities which affect interstate commerce.

166.    At all times relevant to this action, Defendants Jason Galanis, John Galanis, Archer, Cooney, Dunkerley, Morton, Hirst, and Jon Burnham were associated with at least one of the various enterprises, yet were separate and distinct from the enterprises. Defendants Jason Galanis, John Galanis, Archer, Cooney, Dunkerley, Morton, Hirst, and Jon Burnham are individuals capable of holding a legal or beneficial interest in property and are persons within the meaning of 18 U.S.C. § 1961(3).

167.    Dating back to March 2014, Defendants Jason Galanis, John Galanis, Archer, Cooney, Dunkerley, Morton, and Hirst unlawfully, knowingly, and intentionally conducted and participated, directly and indirectly, in the conduct, management, control, and operation of the various Defendant entities: BFG, GMT, Wealth-Assurance, Valor Group, Burnham Securities, Burnham Financial, CORFA, and Thorsdale which affected interstate commerce through a pattern of racketeering activity consisting of numerous acts of racketeering having effect in the State of South Carolina indictable under 18 U.S.C. § 664 (Theft or embezzlement from employee benefit plan), and including the acts of racketeering alleged in this complaint.

168.    In 2014, Defendants Jason Galanis, John Galanis, Archer, Cooney, Dunkerley, Morton, and Hirst knowingly and intentionally devised one or more schemes to defraud and obtain monetary compensation and goods from Michelin by means of material, knowingly false and fraudulent acts, pretenses, representations, and omissions of fact.

169.    As a part of and in furtherance of this scheme, Defendants Jason Galanis, John Galanis, Archer, Cooney, Dunkerley, Morton, and Hirst committed numerous predicate acts of theft or embezzlement from employee benefit plans. Michelin relied on Defendants' material, knowingly fraudulent pretenses, representations, and omissions of fact. Specifically, Defendants knowingly instigated the scheme with the intent of finding buyers for the Wakpamni Lake Bonds,

and instead of investing the bond revenue in an annuity as per the bond indenture, Defendants created a personal fund for themselves, providing vast amounts of liquidity.

170.    Each instance of embezzlement by Defendants occurring since March 2014, in an aggregate amount exceeds $47 million dollars. With regards to Michelin, Defendants embezzled $8,102,154. These instances constitute "predicate acts" under 18 U.S.C. § 1961(1).

171.    Defendant's multi-year scheme and operations involving numerous fraudulent acts and illegal transactions, as described above, constitute a "pattern" of related and continued predicate acts amount to "racketeering activity" under 18 U.S.C. §§ 1961 and 1962. Defendants' schemes indicate ongoing criminal activity of sufficient scope and persistence to pose a special threat to social well-being and continued criminal activity.

172.    As a direct and proximate result of Defendant's elaborate embezzlement scheme and other unlawful actions in violation of 18 U.S.C. § 1962, Michelin has suffered, is suffering, and will continue to suffer monetary loss to its employee retirement investment portfolio.

173.    Michelin is entitled to an award of treble damages, as well as costs, interest, and attorney's fees for violations of 18 U.S.C. § 1962. Michelin also seeks to recover punitive damages as a result of Defendant's willful, fraudulent scheme.

**FOR A SEVENTH CAUSE OF ACTION AGAINST BFG, GMT, WEALTH-ASSURANCE, WAPCC, VALOR GROUP, BURNHAM SECURITIES, BURNHAM FINANCIAL, CORFA, THORSDALE, MORTON, HIRST, DUNKERLEY, JASON GALANIS, JOHN GALANIS, ARCHER, COONEY, AND JON BURNHAM**
**(Securities Fraud-15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; S.C. CODE ANN. § 35-1-501 et seq.)**

174.    Plaintiff incorporates the relevant and consistent allegations set forth above.

175.    Particular instances of fraud perpetrated against Michelin and similarly situated investors are discussed more fully in the Factual Allegations above. Defendants disseminated or approved the false statements, which they knew or deliberately disregarded were misleading in

that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

176.    Defendants violated Federal Rule 10b-5 and Section 35-1-501 et seq. in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as fraud or deceit upon Michelin, and other similarly situated Plaintiffs, in connection with their purchases of the Bonds.

177.    Defendants' misrepresentations were made to Hughes Capital, an agent of Michelin. Hughes Capital, acting as an agent of Michelin, relied on the misrepresentations in purchasing Bonds on behalf of Michelin.

178.    Through Defendants' fraudulent misrepresentations in relation to the sale or purchase of the Bonds, Michelin has suffered monetary damages to its employee retirement investment portfolio, interest that this money could have accrued if invested with due care, and consequential damages.

179.    Michelin is entitled to recover actual damages, and pursuant to S.C. CODE ANN. § 35-1-501 et seq., all costs and attorneys' fees.

**FOR AN EIGHTH CAUSE OF ACTION AGAINST BFG, GMT, WEALTH-ASSURANCE, WAPCC, VALOR GROUP, BURNHAM SECURITIES, BURNHAM FINANCIAL, CORFA, THORSDALE, US BANK, WLCC, MORTON, HIRST, DUNKERLEY, JASON GALANIS, JOHN GALANIS, ARCHER, COONEY, JON BURNHAM**
**(Tortious Interference with a Contract)**

180.    Plaintiff incorporates the relevant and consistent allegations set forth above.

181.    Michelin entered into an Investment Management Agreement with AAM. The Investment Management Agreement was in effect at all relevant times mentioned in this Complaint.

182.    Defendants BFG, GMT, Wealth-Assurance, WAPCC, Valor Group, Burnham Securities, Burnham Financial, CORFA, Thorsdale, Morton, Hirst, Dunkerley, Jason Galanis, John Galanis, Archer, Cooney, and Jon Burnham had knowledge of the Investment Management Agreement between Michelin and AAM. The Investment Management Agreement was the essential relationship that made acquiring the financial management companies so attractive to Defendants. It was Defendants' knowledge of this relationship that allowed Michelin and other similarly situated investors to be exploited. After necessarily acquiring AAM, Defendants furthered the fraudulent scheme by having the financial management companies invest the Plan's employee retirement funds into a Wakpamni Lake Bond. This investment was in contravention of the Investment Management Agreement between AAM and Michelin.

183.    Defendants US Bank and WLCC, with knowledge of the Investment Management Agreement, completed the tortious interference with the contract by wiring the Plan's misappropriated funds on bogus instructions that came indirectly from Jason Galanis via Dilworth/Tim Anderson. Defendants also arranged for the interference to occur by selecting and approving an ineligible annuity provider (WAPCC-BVI), and executing an ineligible contract as the annuity investment.

184.    Defendants have no justification for the fraudulent scheme.

185.    Defendants acted willfully, wantonly, and recklessly in bringing about AAM's breach of the Investment Management Agreement.

186.    Michelin has suffered damages as a result of Defendants' intentional interference with the Investment Management Agreement between AAM and Michelin.

187.    Michelin is entitled to recover actual damages and punitive damages as a result of Defendants' tortious interference with the Investment Management Agreement between AAM and Michelin.

### C.    Claims Regarding Professional Service Firms in the Transaction Who Failed to meet their Legal Obligations.

### FOR A NINTH CAUSE OF ACTION AGAINST US BANK AND WLCC
### (Breach of Bond Indenture and Breach of Fiduciary Duty in Failing to Disclose Bond Indenture Breach)

188.    Plaintiff incorporates the relevant and consistent allegations set forth above.

189.    Defendant WLCC covenanted in the Bond Indenture that the bulk of the Bond proceeds would be placed in an Annuity Investment (as defined in the Bond Indenture). The Bond Indenture and closing documents for the Bond sale that were executed by or contemporaneously disclosed to WLCC and US Bank (including the alleged "Annuity Contract" itself) established certain requirements for the Annuity Contract, including but not limited to: that the "annuity provider" would be a company that provides "annuity investments" as part of its regular trade or business, with "annuity investments" defined as contracts "whereby the annuity provider shall pay income to [WLCC] at stated intervals and amounts, as stated therein;" that the provider and the investments thereunder would be selected by Private Equity Management, Limited (also referred to as Private Equity Management, L.L.C.); that the provider would be a British Virgin Islands company; that the Annuity Contract purchase price would be

paid through a bank with no United States branches; and that the execution and delivery of the Annuity Contract would occur entirely outside the United States..

190.    Although the purchase price paid for the Bonds became at closing the property of WLCC, held in trust by US Bank for the purposes of the Bond issuance, WLCC never gave US Bank or anyone else specific payout instructions for the Annuity Contract purchase payment; nor did WLCC ever delegate the authority to make such payout instructions to US Bank.

191.    US Bank instead accepted and acted on instructions from Dilworth/Tim Anderson (known by US Bank to be counsel to Burnham Securities and not to WLCC or even to Private Equity Management, Limited); that were relayed from a sender (Jason Galanis) with a "burnhamequitypartners" email domain (that was contemporaneously seen by US Bank); allegedly to an entity whose managing director (as contemporaneously disclosed to US Bank by the executed "Annuity Contract") was a Burnham Securities insider (as known to US Bank through the course of the Bond transaction); through JP Morgan Chase Bank, NA (a bank that was known by US Bank to have United States branches); for the account of an entity whose address was not a British Virgin Islands address).

192.    No Bond proceeds, including the Plan's funds, were ever invested in an Annuity Contract.

193.    The alleged "Annuity Contract" (provided to US Bank before US Bank wired Bond proceeds to pay for the annuity investment) did not meet the definition of "Annuity Investment" in the Bond Indenture. The alleged "Annuity Contract" does not require that the annuity provider (WAPCC-BVI) "shall pay income to the Corporation at stated intervals and amounts, as provided therein." Rather, it states in bold letters on its face: **"The dollar amount of any payments and values under this Contract which are based on investment results of the**

**Separate Account are variable and not guaranteed."** It provides that the investment by WLCC will be maintained in a separate account, invested not at the direction of WAPCC-BVI but at the direction of Private Equity Management, Limited, for whose performance WAPCC-BVI has no responsibility; and the "Annuity Contract" extracts from WLCC an acknowledgment "that the performance of the Separate Account and therefor [*sic*] the distributions therefrom are solely dependent upon the investment performance of such funds or accounts, and we [WAPCC-BVI] have no responsibility whatsoever for such performance."

194.    The alleged annuity provider, WAPCC-BVI, did not meet the definition of "Annuity Provider" in the Bond Indenture in that it was not a company that provides "annuity investments" as part of its regular trade or business, and neither WLCC nor US Bank undertook any investigation or exercised any due diligence to determine whether WAPCC-BVI was eligible to serve as the Annuity Provider. Instead, WLCC and US Bank ignored red flags that would have alerted any reasonable person to WAPCC-BVI's ineligibility or, at a minimum, that further investigation was needed. Those red flags included but were not limited to WAPCC-BVI's insistence that there be no United States connection to the transaction, the fact that returns were not contractually set but were instead entirely dependent the investment returns on a "separate account," and the fact that the selection of investments for that separate account was controlled not by the provider WAPCC-BVI but by an apparently unrelated third party for which WAPCC-BVI disclaimed all responsibility.

195.    By failing to provide the necessary direction to dispose of its assets held by US Bank for the benefit of itself, Michelin, and the other Bondholders, WLCC caused and allowed the diversion of those assets in violation of its covenants in the Bond Indenture and their conversion by Jason Galanis and his co-conspirators, to the injury of Michelin and the other

Bondholders who were, in reliance on those covenants, looking to those assets as the source of repayment of their loans to WLCC via the Bonds. Knowing that its assets were being transferred to purchase an "annuity investment" without its having provided specific instructions therefor, WLCC knew that the transfer was unauthorized and wrongful.

196.    By executing an "Annuity Contract" that violated the Bond Indenture, WLCC caused and allowed the diversion of trust assets in violation of its covenants in the Bond Indenture and their conversion by Jason Galanis and his co-conspirators, to the injury of Michelin and the other Bondholders who were, in reliance on those covenants, looking to those assets as the source of repayment of their loans to WLCC via the Bonds.

197.    By executing an "Annuity Contract" with a provider that was not eligible to issue an annuity investment under the Bond Indenture, WLCC caused and allowed the diversion of trust assets in violation of its covenants in the Bond Indenture and their conversion by Jason Galanis and his co-conspirators, to the injury of Michelin and the other Bondholders who were, in reliance on those covenants, looking to those assets as the source of repayment of their loans to WLCC via the Bonds.

198.    By accepting and acting upon inadequate instructions from a person not authorized to provide such instructions and thereupon releasing assets that it held in trust for the benefit of WLCC, Michelin, and the other Bondholders, US Bank violated the Bond Indenture and violated its fiduciary responsibilities thereunder by causing and allowing the diversion of those assets and their conversion by Jason Galanis and his co-conspirators, to the injury of Michelin and the other Bondholders who were, in reliance on those covenants, looking to those assets as the source of repayment of their loans to WLCC via the Bonds.

199.    By accepting and acting upon an "Annuity Contract" that violated the Bond Indenture, US Bank violated the Bond Indenture and violated its fiduciary responsibilities thereunder by causing and allowing the diversion of those assets and their conversion by Jason Galanis and his co-conspirators, to the injury of Michelin and the other Bondholders who were, in reliance on those covenants, looking to those assets as the source of repayment of their loans to WLCC via the Bonds.

200.    By accepting and acting upon an "Annuity Contract" with a provider that was not eligible to issue an annuity investment under the Bond Indenture, violated the Bond Indenture and violated its fiduciary responsibilities thereunder by causing and allowing the diversion of those assets and their conversion by Jason Galanis and his co-conspirators, to the injury of Michelin and the other Bondholders who were, in reliance on those covenants, looking to those assets as the source of repayment of their loans to WLCC via the Bonds.

201.    Both US Bank and WLCC had a duty to disclose to the Bondholders, both before and after the closing of the Bond transaction, that the intended (and eventually executed) "Annuity Contract" and its provider were in violation of the Bond Indenture and hence of the Bonds themselves.

202.    US Bank and WLCC breached their duty by failing to disclose material information related to the violation of material Bond Indenture and Bond covenants.

203.    US Bank's and WLCC's failure to disclose that material information caused and allowed the diversion of Bondholders' (including Michelin's) assets and their conversion by Jason Galanis and his co-conspirators, to the injury of Michelin and the other Bondholders who were, in reliance on those covenants, looking to those assets as the source of repayment of their loans to WLCC via the Bonds.

204.    Because of its fault in this matter, US Bank is not able to pursue Michelin's claims for relief; and any requirement under the Bond Indenture that the trustee pursue claims under the Bond Indenture or on the Bonds is thereby obviated.

205.    Michelin is entitled to recover damages suffered to its employee retirement investment portfolio, including interest this money could have gained, and consequential damages.

## FOR A TENTH CAUSE OF ACTION AGAINST GREENBERG, DILWORTH, AND TIM ANDERSON
### (Professional Negligence-Legal Malpractice)

206.    Plaintiff incorporates the relevant and consistent allegations set forth above.

207.    Defendants Dilworth and Tim Anderson, counsel to Burnham Securities, knew, or as experienced legal counsel in such matters, with the exercise of reasonable care, should have known, among other things:

(a)    Funds acquired by WLCC through its issuance of Bonds were transferred by US Bank without authorization from WLCC;

(b)    Dilworth/Anderson themselves provided to US Bank the unauthorized instructions, having received them from someone they knew or believed to be associated with their client Burnham Securities and not from WLCC;

(c)    The recipient of funds pursuant to those instructions included an insider (Dunkerley, who executed the "Annuity Contract" as managing director of WAPCC-BVI) who was also an insider to the instructing entity, Dilworth/Anderson's client Burnham Securities (and was Dilworth/Anderson's primary contact at Burnham Securities);

(d)     Those funds were transferred for the purchase of an annuity investment to an entity that was not eligible under WLCC's bond indenture to serve as the annuity provider;

(e)     Those funds were transferred as the purchase price for what purported to be an "annuity investment" but that did not qualify as an "annuity investment" under the Bond Indenture;

(f)     The transfer of funds was in violation of the Bond Indenture, of WLCC's covenants under the Bond Indenture, and of US Bank's fiduciary obligation under the Bond Indenture;

(g)     The "free money" promised to WLCC by the transaction falls into the "too good to be true" category and was a red flag that should have prompted further investigation on behalf of Burnham, WLCC and others involved (including Bond purchasers);

(h)     There was no private placement memorandum for the Bond Issuance, such as is ordinarily prepared when unregistered securities are being offered through a placement agent. At minimum, such a private placement memorandum (had one existed for this transaction) should have described to prospective investors the economic development project, including its size and possible uses; the economy of the surrounding region to demonstrate the market for such a project; the terms of the annuity contract; the financial strength of the annuity contract provider; the track record of the annuity contract provider; and the investment parameters allowed for the separate account required by the WAPCC-BVI Annuity Contract;

and the identity and track record of the investment manager for that separate account.

(i)  The irreconcilable conflicts between the "Annuity Contract" and the "Annuity Management Agreement" made the proposed transaction unworkable;

(j)  Their client Burnham Securities' control of Hughes Capital vitiated Hughes Capital's investment letter (prepared by Dilworth/Anderson) with respect to the Bonds;

(k)  The placement agent (Burnham Securities), the manager of the invested funds (Hughes Capital), and the recipient of the invested funds (WAPCC-Florida) were all controlled by the same group of people with Dilworth/Anderson's contacts, Jason Galanis and Dunkerley, at the center;

(l)  Dilworth/Anderson's communication to WLCC by which it obtained a waiver allowing it to represent Burnham Securities despite the conflict posed by its earlier representation of WLCC was inadequate to support that waiver.

208.  Defendant Greenberg, counsel to WLCC, knew, or as experienced legal counsel in such matters, with the exercise of reasonable care, should have known, among other things:

(a)  Funds acquired by WLCC through its issuance of Bonds were transferred by US Bank without authorization from Greenberg's client, WLCC;

(b)  The unauthorized instructions and the recipient of funds pursuant to those instructions were, or included, the same person who was an insider to both the instructor (Burnham Securities and its counsel) and the receiver (WAPCC-Florida) (that insider in common being Dunkerley);

(c)     Those funds were transferred for the purchase of an annuity investment to an entity that was not eligible under WLCC's bond indenture to serve as the annuity provider;

(d)     Those funds were transferred as the purchase price for what purported to be an "annuity investment" but that did not qualify as an "annuity investment" under the Bond Indenture;

(e)     The transfer of funds was in violation of the Bond Indenture, of WLCC's covenants under the Bond Indenture, and of US Bank's fiduciary obligation under the Bond Indenture;

(f)     The "free money" promised to WLCC by the transaction falls into the "too good to be true" category and was a red flag that should have prompted further investigation on behalf of WLCC and others involved (including Bond purchasers);

(g)     There was no private placement memorandum for the Bond Issuance, such as is ordinarily prepared when unregistered securities are being offered through a placement agent. At minimum, such a private placement memorandum (had one existed for this transaction) should have described to prospective investors the economic development project, including its size and possible uses; the economy of the surrounding region to demonstrate the market for such a project; the terms of the annuity contract; the financial strength of the annuity contract provider; the track record of the annuity contract provider; and the investment parameters allowed for the separate account required by the WAPCC-BVI Annuity Contract;

and the identity and track record of the investment manager for that separate account.

(h)  The irreconcilable conflicts between the "Annuity Contract" and the "Annuity Management Agreement" made the proposed transaction unworkable.

209.  The foregoing facts that Defendants Greenberg, Dilworth, and Tim Anderson knew or should have known would also have put them on high-alert notice that would have prompted an investigation that would have further illuminated the criminal enterprise that they were serving.

210.  By providing their legal services and legal opinions that were necessary to the consummation of the fraudulent transaction that put over $8 million of Michelin's retirement funds into worthless Bonds, and knowing that necessary actors in the transaction were relying upon their skill, professionalism, and expertise, Greenberg, Dilworth, and Tim Anderson, jointly and severally caused and allowed the diversion of Michelin's and other Bondholders' assets and their conversion by Jason Galanis and his co-conspirators, to the injury of Michelin and the other Bondholders who were, in reliance on those covenants, looking to those assets as the source of repayment of their loans to WLCC via the Bonds; aided and abetting that conversion; aided and abetted US Bank's breach of fiduciary duty; aided and abetted WLCC's and US Bank's breach of the Bond Indenture; aided and abetted Hughes Capital's breach of the Investment Management Agreement; aided and abetted the other Defendants' tortious interference with existing contractual relations; and aided and abetted the other Defendants' violation of state securities laws including but not limited to S.C. Code Title 35, Chapter 1, Article 5 (§ 35-1-501 *et seq.*).

211.    In doing so, each of Greenberg, Dilworth, and Tim Anderson were negligent and failed to exercise professional due care in connection with their services as counsel to WLCC and Burnham Securities, respectively.

212.    Greenberg, Dilworth, and Tim Anderson acted willfully, wantonly, and recklessly in failing to recognize the numerous indicators of wrongdoing involved in the transaction.

213.    Michelin's investment in a Bond has resulted in actual damages to its employee retirement investment portfolio.

214.    Michelin is entitled to recover actual damages and punitive damages resulting from Defendants' professional negligence and breach of their professional responsibilities.

215.    In the alternative to this claim, Michelin prays for an Order requiring US Bank and/or WLCC to pursue this claim against Greenberg, Dilworth, and/or Tim Anderson for the benefit of Michelin and those similarly situated pursuant to any applicable provisions of the Bond Indenture, related governing documents, and applicable law related to the extent of professional responsibility obligations.

## FOR AN ELEVENTH CAUSE OF ACTION AGAINST WLLC
### (Breach of Bond Indenture)

216.    Plaintiff incorporates the relevant and consistent allegations set forth above.

217.    Pursuant to the Bond Indenture, WLCC was to pay interest "on the first day of September each year commencing September 1, 2015" to the Plan in return for the Plan's purchase of a Wakpamni Lake Bond. The Plan is to be paid an interest rate of 5.62% on its $8,102,154 investment.

218.    WLCC breached the Bond Indenture by not making the September interest payment to Michelin.

219.    Michelin is entitled to recover in the amount of $455,341.05 plus consequential damages stemming from WLCC's breach of the Bond Indenture.

## PRAYER FOR RELIEF

WHEREFORE, Michelin having fully complained of Defendants herein, prays for the following:

(a) as it relates to the first and second causes of action, actual damages and consequential damages pursuant to Section 29 U.S.C. § 1132 and costs and attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1);

(b) as it relates to the third cause of action, actual damages, consequential damages, and punitive damages;

(c) as it relates to the fourth  and fifth causes of action, actual damages, special damages, and punitive damages;

(d) as it relates to the sixth cause of action, treble damages, costs and attorneys' fees pursuant to 18 U.S.C. § 1962, and punitive damages;

(e) as it relates to the seventh cause of action, actual damages and costs and attorneys' fees pursuant to S.C. CODE ANN. § 35-1-501 et seq.;

(f) as it relates to the eighth cause of action, actual damages and punitive damages;

(g) as it relates to the ninth cause of action, actual damages, incidental damages, and consequential damages;

(h) as it relates to the  tenth cause of action, actual damages and punitive damages;

(i) as it relates to the eleventh cause of action, actual damages, incidental damages, and consequential damages;

(j) as it relates to all causes of action, pre-judgment and post-judgment interest on its damages; and

(k) for such other relief as  this Court may deem just and proper.

Respectfully submitted,

By:  s/ J. D. Quattlebaum
        J. Derrick Quattlebaum, Fed ID No. 5252
        Steve A. Matthews, Fed ID No. 5119
        J. W. Matthews III, Fed ID No. 3202

        HAYNSWORTH SINKLER BOYD, P.A.
        ONE North Main Street, 2nd Floor
        Greenville, SC  29601-2772
        Telephone:   864.240.3200
        Facsimile:    864.240.3300

Attorneys for Plaintiffs,
The Investment Committee of the Michelin
Retirement Plan and the Michelin Retirement
Plan

November 10, 2016