**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| The Michelin Retirement Plan, et. al., | Case No.  6:16-cv-03604-HMH-JDA |
| Plaintiffs, | |
| v. | **PLAINTIFFS' RESPONSE TO GREENBERG TRAURIG, LLP'S MOTION TO DISMISS** |
| Dilworth Paxson, LLP, et. al., | |
| Defendants. | |

Plaintiffs, the Investment Committee of the Michelin Retirement Plan and the Michelin Retirement Plan (together, "Michelin"), submit this response to the motion to dismiss filed by Greenberg Traurig, LLP ("Greenberg") pursuant to F. R. Civ. P. 12(b)(6).

## I.    NATURE OF THE CASE

Defendant Jason Galanis and his cronies stole Michelin's retirement funds (and those of others) by diverting them – without authorization – into the purchase of fraudulent bonds purportedly issued by a Native American tribal corporation. The defendants here include those, such as Greenberg, who participated, willingly and profitably, in the scheme whose criminally fraudulent nature would have been obvious to any reasonably prudent person and certainly to professionals with the experience and training of Greenberg's lawyers. Michelin's claims here allege violation of ERISA, knowingly taking part in a prohibited transaction under ERISA, negligence, civil conspiracy, RICO, securities fraud, tortious interference with a contract, breach of bond indenture, breach of fiduciary duty, and professional negligence.

## II.    SUMMARY OF THE ARGUMENT

Greenberg acted as bond counsel for an obviously fraudulent transaction in which its co-defendants stole over $8 million from Michelin's retirement plan assets.  Greenberg's actions were fundamental and necessary to the transaction.

The transaction waved multiple red flags that would have alerted Greenberg to the fraud, including (i) the "free-money" nature of the transaction; (ii) the fundamental, fatal flaws (apparent on the face of the transaction documents) in the only source of repayment for the bonds; and (iii) the fundamental conflicts of interest (also apparent on the face of the transaction documents) arising from various participants wearing hats for several different parties with competing interests, thus eliminating the checks that would be normal in a bond issuance (for example, the managing director of the placement agent which gave directions for where the money was to be sent also being the president and director of the entity named as recipient in those very directions). Yet Greenberg allowed itself and its reputation to be used to consummate the theft by drafting some key documents, reviewing and revising others, issuing its approving opinion, and shepherding its client Wakpamni Lake Community Corporation ("WLCC") (whose good faith and even whose very legitimacy as a Native American corporation are in question in this lawsuit and in others) through the deal, apparently without resolving or even raising the series of notices of underlying criminal intent.

## III.    FACTUAL BACKGROUND

**A.    The Nature of the Bond Transaction and the Unworkably Faulty Documentation Were Red Flags that Should Have Prompted Further Investigation from Greenberg Traurig.**

Greenberg was retained to represent WLCC in the bond transaction.  See Complaint ¶6. Michelin has alleged that the nature of this transaction (including the "free money" aspect), and

the unworkably faulty documentation were among the multiple was a red flags that should have prompted further investigation from Greenberg.  See Complaint at ¶208(f).

Michelin has alleged specific facts to support this conclusion.  It has alleged that the bond transaction called for most of the proceeds of relatively low-interest bonds to be invested into a higher-yielding annuity contract (the "Annuity Contract," **Exhibit A**) that would generate sufficient income to pay the principal and interest on all of the bonds, leaving WLCC with free use of the remaining un-invested proceeds (and excess Annuity Contract income) to pay for a tribal economic development project – in other words, free money.  Complaint at ¶¶46 54, 68, 189, 217.  Michelin has alleged that over $22 million of the bond proceeds from the first bond issuance on August 25, 2014 (into which Michelin's funds were diverted) were supposed to go toward the purchase of the Annuity Contract (but were misappropriated).  See id. ¶54.

Michelin has also alleged that the Annuity Contract was in irreconcilable conflict with the agreement under which the Annuity Contract purchase price was to be invested (the "Annuity Management Agreement," **Exhibit B**) concerning the control of investment decisions, thereby crippling from the outset the intended source of repayment for the bonds.  Complaint at ¶51.

These allegations alone are sufficiently specific at the pleading stage to allege the nature of the bond transaction putting Greenberg on notice.  However, out of abundance of caution, Michelin is now offering the following additional specific facts that derive from the documents referenced in the Complaint.

First, the documentation for the Annuity Contract, the intended source for payment of the bonds, was in further direct conflict with the governing indenture under which the August 25, 2014 bonds were issued (the "Indenture," **Exhibit C**).  The Indenture provides that under the Annuity Contract, "the Annuity Provider shall pay income to [WLCC] at stated intervals and

amounts, as provided therein" (Indenture, Ex. C, § 1.2), clearly contemplating a direct obligation of the Annuity Provider with a fixed stream of payments. The Annuity Contract, however, describes itself in bold font on its cover as a "**Variable** Annuity Contract," and states, also in bold on the cover, that "[t]he dollar amount of any payments and values under this Contract which are based on investment results of the Separate Account are **variable and not guaranteed**." See Annuity Contract, Ex. A, at p. i. In other words, the Annuity Contract, which Greenberg's client entered and which Greenberg would have seen in the course of its professional representation, was not permitted under the Indenture.

Moreover, there is unresolved confusion in the documents over what was being invested and hence over what the payout from the Annuity Contract would be. The Indenture (see Indenture, Ex. C, §1.2, p. 4 & § 2.12, p. 17) and the Closing Statement for the August 25, 2014, closing (**Exhibit D**) called for $22,094,089 to be invested in the Annuity Contract. The Supplemental Indenture for the August 27, 2014 closing (the "Supplemental Indenture," **Exhibit E**) and the Closing Statement therefor (**Exhibit F**) directed $2,228,847 into the Annuity Contract, for a total of $24,322,936. The Annuity Contract, however, describes itself as being in the amount of $25,250,000, a figure also recited in the Supplemental Indenture at §1.2, p. 4. A varation in the amount invested would necessarily change the scheduled payout of the Annuity Contract. To contemplate leaving a determination of the available security until after bonds have been purchased is surprising enough. To fail to follow through and ever to reconcile the disparity is staggering.

In addition, the Indenture provides that the "Annuity Provider," Wealth Assurance Private Client Corporation ("WAPCC") – that is, WLCC's counterparty on the Annuity Contract – must be "a company that provides Annuity Investments as part of its regular trade or business."

Indenture, Ex. C, § 1.2.  WAPCC, however, was incorporated only three (3) days before Michelin's money was stolen for delivery to WAPCC; and at least through December 2014, it had issued no annuity contracts to anyone other than WLCC.  Complaint at ¶53.

The bonds were not general obligation, full-faith-and-credit bonds but rather were only "Special Limited Revenue Bonds (Taxable)."  Indenture, Ex. C.  They were "enforceable only against[] the Pledged Revenues" and there was "no recourse against [WLCC] or any other property now or hereafter owned by it."  Indenture, Ex. C, § 8.1, p. 30 & p. A-6.  Effectively, this meant that the only real recourse of the bond purchasers was against the assets invested in the annuity with WAPCC.[1]  Their risk was tied completely to the performance of the annuity.

This transaction was not a typical debt security investment. The bondholders were not investing in an operating company with assets of its own, taking risk for a fixed rate of interest, with no up-side but in line ahead of equity investors in the event that the company's business failed. Rather, the bondholders (or, rather, their faithless investment manager, in collusion with the other defendants) were turning over money to an asset-less company for it to invest in a black-box annuity contract, issued by an unknown entity with no disclosed track record, on an unsubstantiated promise of better-than-market returns, where the _entire_ risk was to be borne by the bondholders, with no priority over any equity investors in the company, but the company (its equity owners) was to obtain a substantial portion of the promised benefits of the contract.  No rational investor would buy these bonds.  He, or she, would simply purchase the annuity contract

---

[1] "Pledge Revenues" is defined to include income to WLCC from the Annuity Contract or in connection with "Economic Development Projects" financed through the bond proceeds. Indenture, Ex. C, at p. 10.  However, the investment in any such Economic Development Project was only a minimal portion of the bond proceeds.  See Ex. D at Schedule C.  Moreover, the Wakpamni District is "one of the poorest regions in the United States."  See Complaint in SEC v. Archer, et. al., 1:16-cv-03505-WHP, at ¶3, **Exhibit G**. Consequently, no significant income was anticipated from any such project relative to the bond obligations.

himself/herself – or better yet, engage the investment manager to make the same underlying investments directly, without having to compensate the middle-man annuity provider. Assuming that a rational investor had as a primary, laudable motivation to assist an impoverished tribal area as a social investment, he or she would never provide $2 million in assistance and simultaneously risk (with no benefit to the impoverished area) an additional $20 million, in hopes of getting the $2 million back, solely in reliance on payback from a third-party's investment savvy without demanding disclosure of the track record and financial condition of the third party – in this case, both the annuity provider and the investment manager.

Thus, even without regard to the specific fraudulent acts, this bond transaction was so flawed that no rational investor would have purchased these bonds. This fundamental fact was clearly known to Greenberg since it prepared and/or reviewed the bond documents. Galanis also knew that, since no rational purchaser would buy these bonds, he would have to gain control of a purchaser (or its decision-making agent) in order to force a purchase. Indeed, when Michelin was finally informed of the purchase of these bonds in its account, it immediately directed that the bonds be sold as soon as possible, even before it had learned of the fraudulent acts. Complaint ¶75.

Yet Greenberg did not attempt to verify that Hughes Capital Management, LLC (Michelin's retirement assets investment manager, which is now in SEC receivership as a result of its role in this fraud (see *SEC v. Atlantic Asset Management*, LLC, Case No. 1:15-cv-9764 (S.D.N.Y.)) ("Hughes") had authority to invest its clients funds in WLCC bonds. Greenberg had drafted the Placement Agency Agreement, which directed that bond purchasers had to be accredited investors, and which required WLCC at closing to provide "a certificate of **each purchaser** of the Bonds certifying that it is a Qualified Investor . . ." Placement Agency

Agreement, §7(a)(v), **Exhibit H**. But, rather than a certificate of "each purchaser," Greenberg apparently counseled its client to produce (actually, to rely on a production from the co-defendant placement agent Burnham Securities or its counsel, co-defendant Dilworth Paxson) a single letter, purportedly from Hughes, stating that it was making various representations on behalf of its retirement funds clients, in violation of the sensible requirement that Greenberg itself had put into the Placement Agency Agreement.  <u>See</u> Qualified Investment Letter of August 21, 2014, **Exhibit I**.[2]  Even worse, the certificate never stated, and Greenberg apparently never required either for itself or its client or the named retirement fund purchasers, even a bare representation from Hughes (much less any documentation such as investment management agreements or authorized investment policies or guidelines) that Hughes had authority to make this investment on behalf of these retirement funds.

This failure to get a statement of due authority is not a mere oversight resulting from an unexpected sale through an intermediate fiduciary. Rather, it is all the more outrageous, because Section 2 of the Placement Agency Agreement, governing the manner in which and the classes of persons to whom the Placement Agent could offer the bonds, was a complete sham: the fix was already in that the bonds would be sold via Hughes to various third parties. This is proven by Section 8 of that very same Placement Agency Agreement – the one prepared by Greenberg – which states that, upon closing, the bonds are be delivered to Hughes in such names and amounts as Hughes designates (those names being defined by the Placement Agency Agreement as the "Purchasers").

---

[2]    The Placement Agency Agreement appears to have been drafted by Greenberg, based on the similarity of the document identifying number in a footer to the document identifying number in the footer on Greenberg's bond counsel opinion letter. The Qualified Investor Letter appears to have been drafted by Dilworth Paxson, based on the similarity of the document identifying number in a footer to the document identifying number in the footer on Dilworth's placement agent's counsel opinion letter.

Greenberg was well aware that these were arbitrage bonds - that the proceeds were going to be used to purchase a purportedly higher-yielding annuity to get "free money."  It was well aware that these were non-recourse, full-faith-and-credit bonds.  It drafted (or reviewed drafts from co-defendant Dilworth Paxson LLP of) all the bond documents.  As such, and even aside from the fraud, Greenberg was aware that the bond purchasers bore the sole risk of the Annuity Contract performance (that is – assuming that the Annuity Contract had not been a complete fiction) while not sharing in any upside potential, and that no reasonable investor would purchase these bonds.  Equally important, Greenberg knew that the victims were all employee retirement plans, including Michelin's ERISA-governed retirement plan.

**B.**    **The Status of the Bond Issuer Was a Red Flag that Should Have Prompted Further Investigation from Greenberg Traurig.**

As part of the bond transaction, Greenberg opined that 1) WLCC is a duly-organized subsidiary of the Wakpamni Lake Community, 2) WLCC is an economic arm and instrumentality of the Wakpamni Lake Community, 3) the Wakpamni Lake Community is a subordinate governmental unit of the Oglala Sioux Tribe, 4) WLCC is valid and in good standing under Tribal law, and 5) WLCC has the authority pursuant to tribal laws to issue the bonds. Greenberg Opinion Letter, **Exhibit J**.  Michelin is learning new potential facts surrounding the bond issuer that should also have been a red flag.

A January 2017 lawsuit, which is derived largely from a June 2014 Al Jazeera article, raises questions about WLCC.  It alleges that Raycen Raines and other "rogue members of the Wakpamni District" set up WLCC to allow payday lending companies to use the WLCC's name in an attempt to circumvent certain payday lending and consumer fraud statutes while ostensibly shielding the payday lending companies from liability through alleged Native American sovereign immunity.  See Complaint in <u>Wiley, et. al. v. Jardine, et. al.</u>, 3:17-cv-00011-MHL,

(E.D. Va), **Exhibit K**.  The lawsuit alleges that WLCC "holds itself out as an 'arm and instrumentality' of the Tribe even though the Tribe does no participate in any of the business functions of the WLCC and does not receive any of the ill-gotten profits," rather Raycen Raines receives a percentage cut from the payday lending groups.  See id. at ¶¶2,15.  It also alleges that Mr. Raines had attempted to run a similar scheme in 2012 that was specifically rejected by the Oglala Sioux tribe.  See id. at ¶¶24-28.

Mr. Raines appears to have been a main component of this transaction from WLCC's standpoint.  He was listed as the contact for WLCC on Greenberg's invoice (**Exhibit L**), in the distribution list for the bond transaction (**Exhibit M**), and the Placement Agency Agreement (**Exhibit H**).  In June 2014, the Oglala Sioux Tribal Council passed a resolution "formally stating "that Raycen Raines and associates has no authority to act on behalf of the Oglala Sioux Tribe with regard to any federal tax matters or other economic development matters with regard to [Tribal Economic Development] bonds or any other economic development projects . . ." Resolution No. 14-120, **Exhibit N**.  This resolution was prompted by Raines inducing the president of the Oglala Sioux Tribe to give Raines a Power of Attorney over economic development projects despite personal knowledge by Raines of the Tribe's rejection of a Tribal Economic Development bonds project and his knowledge "that he had no authority to represent any interests of the Tribe with regard to any financial matters."   Id.

Greenberg time records indicate that Greenberg prepared a resolution of the Oglala Sioux Tribe to amend or clarify Oglala Sioux Ordinance 12-17, which sets forth the powers of the districts within the Oglala Sioux Tribe.  Greenberg Invoice, Ex. L.  At this stage, Michelin does not have a copy of the proposed resolution, but time records indicate that it was to amend or clarify the "economic development powers" of Ordinance 12-17.  Id.  On July 29, 2014, the

Oglala Sioux Tribe tabled the proposed resolution (7/29/14 Minutes, **Exhibit O**), which required Greenberg and the WLCC board "to discuss paths forward in order to protect our business partners and move quickly." Ex. L. These issues were not mentioned in the bond documents.

In August 2014, concerns about WLCC, the bond issuer, were raised by Michelle Morton, an agent of Hughes Capital, apparently based on publicly available information that would likewise have been available to Greenberg. Ms. Morton raised numerous questions about WLCC, including its legal status, its legal relationship with the Oglala Sioux tribe, the impoverished nature of the region, sovereign immunity issues, and whether WLCC or the Oglala Sioux tribe would be legally or financially accountable for the Wakpamni Lake Bonds. Complaint ¶70. Among other things, Morton brought up the fact that WLCC alleged in a June 2014 lawsuit that its profits allegedly went to Wakpamni Lake rather than the Oglala Sioux Tribe. **Exhibit P**. She also brought up the concern that the Tribe was 80% unemployed and that its profits were dependent on payday lending. Id. These potential issues were not disclosed anywhere in the bond documents.

On August 17, 2014, Jason Galanis responded to the e-mail of Morton and wrote, "we also attach the legal opinion draft from Greenberg Traurig detailing the status of the Wakpamni. Your memo reached incorrect legal conclusions, and hopefully the attached document provides clarity. As you may know, Greenberg Traurig is one of the largest law firms in the world. The firm also has a large practice dedicated to Indian matters." Id. Michelin does not have possession at this stage of the draft opinion that Galanis attached.

B.    **The Fraudulent Scheme.**

The scheme of Galanis and his cohorts can be summed up in four parts: 1) locating a bond issuer; 2) engineering the bond issuance to give Jason Galanis and his associates

undisclosed control over the bond proceeds; 3) identifying victims whose assets could be taken over to force a purchase of the bonds; and 4) misappropriating the bond proceeds for the benefit of Jason Galanis and his associates.  Complaint ¶43.  The known individual conspirators at this stage of the litigation include Jason Galanis, as well as his father, John Galanis, Devon Archer, Bevan Cooney, Hugh Dunkerley, Gary Hirst, and Michelle Morton.  Id. at ¶44.

Jason and John Galanis had initial contact with WLCC in March 2014, proposing the potential for a bond transaction.  Complaint ¶45.  John Galanis was WLCC's primary point of contact regarding the bonds throughout the scheme.  See Complaint in *SEC v. Archer*, *et. al.*, 1:16-cv-03505-WHP, at ¶30.

Jason Galanis, through and with these individual conspirators, had control of each essential element of the bond transaction, thereby allowing this scheme to work and the sham bonds to be issued.

**Control over the Placement Agent, Burnham Securities**: Jason Galanis, Archer, Cooney, and Dunkerley controlled Burnham Securities, which served as the Placement Agent for the bond issuance.  Complaint ¶¶24, 47.  Dunkerley served as Managing Director of Burnham Securities.  Id. ¶24.

**Control over the "Independent" Investment Management Company**:  An independent investment management company was supposed to manage the investment of the bond proceeds and select an Annuity Contract provider.  Complaint ¶50.  Through Galanis' orchestration, WLCC appointed Private Equity Management Limited as the investment manager and entered into the Annuity Management Agreement with Private Equity Management.  Id. However, Private Equity Management was actually a fictitious entity created by Jason Galanis. Id.  The Annuity Management Agreement was signed by Galanis's associate.  Id.

**Control over the Annuity Provider, WAPCC**: Galanis and cohorts also controlled the annuity provider, WAPCC, who Galanis also selected.  WAPCC exists as two distinct, separately formed entities, with one entity located in the British Virgin Islands ("WAPCC-BVI") and the other entity located in Florida ("WAPCC-Florida") (collectively, WAPCC).   Complaint ¶19. Hugh Dunkerley, Galanis's cohort who is also the managing director of the Placement Agent, Burnham Securities, incorporated WAPCC-BVI and WAPCC-Florida.   Id.   The Annuity Contract between WLCC and WAPCC-BVI identifies WAPCC as a British Virgin Islands incorporated entity that is deceptively referred to as "part of the Wealth-Assurance Group of Companies."  Id. ¶52.  Dunkerley incorporated WAPCC-BVI on August 22, 2014, just four days before Jason Galanis selected WAPCC-BVI as the Annuity Contract provider for the first issuance of the Bonds (the first issuance being the Wakpamni Lake Bonds purchased with the retirement funds belonging to Michelin and others).  Id. ¶53.  He had incorporated the identically named WAPCC-Florida in Florida on July 7, 2014.  Id. ¶54.  Dunkerley is the sole officer of WAPCC-Florida and is the sole shareholder of WAPCC-BVI.   Id. ¶¶53-54.   The Annuity Contract identified Dunkerley as the president and director of WAPCC-BVI.  Complaint ¶54.

**Control over the purchaser, Hughes Capital Management:**  A crucial element of the scheme was Galanis and cohorts gaining control over Hughes Capital.  Hughes Capital was an investment manager that managed certain assets held by the Michelin Retirement Plan. Complaint ¶¶36-37.   Galanis, Archer, Cooney, and Dunkerley gained control over Hughes Capital in August 2014.[3]  Id. ¶56.  As part of the control, Galanis was able to appoint Gary Hirst,

---

[3]      The details of how they gained control are contained in paragraphs 57 through 65 of the Complaint.

one of his co-conspirators, as Chief Investment Officer on August 12, 2014.[4]  Id. ¶¶25, 63-65.

By August 14, 2014, Hirst analyzed which Hughes Capital assets could be liquidated to generate

funds to purchase the bonds at issue.  Id. ¶65.  The Hughes Capital compliance officer decided

that the clients' investment guidelines would not allow for purchase of the bonds without prior

consultation with the client.  Id. ¶67.  Nevertheless, Galanis and Hirst prevailed; and Hirst signed

the trade tickets purchasing $27,077,436 of Wakpamni Lake Bonds on behalf of nine of Hughes

Capital's clients, including the Plan.  Id. ¶¶71-72.

    The proceeds of the bonds were wired to a bank account held by WAPCC-Florida.

Complaint ¶19.  Hirst is the assistant secretary of WAPCC-Florida and the signatory on its bank

account.  Id. ¶25.  Dunkerley is listed as the sole officer of WAPCC-Florida on the Florida

incorporation documents.  Id. ¶55.  Predictably, the funds were misappropriated by Galanis,

Dunkerley, Hirst, and the other cohorts to fund their lavish lifestyles.  WLCC did not authorize

the transfer of the bond proceeds.  Id. ¶208.

## C.    **Greenberg Traurig's Constructive Knowledge of the Fraudulent Scheme.**

    Again, Greenberg Traurig acted as counsel to WLCC.  Complaint ¶6.  This allegation

alone is sufficient to put Greenberg on notice of the transaction documents.  However, since

Greenberg complains of a lack of evidentiary facts (which are not required at this stage), out of

abundance of caution, Michelin refers to the Greenberg opinion letter (Ex. J) and the Greenberg

invoice in Michelin's possession (Ex. L), which reveal that Greenberg reviewed the documents

involved in the bond transaction.

---

[4]    He resigned from that position only a few days later to avoid making certain necessary
disclosures to the SEC.  Complaint ¶65.  However, the resignation was in form only, as he
remained in the same capacity as a "consultant."  Id.

The fact that no reasonable investor would purchase the bonds should have put Greenberg on notice that the transaction was a sham, in addition to the numerous other red flags relating to the bond transaction, discussed above. There were several other facts that were evident to Greenberg that should have put it on notice of the problem, particularly in light of the nature of the transaction itself.

First, Greenberg was aware that Hugh Dunkerley was both the managing director for Burnham Securities (the Placement Agent) and the president and director of WAPCC-BVI, the Annuity Contract provider. The Distribution List for the bond transaction listed Hugh Dunkerley as the managing director for Burnham Securities, and Dunkerley signed Placement Agency Agreement on behalf of Burnham Securities. Complaint ¶¶54, 68. The Annuity Contract identified Dunkerley as the president and director of WAPCC-BVI. Complaint ¶54. These documents clearly show that one of the main cohorts in this scheme was involved in entities that were on completely opposite ends of the transaction. Again, Burnham Securities was the one who provided instructions as to where to wire the funds, and WAPCC was to receive the funds, meaning the same person was listed as officer of both the director of the funds and the recipient of the funds- a major conflict that would have put any reasonable person on notice of a problem. See, e.g., Complaint ¶208.

Second, the closing documents for these transactions included an investment letter dated August 21, 2014, from Hughes Capital to WLCC identifying the Hughes Capital clients who were purchasing the bonds, including Michelin, and purportedly making representations, warranties, and covenants on their behalf. Id. ¶72. The investment letter was provided to WLCC and Greenberg, among others. Id. The letter references the Plan, thereby putting Greenberg on notice that ERISA funds would be used to invest in the bonds. Moreover, the letter was signed

by Gary Hirst, who also is listed as the Hughes trader on the trade tickets purchasing the bonds from August 22-26, 2015.  Id.  Mr. Hirst was also listed on the distribution list (Ex. M) as "Annuity Contract Provider's Counsel."   In addition, Hirst also was signatory on the WAPCC-Florida bank account, where the money was transferred.  Complaint ¶25.  This gave Greenberg knowledge of a fundamental conflict that was a key component of the scheme, as this meant Hirst was the key agent of the purchaser Hughes (and even signed the trade tickets for Hughes), and also controlled the account where the bond proceeds were being deposited.

Third, the Annuity Contract and the Annuity Management Agreement were in irreconcilable conflict over the management of invested funds, to an extent that put any reasonable participant in the transaction on notice that the transaction was unworkable and likely fraudulent.  Id. ¶51.  For example, the Annuity Contract provided that WLCC was to have absolutely no input, directly or indirectly, in the selection, identification, or recommendation of investments under the Annuity Contract.  Id.  The Annuity Management Agreement, however, included investment guidelines approved by WLCC and provided that WLCC could modify the guidelines at any time and could give the manager instructions to buy, sell, or make any investment. Id.  The structure under which WAPCC-BVI was supposed to be guaranteeing investment results to WLCC, but abdicating the selection of investments to a manager that WAPCC-BVI did not select or control (regardless of whether WLCC itself could select or control that manager) was a sufficient red flag to put any competent transaction participant on notice that the proposed transaction was neither normal nor legitimate.  Id.

Fourth, the Indenture and other bond documents, established certain requirements for the Annuity Contract, including that:

- the "annuity provider" would be a company that provides "annuity investments" as part of its regular trade or business, with "annuity investments" defined as contracts "whereby the annuity provider shall pay income to [WLCC] at stated intervals and amounts, as stated therein;"

- the provider and the investments thereunder would be selected by Private Equity Management, Limited (also referred to as Private Equity Management, L.L.C.);

- the provider would be a British Virgin Islands company;

- the Annuity Contract purchase price would be paid through a bank with no United States branches; and

- the execution and delivery of the Annuity Contract would occur entirely outside the United States.

Complaint ¶189.

These requirements were blatantly violated. As noted above, WAPCC was not a company that provides "annuity investments" as part of its regular trade or business; rather it was incorporated only three (3) days before the money was stolen. Id. ¶194. Yet Greenberg's client, WLCC, entered into the Annuity Contract with WAPCC-BVI in violation of the Bond Indenture, thereby allowing the diversion of trust assets in violation of its covenants in the Bond Indenture. Complaint ¶¶196-97, see also ¶¶52-53.

Moreover, even if WAPCC-BVI had been a proper Annuity Provider (which it clearly was not), the bond proceeds were not even disbursed to WAPCC-BVI as required in the Annuity Contract, nor were they directed to an account at a bank "without any offices and/or branches in the United States," as required. Complaint ¶54. Although the purchase price paid for the Bonds became at closing the property of Greenberg's client, WLCC, held in trust by U.S. Bank for the

16

purposes of the Bond issuance, WLCC never gave U.S. Bank or anyone else specific payout instructions for the Annuity Contract purchase payment; nor did WLCC ever delegate the authority to make such payout instructions to U.S. Bank.  Id. ¶190.  Not surprisingly, then, the bond proceeds were not directed to a WAPCC-BVI account at a bank "without any offices and/or branches in the United States", as required in the Annuity Contract.  Id. ¶54.  Instead, the proceeds were directed to a bank account at a Beverly Hills, California branch of JPMorgan Chase Bank, in the name of an identically named WAPCC-Florida that had been incorporated by Dunkerley in Florida on July 7, 2014.  Id.  This violation was a material element in concealing Defendants' misappropriation of funds.  Id. ¶52.  WAPCC-Florida was not eligible under the Bond Indenture or even the Annuity Contract to receive any funds.  This transfer of funds was in violation of the Bond Indenture.  Id. ¶¶197, 200, 208(c)-(e).

Fifth, there was no private placement memorandum for the Bond Issuance, such as is ordinarily prepared when unregistered securities are being offered through a placement agent. At minimum, such a private placement memorandum (had one existed for this transaction) should have described to prospective investors the economic development project, including its size and possible uses; the economy of the surrounding region to demonstrate the market for such a project; the terms of the annuity contract; the financial strength of the annuity contract provider; the track record of the annuity contract provider; and the investment parameters allowed for the separate account required by the WAPCC-BVI Annuity Contract; and the identity and track record of the investment manager for that separate account.  Complaint ¶208(g).  The lack of these features, which are ordinarily included, was yet another red flag.

Finally, the Indenture stated that the authorized bonds were in the amount of $24,844,089. Indenture, Ex. C, §2.9. It also stated that additional bonds that would be on a parity

lien (that is, equal footing) status vis-à-vis the original bonds with respect to their claim on the repayment source could be issued only for the purpose of refunding original bonds. *Id.*, Article III. Yet at the very point at which Greenberg was providing its opinion for the August 25 bonds that the Indenture was "legal, valid and binding . . . in accordance with its terms," it was in the process of preparing a new bond issuance for $2,233,347, to close on August 27, that would be, according to its Supplemental Indenture (Ex. E) and according to Greenberg's own opinion for that second issuance (**Exhibit Q**) on a parity with the original bonds.  Because those August 27 bonds were for the purpose of making another investment in the Annuity Contract and not for refunding (Supplemental Indenture, Ex. E, §§ 2.1 and 2.4), their issuance was in direct violation of the Indenture. If the August 27 bonds were, in fact, on parity with the original August 25 bonds, then Greenberg's opinion on August 25 that the Indenture was binding in accordance with its terms was false. If, on the other hand, the August 27 bonds were not on parity with the original August 25 bonds, then Greenberg's activity in preparing the August 27 bonds for market was an unlawful attempt to dilute the security of the original August 25 bondholders (and would mean that Greenberg's opinion on August 27 as to parity was false).

## IV.    LEGAL STANDARD

To be legally sufficient a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[A] complaint need only give the defendant fair notice of what the claim is and the grounds upon which it rests." E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc., 637 F.3d 435, 440 (4th Cir. 2011) (internal citations omitted).  "A plaintiff need not plead detailed evidentiary facts, and a complaint is sufficient if it will give a defendant fair notice of what the plaintiff's claim is and the grounds

upon which it rests." Whitt v. Wells Fargo Fin., Inc., 664 F. Supp. 2d 537, 541 (D.S.C. 2009) (citing Bolding v. Holshouser, 575 F.2d 461, 464 (4th Cir.1978)).

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) "should only be granted if, 'accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" Priority Auto Group, Inc. v. Ford Motor Co., 757 F.3d 137, 139 (4th Cir. 2014) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)); see also In re Regions Morgan Keegan ERISA Litigation, 692 F. Supp.2d 944, 952 (W.D. Tenn. 2010) ("A plaintiff can support a claim 'by showing any set of facts consistent with the allegations in the complaint.'") (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 563 (2007)).     It "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 566 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).

"In addition to accepting the truth of all factual allegations, a court also 'must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" Loftus v. F.D.I.C., 989 F. Supp. 2d 483, 488 (D.S.C. 2013) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S.,

308, 322 (2007)). "A court may similarly consider documents or exhibits attached to a motion to dismiss, 'so long as they are integral to the complaint and authentic.'" Id. at 489 (quoting Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md., 684 F.3d 462, 467 (4th Cir. 2012)). "When ruling on a Rule 12(b)(6) motion to dismiss, the trial judge must accept as true all of the facts alleged in the plaintiff's complaint and construe all reasonable inferences in favor of the plaintiff." Id. at 488.

## V.     ARGUMENT

### A.     Michelin Has Stated a Claim against Greenberg under ERISA (Count II).

ERISA Section 502(a)(3), codified at 29 U.S.C. § 1132(a)(3), provides that "a participant, beneficiary, or fiduciary" may bring an ERISA action:

> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a)(3); see also LeBlanc v. Cahill, 153 F.3d 134, 150 (4th Cir. 1998)

Liability under this provision extends to a nonfiduciary, nonparty-in-interest. Indeed, the Supreme Court in Harris Trust and Savings Bank v. Salomon Smith Barney, 530 U.S. 238, 246 (2000) held that "§ 502(a)(3) admits of no limit . . . on the universe of possible defendants" because that provision "makes no mention at all of which parties may be proper defendants —the focus, instead, is on redressing the 'act or practice which violates any provision of [this subchapter].'" See also LeBlanc, 153 F.3d at 153 ("The key requirement for liability is that the subsection at issue expressly prohibits a transaction involving a nonfiduciary third party.").

As used in 29 U.S.C. § 1132(a)(3), the phrase "this subchapter" (i.e., ERISA Title I) "includes 29 U.S.C. §§ 1001–1191." Denny's, Inc. v. Cake, 364 F.3d 521, 525 (4th Cir. 2004). Consequently, pursuant to 29 U.S.C. § 1132(a)(3), "a participant, beneficiary, or fiduciary" may

bring a civil action against non-fiduciaries to enforce 29 U.S.C. § 1106, among others.    29

U.S.C. § 1106(a)(1) prohibits a fiduciary from

> caus[ing] the plan to engage in a transaction that he knows or
> should know constitutes a direct or indirect
>     (A) sale or exchange, or leasing, of any property between the
>     plan and a party in interest;
>     (B) lending of money or other extension of credit between the
>     plan and a party in interest;
>     (C) furnishing of goods, services, or facilities between the plan
>     and a party in interest;
>     (D) transfer to, or use by or for the benefit of a party in interest,
>     of any assets of the plan; or
>     (E) acquisition, on behalf of the plan, of any employer security or
>     employer real property in violation of section 1107(a) of this
>     title.

29 U.S.C. § 1106(b) prohibits a fiduciary from:

> (1) deal[ing] with the assets of the plan in his own interest or for
> his own account,
> (2) in his individual or in any other capacity act in any transaction
> involving the plan on behalf of a party (or represent a party) whose
> interests are adverse to the interests of the plan or the interests of
> its participants or beneficiaries, or
> (3) receiv[ing] any consideration for his own personal account
> from any party dealing with such plan in connection with a
> transaction involving the assets of the plan.

Greenberg does not dispute that a fiduciary of a plan may bring a civil action to obtain

"appropriate equitable relief" to redress violations of ERISA against a nonfiduciary "party in

interest" to a transaction barred by § 406(a).  It also does not challenge, for purposes of its

motion, that Michelin has standing to bring such a claim; that Michelin has sufficiently alleged

that Morton, Hirst, and Hughes Capital owed fiduciary duties and engaged in transactions

prohibited under 29 U.S.C. § 1106 of ERISA (Complaint ¶¶ 36–37, 119);[5] or that Dunkerley and

---

[5]    See 29 U.S.C. § 1002(21)(a); In re Enron Corp. Securities, Derivative & ERISA
Litigation, 284 F. Supp. 2d 511, 543, (2003) ("Under ERISA, a person or entity may be deemed
a fiduciary either by assumption of the fiduciary obligations . . . or by express designation by the

BFG Socially Responsible Investments, Ltd. ("BFG") are parties in interest that engaged in prohibited transactions under 29 U.S.C. § 1106 (id. ¶ 132).

Rather, Greenberg argues that Michelin did not sufficiently plead that Greenberg "knew or should have known" of the prohibited transaction and that Michelin does not seek equitable relief.  These arguments are without merit, as explained below.

**1.     Michelin properly alleged that Greenberg knew or should have known that the Bond transaction in which it was involved was in violation of ERISA.**

Michelin alleges that Greenberg knew or should have known that it was participating transactions prohibited under 29 U.S.C. § 1106.  See, e.g., Complaint ¶¶130-35.  Contrary to Greenberg's argument, Michelin's allegations go well beyond conclusory allegations and are sufficient to state a claim.

As Greenberg acknowledges, the standard is not actual knowledge.  Rather, Michelin need only allege sufficient facts that Greenberg knew or should have known of the occurrence of a prohibited transaction.  Harris Trust and Savings Bank, 530 U.S. at 251.  In discussing the concept of constructive knowledge in an ERISA claim against non-fiduciaries, the Supreme Court in Harris Trust and Savings Bank looked to the common law of trusts and specifically cited the Restatement (Second) of Trusts § 297 in finding the sufficiency of constructive knowledge.  Id. at 253.  Comment A to the Restatement (Second) of Trusts § 297, discussing the constructive knowledge requirement, provides:

> A third person has notice of a breach of trust not only when he knows of the breach, but also when he should know of it; that is **when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee is a trustee and whether he is committing a**

ERISA plan documents.") "Fiduciary status under ERISA is to be construed liberally, consistent with ERISA's policies and objectives, and is defined in functional terms of control and authority over the plan . . . ." Enron, 284 F. Supp. 2d  at 544 (internal quotations omitted).

> **breach of trust**, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust.
>
> Whether a third person who deals with one who is in fact a trustee should inquire whether he is a trustee and whether a breach of trust is being committed, and if so the extent of the inquiry which he should make, depends upon the circumstances.

See Restatement (Second) of Trusts § 297 cmt a (emphasis added).; see also Heritage Equity Grp. 401(k) Sav. Plan v. Crosslin Supply Co., 638 F. Supp. 2d 869, 876 (M.D. Tenn. 2009).

As an initial matter, Michelin has sufficiently alleged knowledge that the bonds were to be purchased using proceeds subject to ERISA, including the Michelin Plan. The closing documents for these transactions included an investment letter dated August 21, 2014, from Hughes Capital to the bond issuer WLCC identifying the Hughes Capital clients who were purchasing the bonds (including Michelin) and purportedly making representations, warranties, and covenants on their behalf. Complaint ¶72. The names of some of the bond purchasers contained "Pension Plan." Investment Letter, Ex. I. This put Greenberg on notice that the bond holders contained pension and/or retirement plans (subject to ERISA).

Regarding constructive knowledge of a prohibited transaction, again, the nature of the bond transaction itself constitutes "circumstances" that should have put Greenberg on high alert for fraud. Michelin's Complaint is replete with instances of fiduciaries of the plan engaging in prohibited transactions under ERISA. The facts regarding Greenberg's constructive knowledge are discussed in section III, D. Michelin has alleged specific facts in the Complaint to establish, for pleading purposes, that Greenberg had sufficient knowledge of facts "that would lead a reasonably intelligent and diligent person to inquire" about the prohibited transactions. At this stage, it is reasonable to infer that Greenberg reviewed all the documents relating to the transaction as bond counsel for WLCC. Moreover, in the opinion letter prepared by Greenberg

pertaining to this transaction (Ex. J), Greenberg represented that "[a]s counsel to the Issuer, we have examined and are familiar with the books, records, and files of the Issuer, the executed Bonds, the Resolution, the Indenture, the Placement Agency Agreement, and such other documents (collectively, the "Documents") and information as we have considered pertinent . . ."

The Complaint also alleges specific facts clearly within in Greenberg's knowledge that should have at least led to further inquiry that would give it knowledge of a prohibited transaction. One example is the dual roles played by Hirst, whom Greenberg does not dispute to have been a fiduciary and a party in interest. See 29 U.S.C. § 1002(14)(A). Hirst was the CIO and later a consultant of Hughes Capital, made the decision on behalf of Hughes Capital to use assets of the Plan to purchase the bonds, and executed this decision by signing the purchase tickets. Complaint ¶¶63-65, 72. He even signed the investment letter (Ex. I) on behalf of Hughes Capital.[6]  Michelin specifically alleged that Greenberg reviewed that letter. Complaint ¶72. Hirst was also listed as "Annuity Contact Provider's Counsel" in the distribution list (Ex. M) that was drafted by Greenberg, as revealed in its invoice (Ex. L). Obviously, it would clearly be a prohibited transaction for a fiduciary of the plan to also handle the investments purchased with the bond proceeds that Hirst decided to sell from the Plan.

Significantly, Hirst was also the signatory on the WAPCC-Florida account where the bond proceeds were transferred- an unequivocal conflict clearly prohibited under 29 U.S.C. 1106, and a fundamental component of the scheme in this case because it gave the conspirators access to the funds. Complaint at ¶¶25, 51–55. The other conflicting roles served by Hirst, as revealed in the documents Greenberg reviewed, should have put Greenberg on notice to

---

[6]    In addition, according to a billing statement regarding Greenberg's services in this transaction, Greenberg conducted a call with Purchaser's Counsel on July 8, 2014, which was less than two months before the transaction date. Without discovery it is unknown what was discussed on this call.

24

investigate Hirst and discover his status as signatory of the very account where the money was being transferred.

Moreover, Dunkerley and BFG are alleged to be a party in interest. Complaint ¶ 132. BFG became the sole preferred member of GMT Duncan, LLC ("GMT") in August 2014 when GMT acquired Hughes Capital. Complaint ¶¶10, 132. Dunkerley was the managing member of BFG. Id. at ¶24. Thus, Dunkerley and BFG were clearly parties in interest pursuant to 29 US.C. §1002(14), and benefitted from the bond purchase. Complaint ¶¶132-133. Yet Dunkerley simultaneously served as Managing Director of Burnham Securities, the Placement Agent, and president and director of WAPCC-BVI, the annuity provider, and WAPCC-Florida, where the funds were actually transferred. Id. ¶24. Dunkerley signed the Placement Agency Agreement on behalf of Burnham Securities, and the Annuity Contract on behalf of WAPCC. Id. ¶¶ 52–54, 68. Clearly, this was prohibited under 29 U.S.C. 1106(a)(1), and the specific facts regarding Greenberg's knowledge and documents sufficiently establish at this stage that Greenberg had constructive knowledge of this prohibited transaction.

These facts, in addition to the other signals discussed in the Factual Background, above, should also have put Greenberg "on high-alert notice that would have prompted an investigation that would have further illuminated the criminal enterprise that they were serving." Id. ¶209. Under the circumstances of this transaction, the specific allegations regarding Greenberg's knowledge and information are sufficient to show constructive knowledge of the prohibited transactions, or, at a minimum, put a "reasonably intelligent and diligent person to inquire" about whether there have been prohibited transaction, and had Greenberg pursued such inquiries, it would have gained "knowledge or [would have had] reason to know" of the prohibited transactions.

25

For example, in Heritage Equity Grp. 401(k) Sav. Plan v. Crosslin Supply Co., 638 F. Supp. 2d 869 (M.D. Tenn. 2009), the Court found that the plaintiffs had sufficiently alleged that the defendants had knowledge of commingling of ERISA funds and that knowledge of such behavior "could, if proven, give rise to Defendants having constructive knowledge of [a fiduciary's] illicit transfer in violation of ERISA." Id. at 876-77. The Court rejected the defendants' arguments given the motion to dismiss stage:

> The Defendants' protestations that they were not at fault here and had no real knowledge of the specifics of the fraudulent transfer are also unavailing at the motion to dismiss stage. While Plaintiffs have not alleged that Defendants knew of the Heritage Plan or its plan assets specifically, Plaintiffs have alleged facts that give rise to possible constructive knowledge that would entitle Plaintiffs to equitable relief under ERISA § 502(a)(3). While discovery may bear out a different result, the Court cannot evaluate the disputed facts at this stage of the litigation. "[A] nonfiduciary's knowledge of the breach can be inferred from surrounding circumstances raising a reasonable inference of knowledge," and Plaintiffs have properly alleged surrounding circumstances that create such an inference here. Brock v. Hendershott, 840 F.2d 339, 342 (6th Cir.1988).

Id. at 877; see also In re Regions Morgan Keegan ERISA Litig., 692 F. Supp. 2d 944, 966 (W.D. Tenn. 2010) (finding that the plaintiffs adequately pled that the defendants knowingly participated in violations of ERISA's fiduciary obligations).

Here, too, Plaintiffs have alleged facts that give rise to possible constructive knowledge that would entitle Plaintiffs to equitable relief under ERISA § 502(a)(3).

2. **Michelin is seeking equitable relief under 29 § 1132(a)(3) in the form of restitution.**

With regards to its ERISA claim against Greenberg, Michelin agrees that it is only entitled to "appropriate equitable relief" as permitted by 29 U.S.C. § 1132(a)(3). In paragraph 54 of the Complaint, Michelin alleges that to date it has not received any restitution. Complaint ¶ 54. Michelin is also entitled to the equitable remedies of accounting and disgorgement.

"[U]nder section 502(a)(3), relief was limited to those categories of relief that were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." Griggs v. E.I. DuPont de Nemours & Co., 385 F.3d 440, 444 (4th Cir. 2004) (internal quotations omitted).

Greenberg relies upon Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002) and Montanile v. Board of Trustees of the Nat'l Elevator Indus. Health Benefit Plan, 136 S. Ct. 651, 687 (2016). Restitution in equity ordinarily takes "the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." Griggs, 385 F.3d at 444 (citing Great-West, 534 U.S. at 213). "A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner. " Id. at 444-45 (citing Great-West, 534 U.S. at 213). In those cases where the funds or property sought have "dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor, and the plaintiff cannot enforce a constructive trust of or an equitable lien upon other property of the defendant." Id. at 445 (citing Great-West, 534 U.S. at 213-14).

However, Great-West and Montanile are distinguishable. They deal with enforcement of an equitable lien by a subrogee against settlement proceeds that had been paid by third party tortfeasor. Contrary to the plaintiffs in those cases, Michelin is not seeking to "enforce a constructive trust of or an equitable lien" through subrogation created pursuant to contractual obligation "for the benefits that they conferred," Griggs, 385 F.3d at 445 (citing Great-West, 534 U.S. at 214). Michelin only seeks to the return of Plan funds wrongfully removed from its trust.

The Supreme Court in <u>Harris Trust & Savings Bank</u> discussing the law of trusts in the context of equitable relief under ERISA, stated that "[t]he trustee or beneficiaries may then maintain an action for restitution of the property (if not already disposed of) **or disgorgement of proceeds (if already disposed of)**, and disgorgement of the third person's profits derived therefrom." 530 U.S. at 250 (emphasis added). Similarly, in <u>Mertens v. Hewitt Associates</u>, 508 U.S. 248, 262 (1993), that nonfiduciary service providers "must disgorge assets and profits obtained through participation as parties-in-interest in transactions prohibited by § 406 . . ."

In <u>LeBlanc v. Cahill</u>, 153 F. 3d 134 (4th Cir. 1998), the plaintiff brought a Section 502(a)(3) claim against a non-fiduciary seeking to "disgorge the profits and gains." <u>Id.</u> at 153. The Fourth Circuit held that "[t]he relief sought falls squarely within the Court's definition of "appropriate equitable relief" as stated in ERISA § 502(a)(3)." <u>Id.</u>

To the extent Greenberg argues that <u>Montanile</u> overrules <u>LeBlanc</u>, that argument is misplaced. This issue was recently discussed by the Eastern District of Pennsylvania in <u>Spear v. Fenkell</u>, No. CV 13-2391, 2016 WL 5661720, at *32 (E.D. Pa. Sept. 30, 2016), *clarified on denial of reconsideration*, No. CV 13-2391, 2016 WL 7475814 (E.D. Pa. Dec. 29, 2016). <u>Spear</u> reaffirmed the Third Circuit's opinion in <u>Edmonson v. Lincoln Nat. Life Ins. Co.</u>, 725 F.3d 406, 420 (3d Cir. 2013) that "Edmonson's claim for disgorgement, which is akin to an accounting for profits, is an equitable remedy available under ERISA and <u>Great–West Life</u>."[7] <u>Spear</u>, 2016 WL 5661720, at *32. The <u>Spear</u> Court found that <u>Montanile</u> did not overrule <u>Edmonson</u>, explaining

> *Montanile* concerned the enforceability of an equitable lien. 136 S. Ct. at 656. *Montanile* had nothing to say about a disgorgement remedy; certainly the Supreme Court did not overrule Edmonson explicitly. At best, [the defendant] can argue that the rationale of *Montanile* is in tension with accounting and disgorgement as equitable remedies, because by definition they are employed where

---

[7] Notably, the Fourth Circuit has found <u>Edmonson</u> instructive and adopted its reasoning with respect to disgorgement of profits. <u>See</u> <u>Pender v. Bank of Am. Corp.</u>, 788 F.3d 354, 366-67 (4th Cir. 2015).

> trust assets have been dissipated. But that tension is nothing new. The Court in *Knudson* noted that accounting was an exception to its general rule that ERISA section 502(a)(3) allows recovery only against specifically identifiable assets subject to a trust or equitable lien. *Knudson*, 534 U.S. at 214 n. 2. In *Montanile* the Court did not retract or even address its language in *Mertens*, *Harris*, and *Knudson* endorsing accounting and disgorgement. Accounting and disgorgement neatly fit the Supreme Court's oft-repeated test: they were "typically available in equity." *Montanile*, 136 S. Ct. at 657.

Spear, 2016 WL 5661720, at *33.

Similarly, here, Montanile does not overrule LeBlanc, particularly in light of the guidance provided by the Supreme Court in Harris and Mertens.

For these reasons, Michelin has adequately pled an ERISA claim against Greenberg, and Greenberg's motion to dismiss should be denied.  In the alternative, if the Court finds that Michelin's allegations are deficient, Michelin requests it be allowed to amend the Complaint.

**B.    Michelin Has Stated a Claim against Greenberg for Legal Malpractice (Count X).**

Greenberg also argues that Count 10 of must be dismissed because Michelin did not plead the existence of an attorney-client relationship between Michelin and Greenberg.

An attorney-client relationship is not an absolute prerequisite for a claim against counsel. For example, in Fabian v. Lindsay, 410 S.C. 475, 765 S.E.2d 132 (2014), the South Carolina Supreme Court rejected the strict privity requirement for attorney malpractice actions.  In so holding, the Court discussed various approaches, including the California rule, which holds that:

> the determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury, and the policy of preventing future harm.

Id. at 484-85, 765 S.E.2d at 137 (quoting Lucas v. Hamm, 56 Cal.2d 583, 364 P.2d 685 (1961)).

The Fabian Court found that this "balancing test propounded by the California courts provides a valuable framework in evaluating the considerations that support adoption of a cause of action." Id. at 491, 765 S.E.2d at 141.

In Moore v. Weinberg, 383 S.C. 583, 681 S.E.2d 875 (2009), the South Carolina Supreme Court held that the plaintiff could maintain a negligence action against an attorney even though the attorney represented a party that was adverse to the plaintiff. Specifically, the plaintiff, Moore, lent money to a long time business partner, Wheeler. Id. at 586, 681 S.E.2d at 877. Wheeler informed Moore that he was the plaintiff in a lawsuit involving the sale of Moore's music business, and that Weinberg was representing Moore in that matter. Id. Wheeler was a long-time (30 year) client of Weinberg. Id. Wheeler informed Moore that $100,000 had been deposited in an escrow account pending resolution of litigation and proposed using the escrowed funds to secure the loan. Id. Wheeler executed a note to Moore, and Weinberg then prepared an document stating that Wheeler assigned to Moore "so much of recovery that he may make from the debt owed to him by [the music business] and the escrow account, which is pending as a result of said litigation." Id. The music business litigation later settled, but Weinberg forgot about the document and disbursed the proceeds to his client, Wheeler. Id. at 587, 681 S.E.2d at 877. Moore sued Weinberg for negligence, conversion, and conspiracy. The Court rejected Weinburg's argument that allowing a negligence claim would intrude on the attorney/client relationship or compromise the attorney's duties to his client. Id. at 588. 681 S.E.2d at 878.

Courts have found that non-clients can recover against attorneys for claims of negligent misrepresentation contained in the attorneys' legal opinions. In fact, one of the cases cited in Greenberg's motion so holds. Specifically, in Mehaffy, Rider, Windholz etc. v. Central Bank,

892 P.2d 230 (Colo. 1995), the Colorado Supreme Court held that an attorney who issues an opinion letter for the purpose of inducing a non-client to purchase municipal notes or bonds can be liable for negligent misrepresentation. Id. at 233, 237. Other cases have similarly held. See, e.g., Bradford Securities Processing Services, Inc. v. Plaza Bank and Trust, 653 P.2d 188 (Okla. 1982) (finding that a plaintiff, a non-client pledgee of a bond, had stated a cause of action against a bond counsel for negligent preparation of a bond opinion). South Carolina has similarly recognized a claim for negligence based on inaccurate statements in an attorney's report, even where the plaintiff was not a client of the defendant law firm and did not actually rely on the opinion prepared by the attorney. See South Carolina State Ports Authority v. Booz-Allen & Hamilton, Inc., 289 S.C. 373, 346 S.E.2d 324 (1986) (holding that the defendant law firm owed a duty to the South Carolina State Ports Authority to accurately report data concerning the Charleston port, if it knew or should have known that the report was intended to be used by *the Georgia Ports Authority* as a marketing device).

Greenberg Traurig's legal services and opinions were necessary to the consummation of this sham bond transaction that put over $8 million of Michelin's retirement funds into worthless Bonds. Complaint ¶210; see also Rose v. Ark. Val. Environ. & Utility Auth., 562 F. Supp. 1180, 1206 (W.D. Mo. 1983) (finding that the attorney defendant's actions as bond counsel in issuing "a misleading bond opinion 'would clearly mark him as a substantial actor and integral participant in the scheme or plan, since a bond opinion was a necessary step in issuing and marketing the bonds'"). Greenberg knew that necessary actors in the transaction were relying on its skill, professionalism, and expertise, thereby causing and allowing the diversion of Michelin's and other Bondholders' assets. Complaint ¶210. It failed to recognize the numerous in indicators of wrongdoing involved in the transaction, discussed in section III, D, above.

31

The factors adopted by the South Carolina Supreme Court in analyzing whether a duty exists under these situations weighs in favor of finding the existence of a duty, at least at this pleading stage. First, it is clear that "the transaction was intended to affect the plaintiff." Clearly Michelin was greatly affected by this transaction as it had over $8 million in its assets stolen. This was entirely foreseeable. Greenberg knew that Hughes Capital was purchasing the bonds, and had knowledge of the purchasers, including Michelin. Complaint ¶72. It also knew that there was risk that the bonds would not be paid. Moreover, as discussed herein, the circumstances of this transaction should have put it on notice of potential fraud, yet it ignored all these red flags. Furthermore, Greenberg's actions were closely connected to the injury. Again, its legal services and opinions were necessary to the consummation of this sham bond transaction that put over $8 million of Michelin's retirement funds into worthless Bonds. Complaint ¶210 At a minimum, it had constructive knowledge of the conflicts of interest and other red flags discussed above. Finally, the policy of preventing future harm favors finding a duty.

Bond counsel are a necessary part of bond transactions and give the country's vitally important financial markets the necessary assurance of legitimacy for the bond transactions on which they opine.[8] Bond counsel must not be incentivized to look the other way when

---

[8]    According to <u>The Function and Professional Responsibilities of Bond Counsel</u>, Third Edition (2011), National Association of Bond Lawyers, at pp. 4-5 (internal citations omitted):

> In response to investor concerns, it became the practice for underwriters or purchasers to obtain an opinion regarding bond validity from lawyers whose expertise, objectivity, professional standing and independence from the issuer made their opinions acceptable to the bond underwriters through whom bond issues were sold to investors. The premise underlying this arrangement was that bond counsel would not act as an advocate for the issuer or investors, but would have the expertise required to provide assurance of the validity of the bonds and exercise objectivity in applying that expertise. A bond issue accompanied by improving opinion of recognized bond counsel could be sold more readily. Thus, the practice of having a bond opinion arose out of a marketing need – notwithstanding the fact that the validity of bonds could be confirmed in court in

substantial indicia of problems or even, as here, outright criminal fraud appears throughout the transaction.

Even if the attorney-client relationship were a bar to Michelin's claim (which it is not), Greenberg's opinion letter contained a negligent misrepresentation that brings the claim outside of the attorney-client realm.  Specifically, Greenberg represented in its opinion letter (Ex. J) that "[p]roceeds from the sale of the Bonds are to be used to finance: (i) the purchase of an Annuity Contract . . ."    Moreover, the Bond Indenture and other bond documents prepared by Greenberg state that the bulk of the bond proceeds would be placed in an annuity investment with an annuity provider that provides annuity investments as part of its regular trade or business. Complaint ¶189.   As set forth above, these representations were false.  The proceeds from the sale of the Bonds were not used to finance the purchase of a fixed payment Annuity Contract, but were placed in what claimed to be a variable rate, non-recourse investment (and, in fact, was not even that).  In addition, there was no "Annuity Provider" meeting the Indenture's definition. WAPCC-BVI was not in the business of providing annuity investments - it had only been incorporated 4 days before the Bond Indenture.  Even if WAPCC-BVI had been a legitimate annuity provider, the proceeds were not even wired to a bank account of WAPCC-BVI in the British Virgin Islands, as required.  Instead, they were wired to a bank account of WAPCC-Florida located in California, which was controlled by Hirst.  Had Greenberg bothered to undertake even the slightest investigation of the truth of its representation, it would have quickly discovered that WAPCC-BVI was not a real annuity provider but had only been incorporated days earlier, and that the bank account where the proceeds were actually transferred was not a

_____

some jurisdictions. Use of bond counsel opinions became well-established by 1900 and remained standard practice in the municipal bond industry.

bank account of any legitimate provider.  Rather it was controlled by Hirst, the main fiduciary of the purchaser, which was the lynchpin of the entire scheme.

Moreover, these negligent misrepresentations were the proximate cause of Michelin's damages.  Had the representations not been made, the transaction could not have gone through.  These representations in the opinion letter and the Bond Indenture "were necessary to the consummation of the fraudulent transaction that put over $8 million of Michelin's retirement funds into worthless Bonds."  Complaint ¶210.  Greenberg knew that its skill, professionalism, and expertise were being relied upon.  The use of Michelin's funds depended upon, hence Michelin relied upon, these false representations.

In addition, Michelin's claim for professional negligence includes a claim for aiding and abetting a conversion and a breach of fiduciary duty.  Complaint ¶210.  As set forth above, Greenberg knew that Hirst, Morton, and Hughes Capital owed fiduciary duties to Michelin.  It knew through the purchase letter that Hughes Capital was managing Michelin funds and going to use the funds to purchase these bonds.  Complaint ¶72.  As counsel to WLCC and through its review and preparation of documents, Greenberg knew that U.S. Bank was trustee and owed a fiduciary duty to Michelin.

For all of the foregoing reasons, already set forth in this brief, Greenberg knew, or at least should have known, that these fiduciaries were breaching their duties to Michelin.  Regarding U.S. Bank's duty, Greenberg should have known that the wiring of funds by U.S. Bank was to insiders and not even in accordance with the Indenture obligations and without authorization from WLCC.  See Complaint ¶208.  Greenberg rendered substantial assistance to these breaches of fiduciary duties by serving as bond counsel and reviewing and creating the Indenture and

other documents, and rendering its opinions that were necessary for the consummation of the fraudulent transaction that directly led to the raiding of Michelin assets. <u>See</u> Complaint ¶210.

For these reasons, Michelin has sufficiently alleged the professional negligence claim in Count X, and Greenberg's motion to dismiss should be denied. In the alternative, should the Court find that the claim has not been sufficiently alleged, Michelin respectfully requests that the Court grant leave to Michelin to file an Amended Complaint.

<b>CONCLUSION</b>

For all of the foregoing reasons, Michelin respectfully requests that Greenberg Traurig's motion be denied. In the alternative, should the Court find that Michelin has not sufficiently alleged its claims, Michelin respectfully requests that the Court grant leave to Michelin to file an Amended Complaint.[9]

Respectfully submitted,


By:  s/J. Derrick Quattlebaum

J. Derrick Quattlebaum, Fed ID No. 5252
Steve A. Matthews, Fed ID No. 5119
J. W. Matthews III, Fed ID No. 3202

HAYNSWORTH SINKLER BOYD, P.A.
ONE North Main Street, 2nd Floor
Greenville, SC  29601-2772
Telephone:  864.240.3200
Facsimile:  864.240.3300

Attorneys for Plaintiffs, The Investment
Committee of the Michelin Retirement Plan
and the Michelin Retirement Plan

March 7, 2017

---

[9] Greenberg also argues that an affidavit is required under S.C. Code § 15-36-100. However, the plain language of that section shows that applies only to "professionals licensed by or registered with the State of South Carolina." Here, the Greenberg attorneys were not so licensed or registerd, and, consequently, S.C. Code § 15-36-100 does not apply.