**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| The Michelin Retirement Plan, et. al., | Case No. 6:16-cv-03604-HMH-JDA |
| Plaintiffs, | |
| v. | **PLAINTIFFS' RESPONSE TO MOTION TO DISMISS BY DILWORTH PAXSON, LLP AND TIMOTHY B. ANDERSON** |
| Dilworth Paxson, LLP, et. al., | |
| Defendants. | |

Plaintiffs, the Investment Committee of the Michelin Retirement Plan and the Michelin Retirement Plan (together, "Michelin"), submit this response to the motion to dismiss filed by Dilworth Paxson, LLP ("Dilworth") and Timothy B. Anderson ("Anderson").

## I.     NATURE OF THE CASE

Jason Galanis and his cronies stole Michelin's employee retirement funds (and those of others) by diverting them – without authorization – into the purchase of fraudulent bonds purportedly issued by a Native American tribal corporation. The defendants here include those, such as Dilworth and Anderson, who participated, willingly and profitably, in the scheme whose criminally fraudulent nature would have been obvious to any reasonably prudent person and certainly to professionals with the experience and training of Dilworth and Anderson. Michelin's claims here allege violation of ERISA, knowingly taking part in a prohibited transaction under ERISA, negligence, civil conspiracy, RICO, securities fraud, tortious interference with a contract, breach of bond indenture, breach of fiduciary duty, and professional negligence.

## II.     SUMMARY OF THE ARGUMENT

Dilworth and Anderson knew that the injured parties of the scheme would be employee retirement plans, including Michelin's ERISA-governed retirement plan.    Dilworth and

Anderson acted as counsel to the placement agent, Burnham Securities, for an obviously fraudulent transaction in which its client and co-defendants stole over $8 million from Michelin's retirement plan assets.  The transaction waved multiple red flags that would have alerted Dilworth to the fraud, including (i) the "free-money" nature of the transaction; (ii) the fundamental, fatal flaws (apparent on the face of the transaction documents) in the only source of repayment for the bonds; and (iii) the fundamental conflicts of interest (also apparent on the face of the transaction documents) arising from various participants wearing hats for several different parties with competing interests, thus eliminating the checks that would be normal in a bond issuance.  For example, Hugh Dunkerley, the managing director of Dilworth's client which gave directions for where the money was to be sent, also was the president and director of the entity named as recipient for those cash transfers.  Yet Dilworth allowed itself and its reputation to be used to consummate the theft by drafting key documents, reviewing and revising others, and even forwarding wiring instructions (along with documents revealing the conflicts of interest) from its client without authority to issue such instructions.  The causal result was that money taken from Michelin's employee retirement plan was sent to an account for an institution that had been incorporated only three (3) days prior, in violation of all reasonable legal standards.

### III.     FACTUAL BACKGROUND

**A.     <u>The Nature of the Bond Transaction and the Unworkably Faulty Documentation Gave Actual or Constructive Knowledge to Dilworth and Anderson.</u>**

Dilworth was retained to represent Burnham Securities, the placement agent in the bond transaction.  Complaint ¶6.  Anderson is an attorney, then with Dilworth, who primarily handled the matter for Dilworth.  <u>Id.</u> ¶17.  The engagement letter, which was dated June 13, 2014, was signed by Hugh Dunkerley, on behalf of Burnham Securities, and by Anderson, on behalf of Dilworth.  Engagement letter, **Exhibit A**.  As part of its representation, Dilworth examined the

2

Indenture and other documents executed and delivered in connection with the issuance of the Bonds. Id.; August 25, 2014 Dilworth Opinion Letter, **Exhibit B**.

Michelin has alleged that the nature of this transaction (including the "free money" aspect), and the unworkably faulty documentation were among the multiple red flags that should have prompted further investigation from Dilworth. Complaint ¶207(f). It has alleged that the bond transaction called for most of the proceeds of relatively low-interest bonds to be invested into a higher-yielding annuity contract (the "Annuity Contract," **Exhibit C**) that would generate sufficient income to pay the principal and interest on all of the bonds, leaving WLCC with free use of the remaining un-invested proceeds (and excess Annuity Contract income) to pay for a tribal economic development project – in other words, free money. Complaint at ¶¶46 54, 68, 189, 217. Michelin has alleged that over $22 million of the bond proceeds from the first bond issuance on August 25, 2014 (into which Michelin's funds were diverted) were supposed to go toward the purchase of the Annuity Contract (but were misappropriated). See id. ¶54.

Michelin has also alleged that the Annuity Contract was in irreconcilable conflict with the agreement under which the Annuity Contract purchase price was to be invested (the "Annuity Management Agreement," **Exhibit D**) concerning the control of investment decisions, thereby crippling from the outset the intended source of repayment for the bonds. Id. ¶51.

These allegations of red flags alone are sufficiently specific. In addition, the following specific facts derive from the documents referenced in the Complaint.

First, the documentation for the Annuity Contract, the intended source for payment of the bonds, was in further direct conflict with the governing indenture under which the August 25, 2014 bonds were issued (the "Indenture," **Exhibit E**). The Indenture provides that under the Annuity Contract, "the Annuity Provider shall pay income to [WLCC] at stated intervals and

3

amounts, as provided therein" (Indenture, Ex. E, § 1.2), clearly contemplating a direct obligation of the Annuity Provider with a fixed stream of payments.  The Annuity Contract, however, describes itself in bold font on its cover as a "**Variable** Annuity Contract," and states, also in bold on the cover, that "[t]he dollar amount of any payments and values under this Contract which are based on investment results of the Separate Account are **variable and not guaranteed**."  See Annuity Contract, Ex. C, at p. i.  In other words, the Annuity Contract, which Dilworth/Anderson sent with the wiring instructions that allowed the funds to be misappropriated into an account controlled by Galanis and his cohorts, was not permitted under the Indenture.

Moreover, there is unresolved confusion in the documents over what was being invested and hence over what the payout from the Annuity Contract would be. The Indenture (see Indenture, Ex. E, §1.2, p. 4 and § 2.12, p. 17) and the Closing Statement for the August 25, 2014, closing (**Exhibit F**) called for $22,094,089 to be invested in the Annuity Contract. The wiring instruction (email of August 26, 2014: defendant Anderson to defendant U.S. Bank, **Exhibit G**), however, states the amount of the investment to be $22,092,089.  The Supplemental Indenture for the August 27, 2014 closing (the "Supplemental Indenture," **Exhibit H**) and the Closing Statement therefor (**Exhibit I**) directed $2,228,847 into the Annuity Contract, for a total of $24,322,936 (or $24,320,936, depending on whether the August 25 Closing Statement or the August 26 email was correct).  The Annuity Contract, however, describes itself as being in the amount of $25,250,000, a figure also recited in the Supplemental Indenture at §1.2, p. 4. According to the wiring instruction, Ex. G, "[t]he parties will reconcile the cumulative funds **and adjust the face value** of the annuity accordingly, on a post close basis."  To contemplate leaving a determination of the available security until after bonds have been purchased is surprising enough.  To fail to follow through and ever to reconcile the disparity is staggering.

In addition, the Indenture provides that the "Annuity Provider," Wealth Assurance Private Client Corporation ("WAPCC") must be "a company that provides Annuity Investments as part of its regular trade or business." Indenture, Ex. E, § 1.2. WAPCC, however, was incorporated only three (3) days before Michelin's money was stolen for delivery to WAPCC; and at least through December 2014, it had issued no annuity contracts to anyone other than WLCC. Complaint ¶53.

The bonds were not general obligation, full-faith-and-credit bonds but rather were only "Special Limited Revenue Bonds (Taxable)." Indenture, Ex. E. They were "enforceable only against[] the Pledged Revenues" and there was "no recourse against [WLCC] or any other property now or hereafter owned by it." Id. § 8.1, p. 30 & p. A-6. Effectively, this meant that the only real recourse of the bond purchasers was against the assets invested in the annuity with WAPCC.[1] Their risk was tied completely to the performance of the annuity.

This transaction was not a typical debt security investment. The bondholders were not investing in an operating company with assets of its own, taking risk for a fixed rate of interest, with no up-side but in line ahead of equity investors in the event that the company's business failed. Rather, the bondholders (or, rather, their faithless investment manager, in collusion with the other defendants) were turning over money to an asset-less company for it to invest in a black-box annuity contract, issued by an unknown entity with no disclosed track record, on an unsubstantiated promise of better-than-market returns, where the entire risk was to be borne by

---

[1] "Pledged Revenues" is defined to include income to WLCC from the Annuity Contract or in connection with "Economic Development Projects" financed through the bond proceeds. Indenture, Ex. E, at p. 10. However, the investment in any such Economic Development Project was only a minimal portion of the bond proceeds. See Ex. F at Schedule C. Moreover, the Wakpamni District is "one of the poorest regions in the United States." See Complaint in SEC v. Archer, et. al., 1:16-cv-03505-WHP, at ¶3, **Exhibit J**. Consequently, no significant income was anticipated from any such project relative to the bond obligations.

the bondholders, with no priority over any equity investors in the company, but the company (its equity owners) was to obtain a substantial portion of the promised benefits of the contract. No rational investor would buy these bonds. He, or she, would simply purchase the annuity contract himself/herself – or better yet, engage the investment manager to make the same underlying investments directly, without having to compensate the middle-man annuity provider. Assuming that a rational investor had as a primary, laudable motivation to assist an impoverished tribal area as a social investment, he or she would never provide $2 million in assistance and simultaneously risk (with no benefit to the impoverished area) an additional $20 million, in hopes of getting the $2 million back, solely in reliance on payback from a third-party's investment savvy without demanding disclosure of the track record and financial condition of the third party – in this case, both the annuity provider and the investment manager.

Thus, even without regard to the specific fraudulent acts, this bond transaction was so flawed that no rational investor would have purchased these bonds. This fundamental fact was clearly known to Dilworth since it drafted/reviewed the key bond documents. The plan necessarily involved gaining control of a purchaser (or its decision-making agent) in order to force a purchase. Indeed, when Michelin was finally informed of the purchase of these bonds in its account, it immediately directed that the bonds be sold as soon as possible, even before it had learned of the fraudulent acts. Complaint ¶75.

Yet Dilworth did not attempt to verify that Hughes Capital Management, LLC (Michelin's retirement assets investment manager, which is now in SEC receivership as a result of its role in this fraud (see *SEC v. Atlantic Asset Management*, LLC, Case No. 1:15-cv-9764 (S.D.N.Y.)) ("Hughes") had authority to invest its client's funds in WLCC bonds. Dilworth's client was the Placement Agent and a party to the Placement Agency Agreement, which directed

that the Placement Agent solicit purchases of the bonds by institutional purchasers "reasonably believed by the Placement Agent to qualify as an 'Accredited Investor,'" and which required WLCC at closing to provide "a certificate of **each purchaser** of the Bonds certifying that it is a Qualified Investor . . ." Placement Agency Agreement, §§2(c), 3(a), 7(a)(v), **Exhibit K**.  But, rather than a certificate of "each purchaser," Dilworth prepared a single letter, purportedly from Hughes, stating that it was making various representations on behalf of its retirement funds clients, in violation of the sensible certificate requirement in the Placement Agency Agreement. <u>See</u> Qualified Investment Letter of August 21, 2014, **Exhibit L**.[2]  Even worse, the certificate never stated, and Dilworth apparently never required either for itself or its client or the named retirement fund purchasers, even a bare representation from Hughes (much less any documentation such as investment management agreements or authorized investment policies or guidelines) that Hughes had authority to make this investment on behalf of the retirement funds.

This failure to get a statement of due authority is not a mere oversight resulting from an unexpected sale through an intermediate fiduciary. Rather, it is all the more outrageous, because Section 3 of the Placement Agency Agreement, governing the manner in which and the classes of persons to whom the Placement Agent could offer the bonds, was a complete sham: the fix was already in that the bonds would be sold via Hughes to various third parties. This is proven by Section 8 of that very same Placement Agency Agreement, which states that, upon closing, the bonds are be delivered to Hughes in such names and amounts as Hughes designates (those names being defined by the Placement Agency Agreement as the "Purchasers").

---

[2]     The Placement Agency Agreement appears to have been drafted by Greenberg, based on the similarity of the document identifying number in a footer to the document identifying number in the footer on Greenberg's bond counsel opinion letter. The Qualified Investor Letter appears to have been drafted by Dilworth, based on the similarity of the document identifying number in a footer to the document identifying number in the footer on Dilworth's placement agent's counsel opinion letter.

Dilworth was well aware that these were arbitrage bonds - that the proceeds were going to be used to purchase a purportedly higher-yielding annuity to get "free money." It was well aware that these were non-recourse, not full-faith-and-credit bonds. It drafted (or reviewed drafts from co-defendant Greenberg Traurig of) all the bond documents. As such, and even aside from the fraud, Dilworth was aware that the bond purchasers bore the sole risk of the Annuity Contract performance (that is – assuming that the Annuity Contract had not been a complete fiction) while not sharing in any upside potential, and that no reasonable investor would purchase these bonds. Equally important, Dilworth knew that the victims were employee retirement plans, including Michelin's ERISA-governed retirement plan.

## B.    The Fraudulent Scheme.

The scheme of Galanis and his cohorts can be summed up in four parts: 1) locating a bond issuer; 2) engineering the bond issuance to give themselves control over the bond proceeds; 3) identifying victims whose assets could be taken over to force a purchase of the bonds; and 4) misappropriating the bond proceeds for their own benefit. Complaint ¶43. The known individual conspirators at this stage include Jason Galanis, as well as his father, John Galanis, Devon Archer, Bevan Cooney, Hugh Dunkerley, Gary Hirst, and Michelle Morton. Id. ¶44. Jason and John Galanis had initial contact with WLCC regarding a potential bond transaction in March 2014. Id. ¶45. Jason Galanis, through and with these individual conspirators, had control of each essential element of the bond transaction, thereby allowing this scheme to work.

**Control over the Placement Agent, Burnham Securities**: Jason Galanis, Archer, Cooney, and Dunkerley controlled Burnham Securities, which served as the Placement Agent for the bond issuance. Id. ¶¶24, 47. Dunkerley served as Managing Director of Burnham Securities. Id. ¶24.

**Control over the "Independent" Investment Management Company**:    An independent investment management company was supposed to manage the investment of the bond proceeds and select an Annuity Contract provider.  Complaint ¶50.  Through Galanis's orchestration, WLCC appointed Private Equity Management Limited as the investment manager and entered into the Annuity Management Agreement with Private Equity Management.  Id. However, Private Equity Management was actually a fictitious entity concocted by Galanis.  Id.

**Control over the Annuity Provider, WAPCC**: Galanis and cohorts also controlled the Annuity Contract Provider, WAPCC, which Galanis also selected.  WAPCC exists as two distinct entities, with one entity located in the British Virgin Islands ("WAPCC-BVI") and the other in Florida ("WAPCC-Florida").  Complaint ¶19.  Dunkerley, the managing director of Burnham Securities, incorporated WAPCC-BVI on August 22, 2014, just three days before Jason Galanis selected WAPCC-BVI as the Annuity Contract provider for the first issuance of the bonds on August 25, 2014 (those being the bonds purchased with retirement funds belonging to Michelin and others).  Id. ¶53.  He had incorporated the identically named WAPCC-Florida in Florida on July 7, 2014.  Id. ¶54.  Dunkerley is the sole officer of WAPCC-Florida and is the president and director of WAPCC-BVI, as identified in the Annuity Contract.  Id. ¶¶53-54.

**Control over the purchaser, Hughes:**  Galanis, Archer, Cooney, and Dunkerley gained control over Hughes in August 2014.[3]  Id. ¶56.  Galanis was able to appoint co-conspirator Hirst as Hughes' Chief Investment Officer on August 12, 2014.[4]  Id. ¶¶ 25, 63-65.  By August 14, 2014, Hirst analyzed which Hughes-managed assets could be liquidated to generate funds to purchase the bonds.  Complaint ¶65.  The Hughes compliance officer decided that the clients'

---

[3]    The details of how they gained control are set forth in paragraphs 57-65 of the Complaint.
[4]    He resigned from that position only a few days later to avoid making certain necessary disclosures to the SEC.  Complaint ¶65.  However, the resignation was in form only, as he remained in the same capacity as a "consultant."  Id.

investment guidelines would not allow for purchase of the bonds without prior client consultation, id. ¶67, but Hirst still signed the trade tickets purchasing $27,077,436 of the Bonds on behalf of nine of Hughes clients, including the Plan.  Id. ¶¶71-72.

Pursuant to instructions forwarded by Dilworth/Anderson, the proceeds of the bonds were wired to a bank account held by WAPCC-Florida.  Complaint ¶19.  Hirst is the assistant secretary of WAPCC-Florida and the signatory on its bank account.  Id. ¶25.  The funds were misappropriated by Galanis, Dunkerley, Hirst, and the other cohorts to fund their lavish lifestyles.  WLCC did not authorize the transfer of the bond proceeds.  Id. ¶208.

## C.    **Dilworth and Anderson's Constructive Knowledge of the Conflicts of Interest.**

In addition to the nature of this transaction and the unworkably faulty documentation discussed above, there were several other facts that gave Dilworth/Anderson constructive notice of the problem, particularly in light of the nature of the transaction itself.

First, Michelin has alleged that Dilworth/Anderson knew or should have known that their client, Burnham Securities, controlled Hughes.  Complaint ¶207(j).  Control over both the placement agent and purchaser would be an obvious conflict of interest.  Michelin has also alleged that Dilworth/Anderson knew or should have known that "[t]he placement agent (Burnham Securities), the manager of the invested funds (Hughes Capital), and the recipient of the invested funds (WAPCC-Florida) were all controlled by the same group of people with Dilworth/Anderson's contacts, Jason Galanis and Dunkerley, at the center."  Id.

Second, Dilworth was aware that Dunkerley was both the managing director for its client, Burnham Securities (the Placement Agent), and the president of WAPCC-BVI, the Annuity Contract provider.  Dilworth's engagement letter with Burnham Securities was addressed to the attention of Dunkerley.  Dilworth Engagement Letter, Ex. A.  Moreover, the Distribution List

for the bond transaction listed Dunkerley as the managing director for Burnham Securities, and Dunkerley signed the Placement Agency Agreement on behalf of Burnham Securities. Complaint ¶¶54, 68; Distribution List, **Exhibit M**. The Annuity Contract identified Dunkerley as the president and director of WAPCC-BVI. Complaint ¶54. Anderson/Dilworth was aware of the Annuity Contract. Dilworth's opinion letter references the "Annuity Investment (as described in the Indenture) . . ." Dilworth Letter of August 25, 2014, Ex. B. Moreover, Anderson, acting on behalf of Dilworth, e-mailed a signed copy of the Annuity Contract when he forwarded email instructions to the indenture trustee (U.S. Bank), to send the Annuity Contract purchase price from the bond proceeds to a bank account at a Beverly Hills, California branch of JPMorgan Chase Bank. Complaint ¶54; Wiring Instructions e-mail, Ex. G. Accordingly, Dilworth/Anderson knew that "[t]he recipient of funds pursuant to those instructions included an insider (Dunkerley, who executed the 'Annuity Contract' as managing director of WAPCC-BVI) who was also an insider to the instructing entity, Dilworth/Anderson's client Burnham Securities (and was Dilworth/Anderson's primary contact at Burnham Securities)." Complaint ¶207(c).

Third, Dilworth/Anderson drafted the investment letter dated August 21, 2014, from Hughes to WLCC identifying the Hughes clients who were purchasing the bonds, including Michelin, and purportedly making representations, warranties, and covenants on their behalf. Complaint ¶72. The letter references the Plan, id., thereby establishing Anderson/Dilworth's notice that ERISA funds would be used to invest in the bonds. Moreover, the letter was signed by Hirst, who also is listed as the Hughes trader on the trade tickets purchasing the bonds from August 22-26, 2015. Id.; Investment Letter, Ex. L. Hirst was also listed on the distribution list as "Annuity Contract Provider's Counsel." Distribution List, Ex. M. In addition, Hirst was signatory on the WAPCC-Florida bank account, where the money was transferred pursuant to

Dilworth/Anderson's e-mail to U.S. Bank. Complaint ¶25, Wiring Instructions e-mail, Ex. G. This gave Dilworth/Anderson constructive knowledge of a fundamental conflict that was a key component of the scheme, as this meant Hirst was the key agent of the purchaser Hughes, and also controlled the account where the bond proceeds were being deposited.

Fourth, the Annuity Contract and the Annuity Management Agreement were in irreconcilable conflict over the management of invested funds, to an extent that put any reasonable participant in the transaction on notice that the transaction was unworkable and likely fraudulent. Complaint ¶51. For example, the Annuity Contract provided that WLCC was to have absolutely no input, directly or indirectly, in the selection, identification, or recommendation of investments under the Annuity Contract. Id. The Annuity Management Agreement, however, included investment guidelines approved by WLCC and provided that WLCC could modify the guidelines at any time and could give the manager instructions to buy, sell, or make any investment. Id. The structure under which WAPCC-BVI was supposed to be guaranteeing investment results to WLCC, but abdicating the selection of investments to a manager that WAPCC-BVI did not select or control (regardless of whether WLCC itself could select or control that manager) was a sufficient red flag to put any competent transaction participant on notice that the proposed transaction was neither normal nor legitimate. Id.

Fifth, the Indenture and other bond documents, established certain requirements for the Annuity Contract, including that:

- the "annuity provider" would be a company that provides "annuity investments" as part of its regular trade or business, with "annuity investments" defined as contracts "whereby the annuity provider shall pay income to [WLCC] at stated intervals and amounts, as stated therein;"

- the provider and the investments thereunder would be selected by Private Equity Management, Limited (also referred to as Private Equity Management, L.L.C.);

- the provider would be a British Virgin Islands company;

- the Annuity Contract purchase price would be paid through a bank with no United States branches; and

- the execution and delivery of the Annuity Contract would occur entirely outside the United States.

Complaint ¶189.

These requirements were blatantly violated.  As noted above, WAPCC was not a company that provides "annuity investments" as part of its regular trade or business; rather it was incorporated only three (3) days before the money was stolen.  Id. ¶194.

Additionally, the wire instructions sent by Dilworth/Anderson did not direct the bond proceeds to a WAPCC-BVI account at a bank "without any offices and/or branches in the United States", as required in the Annuity Contract (which was attached to the e-mail with the wiring instructions).  Complaint ¶54.  Instead, the proceeds were directed to a bank account at a Beverly Hills, California branch of JPMorgan Chase Bank, in the name of WAPCC-Florida, which had been incorporated by Dunkerley on July 7, 2014.  Id.  WAPCC-Florida was not eligible under the Indenture or even the Annuity Contract to receive any funds.  This transfer of funds was in violation of the Indenture.  See id. ¶¶197, 200, 207(c)-(e).

Sixth, there was no private placement memorandum for the Bond Issuance, such as is ordinarily prepared when unregistered securities are being offered through a placement agent. At minimum, such a private placement memorandum (had one existed for this transaction) should have described to prospective investors the economic development project, including its size and

possible uses; the economy of the surrounding region to demonstrate the market for such a project; the terms of the Annuity Contract; the financial strength of the Annuity Contract provider; the track record of the Annuity Contract provider; and the investment parameters allowed for the separate account required by the WAPCC-BVI Annuity Contract; and the identity and track record of the investment manager for that separate account. Complaint ¶207(g). The lack of these features, which are ordinarily included, was yet another red flag.

Finally, the Indenture stated that the authorized bonds were in the amount of $24,844,089. Indenture, Ex. E, §2.9. It also stated that additional bonds that would be on a parity lien (that is, equal footing) status with the original bonds as to their claim on the repayment source could be issued only for the purpose of refunding original bonds. Id., Article III. Yet while Dilworth was providing its opinion for the August 25 bonds that the "obligations of the Issuer under the Indenture constitute binding obligations of the Issuer, enforceable against the Issuer in accordance with its terms," it was involved in a new bond issuance for $2,233,347, to close on August 27, that would be, according to the Supplemental Indenture (Ex. H) and according to Dilworth's own opinion for that second issuance (**Exhibit N**) on a parity with the original bonds. Because those August 27 bonds were for the purpose of making another investment in the Annuity Contract and not for refunding (Supplemental Indenture, Ex. H, §§ 2.1 and 2.4), their issuance was in direct violation of the Indenture. If the August 27 bonds were on parity with the August 25 bonds, then Dilworth's August 25 opinion that the Indenture was binding in accordance with its terms was false. If, on the other hand, the August 27 bonds were not on parity with the original August 25 bonds, then Dilworth's activity in preparing the August 27 bonds was an unlawful attempt to dilute the security of the original August 25 bondholders (and would mean that Dilworth's August 27 opinion as to parity was false).

## IV.     ARGUMENT

**A.     This Court Can Properly Exercise Personal Jurisdiction Over Dilworth/Anderson.**

### 1.     Standard.

When "a district court rules on a Rule 12(b)(2) motion without conducting an evidentiary hearing or without deferring ruling pending receipt at trial of evidence relevant to the jurisdictional issue, but rather relies on the complaint and affidavits alone, 'the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge.'" In re Celotex Corp., 124 F.3d 619, 628 (4th Cir. 1997) (quoting Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)).  The court must construe all disputed facts and draw all reasonable inferences from the proof in favor of jurisdiction. Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003); In re Celotex Corp., 124 F.3d at 628 (quoting Combs, 886 F.2d at 676).

### 2.     This Court Has Jurisdiction Over Dilworth and Anderson Pursuant to ERISA, 29 U.S.C. §1132(e)(2).

 ERISA Section 502(e) (29 U.S.C. § 1132(e)) "'provides for nationwide service of process'" whereby "'[t]he relevant inquiry is not whether the defendant has sufficient minimum contacts with the forum state, but rather, whether the defendant has sufficient contacts with the United States as a whole.'" Abercrombie v. Cont'l Cas. Co., 295 F. Supp. 2d 604, 607 (D.S.C. 2003) (quoting Schrader v. Trucking Employees of N. Jersey Welfare Fund, Inc., 232 F. Supp. 2d 560, 571 (M.D.N.C. 2002)); see also Trustees of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc., 791 F.3d 436, 443 (4th Cir. 2015).

Here, this is a proper ERISA enforcement action, as set forth in section IV, D, 2 below, which Michelin incorporates herein by reference.  Moreover, there is no question that Dilworth and Anderson have sufficient minimum contacts with the United States.  Dilworth is a

Pennsylvania limited liability partnership, and Anderson worked with Dilworth during the relevant time period and was working for a different law firm in Pennsylvania when the Complaint was filed. Complaint ¶¶16-17; ECF #91-1 p. 6. Consequently, Dilworth and Anderson have sufficient minimum contacts and are subject to jurisdiction in this district. In addition, the Plan is and was administered in South Carolina and the injury was felt in South Carolina. Complaint ¶¶1, 31; Michelin Retirement Plan (relevant portion) §10.9, **Exhibit O**; see Denny's, Inc. v. Cake, 364 F.3d 521, 524 (4th Cir. 2004) (ERISA action can be brought "in a district 'where the plan is administered'"); Longo v. Trojan Horse Ltd., 992 F. Supp.2d 612, 618 (M.D.N.C. 2014) (ERISA action can be brought where the breach took place and a "breach under ERISA is deemed to have 'occurred in the district where the beneficiary receives his benefits.'"). Dilworth/Anderson has waived service of process. See Peay v. BellSouth Medical Assistance Plan, 205 F.3d 1206, 1210 n. 3 (10th Cir. 2000) (holding that as long as Fifth Amendment due process is satisfied, §1132(e)(2) confers jurisdiction over defendants by authorizing service of process on them, and finding that service was proper where the defendant Plan waived service of process); Fed. R. Civ. P. 4(k)(1)(C).

The exercise of personal jurisdiction over Dilworth/Anderson comports with the Fifth Amendment. As the Fourth Circuit recently explained:

> To make out a Fifth Amendment challenge to personal jurisdiction, Defendants [must] show that "the district court's assertion of personal jurisdiction over [them] would result in 'such extreme inconvenience or unfairness as would outweigh the congressionally articulated policy' evidenced by a nationwide service of process provision." [ ] Normally, when a defendant is a United States resident, it is "highly unusual ... that inconvenience will rise to a level of constitutional concern."

Plumbing Servs., Inc., 791 F.3d at 444 (internal citations omitted).

Dilworth/Anderson has not satisfied this "heavy burden." <u>See id.</u>  Dilworth and Anderson are both United States residents, have hired able counsel, and have not identified any inconvenience, and certainly not one that would meet this heavy burden.

In addition, the Court may exercise pendent jurisdiction over Count X.  The doctrine of pendent personal jurisdiction provides that where a federal statute authorizes nationwide service of process and the federal and state claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available.  <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1056 (2d Cir. 1993).  The Fourth Circuit explicitly recognized the doctrine of pendent personal jurisdiction in <u>ESAB Group, Inc. v. Centricut, Inc.</u>, 126 F.3d 617, 628 (4th Cir. 1997):

> [w]hen a federal statute authorizes a federal district court to exercise personal jurisdiction over a defendant beyond the borders of the district and the defendant is effectively brought before the court, we can find little reason not to authorize the court to adjudicate a state claim properly within the court's subject matter jurisdiction so long as the facts of the federal and state claims arise from a common nucleus of operative fact.

Here, Plaintiffs' Count X claim arises from a common nucleus of operative fact.  Consequently, the Court may exercise pendant jurisdiction over that claim.

**B.    <u>Plaintiffs Have Standing to Assert the Claims and This Court Has Subject Matter Jurisdiction Over the Claims Against Dilworth and Anderson.</u>**

**1.    Standard.**

The elements of standing only need "be supported in the same way as any other matter on which the plaintiff bears the burden of proof, [] with the manner and degree of evidence required at the successive stages of litigation." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992) (citing <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 883–889 (1990); <u>Gladstone, Realtors v. Village of Bellwood</u>, 441 U.S. 91, 114–115, and n. 31 (1979)). "At the pleading

stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Lujan, 504 U.S. at 561 (citing Lujan, 497 U.S. at 889).

> **2.      The fact that the bonds were purchased in the name of the Michelin North America Master Trust is irrelevant to the standing issue.**

Michelin alleged that $8,102,154 was raided from the Michelin Retirement Plan due to the scheme alleged in the Complaint, which Dilworth/Anderson helped perpetrate. Dilworth/Anderson argue that the Michelin Retirement Plan and the Michelin Investment Trust lack standing because the bonds were purchased in the name of Michelin North America Master Trust. However, ERISA requires that the Plan place its assets in trust. See 29 U.S.C. § 1103. The Michelin North America Master Trust was simply the name of the trust. The Michelin Retirement Plan is the only ERISA plan for which the Master Trust holds title to assets. In any event, regardless of the name of the registered owner of the bonds, the bottom line is that $8,102,154 was raided from the Michelin Retirement Plan, which is clearly sufficient injury to confer standing. Michelin has sufficiently alleged this injury.

In addition, the Investment Committee is a fiduciary under ERISA and was charged with investing assets. Michelin alleged that it "established and maintains one or more pension and/or retirement programs, including the Plan [that was raided in this Action], for certain employees. Compl. ¶ 35. It also alleged that "under the terms of the Plan, its Investment Committee retains the power to control and manage the assets of the Plan to the extent of its power of appointment of investment managers, as that term is defined in Section3(38) of ERISA." Id. Consequently, the fact that the bonds were registered in the name of the Master Trust is inconsequential.

### 3.    The Investment Committee and the Plan suffered an injury in fact.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (quoting Lujan, 504 U.S. at 560). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." Id. (internal quotations omitted.) "A 'concrete' injury must be 'de facto'; that is, it must actually exist. Id. Clearly, Michelin has suffered an injury in fact.

Dilworth/Anderson argue that the Investment Committee and the Michelin Retirement Plan are not proper parties under ERISA because they are not a participant, beneficiary, or fiduciary. However, the Investment Committee is a fiduciary entitled to seek relief under 29 U.S.C. § 1132(a)(3) because "[u]nder the terms of the Plan, [the] Investment Committee retains the power to control and manage the assets of the Plan to the extent of its power of appointment of investment managers, as that term is defined in Section3(38) of ERISA." Id. Moreover, the "Investment Management Agreement" states that Michelin "may add to, or remove any of the Investment Assets at any time and from time to time . . . .", and provide investment objectives and guidelines, "together with a statement of any and all specific investment restrictions applicable to the management of the Investment Assets." See Inv. Mgmt. Ag., **Exhibit P**. Moreover, the fact that the Investment Committee entered into the Investment Management Agreement itself renders the Investment Committee a fiduciary. See Belheimer v. Federal Exp. Corp. Long Term Disability Plan, No. 6:12-00383-GRA 2012 WL 5945042 (D.S.C. Nov. 28, 2012) ("The power to appoint fiduciaries is itself a fiduciary function."); Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1465 (4th Cir. 1996); Pender v. Bank of Am. Corp., 788 F.3d 354, 362 (4th Cir. 2015); 29 U.S.C. § 1002(21)(A) ("a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting

19

management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.").

Clearly the Investment Committee is a fiduciary that Section 502(a)(3) authorizes to file a civil action and has standing to sue in this case. Moreover, given the Investment Committee's fiduciary status, it has a "legally protected interest." LeBlanc v. Cahill, 153 F.3d 134, 150 (4th Cir. 1998); see also Lujan, 504 U.S. at 578. The removal of $8,102,154 under its control is a particularized, concrete "injury in fact." [5]

### 4.    Michelin's Injury Was "Fairly Traceable" to the Actions of Dilworth/ Anderson.

Article III standing requires that "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant . . . ." Lujan, 504 U.S. at 560. Dilworth/Anderson first argue that the injury is not traceable because there was no knowing participation. This argument is without merit for the reasons set forth in section IV, D, 2, below.

Dilworth/Anderson also argue that Michelin lacks standing with regard to the ERISA claim because it fails to seek proper equitable relief. This argument is also without merit.

In paragraph 54 of the Complaint, Michelin alleges that to date it has not received any restitution. Complaint ¶ 54. Michelin is also entitled to the equitable remedies of accounting and disgorgement. These are appropriate equitable remedies. The Supreme Court in Harris Trust & Savings Bank, discussing the law of trusts in the context of equitable relief under ERISA, stated that "[t]he trustee or beneficiaries may then maintain an action for restitution of the property (if

---

[5] Under 29 U.S.C. § 1132(d), the Plan is an  entity that "may sue" and is clearly a proper party under its common law claim, Count X, since its assets were misappropriated.

not already disposed of) **or disgorgement of proceeds (if already disposed of)**, and **disgorgement of the third person's profits derived therefrom**." 530 U.S. at 250 (emphasis added). In LeBlanc v. Cahill, 153 F. 3d 134 (4th Cir. 1998), the plaintiff brought a Section 502(a)(3) claim against a non-fiduciary seeking to "disgorge the profits and gains." Id. at 153. The Fourth Circuit held that "[t]he relief sought falls squarely within the Court's definition of "appropriate equitable relief" as stated in ERISA § 502(a)(3)." Id. Moreover, "'surcharge' i.e., 'make-whole relief,' constitutes 'appropriate equitable relief under Section 1132(a)(3)." McCravy v. Metropolitan Life Insurance Company, 690 F.3d 176, 181 (4th Cir. 2012) (citing CIGNA Corp. v. Amara, 563 U.S. 421 (2011)).

Dilworth/Anderson rely on Montanile v. Board of Trustees of the Nat'l Elevator Indus. Health Benefit Plan, 136 S. Ct. 651 (2016). However, Montanile is distinguishable. It deals with enforcement of an equitable lien by a subrogee against settlement proceeds that had been paid by third party tortfeasor. Contrary to the plaintiffs in those cases, Michelin is not seeking to "enforce a constructive trust of or an equitable lien" through subrogation created pursuant to contractual obligation "for the benefits that they conferred." Griggs v. E.I. DuPont de Nemours & Co., 385 F.3d 440, 445 (4th Cir. 2004). Michelin only seeks to the return of Plan funds wrongfully removed from its trust.

The Eastern District of Pennsylvania recently discussed disgorgement as an equitable remedy in Spear v. Fenkell, No. CV 13-2391, 2016 WL 5661720, at *32 (E.D. Pa. Sept. 30, 2016), *clarified on denial of reconsideration*, No. CV 13-2391, 2016 WL 7475814 (E.D. Pa. Dec. 29, 2016). Spear reaffirmed the Third Circuit's opinion in Edmonson v. Lincoln Nat. Life Ins. Co., 725 F.3d 406, 420 (3d Cir. 2013) that "Edmonson's claim for disgorgement, which is akin to an accounting for profits, is an equitable remedy available under ERISA and Great–West

Life."[6]  Spear, 2016 WL 5661720, at *32.  The Spear Court found that Montanile did not

overrule Edmonson, explaining

> Montanile concerned the enforceability of an equitable lien. 136 S.
> Ct. at 656. Montanile had nothing to say about a disgorgement
> remedy; certainly the Supreme Court did not overrule Edmonson
> explicitly. . .  In Montanile the Court did not retract or even
> address its language in Mertens, Harris, and Knudson endorsing
> accounting and disgorgement. Accounting and disgorgement
> neatly fit the Supreme Court's oft-repeated test: they were
> "typically available in equity." Montanile, 136 S. Ct. at 657.

Spear, 2016 WL 5661720, at *33.  Similarly, here, Montanile does not overrule LeBlanc,

particularly in light of the guidance provided by the Supreme Court in Harris and Mertens.

For these reasons, Michelin has adequately pled equitable relief on the ERISA claim

against Dilworth/Anderson, and Dilworth/Anderson's motion to dismiss should be denied.  In the

alternative, if the Court finds that Michelin's allegations are deficient, Michelin requests that it

be allowed to amend the Complaint.

## C.    **Dilworth/Anderson Cannot Invoke the Forum Selection Clause in the Engagement Letter with Burnham Securities.**

Dilworth/Anderson assert that Michelin is bound by the arbitration provision found in the

engagement letter with Burnham Securities, which provides that "[a]ny dispute involving the

relationship between the client and this Firm will be arbitrated in Philadelphia . . ."  Engagement

Letter, Ex. A. Michelin was not a party to this agreement, and the dispute does not involve the

relationship between Dilworth and Burnham Securities.  Michelin is not seeking to enforce any

provision of the Defendants and Burnham Securities retention agreement.  See R.J. Griffin & Co.

v. Beach Club II Homeowners Ass'n, 384 F.3d 157, 162-64 (4th Cir. 2004) (a non-signatory is

not bound to an arbitration provision contained in an agreement it did not sign where the non-

---

[6] Notably, the Fourth Circuit has found Edmonson instructive and adopted its reasoning with
respect to disgorgement of profits.  See Pender, 788 F.3d at 366-67.

signatory seeks to enforce legal duties arising from law and not from the terms of the agreement). Consequently, Dilworth/Anderson's argument is without merit.

**D.** **Plaintiffs Have Stated a Claim Against Dilworth and Anderson.**

    **1.** **Legal Standard.**

To be legally sufficient a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[A] complaint need only give the defendant fair notice of what the claim is and the grounds upon which it rests." E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc., 637 F.3d 435, 440 (4th Cir. 2011) (internal citations omitted). "A plaintiff need not plead detailed evidentiary facts, and a complaint is sufficient if it will give a defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Whitt v. Wells Fargo Fin., Inc., 664 F. Supp. 2d 537, 541 (D.S.C. 2009) (citing Bolding v. Holshouser, 575 F.2d 461, 464 (4th Cir.1978)).

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) "should only be granted if, 'accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" Priority Auto Group, Inc. v. Ford Motor Co., 757 F.3d 137, 139 (4th Cir. 2014) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)). "In addition to accepting the truth of all factual allegations, a court also 'must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" Loftus v. F.D.I.C., 989 F. Supp. 2d 483, 488 (D.S.C. 2013) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S., 308, 322 (2007)). "A court may similarly consider documents or exhibits attached to a motion to dismiss, 'so long as they are integral to the

complaint and authentic.'" Id. at 489 (quoting Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md., 684 F.3d 462, 467 (4th Cir. 2012)).

  **2. Michelin Has Stated a Claim against Dilworth and Anderson under ERISA.**

  ERISA Section 502(a)(3), codified at 29 U.S.C. § 1132(a)(3), provides that "a participant, beneficiary, or fiduciary" may bring an ERISA action:

> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a)(3); see also LeBlanc v. Cahill, 153 F.3d 144, 150 (4th Cir. 1998).

  Liability under this provision extends to a nonfiduciary, nonparty-in-interest.  See Leblanc, 153 F.3d at 138.  Indeed, the Supreme Court in Harris Trust and Savings Bank v. Salomon Smith Barney, 530 U.S. 238, 246 (2000) held that "§ 502(a)(3) admits of no limit . . . on the universe of possible defendants" because that provision "makes no mention at all of which parties may be proper defendants —the focus, instead, is on redressing the 'act or practice which violates any provision of [this subchapter].'"  See also LeBlanc, 153 F.3d at 153.

  As used in 29 U.S.C. § 1132(a)(3), the phrase "this subchapter" (i.e., ERISA Title I) "includes 29 U.S.C. §§ 1001–1191."  Denny's, Inc. v. Cake, 364 F.3d 521, 525 (4th Cir. 2004).  Consequently, pursuant to 29 U.S.C. § 1132(a)(3), "a participant, beneficiary, or fiduciary" may bring a civil action against non-fiduciaries to enforce 29 U.S.C. § 1106, among others.    29 U.S.C. § 1106(a)(1) prohibits a fiduciary from

> caus[ing] the plan to engage in a transaction that he knows or should know constitutes a direct or indirect
>  (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>  (B) lending of money or other extension of credit between the plan and a party in interest;
>  (C) furnishing of goods, services, or facilities between the plan and a party in interest;

>(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
>(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(b) prohibits a fiduciary from:

>(1) deal[ing] with the assets of the plan in his own interest or for his own account,
>(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
>(3) receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

Dilworth/Anderson "accept" "for purpose of this Motion only," that Morton, Hirst, and Hughes are fiduciaries under ERISA. (ECF No. 91-1 at p. 21 n.16). It does not challenge that Morton, Hirst, and Hughes engaged in transactions prohibited under 29 U.S.C. § 1106 of ERISA; or that Dunkerley and BFG Socially Responsible Investments, Ltd. ("BFG") are parties in interest that engaged in prohibited transactions under 29 U.S.C. § 1106. Complaint ¶ 132. Rather, Dilworth/Anderson argue that Michelin did not sufficiently plead that Dilworth/Anderson knowingly participated in the prohibited transactions (despite the allegations in Complaint ¶¶134-35). These arguments are without merit.

Michelin need only allege sufficient facts that Dilworth/Anderson knew or should have known of the occurrence of a prohibited transaction. In discussing constructive knowledge in an ERISA claim against non-fiduciaries, the Supreme Court in Harris Trust and Savings Bank looked to the common law of trusts and cited the Restatement (Second) of Trusts § 297 in finding the sufficiency of constructive knowledge. Id. at 253. Comment A to the Restatement (Second) of Trusts § 297, discussing the constructive knowledge requirement, provides:

> A third person has notice of a breach of trust not only when he knows of the breach, but also when he should know of it; that is **when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee is a trustee and whether he is committing a breach of trust**, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust.
>
> Whether a third person who deals with one who is in fact a trustee should inquire whether he is a trustee and whether a breach of trust is being committed, and if so the extent of the inquiry which he should make, depends upon the circumstances.

See Restatement (Second) of Trusts § 297 cmt a (emphasis added).; see also Heritage Equity Grp. 401(k) Sav. Plan v. Crosslin Supply Co., 638 F. Supp. 2d 869, 876 (M.D. Tenn. 2009).

Michelin's Complaint is replete with instances of fiduciaries of the plan engaging in prohibited transactions under ERISA. The facts regarding Dilworth/Anderson's constructive knowledge are discussed in section III, C above. Michelin has alleged specific facts to establish, for pleading purposes, that Dilworth/Anderson had sufficient knowledge of facts "that would lead a reasonably intelligent and diligent person to inquire" about the prohibited transactions.

As an initial matter, Michelin has sufficiently alleged knowledge that the bonds were to be purchased using proceeds subject to ERISA, including the Michelin Plan. The Complaint alleges that Dilworth/Anderson prepared an investment letter dated August 21, 2014, from Hughes to WLCC identifying the Hughes clients who were purchasing the bonds (including Michelin) and purportedly making representations, warranties, and covenants on their behalf. Complaint ¶72. The names of some of the bond purchasers contained "Pension Plan". Investment Letter, Ex. L. This put Dilworth/Anderson on notice that the bond holders contained pension and/or retirement plans (subject to ERISA).

The Complaint also alleges sufficiently specific facts of Dilworth/Anderson's constructive knowledge of a prohibited transaction. For example, Dunkerley and BFG are

alleged to be parties in interest by their interests in Hughes, through GMT Duncan, LLC. Compl. ¶¶10, 132-33. Yet Dunkerley simultaneously served as Managing Director of Burnham Securities, the Placement Agent, and president and director of WAPCC-BVI, the annuity provider, and WAPCC-Florida, where the funds were actually transferred. Id. ¶24. Clearly, this was prohibited under 29 U.S.C. 1106(a)(1). Dilworth/Anderson had constructive knowledge of this conflict as established by the Dilworth engagement letter addressed to Dunkerley on behalf of Burnham Securities, and Dunkerley's identification as president and director of WAPCC-BVI in the Annuity Contract, which Dilworth/Anderson sent to U.S. Bank. Id. ¶¶ 52–54, 68.

Another example is the dual roles played by Hirst, whom Dilworth/Anderson do not dispute to have been a fiduciary and a party in interest (ECF No. 91 p. 21). Hirst was the CIO of Hughes, made the decision to purchase the bonds on behalf of Hughes, signed the purchase tickets for Hughes, and signed the investment letter (which was prepared by Dilworth/Anderson) on behalf of Hughes. Complaint ¶¶63-65, 72; Inv. Letter, Ex. L. Yet Hirst was also listed as "Annuity Contact Provider's Counsel" in the distribution list for the bond transaction (Ex. M). This was clearly a prohibited transaction because the same fiduciary who made the decision to invest was also acting on behalf of the entity where the proceeds were invested. In addition, Hirst was also the signatory on the WAPCC-Florida account where the bond proceeds were transferred- an unequivocal prohibition under 29 U.S.C. 1106 that allowed the conspirators to steal the Michelin retirement funds. Complaint at ¶¶25, 51–55.

Dilworth/Anderson's knowledge of these conflicting roles, the nature of this transaction, the unworkably faulty documents, and the other facts discussed in section III, C, above, amount to constructive knowledge of these prohibited transactions. At a minimum, these facts are more than sufficient, particularly at the pleading stage, to prompt further investigation by

Dilworth/Anderson regarding the fraud, and, among others, investigation as to who controlled the account where the funds were being wired pursuant to the instructions from Dilworth/Anderson.

In Heritage Equity Grp. 401(k) Sav. Plan v. Crosslin Supply Co., 638 F. Supp. 2d 869 (M.D. Tenn. 2009), the Court found that the plaintiffs had sufficiently alleged that the defendants had knowledge of commingling of ERISA funds and that knowledge of such behavior "could, if proven, give rise to Defendants having constructive knowledge of [a fiduciary's] illicit transfer in violation of ERISA." Id. at 876-77. The Court rejected the defendants' arguments given the motion to dismiss stage:

> The Defendants' protestations that they were not at fault here and had no real knowledge of the specifics of the fraudulent transfer are also unavailing at the motion to dismiss stage. While Plaintiffs have not alleged that Defendants knew of the Heritage Plan or its plan assets specifically, Plaintiffs have alleged facts that give rise to possible constructive knowledge that would entitle Plaintiffs to equitable relief under ERISA § 502(a)(3). While discovery may bear out a different result, the Court cannot evaluate the disputed facts at this stage of the litigation. "[A] nonfiduciary's knowledge of the breach can be inferred from surrounding circumstances raising a reasonable inference of knowledge," and Plaintiffs have properly alleged surrounding circumstances that create such an inference here. Brock v. Hendershott, 840 F.2d 339, 342 (6th Cir.1988).

Id. at 877; see also In re Regions Morgan Keegan ERISA Litig., 692 F. Supp. 2d 944, 966 (W.D. Tenn. 2010) (finding the plaintiffs adequately pled that the defendants knowingly participated in violations of ERISA fiduciary's obligations to invest plan assets prudently and loyally).

Here, too, Plaintiffs have alleged facts that give rise to possible constructive knowledge that would entitle Plaintiffs to equitable relief under ERISA § 502(a)(3).

### 3.    Michelin Has Stated a Claim against Dilworth and Anderson for Professional Negligence.

Dilworth/Anderson also argue that Count X of Michelin's complaint must be dismissed because Michelin did not plead the existence of an attorney-client relationship between Michelin and Dilworth/Anderson.  However, an attorney-client relationship is not an absolute prerequisite for a claim against counsel.  For example, in Fabian v. Lindsay, 410 S.C. 475, 765 S.E.2d 132 (2014), the South Carolina Supreme Court rejected the strict privity requirement for attorney malpractice actions.   In so holding, the Court discussed various approaches, including the California rule, which holds that:

> the determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury, and the policy of preventing future harm.

Id. at 484-85, 765 S.E.2d at 137 (quoting Lucas v. Hamm, 56 Cal.2d 583, 364 P.2d 685 (1961)).

The Fabian Court found that this "balancing test propounded by the California courts provides a valuable framework in evaluating the considerations that support adoption of a cause of action." Id. at 491, 765 S.E.2d at 141.

In Moore v. Weinberg, 383 S.C. 583, 681 S.E.2d 875 (2009), the South Carolina Supreme Court held that the plaintiff could maintain a negligence action against an attorney even though the attorney represented a party that was adverse to the plaintiff.  Specifically, the plaintiff, Moore, lent money to a long time business partner, Wheeler.  Id. at 586, 681 S.E.2d at 877.  Wheeler informed Moore that he was the plaintiff in a lawsuit involving the sale of Moore's music business, and that Wheeler's long-time attorney, Weinberg, was representing Wheeler in that matter.  Id.  Wheeler informed Moore that $100,000 had been deposited in an

escrow account pending resolution of litigation and proposed using the escrowed funds to secure the loan. Id. Wheeler executed a note to Moore, and Weinberg then prepared a document stating that Wheeler assigned to Moore "so much of recovery that he may make from the debt owed to him by [the music business] and the escrow account, which is pending as a result of said litigation." Id. The music business litigation later settled, but Weinberg forgot about the document and disbursed the proceeds to his client, Wheeler. Id. at 587, 681 S.E.2d at 877. Moore sued Weinberg for negligence, conversion, and conspiracy. The Court found that Moore could maintain the action and rejected Weinburg's argument that allowing a negligence claim would intrude on the attorney/client relationship or compromise the attorney's duties to his client. Id. at 588. 681 S.E.2d at 878.

Courts have found that non-clients can recover against attorneys for claims of negligent misrepresentation contained in the attorneys' legal opinions. In State Coll. Area Sch. Dist. v. Royal Bank of Canada, 825 F. Supp. 2d 573, 584 (M.D. Pa. 2011), the Middle District of Pennsylvania applied Pennsylvania law and found that the bank who was acting as purchaser could maintain a negligent misrepresentation claim against the law firm who acted as bond counsel to the issuer, even though the law firm was counsel to the issuer and had no such relationship with the bank. See also Mehaffy, Rider, Windholz etc. v. Central Bank, 892 P.2d 230, 233, 237 (Colo. 1995) (holding that an attorney who issues an opinion letter for the purpose of inducing a non-client to purchase municipal notes or bonds can be liable for negligent misrepresentation); Bradford Securities Processing Services, Inc. v. Plaza Bank and Trust, 653 P.2d 188 (Okla. 1982) (finding that a plaintiff, a non-client pledgee of a bond, had stated a cause of action against a bond counsel for negligent preparation of a bond opinion). South Carolina has similarly recognized a claim for negligence based on inaccurate statements in an attorney's

report, even where the plaintiff was not a client of the defendant law firm and did not actually rely on the opinion prepared by the attorney.  See South Carolina State Ports Authority v. Booz-Allen & Hamilton, Inc., 289 S.C. 373, 346 S.E.2d 324 (1986) (holding that the defendant law firm owed a duty to the South Carolina State Ports Authority to accurately report data concerning the Charleston port, if it knew or should have known that the report was intended to be used by *the Georgia Ports Authority* as a marketing device).  Consequently, Michelin's claim is viable regardless of which state's law applies.

The factors adopted by the South Carolina Supreme Court in analyzing whether a duty exists under these situations weighs in favor of finding the existence of a duty, at least at this pleading stage.  First, it is clear that "the transaction was intended to affect the plaintiff."  Clearly Michelin was greatly affected by this transaction as it had over $8 million in its assets stolen. This was entirely foreseeable.  Dilworth/Anderson knew that Hughes was purchasing the bonds, and had knowledge of the purchasers, including Michelin.  Complaint ¶72.  It also knew that there was risk that the bonds would not be paid.  Moreover, as discussed herein, the circumstances of this transaction gave Dilworth/Anderson constructive notice of potential fraud, yet it ignored all these red flags.  Furthermore, Dilworth/Anderson's actions were closely connected to the injury.  It represented one of the co-conspirators and undertook actions that were necessary to the consummation of this sham bond transaction that put over $8 million of Michelin's retirement funds into worthless Bonds.  Id. ¶210  It forwarded wire instructions to U.S. Bank into a bank account controlled by the co-conspirators, including its client and Hirst, who it knew to be a fiduciary to Michelin. that allowed the funds  It had constructive knowledge of the conflicts of interest and other red flags discussed above.  Finally, the policy of preventing future harm favors finding a duty.

Even if the attorney-client relationship were a bar to Michelin's claim (which it is not), Dilworth/Anderson's opinion letter contained a negligent misrepresentation that brings the claim outside of the attorney-client realm. Specifically, Dilworth represented in its opinion letter (Ex. B) that the Bonds were being issued "to finance the purchase of a certain Annuity Investment (as described in the Indenture)." Moreover, the Indenture and other documents reviewed by Dilworth state that the bulk of the bond proceeds would be placed in an annuity investment with an annuity provider that provides annuity investments as part of its regular trade or business. Complaint ¶189. As set forth above, these representations were false. The proceeds from the sale of the bonds were not used to finance the purchase of a fixed payment Annuity Contract, but were placed in what claimed to be a variable rate, non-recourse investment (and, in fact, was not even that). In addition, there was no "Annuity Provider" meeting the Indenture's definition. WAPCC-BVI was not in the business of providing annuity investments - it had only been incorporated three days before the Indenture.

Even if WAPCC-BVI had been a legitimate annuity provider, the instructions that were provided by Dilworth/Anderson for wiring the proceeds did not call for the proceeds to be wired to a bank account of WAPCC-BVI in the British Virgin Islands, as required. Instead, they were wired to a WAPCC-Florida bank account in California that was controlled by Hirst. Had Dilworth/Anderson bothered to undertake even the slightest investigation of the truth of its representation, it would have quickly discovered that WAPCC-BVI was not a real annuity provider but had only been incorporated days earlier, and that the bank account where the proceeds were actually transferred was not a bank account of any legitimate provider. Rather it was controlled by Hirst, the Michelin fiduciary, which was the lynchpin of the scheme.

Moreover, these negligent misrepresentations were the proximate cause of Michelin's damages. Had the representations not been made, the transaction could not have gone through. These representations in the opinion letter and the Indenture "were necessary to the consummation of the fraudulent transaction that put over $8 million of Michelin's retirement funds into worthless Bonds." Complaint ¶210. Dilworth/Anderson knew that their skill, professionalism, and expertise were being relied upon. The use of Michelin's funds depended upon, hence Michelin relied upon, these false representations.

In addition, Michelin's claim for professional negligence includes a claim for aiding and abetting a conversion and a breach of fiduciary duty. Id. As set forth above, Dilworth/Anderson knew that Hirst, Morton, and Hughes owed fiduciary duties to Michelin, and knew through the purchase letter (which it drafted) that Hughes was managing Michelin funds and going to use the funds to purchase these bonds. Id. ¶72. As counsel to Burnham Secruities and through its review and preparation of documents, Dilworth/Anderson knew that U.S. Bank was trustee and owed a fiduciary duty to Michelin. It aided and abetted that breach of fiduciary duty by sending wire instructions that were contrary to the governing documents and without so much as investigating the bank account or the company to whose bank account the funds were being wired pursuant to the instructions it was sending. Liability for aiding and abetting extends to lawyers. Granewich v. Harding, 985 P.2d 788, 793-94 (Or. 1999) ("[l]egal authorities, however, virtually are unanimous in expressing the proposition that one who knowingly aids another in the breach of a fiduciary duty is liable to the one harmed thereby. That principle readily extends to lawyers."); Kalan v. Farmers & Merchants Trust Co. of Chambersburg, No. CV 15-1435, 2016 WL 2941041, at *2 (E.D. Pa. May 20, 2016) (citing Granewich, supra, and finding that "there are no relevant differences between the elements of the claim in Oregon and Pennsylvania");

Chem-Age Indus., Inc. v. Glover, 652 N.W.2d 756, 774 (S.D. 2002) (recognizing aiding and abetting breach of fiduciary duty claim against attorneys); Holmes v. Young, 885 P.2d 305, 308 (Colo. App.1994); Restatement (Second) of Trusts (1959) § 326 ("A third person who, although not a transferee of trust property, has notice that the trustee is committing a breach of trust and participates therein is liable to the beneficiary for any loss caused by the breach of trust").

For all of the foregoing reasons, already set forth in this brief, Dilworth/Anderson knew, or at least should have known, that these fiduciaries were breaching their duties to Michelin. Regarding U.S. Bank's duty, Dilworth/Anderson should have known that the wiring of funds by U.S. Bank was to insiders and not even in accordance with the Indenture obligations and without authorization from WLCC. Complaint ¶208. Dilworth/Anderson rendered substantial assistance to these breaches of fiduciary duties by rendering its opinions and also forwarding these erroneous wiring instructions that were necessary for the consummation of the fraudulent transaction that directly led to the raiding of Michelin assets. Id. ¶210.

For these reasons, Michelin has sufficiently alleged the professional negligence claim in Count X, and Dilworth/Anderson's motion to dismiss should be denied. In the alternative, should the Court find that the claim has not been sufficiently alleged, Michelin respectfully requests that the Court grant leave to Michelin to file an Amended Complaint.[7]

---

[7] Dilworth/Anderson also argue that the action is barred by the lack of a certificate of merit that is required under "Pa. R. C. P. 1042.3(a)." However, even if this rule of civil procedure could be regarding as substantive, as Dilworth asserts, Pennsylvania substantive law does not apply to this matter. Rather South Carolina law applies since the injury was felt in South Carolina. See Lister v. NationsBank of Delaware, N.A., 329 S.C. 133, 494 S.E.2d 449 (Ct.App.1997). Dilworth cites Rogers v. Lee, 414 S.C. 225, 777 S.E.2d 402 (Ct. App. 2015), but Rogers is distinguishable because it dealt with a North Carolina attorney's representation of a worker injured in North Carolina working for a North Carolina employer bringing a North Carolina workers' compensation claim, and the injury- lost opportunity to pursue the North Carolina workers' compensation claim based on a settlement (to which the client and attorney agreed)- occurred in North Carolina. The Rogers Court distinguished the injury from Lister where the injury was to

## CONCLUSION

For all of the foregoing reasons, Michelin respectfully requests that Dilworth and Anderson's motion be denied.  In the alternative, should the Court find that Michelin has not sufficiently alleged its claims, Michelin respectfully requests that the Court grant leave to Michelin to file an Amended Complaint.

Respectfully submitted,

By: s/J. Derrick Quattlebaum
    J. Derrick Quattlebaum, Fed ID No. 5252
    Steve A. Matthews, Fed ID No. 5119
    J. W. Matthews III, Fed ID No. 3202

    HAYNSWORTH SINKLER BOYD, P.A.
    ONE North Main Street, 2nd Floor
    Greenville, SC  29601-2772
    Telephone:   864.240.3200
    Facsimile:    864.240.3300

    Attorneys for Plaintiffs,
    The Investment Committee of the Michelin
    Retirement Plan and the Michelin Retirement
March 10, 2017                              Plan

---

the plaintiffs' money, and therefore suffered in South Carolina.  Id. at 231-32, 494 S.E.2d at 405. The present case is a financial injury, like Lister, felt in South Carolina, and, therefore, South Carolina law applies.  Moreover, S.C. Code § 15-36-100 does not require the filing of an affidavit, as the plain language of that section shows that applies only to "professionals licensed by or registered with the State of South Carolina."  Here, the Dilworth attorneys were not so licensed or registered, and, consequently, S.C. Code § 15-36-100 does not apply.