IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| The Michelin Retirement Plan; | ) | Case No.: 6:16-cv-03604-DCC-JDA |
| The Investment Committee of the Michelin | ) | |
| Retirement Plan, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF THE MAGISTRATE JUDGE** |
| Chicago Transit Authority Retiree Health | ) | |
| Care Trust, | ) | |
| | ) | |
| Intervenor Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Dilworth Paxson LLP; | ) | |
| BFG Socially Responsible Investments, | ) | |
| Ltd.; Burnham Financial Group, Inc.; | ) | |
| Burnham Securities, Inc.; | ) | |
| COR Fund Advisors, LLC; | ) | |
| GMT Duncan, LLC; | ) | |
| Thorsdale Fiduciary and | ) | |
| Guaranty Company Ltd.; | ) | |
| Valor Group Ltd.; Wakpamni Lake | ) | |
| Community Corp.; Wealth-Assurance AG; | ) | |
| Wealth Assurance Private Client | ) | |
| Corporation; Timothy B. Anderson; | ) | |
| Jon Michael Burnham; Devon D. Archer; | ) | |
| Bevan T. Cooney; Hugh Dunkerley; | ) | |
| Jason W. Galanis; John P. Galanis; | ) | |
| Gary T. Hirst; Frankie D. Hughes; | ) | |
| and Michelle A. Morton, | ) | |
| | ) | |
| Defendants,[1] | ) | |
| | ) | |
| | ) | |
| Frankie D. Hughes, | ) | |
| | ) | |
| Counter Claimant, | ) | |

---

[1]The caption represents the current parties to the litigation.  Some parties have been
dismissed from this action over the course of the proceedings.



)
v.                       )
)
The Michelin Retirement Plan;        )
The Investment Committee of the Michelin )
Retirement Plan,                )
)
        Counter Defendants.     )
)
_____ )

This matter is before the Court on a motion to dismiss filed by Defendants Dilworth Paxon, LLP ("Dilworth") and Timothy B. Anderson (collectively, the "DP Defendants"). [Doc. 301.] Pursuant to the provisions of 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2)(e), D.S.C., this magistrate judge is authorized to review all pre-trial matters in cases involving litigation by individuals proceeding pro se and to submit findings and recommendations to the District Court.

Michelin Retirement Plan and the Investment Committee of the Michelin Retirement Plan ("Plaintiffs") filed this action on November 10, 2016, alleging eleven causes of action against the above-named defendants. [Doc. 1.] On September 14, 2018, the DP Defendants filed a motion to dismiss the counts against them under Federal Rules of Civil Procedure 12(b)(1), (2), (3), and (6). [Doc. 301.] Plaintiffs filed a response on September 27, 2018. [Doc. 309.] The DP Defendants filed a reply on October 4, 2018. [Doc. 315.] Accordingly, the motion is now ripe for review.

## BACKGROUND

The following facts are taken directly from the Complaint. Plaintiff, the Michelin Retirement Plan ("the Plan"), is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). [Doc. 1 ¶ 1.] The Plan was

established and is maintained by Michelin North America, Inc., a corporation with its principal place of business in Greenville, South Carolina. [*Id.*] Plaintiff, the Investment Committee of the Michelin Retirement Plan (the "Investment Committee"), "retains the power to control and manage the assets of the Plan to the extent of its power of appointment of investment managers, as that term is defined in Section 3(38) of ERISA."[2] [*Id.* ¶ 35.] On January 19, 1999, the Investment Committee entered into an "Investment Management Agreement" with Hughes Capital Management, LLC ("Hughes Capital"), a Virginia limited liability company. [*Id.* ¶¶ 4, 36.] Through the Investment Management Agreement, Hughes Capital assumed responsibility to "manage and invest certain Plan funds." [*Id.* ¶ 37.]

By letter dated August 22, 2014, Hughes Capital notified the Investment Committee that it had been acquired by GMT Duncan, LLC ("GMT"), a company founded by Michelle A. Morton ("Morton"). [*Id.* ¶ 38.] Between August 22, 2014, and August 26, 2014, Hughes Capital used $8,102,154 of employee retirement funds from the Plan to purchase a Wakpamni Lake Bond ("the Bond"). [*Id.* ¶ 39.] The Bond was issued by Wakpamni Lake Community Corporation ("WLCC"), a tribally chartered corporation associated with the Oglala Sioux Tribe of the Pine Ridge Indian Reservation in South Dakota. [*Id.* ¶ 5.] By letter dated September 2, 2014, Hughes Capital notified the Investment Committee that part of the Plan's portfolio had been used to purchase the Bond. [*Id.* ¶ 40.]

In a letter dated October 10, 2014, the Investment Committee notified Hughes

---

[2]For that reason, Plaintiffs allege that the Investment Committee "is a fiduciary of the Plan and as such is a proper Plaintiff with standing to bring this action against Defendants." [Doc. 1 ¶ 2.]

3

Capital of the Investment Committee's termination of the Investment Management Agreement. [*Id.* ¶ 41.] The Investment Committee directed Hughes Capital to transfer the Plan's portfolio, except for the Bond, to Northern Trust Investments, Inc. [*Id.*] Hughes Capital was directed to dispose of the Bond in the most efficient way possible. [*Id.*] For over a year, Plaintiffs were led to believe that efforts were ongoing to sell the Bond. [*Id.* ¶ 42.] On or about January 14, 2016, Plaintiffs learned that the Securities and Exchange Commission ("SEC") filed a complaint against Atlantic Asset Management, LLC ("AAM"), a company purchased by GMT in April 2015, and the surviving entity of a merger involving Hughes Capital. [*Id.* ¶¶ 3, 42.] Plaintiffs then began to suspect that its funds may have been fraudulently misappropriated. [*Id.* ¶ 42.]

Plaintiffs allege that Jason Galanis ("Jason") and John Galanis began a scheme to fraudulently misappropriate funds in 2014, when they convinced WLCC to issue bonds. [*Id.* ¶ 45.] Specific allegations are outlined in the Complaint; however, Plaintiffs generally allege that the scheme involved the Defendants engaging in the following acts:

- Setting up the Bond transaction to supposedly invest the proceeds in an "annuity" that was entirely fake;

- Placing co-conspirators in control of each entity involved with every aspect of the Bond transaction and carrying out their conspiracy with those persons;

- Acquiring ownership and control of investment management companies in order to steal retirement funds entrusted to those companies by "investing" those funds in fraudulent bonds;

- Using their conspiratorial cooperation to force client funds into the purchase of the issued tribal bonds; and

- Raiding the proceeds from closing the bonds in order to create a "slush fund" that would pay certain Defendants,

4

> directly and indirectly, to support their lifestyles, legal
> fees, and speculative ventures.

[*Id.* at 2; *see id.* ¶¶ 43–117.]

Plaintiffs do not allege that the DP Defendants were actually aware of the plan to misappropriate the Board proceeds, but they do allege the DP Defendants played a part in the Bond transaction and an unwitting role in the misappropriation. Dilworth served as legal counsel for the placement agent, Burnham Securities, and undertook responsibility for preparing and examining the documents necessary to financing WLCC's project. [*Id.* ¶ 16.] Anderson served as Dilworth's lead attorney in this matter. [*Id.* ¶ 17.] In June 2014, the DP Defendants provided WLCC with a summary of the bond program that listed Wealth-Assurance AG ("Wealth-Assurance") as the annuity issuer and an independent investment management company as the portfolio manager. [*Id.* ¶ 48] The DP Defendants prepared an "investment letter dated August 21, 2014, from Hughes Capital to the bond issuer WLCC identifying the Hughes Capital clients who were purchasing the bonds (including [the Plan]) and purportedly making representations, warranties, and covenants on their behalf." [*Id.* ¶ 72.]

A critical part of Jason's plan to misappropriate the Bond proceeds involved having the U.S. Bank National Association ("US Bank"), which served as indenture trustee [*id.* ¶ 7], send Bond proceeds to a fictitious company under his control. The DP Defendants played a role in that happening insofar as they received email instructions from Jason, who "they knew or believed to be associated with their client Burnham Securities" [*Id.* ¶ 207b], and forwarded the instructions to US Bank, along with "a signed copy of the Annuity

Contract"[3] [*Id.* ¶ 54].  The instructions, which purported to be from "jason galanos" of "burnhamequitypartners.com," instructed the US Bank "to send the Annuity Contract purchase price from the bond proceeds to a [particular] bank account at a Beverly Hills, California branch of JPMorgan Chase Bank." [*Id.*]  US Bank followed Jason's instructions and "wired over $22 million of WLCC's bond proceeds, including over $8 million of [the Plan's] retirement funds" to the company that the instructions identified.  [*Id.*] The effect of that action was to place those proceeds "directly into the hands of the criminal conspirators" who misappropriated them. [*Id.*]

Plaintiffs allege eleven causes of action in the Complaint.  The DP Defendants are named in Counts II and X.  [*Id.* ¶¶ 130–39, 206–15.]  In Count II, the Complaint alleges that "[b]y investing the Plan's funds in a Wakpamni Lake Bond, and knowing that the funds would be misappropriated by Jason . . . and his associates, AAM/Hughes Capital, Morton, and [Gary T.] Hirst used the Plan's funds for benefit of GMT and Dunkerley, which are both parties in interest" pursuant to 29 U.S.C. § 1002(14)(H).[4]  [*Id.* ¶ 133.]   The Complaint alleges that the DP Defendants "had actual knowledge or constructive knowledge that the Plan fiduciaries planned to misappropriate the funds through this prohibited and self-dealing

_____

[3]Plaintiffs allege that the bond transaction called for most of the proceeds of relatively low-interest bonds to be invested into a higher-yielding annuity contract (the "Annuity Contract") that would yield income sufficient to pay both the principal and the interest on all of the bonds, leaving WLCC able to use the remaining proceeds to fund a tribal economic development project.  [Doc. 1 ¶ 46.]

[4]The Complaint alleges that "GMT is a party in interest . . . because Morton is the half-owner of GMT," that "BFG is a party in interest because it is the sole preferred member of GMT and thus a '10 percent or more shareholder' of a person described in subparagraph (G) of Section 29 U.S.C. § 1002(14)," and that "Dunkerley, as the managing member of BFG, would also qualify as a party in interest under that same section."  [Doc. 1 at  ¶¶ 131–32.]

transaction" and yet the DP Defendants "knowingly participated in [the] transaction," causing the Plan to "suffer[] damages to its employee retirement investment portfolio, [loss of] interest that this money could have accrued if invested with due care, and consequential damages." [*Id.* ¶¶ 134–36.]  It alleges that Plaintiffs, "under the equitable powers of the Court, as defined in Section 29 U.S.C. 1132, [are] entitled to all damages, including the return of the Plan's funds and all consequential damages incurred due to Defendant[s'] breach of fiduciary duties," as well as costs and attorney's fees. [*Id.* ¶¶ 137–38.]  In its prayer for relief, the Complaint requests in regard to Count II "actual damages and consequential damages pursuant to Section 29 U.S.C. § 1132 and costs and attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1)." [*Id.* at 57.]

Count X is asserted against the DP Defendants for professional negligence. [*Id.* ¶¶ 206–15.]  As is relevant here, Count X alleges that the DP Defendants, "knowing that necessary actors in the transaction were relying upon their skill, professionalism, and expertise," provided "legal services and legal opinions that were necessary to the consummation of the fraudulent transaction that put over $8 million of [the Plan's] retirement funds into worthless Bonds," causing "the diversion of [the Plan's] . . . assets and their conversion by Jason Galanis and his co-conspirators." [*Id.* ¶ 210.]  It alleges the DP Defendants "knew or should have known [various facts that] would . . . have put them on high-alert notice that would have prompted an investigation that would have further illuminated the criminal enterprise that they were serving." [*Id.* ¶ 209; *see also id.* ¶ 207.]  It alleges that the DP Defendants "acted willfully, wantonly, and recklessly in failing to

recognize the numerous indicators of wrongdoing involved in the transaction."[5]    [*Id.* ¶¶ 211–12.]    For Count X, Plaintiffs request "actual damages and punitive damages resulting from Defendants' professional negligence and breach of their professional responsibilities." [*Id.* ¶ 214.]  Alternatively, Plaintiffs request "an Order requiring US Bank and/or WLCC to pursue this claim against Greenberg, Dilworth, and/or Tim Anderson for the benefit of [Plaintiffs] and those similarly situated pursuant to any applicable provisions of the Bond Indenture, related governing documents, and applicable law related to the extent of professional responsibility obligations."[6] [*Id.* ¶ 215.]

## APPLICABLE LAW

**Motion to Dismiss Standard**

### *Rule 12(b)(1)*

A claim may be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Plaintiff bears the burden of proving subject matter jurisdiction.

---

[5]Count X also alleges that, in bringing about the purchase of the bonds, the DP Defendants

> aided and abetted [the] conversion [of the Plan's assets]; aided and abetted US Bank's breach of fiduciary duty; aided and abetted WLCC's and US Bank's breach of the Bond Indenture; aided and abetted Hughes Capital's breach of the Investment Management Agreement; aided and abetted the other Defendants' tortious interference with existing contractual relations; and aided and abetted the other Defendants' violation of state securities laws including but not limited to S.C. Code Title 35, Chapter 1, Article 5 (§ 35-1-501 *et seq*.).

[Doc. 1 ¶ 210.]

[6]On June 12, 2017, this Court granted a motion by Chicago Transit Authority Retiree Health Care Trust to Intervene as a Plaintiff. [Doc. 218.] The claims asserted in the Intervenor Complaint are not relevant to the motion now before the Court.

*McNutt v. GMAC*, 298 U.S. 178, 189 (1936).

Federal courts are courts of limited jurisdiction, constrained to exercise only the authority conferred by Article III of the Constitution and affirmatively granted by federal statute. *In re Bulldog Trucking, Inc.*, 147 F.3d 347, 352 (4th Cir. 1998); *see also Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 533 (2012) (explaining that the federal government possesses only limited powers). Because federal courts have limited subject matter jurisdiction, there is no presumption that the Court has jurisdiction. *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999).

"[T]he facts providing the court jurisdiction must be affirmatively alleged in the complaint." *Pinkley, Inc.*, 191 F.3d at 399. To this end, Federal Rule of Civil Procedure 8(a)(1) requires that the complaint provide a short and plain statement of the grounds for the courts jurisdiction[.] If, however, the Complaint does not contain "an affirmative pleading of a jurisdictional basis[,] a federal court may find that it has jurisdiction if the facts supporting jurisdiction have been clearly pleaded." *Id.* Although the absence of subject-matter jurisdiction may be raised at any time during the case, determining jurisdiction at the outset of the litigation is the most efficient procedure. *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999). If the Court, viewing the allegations in the light most favorable to Plaintiff, finds insufficient allegations in the pleadings, the Court will lack subject-matter jurisdiction. *Id.*

Because standing implicates the Courts' subject-matter jurisdiction, this Court must address it. Article III limits a federal courts jurisdiction to "cases and controversies, and part of that requirement is that a plaintiff must establish that he has standing to sue. *See David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013); *see also Doe v. Va. Dep't of State*

9

*Police*, 713 F.3d 745, 753 (4th Cir. 2013). To possess Article III standing, "[t]he plaintiff [or the entity on whose behalf the plaintiff is suing] must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see DiFelice v. U.S. Airways, Inc.*, 235 F.R.D. 70, 75 (E.D. Va. 2006). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Accordingly, a motion to dismiss a claim for lack of standing will be denied so long as at least one plaintiff has standing to litigate the claim, regardless of whether other plaintiffs also have standing. *J.E.C.M. ex. rel. Saravia v. Lloyd*, No. 1:18-cv-00903, 2018 WL 6004672, at *10 (E.D. Va. Nov. 15, 2018).

### *Rule 12(b)(6)*

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim should be dismissed if it fails to state a claim upon which relief can be granted. When considering a motion to dismiss, the court should "accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, the court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Further, for purposes of a Rule 12(b)(6) motion, a court may rely on only the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985). If matters outside the pleadings are presented to and not excluded by

the court, the motion is treated as one for summary judgment under Rule 56 of the Federal

Rules of Civil Procedure.  Fed. R. Civ. P. 12(d).

With respect to well-pleaded allegations, the United States Supreme Court explained

the interplay between Rule 8(a) and Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short
> and plain statement of the claim showing that the pleader is
> entitled to relief," in order to "give the Defendants fair notice of
> what the . . . claim is and the grounds upon which it rests."
> While a complaint attacked by a Rule 12(b)(6) motion to
> dismiss does not need detailed factual allegations, a plaintiff's
> obligation to provide the "grounds" of his "entitle[ment] to relief"
> requires more than labels and conclusions, and a formulaic
> recitation of the elements of a cause of action will not do.
> Factual allegations must be enough to raise a right to relief
> above the speculative level on the assumption that all the
> allegations in the complaint are true (even if doubtful in fact).

550 U.S. 544, 555 (2007) (footnote and citations omitted); *see also* 5 Charles Alan Wright

& Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235–36 (3d ed. 2004) ("[T]he

pleading must contain something more . . . than a bare averment that the pleader wants

compensation and is entitled to it or a statement of facts that merely creates a suspicion

that the pleader might have a legally cognizable right of action.").

"A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the Defendants is liable for the misconduct

alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than

a sheer possibility that a Defendants has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S.

at 556).  The plausibility standard reflects the threshold requirement of Rule 8(a)(2)—the

pleader must plead sufficient facts to show he is entitled to relief, not merely facts

11

consistent with the Defendants's liability. *Twombly*, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a Defendants's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" (quoting *Twombly*, 550 U.S. at 557)). Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible the plaintiff is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

## DISCUSSION

### Subject-matter jurisdiction

The DP Defendants argue, for several reasons, that Plaintiffs' Complaint fails to establish standing to assert the claims alleged against the DP Defendants and, thus, that the Court lacks subject-matter jurisdiction over these claims. The Court disagrees.

At a minimum, Plaintiffs allege in part that the Plan suffered an Article III injury-in-fact when millions of Plan assets were expended to purchase bonds that the co-conspirators knew would soon by rendered worthless, thereby reducing the value of the Plan's asset portfolio. [Doc. 1 ¶¶ 210, 213]. Given the role that the DP Defendants allegedly played in that transaction, including providing opinions that Plaintiffs allege were "necessary to the consummation of the fraudulent transaction" [*id.* ¶ 210] and forwarding instructions to US Bank to wire the Bond proceeds to an entity that Jason controlled [*id.* ¶ 54], Plaintiffs satisfactorily allege that that injury was fairly traceable to the DP Defendants' conduct. The Complaint's allegations are also sufficient regarding redressability insofar as Plaintiffs seek monetary compensation for both counts against the DP Defendants, which,

if they were to succeed in obtaining, could at least partially remedy the reduction in the value of the Plan's portfolio.[7]

The DP Defendants argue that Plaintiffs have not alleged that the Plan suffered an injury-in-fact because any injury related to the Bond was necessarily suffered only by the holder of the Bond that the Plan assets were used to purchase. [Docs. 301-1 at 13-15; 315 at 3.] The DP Defendants contend that neither Plaintiff was the legal owner of the Bond and that the bondholder was in fact a separate legal entity, the Michelin North America Trust (the "Trust"), which is not a Plaintiff in this case.[8] [Doc. 301-1 at 14.] The DP Defendants argue that any injury related to the misappropriation of the Bond proceeds was necessarily suffered by the Trust rather than by the Plan. [*Id.* at 13–15.] Plaintiffs respond that the fact that the Trust, and not the Plan, was the legal owner of the Bond merely reflects that ERISA requires that the Plan place its assets in trust, 29 U.S.C. § 1103, and that the "bottom line" is that Plaintiffs allege that the Plan's portfolio is substantially diminished in value as a result of this scheme that the DP Defendants are allegedly legally liable for. [Doc. 309 at 15–16.] The Court agrees with Plaintiffs' analysis and concludes

---

[7]In arguing that the Plaintiffs have not alleged redressability, the DP Defendants contend that, as a matter of law, compensatory damages are not available for a § 503(a) cause of action [Doc. 301-1 at 16–17], but that argument goes only to the merits of Plaintiffs' claim against the DP Defendants; it does not affect Plaintiffs' standing to assert the claim. *See Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 985 (D.C. Cir. 2017) ("Redressability, like any other aspect of jurisdiction, 'is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)); *Cal. ex rel. Lockyer v. USDA*, 459 F. Supp. 2d 874, 888 (N.D. Cal. 2006) ("When deciding whether a plaintiff has standing, the court ordinarily will assume that it has the ability to grant the relief sought.").

[8]The DP Defendants attach the Bond document as an exhibit to their memorandum in support of their motion to dismiss. [Doc. 301-6.]

that the fact that the Plan's assets are held in trust does nothing to prevent the existence of a live controversy between Plaintiffs and the DP Defendants.

The DP Defendants also argue that Plaintiffs lack standing regarding Count II because neither Plaintiff is statutorily authorized to litigate the ERISA claim that is the subject of that count.   [Docs. 301-1 at 18–20; 315 at 7–9.]  As the DP Defendants note, such claims may be brought only by a "participant, beneficiary, or fiduciary."  29 U.S.C. §1132(a)(3) ("A civil action may be brought . . . by a participant, beneficiary, or fiduciary . . . to obtain . . . equitable relief. . . to redress" violations of this subchapter.).   The DP Defendants maintain that neither the Plan nor the Investment Committee fit that description. [Docs. 301-1 at 18–20; 315 at 7–9.]

Although the issue of whether a plaintiff is statutorily authorized to bring a particular cause of action has been described at times as one of "standing" that is "jurisdictional," *see, e.g.*, *David*, 704 F.3d at 338; *Coyne v. Delany Co. v. Selman*, 98 F.3d 1457, 1464 & n.6 (4th Cir. 1996), the Supreme Court has since clarified "that what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute,'" *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)); *see Pa. Chiropractic Ass'n v. Independence Hosp. Indem. Plan*, 802 F.3d 926, 928 (7th Cir. 2015).   "This inquiry 'does not belong' to the family of standing inquiries because 'the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional *power* to adjudicate the case.'"  *Am. Psychiatric Ass'n*, 821 F.3d at 359 (quoting *Lexmark*, 572 U.S. at 127, 128 n.4).  Thus, whether Plaintiffs have validly pled an entitlement to sue under the

14

statute "is properly examined under Rule 12(b)(6) for failure to state a claim," not under Rule 12(b)(1) for lack of subject-matter jurisdiction. *Bluefeld v. Cohen*, No. PX 15-2857, 2017 WL 1546406, at *4 n.3 (D. Md. Apr. 27, 2017).

Because the Court concludes that Plaintiffs have satisfactorily alleged that the Plan suffered an injury-in-fact, fairly traceable to the complained-of conduct, and redressable by the requested relief, the Court recommends that the DP Defendants' motion to dismiss the claims asserted against them in Counts II and X for lack of standing be denied.[9]

**Merits**

The DP Defendants argue that Counts II and X should both be dismissed against them under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. The Court agrees.

### *Count II*

Count II fails to state a claim against the DP Defendants because, as they argue, the relief they request on this claim is not available in a § 502(a)(3) claim. [Doc. 301-1 at 28.] As the Court has noted, 29 U.S.C. § 1132(a)(3), which provides that "[a] civil action may be brought . . . to obtain . . . equitable relief. . . to redress" violations of this subchapter." The relief that may be awarded under 29 U.S.C. § 1132(a)(3)(B)(I) "is limited

---

[9]Although the DP Defendants argued the claims against them should be dismissed for lack of personal jurisdiction [Doc. 301-1 at 20–26], in their reply, they do not contest that if Plaintiffs have standing to pursue an ERISA claim, the Court would have personal jurisdiction over the DP Defendants, given ERISA's nationwide jurisdictional reach [Doc. 315 at 9–10.] The Court has already explained why Plaintiffs have established Article III standing in this case, and the Court will soon address whether the Plaintiffs are statutorily authorized to bring the ERISA claim at issue. Because the Court concludes, for the reasons that the Court will explain, that at least the Investment Committee is statutorily authorized to bring suit, the Court finds no basis for dismissing Counts II and X for lack of personal jurisdiction.

to traditional equitable relief." *Hornady Transp. LLC v. McLeod Health Servs., Inc.*, 773 F. Supp. 2d 622, 634 (D.S.C. 2011) (citing *Great-West Life & Ann. Ins. Co. v. Knudson*, 534 U.S. 204 (2002)).  In contrast, "a claim which seeks monetary relief (such as a claim for repayment of benefits) is normally a claim for damages, rather than a claim for 'appropriate equitable relief.'"  *Id.* (quoting *Knudson*, 534 U.S. at 214–20).  Accordingly, that section does not allow "recovery of funds under theories of restitution or specific performance where the funds at issue are neither subject to an equitable lien nor in the hands of the defendant-beneficiary." *Id.* (citing *Knudson*, 534 U.S. at 214).  On the other hand, a plaintiff may recover funds under this section "if an equitable lien has been or may still be imposed on the specific funds." *Id.* (citing *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356 (2006) (holding plan's claim for restitution could be pursued under 29 U.S.C. § 1132(a)(3)(B) where a lien was imposed prior to distribution of proceeds of third-party litigation)).

Here, Plaintiffs seek only "actual damages and consequential damages . . . costs and attorneys' fees" [Doc. 1 at 57], which, as the Court has noted, are not available under ERISA section 502(a)(3).  Plaintiffs argue that the Complaint in fact does seek equitable relief against the DP Defendants, specifically noting that "paragraph 54 . . . alleges that to date [Plaintiffs have] not received any restitution."  [Doc. 309 at 18.]  The paragraph to which Plaintiffs refer, which is located in the Complaint's statement of facts, alleges that the more than $8 million in Plan assets at issue in this case "went directly into the hands of the criminal conspirators who have not made and who may never make full restitution to [Plaintiffs] and the other victims."  [Doc. 1 ¶ 54.]  Even under the most liberal of constructions, this allegation is at most an observation that *the criminal conspirators* never made restitution.  There is no reasonable reading by which it is a request for restitution, or

16

any other equitable relief, from *the DP Defendants*.  And the Complaint fails to allege that

the DP Defendants are in possession of any specific property that would be the subject of

equitable relief, in any event.  For this reason, the Court recommends that Count II be

dismissed as against the DP Defendants for failure to state a claim.[10]  *See Horizon Blue*

---

[10]Because the Court concludes that Count II fails to state a claim for reasons
unrelated to the identity of who brought this action, the Court need not address the DP
Defendants' argument that Plaintiffs are not entities who may bring a cause of action for
the violations alleged.  [Doc. 301-1 at 18–20.]  However, the Court notes that the
Investment Committee's power to appoint investment managers—who are ERISA
fiduciaries, 29 U.S.C. § 1002(38); *Seversal Wheeling, Inc. Ret. Comm. v. WPN Corp.*, 119
F. Supp. 3d 240, 263 (S.D.N.Y. Aug. 10, 2015)—confers fiduciary status on the Investment
Committee as well, *see* 29 C.F.R. § 2509.75-8 (D-4) (providing that a board of directors
responsible for the "selection and retention of plan fiduciaries . . . exercise[s] 'discretionary
authority or discretionary control respecting management of such plan' and are, therefore,
fiduciaries with respect to the plan"); *Licensed Div. Dist. No. 1 MEBA/NMU, AFL-CIO v.
Defries*, 943 F.2d 474, 478 (4th Cir. 1991) ("[A] union exercises the discretionary authority
of a fiduciary when it appoints trustees."); *see also Johnson v. Couturier*, 572 F.3d 1067,
1076 (9th Cir. 2009) ("[W]here members of an employer's board of directors have
responsibility for appointment and removal of ERISA trustees, those directors are
themselves subject to ERISA fiduciary duties, albeit only with respect to trustee selection
and retention."); *Hickman v. Tosco Corp.*, 840 F.2d 564, 566 (8th Cir. 1988) (holding that
an entity was a fiduciary "because it appoints and removes the members of the
administrative committee that administers the pension plan"); *Leigh v. Engle*, 727 F.2d 113,
135 (7th Cir. 1984) (similar).  Importantly, the authority to appoint those fiduciaries "carries
with it a duty 'to monitor appropriately' those subject to removal."  *Coyne*, 98 F.3d at 1465
(quoting *Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.3d 732, 736 (7th Cir. 1986)); *see*
29 C.F.R. § 2509.75-8 (FR-17) (stating that "the ongoing responsibilities of a fiduciary who
has appointed trustees or other fiduciaries" include the responsibility to review "[a]t
reasonable intervals the performance of trustees and other fiduciaries . . . in such manner
as may be reasonably expected to ensure that their performance has been in compliance
with the terms of the plan and statutory standards, and satisfies the needs of the plan").
The appointing fiduciary—the Investment Committee—thus is statutorily entitled to assert
claims alleging that the appointed fiduciary—Hughes Capital—breached its fiduciary duties.
*See Coyne*, 98 F.3d at 1466.  Whether the Plan itself is a proper plaintiff on the ERISA
claim is not as clear, as courts have reached varying results on similar facts.  *Compare,
e.g.*, *Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assur. Co.*, 700 F.2d
889, 893 (2d Cir. 1983) (holding that § 1132(e)(1) does not authorize a plan to sue), *and
Local 159 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978, 983 (9th Cir. 1999) (holding that
1132(d)(1) does not authorize plans to sue), *with Saramar Alum. Co. v. Pension Plan for
Emps. of Alum. Indus. & Allied Indus.*, 782 F.2d 577, 581 (6th Cir. 1986) (holding that a

17

*Cross Blue Shield of N.J. v. Transitions Recovery Program*, Civ. No. 10-3197 (RBK/KMW), 2011 WL 2413173, at *4 (D.N.J. June 10, 2011) (holding that because "Plaintiff does not request equitable relief in the form of a constructive trust or equitable lien on particular funds or items in Defendant's possession," "Plaintiff c[ould ]not bring a claim under [ERISA] § 502(a)(3)").

### *Count X*

### **Professional Negligence**

The DP Defendants argue that Count X fails to state a claim for professional negligence because Plaintiffs have not properly pled the existence of an attorney-client

---

plan could sue because it includes those fiduciaries who administer and effectuate its policies), *and Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983) (holding that pension plans are authorized to sue for breach of fiduciary duties).

relationship between Plaintiffs and the DP Defendants.[11]  The Court agrees with the DP

Defendants that Plaintiffs have failed to state a professional-negligence claim.

"In adjudicating non-federal questions, a federal court must apply the law of the

state." *United States v. Little*, 52 F.3d 495, 498 (4th Cir. 1995).  "Federal courts are bound

by the state supreme court's interpretation of state law." *Dr. Allan L. Bergano, D.D.S., P.C.*

*v. City of Va. Beach*, 241 F. Supp. 3d 690, 707 (E.D. Va. Mar. 14, 2017).  If the state

supreme court has not ruled on the issue, the federal court must predict how the state

supreme court would resolve the issue.  *McClung v. Ford Motor Co.*, 472 F.2d 240, 240

(4th Cir. 1973).

The initial question to be answered is which state's law controls.  "A federal court

exercising supplemental jurisdiction applies the choice of law rules of the forum state,"

which in this case is South Carolina.  *Michelin N. Am., Inc. v. Inter City Tire & Auto Ctr.*,

---

[11]The DP Defendants argue that, to the extent that Plaintiffs' claim relies on the existence of the DP Defendants' attorney-client relationship with Burnham Securities, they were bound by the terms of the retention agreement between Dilworth and Burnham Securities, which provides for arbitration of any dispute involving the relationship between Dilworth and Burnham. [Doc. 301-1 at 26.] The DP Defendants maintain that, by asserting the professional negligence claim, Plaintiffs "claim[] some unidentified type of beneficiary status of the retention agreement," and thus must arbitrate the claim in Philadelphia. [Doc. 301-1 at 26–27.]  The DP Defendants, therefore, argue that, assuming Plaintiffs have standing to litigate the professional negligence claim, it should be dismissed for improper venue under Federal Rule of Civil Procedure 12(b)(3).  [*Id.*] The Court disagrees.  As Plaintiffs maintain, the DP Defendants have not shown that Plaintiff entered into that agreement.  Additionally, "[t]his dispute does not involve the relationship between Dilworth and Burnham Securities," and Plaintiffs are "not seeking to enforce any provision of the . . . retention agreement."  [Doc. 309 at 22–23.]  Accordingly, the Court sees no basis for requiring Plaintiffs to arbitrate this claim.  *See R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 162–64 (4th Cir. 2004) (holding that a non-signatory is not bound to an arbitration provision contained in an agreement it did not sign where the non-signatory seeks to enforce legal duties arising from law and not from the terms of the agreement).

*Inc.*, No. 6:13-1067-HMH, 2015 WL 12843916, at *3 (D.S.C. Jan. 20, 2015). "Applying *lex loci delicti* principles as they have been applied by South Carolina courts, this Court must apply the substantive law of the state 'in which *the injury occurred*, not where the results of the injury were felt or where the damages manifested themselves.'" *Advanced Commercial Credit Int'l (ACI) Ltd. v. Citisculpt, LLC*, No. 6:17-cv-69-AMQ, 2018 WL 2149296, at *4 (D.S.C. May 10, 2018) (quoting *Rogers v. Lee*, 777 S.E.2d 402, 405 (S.C. Ct. App. 2015)).

The DP Defendants maintain that Pennsylvania law governs Count X, arguing that "although the results Plaintiffs complain of were allegedly felt in South Carolina," the alleged "injury occurred in Pennsylvania where the DP Defendants undertook all of their actions." [Doc. 301-1 at 17 n.12.] In response, Plaintiffs suggest that South Carolina law governs because "the injury was felt in South Carolina." [Doc. 309 at 35 n.8.] But in any event, they contend that Count X "is viable regardless of which state's law applies." [Doc. 309 at 31.]

The Court is inclined to disagree with both parties' choice-of-law analyses. When the injury suffered is misappropriation of the plaintiff's money, it is the law of the state from which the money was taken that governs the claim. *See Rogers*, 777 S.E.2d at 405 (explaining the basis for the decision in *Lister v. NationsBank of Del., N.A.*, 494 S.E.2d 449 (S.C. Ct. App. 1997)). In this case, the Complaint does not explicitly state where US Bank was holding the Bond proceeds before wiring them in accordance with Jason's instructions. However, the Complaint does allege that US Bank maintains a corporate trust office in Phoenix, Arizona. [Doc. 1 ¶ 7; *see also* Docs. 309-5 at 6; 309-8 at 4; 309-12 at 2.] In the end, the Court need not definitively resolve the question, because the Court concludes that

20

regardless of which state's law governs, no duty of professional care extended from the DP Defendants to Plaintiffs based on the facts alleged.

To pursue a legal malpractice claim there generally must be an attorney-client relationship between the attorney and the plaintiff. *See, e.g.*, *Argoe v. Three Rivers Behavioral Ctr. & Psychiatric Sols.*, 697 S.E.2d 551, 554 (S.C. 2010) ("[A]n attorney owes no duty to a non-client unless he breaches some independent duty to a third person or acts in his own personal interest, outside the scope of his representation of the client." (citation and internal quotation marks omitted)); *Naper v. Bertram*, 954 P.2d 1389, 1393 (Az. 1998) (similar); *Guy v. Liederbach*, 459 A.2d 744, 746 (Pa. 1983) (similar). As Plaintiffs point out, there are exceptions to this general rule.[12] [Doc. 309 at 29–32.] But no such exception applies based on the facts pled here.

The connection that the DP Defendants allegedly had to the injury that the Plan suffered is extremely tenuous. The Complaint alleges the DP Defendants provided WLCC with a summary of the bond program and prepared an "investment letter dated August 21, 2014, from Hughes Capital to the bond issuer WLCC identifying the Hughes Capital clients who were purchasing the bonds (including [the Plan]) and purportedly making representations, warranties, and covenants on their behalf." [Doc. 1 ¶¶ 48, 72.] Dilworth allegedly took these actions and two others, those being that it "forwarded email instructions" to the indenture trustee, US Bank, instructing US Bank as to where it should

---

[12]For example, many courts have held that an attorney's duty of professional care extends to the beneficiaries of a will an attorney has drafted. *See*, *e.g.,* *Fabian v. Lindsay*, 765 S.E.2d 132, 137 (S.C. 2014); *Guy*, 459 A.2d at 746.

send the Annuity Contract purchase price from the Bond proceeds and also "forwarded a signed copy of the Annuity Contract" to the US Bank. [*Id.* ¶ 54.]

Plaintiffs do not allege that, in drafting these basic documents and forwarding these instructions on behalf of their client, the DP Defendants actually realized, or even suspected, that the Plan's funds would be misappropriated, that the instructions were part of the scheme, or that anything was amiss.  Rather, they allege that the DP Defendants "knew or should have known" certain facts that would have alerted a reasonable attorney to the possibility that the instructions were part of a scheme to misappropriate the bond proceeds and that conducting a reasonable investigation would have uncovered the scheme.[13]  Plaintiffs allege that by taking the actions that they took and "failing to recognize the numerous indicators of wrongdoing involved in the transaction" [Doc. 1 ¶ 212], the DP Defendants should be liable to Plaintiffs for professional negligence, despite the fact that Plaintiffs were not their clients [*see, e.g.*, *id.* ¶ 208(f) (allegations that aspects of the Bond transaction would have raised "red flag[s] that *should have* prompted further investigation" (emphasis added); *see also id.* ¶ 209 (alleging that particular "facts that [the DP

---

[13]Such allegations suggest only constructive knowledge; they do not give rise to a reasonable inference of the DP Defendants' actual knowledge of any malfeasance.  *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 309–10 (4th Cir. 2018) (holding that when the defendant could be liable for infringement only if it had actual knowledge of the infringement, a jury charge allowing the jury to find liability if the defendant "knew or should have known" of infringement activity was improper because it would allow imposition of liability for a mere negligent failure to discover the infringement); *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 12 Civ. 4828, 2018 WL 1273343, at *11 (S.D.N.Y. Mar. 5, 2018) ("General allegations that a party 'knew or should have known' about the contract in question" do not properly allege actual knowledge of the contract.); *Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200, 1206 (C.D. Cal. 2006) (noting, in the context of an aiding-and-abetting claim, that "the phrase 'knew or should have known' does not plead actual knowledge").

Defendants] knew or should have know would . . . have put them on high-alert notice that would have prompted an investigation that would have further illuminated the" plan to misappropriate the Plan assets)]. But the Complaint contains no allegation that Plaintiffs actually undertook such further investigation, and there is no allegation that, based on the facts that the DP Defendants actually knew, their knowledge of the planned misappropriation of the Plan assets could be inferred.

Nonetheless, Plaintiffs take the position that the DP Defendants' *constructive* knowledge of the planned misappropriation, and the foreseeability that such misappropriation would severely harm the Plan, are sufficient to give rise to a duty on the DP Defendants' part to take reasonable steps to discover the possible threat to the Plan and protect the Plan from it. [Doc. 309 at 31–32.] But Plaintiffs point to no case in which, on similar facts, an attorney was held liable for failing to discover a plan to harm a non-client.[14] Rather, "where non-clients . . . are concerned, an attorney's liability [for failing to protect from malfeasance] is generally limited to the narrow set of circumstances in which the attorney [himself] has committed fraud or a malicious or tortious act." *Baker v. Wood,*

---

[14]Plaintiffs cite *Moore v. Weinberg*, 681 S.E.2d 875 (S.C. 2009), and *South Carolina State Ports Authority v. Booz-Allen & Hamilton, Inc.*, 346 S.E.2d 324 (S.C. 1986) [Doc. 309 at 30–31], but neither is much help to Plaintiffs' cause. In *Moore*, the Supreme Court of South Carolina held that an attorney could "be liable to a third party for disbursing funds to the attorney's client where the attorney was aware that the funds were assigned to the third party." 681 S.E.2d at 587–88. But the Court made clear that under the facts of that case, the duty arose from the "attorney's role as an escrow agent and [wa]s independent of [the] attorney's status as a lawyer." *Id.* at 588. In *South Carolina State Ports Authority*, the Supreme Court of South Carolina held that "a duty to use due care, running from a consultant to the commercial competitor who is being critiqued [by the consultant], arises when the consultant undertakes to objectively analyze and compare the attributes of commercial competitors for the purpose of giving one a market advantage over the other." 346 S.E.2d at 376–77.

*Ris & Hames, Prof'l Corp.*, 364 P.3d 872, 877 (Colo. 2016); *see Estate of Cabatit v. Canders*, 105 A.3d 439, 443 (Me. 2014) ("In legal malpractice suits, therefore, except in egregious circumstances demonstrating such serious misdeeds as fraud, only a client with whom an attorney stands in privity of contract may bring a suit against the attorney."); *see also Hustler Cincinnati, Inc. v. Cambria*, 625 F. App'x 712, 718 (6th Cir. 2015) (noting that a departure from the general rule precluding attorneys' liability to third parties would be justified only under "special circumstances such as fraud, bad faith, collusion or other malicious conduct" (internal quotation marks omitted)); *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 371–72 (S.D.N.Y. 2013) (similar).   Because such circumstances are not alleged here, regardless of which state's law governs, the Court concludes Plaintiffs have failed to state a professional-negligence claim.[15]

### Aiding and Abetting

Plaintiffs also maintain that, even if the DP Defendants owed no duty of professional care to non-clients, Count X states a claim for aiding and abetting a conversion and for aiding and abetting the US Bank's breach of fiduciary duty based on the DP Defendants' forwarding Jason's wire instructions on the US Bank.  [Doc. 309 at 33–34.]  The DP Defendants contend, however, that Plaintiffs fail to allege the essential elements of aiding and abetting.  [Doc. 315 at 12.]  The Court agrees.

---

[15]The DP Defendants also maintain that Plaintiff failed to file a certificate required for professional negligence claims under both Pennsylvania and South Carolina law.  [Doc. 301-1 at 33–34 (citing Pa. R. C. P. 1042.3(a); S.C. Code Ann. § 15-36-100).] In light of the Court's conclusion that Plaintiffs have not properly pled facts giving rise to a duty of professional care, the Court declines to address this issue.

In considering the requirements for civil aiding-and-abetting liability, courts have generally looked to the Restatement (Second) of Torts § 876(b) (1979) for guidance. See Katerina P. Lewinbuk, *Keep Suing All the Lawyers:  Recent Developments in Claims against Lawyers for Aiding & Abetting a Client's Breach of Fiduciary Duty*, 8 St. Mary's L. J. on Legal Malpractice & Ethics 158, 164 (2017).  That section provides that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . ."  Restatement (Second) of Torts § 876(b) (1979); *see Grimm v. Grimm*, 149 A.3d 77, 88 (Pa. Super. Ct. 2016) (citing section 876(b)); *Sec. Title Agency, Inc. v. Pope*, 200 P.3d 977, 988 (Ariz. Ct. App. 2008) (same); *Future Group, II v. NationsBank*, 478 S.E.2d 45, 50 (S.C. 1996) (same); *see also Auto-Owners Ins. Co. v. Bolden*, 2017 WL 3923356, at *9 (D.S.C. Sept. 7, 2017) (dismissing claim for aiding and abetting under South Carolina law on basis that plaintiff failed to plead facts showing the defendant provided substantial assistance).  Thus, in most states, "to be found liable for aiding and abetting a breach of fiduciary duty, one must demonstrate that the party knew that the other's conduct constituted a breach of fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach." *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 174 (3d Cir. 2004); see *also BMG Rights Mgmt. (US) LLC*, 881 F.3d at 309 ("'An actor is liable for harm resulting to a third person from the tortious conduct of another "if he *knows* that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other."'" (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994)).

25

Even assuming that Plaintiffs' allegations satisfy the knowledge requirement, they satisfy the requirement of "substantial assistance or encouragement." Comment d to § 876 explains that "[t]he assistance of or participation by the defendant may be so slight that he is not liable for the act of the other." Restatement (Second) of Torts § 876 cmt.d. The Restatement provides the following example to illustrate the meaning of "substantial" in this context:

> A is employed by B to carry messages to B's workmen. B directs A to tell B's workmen to tear down a fence that B believes to be on his own land but that in fact, as A knows, is on the land of C. A delivers the message and the workmen tear down the fence. Since A was a servant used merely as a means of communication, his assistance is so slight that he is not liable to C.

Restatement (Second) of Torts § 876 illus. 9. Here, the Complaint alleges that Dilworth merely forwarded Jason's instructions on to the bank. The Complaint does not allege that Dilworth advised Jason concerning the preparation of the instructions, or even that Dilworth read the instructions and considered their legal implications before forwarding them along. Without such allegations, the Complaint alleges that Dilworth was "used merely as a means of communication." Such assistance is "so slight" as to not warrant aiding-and-abetting liability under the Restatement. Restatement (Second) of Torts § 876 cmt.d; *see Lovell v. United Airlines, Inc.*, No. Civ. 09-00146, 2009 WL 3172729, at * 5 (D. Haw. Oct. 2, 2009) (holding when defendants' "role was limited to serving as [a third-party's] means of communication with Plaintiffs," the plaintiffs failed to state an action aiding-and-abetting

claim).[16]  Accordingly, the Court concludes that Count X fails to state a cause of action for

aiding and abetting.[17]

For all of these reasons, the Court recommends that the motion to dismiss be

granted on Count X.

---

[16]Any argument by Plaintiffs for viability of their ERISA claim under Count II based on an aiding-and-abetting theory would fail for the same reason.

[17]Plaintiffs alternatively contend that Count X states a claim for "negligent misrepresentation that brings the claim outside of the attorney-client realm." [Doc. 309 at 32.]  However, each of the three states discussed requires that the plaintiff prove, among other elements, that the defendant negligently misrepresented a fact that the defendant justifiably relied on.  *See KB Home Tucson, Inc. v. Charter Oak Fire Ins.* Co., 340 P.3d 405, 412 n.7 (Ariz. Ct. App. 2014); *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999); *Hurst v. Sandy*, 494 S.E.2d 847, 852 (S.C. Ct. App. 1997).  The Complaint here does not allege either of those elements.

The Court notes that Plaintiffs request, alternative to the claim asserted in Count X, that this Court compel certain other defendants, none of whom had an attorney-client relationship with Dilworth, "to pursue this claim for the benefit of [Plaintiffs] and those similarly situated."  [Doc. 1 ¶ 215.]  Plaintiffs offer no basis in the law for entitling them to such relief, and the Court is not aware of one.

The Court finally notes that Plaintiffs ask that "if the Court finds that Michelin's allegations are deficient, Michelin requests that it be allowed to amend the Complaint." [Doc. 309 at 20.]  Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend should be freely given when justice so requires.  Plaintiffs have not provided an amended complaint for the Court or the other parties' consideration and review, nor have they indicated what additional factual allegations might be contained in a second amended complaint.  Therefore, the record before the Court contains nothing on which the undersigned could make a recommendation with respect to whether Plaintiff should be allowed to amend her Amended Complaint.

**CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, the undersigned recommends that the  DP

Defendants' motion to dismiss [Doc. 301] be GRANTED.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

January 28, 2019
Greenville, South Carolina