**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| **The Michelin Retirement Plan and the Investment Committee of the Michelin Retirement Plan,** | |
| **Plaintiffs,** | **Civil Action No.** 6:16-cv-03604-HMH |
| **and** | |
| **Chicago Transit Authority Retiree Health Care Trust; and the Board of Trustees of the Chicago Transit Authority Retiree Health Care Trust,** | |
| **Intervening Plaintiffs.** | |
| **v.** | |
| **Dilworth Paxson, LLP, BFG Socially Responsible Investments, Ltd., Burnham Financial Group, Inc., Burnham Securities, Inc., GMT Duncan, LLC, Thorsdale Fiduciary and Guaranty Company Ltd., Wealth-Assurance AG, Wealth Assurance Private Client Corporation, Timothy B. Anderson, Hugh Dunkerley, Jason W. Galanis, John P. Galanis, and Michelle A. Morton,** | |
| **Defendants,** | |

## AMENDED COMPLAINT IN INTERVENTION

Intervening Plaintiffs, the Chicago Transit Authority Retiree Health Care Trust and the Board of Trustees of the Chicago Transit Authority Retiree Health Care Trust (collectively, "**RHCT**") allege the following facts and principles of law for their Amended Complaint in Intervention.

## PRELIMINARY STATEMENT

1.     This case arises from a complex financial scheme orchestrated by known fraudsters to steal pension funds through the issuance of Native American tribal bonds.[1]

2.     On a bitter day in November 2014, Timothy B. Anderson ("**Anderson**"), then a partner with the law firm Dilworth Paxson, LLP ("**Dilworth**"), stood on a frozen plot of land on a remote Native American reservation in South Dakota with a shovel in his hand. Anderson was attending a groundbreaking ceremony for what should have been a new town center for the Wakpamni Lake Community, a subdivision of the Oglala Sioux Tribe.

3.     While Anderson kept up appearances with tribal representatives and their counsel, his "primary points of contact" and reputed fraudsters, Jason and John Galanis, were embezzling the funds that were to be used to build the town center where Anderson stood. That money had once belonged to pension funds, and ultimately retirees, including those in Chicago, Illinois and Greenville, South Carolina.

4.     The scheme had warmer beginnings. During a conference in Las Vegas in March, 2014, Anderson met with one of his former clients, Raycen Raines, the CEO of a tribal corporation affiliated with the Oglala Sioux Tribe, and notorious financial fraudster, John Galanis. Galanis had a proposal: Raines's tribal corporation, the Wakpamni Lake Community Corporation ("**WLCC**"), would issue bonds similar in some respects to municipal bonds. The bonds would then be sold to pension funds that invest in social welfare projects, like RHCT. The

---

[1]     Like RHCT's initial pleading, the factual allegations in this Amended Complaint are based substantially on information disclosed during three actions brought by the Securities and Exchange Commission and the United States Department of Justice, respectively. *See SEC v. AAM*, 15 Civ. 9764 (WHP) (S.D.N.Y.); *United States v. Jason Galanis, et al.*, 15 Cr. 0643 (PKC) (S.D.N.Y.); *SEC v. Devon D. Archer et al.*, 16 Civ. 3505 (WHP) (S.D.N.Y.).    Further, RHCT's Amended Complaint reflects information first publicly disclosed through testimony during the May and June 2018 trial in the criminal case, *United States v. Jason Galanis, et al.*, 15 Cr. 0643 (PKC) (S.D.N.Y.).

proceeds would then be used by WLCC to promote economic development on the Oglala Sioux's Pine Ridge Reservation in South Dakota.

5.      But what sounded too good to be true was.  In reality, the bonds were a scheme by John and Jason, the latter of whom had loose affiliations with a New York investment firm, Burnham Securities, Inc. The bonds would be funded, entirely, by a suspect offshore private equity annuity that was also connected to the Galanises.  If the annuity failed, the bonds failed, and the investors would be left without recourse due to the tribe's sovereign status.

6.      To carry out the transaction, the Galanises relied heavily on Anderson, who was intrigued by the business opportunities his new clients presented. Anderson's primary counterpart for WLCC was Raines's girlfriend (later wife), a partner at a prestigious law firm, Greenberg Traurig, LLP ("**Greenberg**").  For months in 2014, Dilworth and Greenberg, blinded by their own personal and economic motivations, negotiated and documented the bond issuance, recklessly ignoring the mounting signs that the annuity was, as Hugh Dunkerley put it during the 2018 criminal trial, "a lie."

7.      Galanis also needed purchasers for bonds—purchasers who were either willing to tolerate extreme risk or, better, who would have no idea the bonds were being purchased in the first place. To that end, Jason Galanis took control of Hughes Capital Management, Inc. ("**HCM**"), an institutional investment firm in Alexandria, Virginia that advised on socially conscious investments. Galanis then installed officers, Michelle Morton and Gary Hirst, individuals he knew would carry out his instructions. Galanis, Hirst and Morton then identified nine pension funds and, disregarding their investment guidelines, signed them up as bondholders.

8.      The transaction could not have closed without cover from Galanis's "professionals."  As a condition of closing, Dilworth issued an opinion letter containing

materially misleading statements about the transaction, the annuity, and the authorization of WLCC to issue the bonds. Dilworth also assisted HCM in preparing an unauthorized accredited investor letter (a so-called "Big Boy letter") for HCM's clients, so that the transaction could be exempt from securities registration requirements.

9.    On August 25, 2014, the first tranche of bonds closed, and the pension funds were placed into a trust account at U.S. Bank. Within days, over $22 million dollars had been wired, with Anderson's assistance, not to an annuity but to a bank account controlled by Galanis in contravention of the agreements. A few days later, Galanis and Dunkerley were stealing the proceeds. The investors were left in the dark for over a year and a half, until the SEC and Department of Justice caught up with the fraudsters in the spring of 2016.

10.    This scheme was carried out by the same general participants and professionals, not once **_but three times_**, with each issuance further depleting the retiree funds that had been stolen.  Eventually, the pension funds were left with over $43,000,000 in collective losses. The Oglala Sioux in South Dakota were similarly victimized, left without the resources to finish the husks of buildings standing where Anderson himself had stood just a year before.

11.    Until recently, this transaction, and the facts behind it, have been largely shrouded from the bondholders by the criminal and SEC investigations and actions in the Southern District of New York. Now, with those facts coming to light, RHCT seeks to recover its losses from those who caused them.

## **PARTIES**

12.    Intervening Plaintiff RHCT is a pension fund, and body politic and corporate of the State of Illinois, established under the Illinois Pension Code (40 ILCS 5/22-101B), to provide

healthcare benefits to retirees of the Chicago Transit Authority, an independent governmental agency of the City of Chicago, Illinois.

13.     RHCT is administered by its Board of Trustees, but also maintains employees, including an Executive Director, who oversee the day-to-day administration of RHCT and its health care plan. RHCT has its principal place of business in Chicago, Illinois, from which RHCT is administered and where its employees work. Its Board of Trustees, who are officials of the body politic and corporate, are all residents of Illinois.

14.     RHCT provides retirement benefits for all levels of retired CTA employees. This includes the many women and men who drive and maintain the fleet of trains, buses and other vehicles used by the CTA to provide transit services to the City of Chicago. The preservation and recovery of retirement funds is of critical importance to RHCT, the retirees who depend on it, the City of Chicago, and the State of Illinois.

15.     Plaintiff Michelin Retirement Plan ("**Michelin**") is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") 29 U.S.C. §1001, *et seq*. **Michelin** was established and is maintained by Michelin North America, Inc. ("**MNA**"), a corporation with its principal place of business in Greenville, South Carolina. Michelin serves an important purpose of providing retirement funds for individuals who work for MNA, including many women and men who reside in Greenville, South Carolina.

16.     Plaintiff the Investment Committee of the Michelin Retirement Plan ("**Michelin Investment Committee**") is a fiduciary of **Michelin**. On information and belief, the Michelin Investment Committee is comprised of individuals who reside in Greenville, South Carolina.

17.     Defendant Jason Galanis resided in Los Angeles, California, but is now currently incarcerated at in San Pedro, California at the Terminal Island Federal Correction Institution.

18.    Defendant John P. Galanis resided in Oceanside, California, but is now incarcerated in in Brooklyn, New York at the Metropolitan Detention Center.

19.    Defendant Hugh Dunkerley ("**Dunkerley**") has resided in Paris, France, but is currently believed to reside in Huntington Beach, California.

20.    Defendant Michelle Morton ("**Morton**") resides in Colonia, New Jersey.

21.    Defendant Burnham Securities, Inc. ("**Burnham Securities**") is a New York corporation with its principal place of business in New York.

22.    Defendant Burnham Financial Group, Inc. ("**Burnham Financial**") is a Delaware corporation with its principal place of business in New York.  Burnham Financial is the holding company for Defendant Burnham Securities.

23.    Defendant Wealth-Assurance AG ("**Wealth Assurance**") is a Lichtenstein Aktiengesellschaft with its principal place of business in Lichtenstein and is a subsidiary of Wealth Assurance Holdings Ltd. n/k/a Valor Group Ltd., a Bermudan entity.

24.    Defendant BFG Socially Responsible Investments, Ltd. ("**BFG**") is a Nevada limited liability company. It is a wholly owned subsidiary of Wealth Assurance.

25.    Defendant GMT Duncan, LLC ("**GMT**") is a Delaware limited liability company. The sole Class A members of GMT were Richard Deary, who on information and belief resides in Raleigh, North Carolina, and Michelle Morton, who resides in New Jersey.  Defendant BFG owned 100 percent of the preferred Class B membership interests of GMT.

26.    Defendant Thorsdale Fiduciary and Guaranty Company Ltd. ("**Thorsdale**") is a Nevada domestic limited liability company. On information and belief, the members of Thorsdale are Ralph Berger (Jason Galanis's father-in-law) and Lucas Mann. On information

and belief, Mr. Berger is now deceased, but was residing in Las Vegas, Nevada. On information and belief, Mr. Mann resides in California.

27.     Defendant Dilworth is a law firm operating as a limited liability partnership organized under the laws of Pennsylvania and has offices throughout the Middle Atlantic States, with no offices in Illinois or South Carolina. As of this Amended Complaint, none of Dilworth's partners listed on its website are identified as working from or residing in Illinois or South Carolina. Only one is identified as being admitted to practice law in Illinois, but with a primary office in Philadelphia. None are identified as being licensed to practice law in South Carolina. None of Dilworth's partners (including the sole partner identified on its website as being admitted to practice law in Illinois) are currently registered as attorneys practicing in Illinois with the Illinois Attorney Registration and Disciplinary Commission.

28.     Based on information and belief, all of Dilworth's partners are citizens of states other than Illinois and South Carolina.

29.     At all times relevant, Defendant Anderson was a Dilworth partner, but now works for another law firm from its Philadelphia address. On information and belief, Anderson is a citizen of Pennsylvania.

30.     Defendant Wealth Assurance Private Client Corporation ("**WAPCC**") is a Florida for-profit corporation with its principal place of business in Florida.

## JURISDICTION AND VENUE

31.     RHCT incorporates all allegations set forth above.

32.     Pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1965, this Court has federal question jurisdiction as to the claims arising under the Federal Securities Laws and Racketeer

Influenced and Corrupt Organizations Act ("**RICO**"). This Court has supplemental jurisdiction over all other claims asserted in this complaint pursuant to 28 U.S.C. § 1367.

33.     Pursuant to 28 U.S.C. § 1332, this Court also has diversity jurisdiction, as all of the plaintiffs in this case are citizens of different states from all of the defendants, and the amount in controversy exceeds $75,000.

34.     Pursuant to S.C. Code Ann. § 36-2-803(A)(1), (3), and (7), this Court has personal jurisdiction over the Defendants since the bond issuance involved: (1) knowingly transacting business in South Carolina (the placement and sale of bonds to registered owners known to reside in South Carolina); (2) knowingly committing a tortious act in part in South Carolina (theft of retirement funds, unauthorized assistance in drafting private placement materials on behalf of a South Carolina retirement plan, interference with an investment management agreement with a South Carolina retirement plan); and/or (3) knowingly entering into a contract to be performed in part in South Carolina (a bond and bond indenture).

35.     Venue lies in this district pursuant to RICO, 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(b). Venue also lies in this district pursuant to S.C. Code Ann. § 15-7-20.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

36.     RHCT incorporates all allegations set forth above.

**A.     RHCT Enters Into an Investment Management Agreement with Hughes Capital Management, Inc.**

37.     On or about September 9, 2009, RHCT entered an Investment Management Agreement (hereinafter, the "**RHCT Agreement**") with investment advisor, HCM. HCM's business was to assist public and large private pension funds with investments in socially conscious programs.  HCM was to manage and invest certain RHCT retirement funds in

accordance with the RHCT Agreement, and the investment guidelines attached thereto, which limited the authority of HCM to invest RHCT's funds in high-risk or speculative securities.

38.    At all times relevant, HCM owed RHCT a fiduciary duty of loyalty and care, which included the obligation not to invest RHCT's funds outside of HCM's authority, to avoid conflicts of interests and self-dealing, and to avoid transactions that were known to be, or should have been known to be, fraudulent or highly speculative.

### B.    Defendants' Creation of the Fraudulent Bond Scheme.

39.    White collar crime runs in the Galanis family.  John "Yanni" Peter Galanis, has been the subject of numerous prior criminal proceedings and SEC enforcement actions dating back to the late 1960s.  A simple internet search of John Galanis reveals dozens of articles detailing his extensive financial crimes over five decades.

40.    In 1973, John Galanis was charged in the Southern District of New York with mail fraud and conspiracy to make false statements to the SEC in connection with a scheme to hide investment losses by Microthermal Applications, Inc. from its investors through a fraudulent and backdated reverse merger.

41.    In May 1987, John Galanis was again charged in the Southern District of New York with conspiracy to defraud the IRS, tax fraud, racketeering, securities fraud, bank fraud and bribery in connection with a scheme connected to the Transpac Drilling Venture Program.

42.    Several months later, in January 1988, John Galanis was charged in New York County Supreme Court with Grand Larceny in the Second Degree, arising out of a separate criminal scheme focused on the real estate industry.

43.     John Galanis was subsequently sentenced to 27 years imprisonment for his various financial crimes. The sentence was widely reported in news articles that were publicly available on the internet at all times relevant to this Amended Complaint.

44.     John Galanis was eventually paroled in 1998, but later absconded from a work release program and remained a fugitive for over a year, before being remanded to state custody in November, 2001. He was subsequently paroled on 2007.

45.     In 2005, John's son, Jason Galanis, was the subject of a SEC enforcement action, *SEC v. Penthouse Int'l, Inc.*, 05 Civ. 0780 (S.D.N.Y.), for accounting fraud and financial reporting violations.  On April 27, 2007, Jason Galanis was enjoined from violating securities regulations and was barred from serving as an officer and director of a public company for a period of five years.

46.     In 2013, Jason and John Galanis set in motion the financial fraud that would ultimately lead to the Wakpamni bond issuance.  To do so, they engaged several of Jason's colleagues and acquaintances, including but not limited to Defendants Dunkerley and Morton, as well as the following individuals: Devon Archer ("**Archer**"), Gary Hirst ("**Hirst**"), Bevan Cooney ("**Cooney**"), Jason Sugarman ("**Sugarman**") and Francisco Martin ("**Martin**").

47.     To carry out the bond issuance, the Galanises needed four components: (1) a financial services conglomerate with the connections and capital to organize the bond issuance; (2) an issuer with a unique defense to liability such as sovereign immunity; (3) a seasoned bond lawyer willing to ignore glaring red-flags in hopes of earning future business; and (4) most importantly, unknowing purchasers who had placed their trust in an socially conscious investment manager.

### 1.    The Financial Services Conglomerate

48.    In 2003, Dunkerley moved from the United Kingdom to Laguna Beach, California.  Over the next several years, Dunkerley held various positions at different financial management and securities firms, before ultimately becoming the Manager of Capital Markets for the West Coast Region for the Federal Deposit Insurance Corporation ("**FDIC**").

49.    In early 2011, Dunkerley was "headhunted" from the FDIC by a man named Steven Sugarman, the head of a California financial services firm called COR Capital, LLC. On information and belief, including testimony from Dunkerley, COR Capital is related to Banc of California, now a publicly traded company (NYSE: BANC).

50.    Shortly thereafter, Steven Sugarman introduced Dunkerley to Jason Galanis. Prior to their first meeting, Sugarman informed Dunkerley that Galanis had a "mixed reputation" and that Dunkerley should meet Galanis and decide for himself what to think of him.

51.    At the time, in 2011, Dunkerley performed internet research and learned about Jason Galanis's prior trouble with the SEC.

52.    In the years that followed, Dunkerley, Steven Sugarman, and his brother, Jason Sugarman, undertook a plan to "rollup" several different financial services companies into one "conglomerate" under the "COR Capital" umbrella. According to Dunkerley, Jason Galanis, Cooney, and Archer each eventually became involved in the COR financial services rollup plan.

53.    To carry out the "rollup," Archer, Cooney, Dunkerley and Galanis, with the assistance of the Sugarmans, and acting in concert with the "COR Group" of entities, formed two companies described by Dunkerley as "special purpose vehicles:" COR Fund Advisors, LLC ("**CORFA**") and Wealth Assurance Holdings Ltd.

54.    In 2013, CORFA was used to acquire a financial stake in a struggling New York investment firm, Burnham Financial.  Burnham Financial was a holding company that owned the investment broker, Burnham Securities, among other things.

55.    Through a series of transactions and a leveraged buyout, CORFA effectively took over Burnham Financial and its subsidiaries, including Burnham Securities, moving the entities under a new umbrella company, Burnham Asset Management.

56.    Separately, Wealth Assurance Holdings was used to acquire a foreign insurance company, Wealth Assurance AG. The Wealth Assurance transaction was brought to COR by Jason Galanis through a broker he knew in the United Kingdom. According to Dunkerley's testimony at trial, Archer, Cooney, Jason Sugarman, and an associate, Gary Hirst, all assisted in financing the acquisition of Wealth Assurance.

57.    With Burnham and Wealth Assurance firmly under the "COR Group" ownership, Galanis, Archer, Cooney, Dunkerley and others took control of these entities, installing themselves and their colleagues on the boards and in other management positions.  Having done so, Galanis began hatching a new scheme that would allow him and his friends to gain access to a "discretionary" source of funds, as Galanis called it in an email to Archer.

**2.    The Issuer and the Attorney.**

58.    By the time he met John Galanis in 2014, Dilworth attorney, Timothy Anderson, had significant experience with tribal bonds. Between approximately 2006 and 2014, Anderson had worked on approximately "five to 10" other Native American bond issuances.

59.    Prior to 2014, Anderson had previously represented the Wakpamni District, a subdivision of the Oglala Sioux Tribe (hereinafter the "**Tribe**") located in South Dakota, on several economic development projects.

60.    In March, 2014, Anderson, acting in his capacity as an agent of Dilworth, traveled to Las Vegas to attend an annual conference on tribal economic development projects. Anderson had worked on a number of tribal projects in the past, and several of his clients were attending the conference.   In addition, Anderson was hopeful that the conference would lead to new business opportunities.

61.    While in Las Vegas, Anderson received a call from one of his contacts from the Wakpamni District, a man by the name of Raycen Raines, the so-called "tribal economic developer" for the Wakpamni Lake Community, a sub-division of the Wakpamni District.

62.    Raines informed Anderson that he and another individual, Steven Haynes of Haynes Investments, LLC, had been contacted by John Galanis to discuss a business proposal. Raines wanted Anderson to attend the meeting with Galanis to discuss the proposal.

63.    The proposal that John Galanis wanted to discuss was the issuance of a tribal economic development bond.  Under the proposal, WLCC, a tribal corporation formed by the Wakpamni Lake Community, would issue debt in the form of bonds with the proceeds to be invested in an annuity contract.

64.    According to John Galanis's plan, the payments made on the annuity contract would fund the principal and interest payments due on the debt, leaving enough funds left over for the tribal development work on the reservation.

65.    During the 2018 criminal trial, Anderson admitted under oath that he believed that the use of the proposed annuity to service the bond debt was "novel," and that "the annuity concept was something new." In other words, an experienced bond lawyer and a member of the National Association of Bond Lawyers, had not, before meeting John Galanis, been involved with bonds that depended on the performance of an annuity contract.

66.     During the March, 2014 meeting, John Galanis stated that the bonds would be placed (*i.e.*, sold) by his son, Jason, who was an investment banker with Burnham Securities in New York. John Galanis explained that he was helping Jason get deals for Burnham.

67.     A simple internet search by Anderson at the time would have disclosed that both John and Jason Galanis were known fraudsters and that their offering was inherently suspect.

68.     From the first meeting in March, 2014, John Galanis was clear about who he had targeted to purchase the bonds: *pension funds*.   Galanis explained that pension funds had investment requirements that required a portion of their assets to be invested in programs and securities that promote good causes, such as community or tribal development. As a result, Galanis explained, pension funds would create a market for the proposed bonds.

69.     Approximately six weeks later, Raines contacted Anderson and informed him that the project was going forward. Shortly after that communication, Anderson received an email from John Galanis, introducing Anderson to his son, Jason, and his colleague, Hugh Dunkerley.

70.     In the discussions with the Galanises that followed, it became clear that Anderson could not represent both the issuer (WLCC) and Burnham in the transaction and would need to choose which client to represent.   Although Anderson had previously represented WLCC, he recognized that Burnham presented more business opportunities and was closer to his office.

71.     On June 14, 2014, Anderson prepared a form engagement letter for Burnham to sign in connection with the bond project. **Exhibit A**. The engagement letter was directed to Hugh Dunkerley at Burnham Securities, Inc., with an address at 18500 Von Karman Ave, Suite 650, Irvine, California.

72.     On information and belief, Burnham Securities does not have, and never had, offices in California.

73.    In the engagement letter, Anderson disclosed the potential conflict created by his prior representation of the "Wakpamni Lake Community" in South Dakota. **Ex. A**, § 8. Anderson noted that he had obtained a similar waiver from the Community in South Dakota.

74.    The Dilworth Engagement Letter was signed by Anderson on behalf of Dilworth and was signed by Hugh Dunkerley as a "Managing Director" of Burnham Securities. In the lower left-hand corner of the engagement letter was a nine-digit "Doc ID" number, 116871020_1, reflecting that the document had been prepared by Dilworth's office.

### 3.    The Victims

75.    By late spring, 2014, Jason Galanis and his accomplices were only missing one component of their fraud: bond purchasers.  As Anderson testified during the criminal trial, the initial bond issuance was supposed to close at the end of July 2014.  However, the closing had to be pushed back, which Anderson understood to be because Galanis and/or Burnham Securities was having a difficult time locating purchasers for the bonds.

76.    From inception, John and Jason Galanis had targeted pension funds for the bond issuance. However, none of their companies in the COR conglomerate had investment control over pension funds that could be exploited by the Galanises.

77.     On or about May 9, 2014, Jason Galanis sent an email to Devon Archer and Bevan Cooney, the subject of which was "Hughes Asset Management [sic]." In the email, Galanis wrote that an associate had "brought us an RIA [registered investment adviser] to acquire. Possibly useful." Galanis went on to state "can buy for 1.7x fee ($3.4 million) with 70% down.  The deal referral comes from two competent sounding marking people (resumes attached)." Attached to Galanis's email were the biographies of Michelle Morton and her business partner, on information and belief, Richard Deary.

78.    Galanis recognized that HCM had management control over certain pension fund clients and intended to acquire HCM to complete the bond issuance.

79.    On June 3, 2014, Jason Galanis gave Morton a document to provide to HCM's then owner, Frankie Hughes, to "demonstrate who [Morton's] financial sponsors are." The document described CORFA as a private equity control investor that owned several businesses, including Wealth-Assurance and Burnham Securities. On June 5, 2014, Jason Galanis sent Morton a term sheet outlining the terms by which CORFA would directly or indirectly (through a subsidiary) finance GMT's purchase of HCM.

80.    On August 1, 2014, Jason Galanis sent Morton a text message stating that he would form BFG—the entity through which the funding of the acquisition would be channeled— the next day. On August 5, 2014, at the direction of Jason Galanis, Dunkerley formed BFG and became its managing member. BFG was supposedly a subsidiary of Wealth Assurance.

81.    One week later, GMT entered into an amended and restated operating agreement with its members, pursuant to which BFG became a "Preferred Member" in GMT. The agreement was signed by Dunkerley on behalf of BFG and stated that notices to BFG were to be sent to Archer. After the acquisition, HCM became GMT's subsidiary and Morton and her business partner became officers of HCM.

82.    On August 12, 2014, Jason Galanis arranged for Wealth Assurance to fund BFG's initial capital contribution of $2,660,618 to GMT, which GMT used to finance its purchase of HMC. On information and belief, at Dunkerley and Galanis's direction, Valor Group (at the time, Wealth Assurance Holdings) provided the money to Wealth Assurance to give to BFG.

83.    At all times, Dunkerley and Galanis were agents of these entities, acting on their behalf and using their authority to acquire HCM for the purposes of carrying out the unlawful WLCC bond issuance.

84.    Morton knew that Jason Galanis's agreement to finance the acquisition of HCM was contingent on her agreement to invest the funds of clients of HCM, including RHCT, in WLCC Bonds. In July 2014, even before the purchase of HCM was complete, Morton e-mailed Jason Galanis "an update on how we will place the bonds in a portfolio" and promised him via text message, "I will make sure you make a TON of money and smile all the way to the bank." Similarly, on August 12, 2014, Morton sent Jason Galanis a text message noting, "You invested because of the bonds not me," to which he responded: "The bonds are only possible because of you my dear."

85.    Before GMT completed its purchase of HCM, Jason Galanis introduced Morton to Hirst as a potential CIO. On August 12, 2014, Hirst sent Morton a draft employment contract. Hirst and Morton executed the contract and related paperwork that same day. Hirst's employment contract was with GMT, not HCM.

86.    A few days later, Hirst informed Morton that he did not want HCM to disclose his name in its form ADV, a form that investment advisers registered with the Securities Exchange Commission are required to file. For that reason, Hirst decided to resign as CIO of HCM and, instead, act as a paid investment consultant, a position that he believed would not require disclosure on HCM's form ADV. As Morton told Jason Galanis, "In regard to Hirst, he opted to be a consultant because as an employee he would have been required to make certain disclosures for our ADV . . . . If we want to follow the contract which has him as CIO it [is] no problem, we just have to change the title, but he has to make the disclosures per regulations."

C.    **Galanis's "Professionals" Execute the Bond Scheme For the First Time.**

87.    Raines testified during the criminal trial that he is the CEO of WLCC. At all times, Raines acted on behalf of WLCC to coordinate and carry out the bond issuance.

88.    On information and belief, in or about May, 2014, Anderson informed Raines that he would be representing Burnham Securities, not WLCC, in the bond transaction. Raines thereafter put Anderson in contact with a lawyer that Raines knew at Greenberg Traurig, LLP, who would act as counsel for WLCC.

89.    Heather Dawn Thompson is a partner with Greenberg Traurig.  Prior to joining Greenberg, Thompson had been an attorney on the Oglala Sioux Pine Ridge Reservation in South Dakota. Thompson specializes in matters related to tribal law and tribal economic development. Thompson was assisted in the representation by two of her partners at Greenberg.

90.    Thompson is now married to Raines, but according to Raines, the two were only "dating" at the time of the bond transactions.

91.    Anderson also contacted U.S. Bank, with which Anderson had worked on other bond issuances, to serve as the indenture trustee. U.S. Bank agreed.

92.    Over the next several months Dilworth, Greenberg and U.S. Bank carried out Jason Galanis's bond transaction, which required the preparation and execution of several documents, without which the transaction would not have occurred.

1.    **The Bond and Annuity Documents**

93.     In early June, 2014, Anderson sent Greenberg a draft placement agency agreement to be entered into between Burnham Securities and WLCC. The draft placement agency agreement was addressed to Raines.

94.     In response, one of Greenberg's attorneys stated that a more detailed placement agency agreement would be appropriate, particularly in light of the "unique" financing (*i.e.*, annuity) for the bonds.

95.     Besides the annuity, the bonds that Anderson was preparing were "unique" in other respects.  For one, they were to be physically delivered to the bondholders, and not placed electronically through the Depository Trust Company ("**DTC**"). This was because Burnham Securities had no ability to place bonds electronically through the DTC.

96.     This was unusual and should have further concerned Anderson. Most modern bond transactions are placed electronically through the DTC and not through physical paper delivery. The fact that Burnham lacked the ability to place the bonds through the DTC should have called into question whether Burnham was qualified to act as a placement agent.

97.     Anderson prepared a series of bond documents, which were shared with Greenberg and ultimately, U.S. Bank, including but not limited to: (a) a bond indenture agreement ("**Indenture**"); (b) a closing agenda; and (c) a closing statement.

98.     The Indenture that Dilworth prepared defined the "**Annuity Investment**" as "a contract . . .  between [WLCC] and the Annuity Provider." **Exhibit B**, § 1.2.  "**Annuity Provider**" was defined as "a company that provides Annuity Investments as part of its regular course of trade or business." *Id.*

99.     The various drafts of these documents shared among Dilworth, Greenberg, and U.S. Bank reflect that there was a high degree of uncertainty over who would be serving as the Annity Provider, as well as the investment manager for the annuity, right up until closing.  This should have been concerning to each of these parties, given that they knew that the bonds would fail without a solid annuity to back the debt service.

100.    Up until a few weeks before closing, the draft Indenture simply left a blank (*i.e.*, _____) where the investment manager for the Annuity Contract was to be identified.

101.    A later draft Indenture dated August 19, 2014 (just six days prior to closing) required WLCC to provide U.S. Bank, at closing, with "A letter of appointment appointing Wealth Assurance AG, as the investment manager with respect to the Annuity Investment." See **Ex. C**, § 2.11(e). Similarly, the Distribution List and Closing Agenda at one point both identified "Wealth Assurance AG" as the annuity provider. **Ex. D & E**.

102.    However, the final draft of the Indenture, executed just days later, referred to a different entity, a company called Private Equity Management, Limited ("**PEM**"). **Exhibit B**, § 2.11(e).  The final Indenture also left open how funds would be distributed to the Annuity Provider, providing only that it would be "as set forth on the Closing Statement." *Id.*, § 2.12.

103.    During the criminal trial, Anderson admitted under oath that the "economic performance of the annuity was important to the bond" and that if Wealth Assurance could not satisfy the necessary payment schedule, the deal would not work. Anderson further testified that "the legal structure [of the bonds] worked if the economics were good."

104.    Anderson believed that his role as counsel for the placement agent did not require him to look into or investigate the economics or perform diligence in connection with the proposed $28,000,000 bond deal he was organizing.

105.    Regardless of the economics, it should have been apparent to Anderson early on that "Wealth Assurance AG" had no real connection to the shell company that would eventually be selected to serve as the "Annuity Provider."

106.    Between July 7 and 8, 2014, Anderson received emails from John Galanis with draft annuity contracts (hereinafter, the "**Annuity Contract**"), not with Wealth Assurance AG,

but instead with a company called "Wealth Assurance Private Client Corporation" ("**WAPCC**"), which was purportedly located in the British Virgin Islands.  In his July 8, 2014 email, John Galanis told Anderson that he had "proofed the annuity and made several changes."

107.    John Galanis had no connection to Wealth Assurance AG, so the fact that John Galanis was reviewing and negotiating the annuity contract should have been concerning to Anderson.

108.    On or about August 5, 2015, Anderson provided comments on another draft Annuity Contract between WLCC and WAPCC. This time, Anderson was sending his comments to Jared Galanis, an attorney, and John's son and Jason's brother.

109.    Again, Jared's role in negotiating and coordinating the Annuity Contract should have been alarming to Anderson, giving the conflicts associated with having the Galanis family involved in the transaction in multiple roles, including as counsel.

110.    It was also unusual that Anderson, who neither represented WLCC or WAPCC, was negotiating and reviewing the Annuity Contract instead of Greenberg.

111.    The draft Annuity Contract was to be signed on behalf of WAPCC by Hugh Dunkerley, the same individual who had signed Anderson's engagement letter as Burnham Securities' Managing Director.

112.    This was yet another red flag that should have caused Anderson to investigate the proposed annuity before opining on the transaction.  Here, the so-called "Annuity Provider," on which the entire legality of the bond transaction hinged, appeared to be nothing more than another fly-by-night entity set up by the Galanises and Dunkerley, and not a company that provides annuities as part of its "regular trade or business," as required by the indenture that Anderson had, himself, prepared. **Ex. B,** § 1.2.

113.    The final version of the Annuity Contract, which Anderson had reviewed, required signatories to physically travel to a "jurisdiction to be selected by [WAPCC]" to execute the agreement.  **Exhibit F** at 7, § 5.  The Annuity Contract also expressly stated that the proceeds from the bond issuance "shall be wire transferred by [WLCC] to the issuer at a bank to be selected by [WAPCC] *which bank shall be a bank without any offices and/or branches in the United States.*" **Ex. F**, at 7, § 5 (emp. add).  The annuity contract further provided, "the purchase payment must be received at the Home Office," which was defined as an office in the British Virgin Islands. *Id.* at 3.

114.    The jurisdictional closing requirements in the Annuity Contract were not insignificant. On information and belief, the act of physically signing the document offshore and wiring the funds offshore was necessary to obtain the tax benefits of using an offshore investment.  As such, the parties who had reviewed and negotiated the Annity Contract knew or should have been aware of these requirements.

115.    In connection with the Annuity Contract, WLCC entered into a separate investment management agreement with yet another "British Virgin Islands" entity, PEM. The PEM Investment Management Agreement, which Anderson had also reviewed, gave PEM a high degree of control over how the bond proceeds would be invested in the WAPCC Annuity. PEM was to be managed by yet another Galanis associate, Francisco Martin. Like the Annuity Contract, Jared Galanis was assisting in the negotiation of the Investment Management Agreement with PEM.

### 2.    The HCM "Big Boy" Private Placement Letter

116.    The Annuity Contract called for the proceeds of the bonds to be invested in "private equity."  RHCT's investment guidelines, and on information and belief, the investment

guidelines of the other bondholders, generally prohibit investment in such securities, which usually carry a high degree of risk.

117.    Anderson testified during the criminal trial that, based on his experience, Native American bonds are usually unrated. RHCT's investment guidelines, and on information and belief, the investment guidelines of the other bondholders, generally prohibit investment in such bonds.

118.    In a typical bond issuance, a private placement memorandum ("**PPM**") would have been prepared outlining the details of the bond issuance and disclosing the potential risks to prospective investors.

119.    Early in the transaction, Greenberg had also recommended to Anderson that it "may be appropriate under the circumstances" for a PPM to be prepared so that it could be provided to the "investors." Greenberg suggested that the PPM disclose, among other things, the source of revenue for the debt service and "risk factors (investment considerations)." Given the timing of the transaction, Greenberg even offered to draft the PPM.

120.    On information and belief, neither Anderson, nor Greenberg, nor anyone else, drafted a PPM for the 2014 WLCC Bonds. No PPM was provided to RHCT, and on information and belief, the other bondholders.

121.    On July 30, 2018, Anderson circulated another draft of a proposed closing agenda. Among the various closing documents identified on the closing agenda was a "Purchaser's letter re: Private Placement."  The responsible party for preparing this document was identified on the closing agenda as "Counsel for Placement Agent" (*i.e.,* Dilworth).

122.    To qualify for an exemption to the securities registration requirements for private securities placements under Regulation D, the Bonds would have to be placed with "accredited

investors." In such transactions, investors often provide a letter acknowledging that they are "accredited," that the investor understands the security is being offered as part of a private placement, and that the investor understands there may be material non-public information regarding the security that has not been disclosed. These letters are generally known in the industry as "Big Boy" letters.

123.    In mid-August, 2014, at Morton's direction, HCM's chief compliance officer reviewed and analyzed the investment guidelines of seven HCM pension fund clients to determine whether their investment guidelines presented a basis to acquire the WLCC bonds.

124.    On August 14, 2014, HCM's compliance officer sent Morton an email concluding that most of the funds' investment guidelines prohibited the acquisition.  The HCM officer specifically noted that RHCT's guidelines appeared to prohibit the investment but suggested that Morton check with RHCT. The HCM officer also noted that Michelin's guidelines prohibited the investment.

125.    HCM never contacted RHCT, or on information and belief, any of the other pension plan bondholders, to discuss, let alone authorize, the acquisition of the WLCC bonds.

126.    By August 20, 2014, HCM had solidified which pension funds it would use to fund Galanis's bonds (including RHCT and Michelin, which HCM's compliance officer had determined were unlikely to permit the purchase of the bonds).

127.    To push the bond issuance forward, Anderson prepared a form "Big Boy" letter for HCM to finalize on behalf of the pension funds that would be purchasing the WLCC bonds. All HCM needed to do was fill in the names.

128.    Like Dilworth's other documents, the Big Boy letter bore Dilworth's DOC ID number, reflecting that it had been prepared, at least in part, by Dilworth. **Exhibit G.**

129.    On information and belief, HCM did not have independent counsel review the "Big Boy" letter that Dilworth had prepared, or otherwise assist in the nearly $25 million dollar private bond placement.  Instead, HCM, specifically Michelle Morton, relied on Dilworth to prepare the documents and coordinate communications so that HCM could acquire the bonds.

130.    The "Big Boy" letter that HCM and Anderson had prepared reflected the names of the public and private pension plans that would be purchasing the first tranche of WLCC bonds, including one in Chicago, the "Chicago Transit Authority," and one in South Carolina, the "Michelin North America Master Trust."

131.    The Chicago Transit Authority is not a pension plan and did not have an investment management agreement with HCM. Instead, the pension fund referred to by HCM was, in fact, RHCT.

132.    Anderson and Dilworth would have known that had they looked at the RHCT Agreement with HCM, which would have disclosed the full name of the pension fund.  At a minimum, Anderson knew by August 20, 2014 that a pension fund related to the Chicago Transit Authority was one of the identified bond purchasers.

133.    The "Big Boy" letter that HCM sent back to Anderson was signed by Michelle Morton, on behalf of HCM, and not the individual pension plans.

134.    Anderson testified that the fact that the letter was signed by Hughes, and not the individual plans, was "not odd, but certainly not the usual."  When asked on cross examination, "Usually, in the normal course of events, the pension funds themselves would sign that type of letter," Anderson responded "Correct, yes."

135.    On cross examination during the criminal trial, Anderson acknowledged that he had performed no due diligence with respect to the investors who were purchasing the bonds.

136.    The HCM "Big Boy" letter was a necessary component of the bond transaction, particularly given that no PPM had been submitted to the individual bondholders. Without the HCM "Big Boy" letter, the 2014 WLCC bonds would not have been issued as unregistered securities and the transaction would not have closed.

137.    As Anderson testified during the criminal trial, on August 24, 2014, the day before the first tranche of WLCC Bonds were issued, he received an email from Jason Galanis, copying Michelle Morton, with the subject line "Terrapin Wilmington Trust." The email contained delivery instructions for eight of the initial WLCC bondholders.

138.    At trial, Anderson read aloud the identity of the initial WLCC bondholders reflected on Galanis's August 24, 2014 email. As he read the exhibit, he identified one of the bondholders as "**The Chicago Transit Authority Retiree Healthcare [sic] Trust, $4,079,499**"

139.    The bond that was proposed for Michelin, a South Carolina pension fund, was by far the largest bond acquired in the first tranche, at total of $8,102,154.  Michelin's bond was nearly twice as large as any other bondholder in the tranche and represented approximately a third of the total bond proceeds from the tranche.

140.    As such, nearly a third of the retirement funds stolen in the first transaction were coming from South Carolina, where Michelin, its retirement plan, and its employees were located. Anderson, Galanis, Dukerley, Morton and their other accomplices each knew that they were directing their activities toward victims in the State of South Carolina, among other locations, prior to closing.

141.    When the indenture was executed at closing on August 25, 2014, "specimen" bonds were prepared reflecting the identity of the initial bondholders. Like most of the

transactional documents involved, these specimen bonds bore a similar nine-digit Doc ID number that had been on Dilworth's initial engagement letter with Burnham Securities.

142.    On information and belief, Dilworth, relying on HCM's staff, failed to investigate the legal names of the various pension funds that would be acquiring the bonds. As such, the paper bonds that Dilworth prepared reflected mistakes in the legal names of the various bondholders, including but in no way limited to RHCT, which was identified only by the first three words of its name "Chicago Transit Authority."

143.    Pursuant to the indenture, the identity of the registered bondholders is not based on the paper bonds but is instead reflected on the Bond Register kept by the indenture trustee, U.S. Bank.  On information and belief, RHCT is the Registered Owner of its $4,073,499 bond.

### 3.    The Opinion Letter.

144.    Prior to the 2014 bond issuance, Raycen Raines, Anderson's contact with the WLCC, had been associated with lawsuits related to various economic companies set up by the Wakpamni Lake Community. In June, 2014, an article about Raines, titled "The Tribe That Said No,"[2] detailed Raines's past involvement in payday lending scams perpetrated by entities set up by the Wakpamni Lake Community. Specifically, the article reported that Raines had set up several payday lending companies on behalf of WLCC without authority from the Oglala Sioux.

145.    On August 19, 2014, just days prior to the bond issuance, a local tribal news outlet, Native Sun News, published another story detailing Raines' adverse past with the Oglala Sioux Tribe.[3]  As reported by Native Sun News, the Tribe had rejected many of Raines's past proposed economic development projects, which often relied on the Tribe's sovereign status to protect it from likely civil suits.

---

[2]    http://projects.aljazeera.com/2014/payday-nation/sioux-tribe-payday.html
[3]    https://www.indianz.com/News/2014/08/19/native-sun-news-oglala-mans-bu.asp

146.    Raines had been Anderson's primary contact for WLCC on prior "economic" matters on which he had worked. At all times relevant, he acted as the primary representative of WLCC to carry out the bond transaction.

147.    A month before the original bond closing date, on June 24, 2014, the Oglala Sioux Tribe passed an unusual resolution stripping Raines of authority to act on its behalf with respect to several economic development matters, including "Tribal Economic Development (TED) Bonds." **Exhibit H**, June 24, 2014 OST Resolution. The recitals to the resolution explained that Raines had "somehow" induced the tribal president, Bryan Brewer, to sign a power of attorney giving Raines authority over all tribal economic development projects. The resolution stripped Raines of tribal authority not only with respect to federal tax matters and "TED bonds," but also "any other economic development projects." **Ex. H.**

148.    In or about early August, 2014, Greenberg prepared new resolutions for the WLCC to sign. Those resolutions delegated substantial authority to Raines to finalize the transaction, despite the June 24, 2014 resolution from the Tribe. Even under the new WLCC resolutions that Greenberg had prepared, WLCC's President, not Raines, was required to execute documents related to the bond issuance.

149.    On August 11, 2014, several days prior to closing, Raines sent Anderson and Greenberg the WLCC signature pages for the bond documents, including the indenture, and new resolutions that had been signed by WLCC's President and Secretary.

150.    Despite being signed by WLCC's President, the bond documents were not final. On information and belief, the version of the bond indenture that was approved by the WLCC, which had an August 13, 2014 closing date, still left the identity of the investment manager for the annuity blank.

151.    Three days later, on August 14, 2014, U.S. Bank's attorney sent Greenberg and Anderson, at Dilworth, a markup of the indenture with several material comments and questions about the transaction.

152.    The result of the negotiations was a new draft of the indenture with an August 19, 2014 closing date. As noted above, the "August 19" version of the bond indenture identified Wealth Assurance AG as the investment manager for the Annuity Contract. **Ex. B**, § 2.11.

153.    By August 19, 2014, Greenberg had completed its opinion letter and submitted it to Anderson to be held "in escrow."   However, again, the bond documents on which Greenberg had opined were not final and the transaction did not close that day.

154.    Sometime between August 13, 2014 and August 25, 2014, the parties completed a yet another version of the bond indenture with an August 25, 2014 closing date.  This *final* version of the indenture identified PEM as the investment manager for the annuity contract, *not Wealth Assurance AG*, as had been identified just days earlier. Under the final version of the indenture, WLCC was also required to provide U.S. Bank with a letter appointing PEM as the investment manager.

155.    On August 25, 2014, Dilworth finalized its own opinion letter. **Exhibit I.** The opinion was directed to, among others, the WLCC in Pine Ridge, South Dakota.

156.    As provided in the Indenture, Dilworth's opinion letter was a necessary condition to the transaction, without which the transaction would not have closed and the bondholders would not have been damaged.

157.    In its opinion letter, Dilworth rendered opinions and made statements that were inconsistent with facts that it knew about the transaction.

158.     For one, Dilworth represented that the bonds were being issued to fund an Annuity Investment, as "*described in the Indenture*." By that point Anderson knew, or recklessly disregarded the fact, that the "Annuity Provider" that had been identified was actually a shell company set up several weeks earlier by Dunkerley and Hirst, with no history of providing annuities and lacking the ability to do so, making it unauthorized under the Indenture.

159.     Further, in rendering opinions about the transaction, Dilworth failed to investigate, or ignored, numerous issues with the transaction, including the fact that the Tribe had stripped Raines of authority to carry out tribal economic development projects, that Raines appeared to be signing final documents on behalf of WLCC (as detailed below), and the fact that Galanis and his accomplices appeared to represent the placement agent, the annuity provider, and through HCM, the purchasers, presenting an irreconcilable conflict of interest.

160.     Dilworth's opinion letter was also based on several assumptions that were unreasonable in light of the facts of which Dilworth had knowledge. One such assumption was that the proceeds from the bonds would be expended as required by the Indenture.  However, Dilworth knew or should have known by that point that the proposed "annuity provider" did not qualify as an "Annuity Provider" under the Indenture.

161.     As a seasoned bond lawyer, Anderson knew that the very fact he was opining on the validity of the transaction would be misleading if he, in the exercise of due care, suspected the bonds were possibly fraudulent.

162.     Anderson knew that foreseeable parties to the transaction, including the indenture trustee and the bondholders themselves, would be harmed by Dilworth's opinion letter if it was issued despite clear indicia of fraud.

**D.     The First Tranche Closes and RHCT's Funds Are Misappropriated**

163.    As Galanis's team of professionals worked to close the transaction, he and Morton worked to select the unwitting pension funds whose money would be stolen.

164.    On August 17, 2014, Morton e-mailed Jason Galanis, acknowledging the conflicts of interest presented by her investment of client funds, including RHCT's, in a transaction where affiliated companies—Wealth Assurance and Burnham Securities—stood to benefit. Morton complained that she was spending considerable time performing due diligence regarding the Wakpamni Lake Bonds "because of the multiple reviews I had to take." She explained, "For instance, since many of the accounts are ERISA funds, I had to consider those guidelines and regulations, I have a fiduciary duty to Burnham, and a fiduciary duty to the clients."

165.    In another e-mail dated August 17, 2014, Morton sent Jason Galanis a memo in which she questioned whether the tribe affiliated with the issuer—a tribal corporation operating in an impoverished region—would be legally or financially accountable for the WLCC Bonds and whether institutional clients would fire HCM if they were dissatisfied with the investment.

166.    In her e-mail, Morton wrote: "The decision regarding what should be done is yours, not mine . . . . To be fair to both of us, if you made the investment [in HCM] with this in mind, I do not have the moral right to stand in the way and everything is in place to move forward . . . ." She reiterated in a text message to Jason Galanis: "Let's be clear, if you want the bonds to go in, I have no say. I am not sitting in the position of making judgement [*sic*]. If you invested in Hughes Capital for this sole purpose than [*sic*] it is your call not mine . . . If you're thinking that I can or would stop this then I totally screwed up my communication." Jason Galanis told Morton to let Hirst "make the decision."

167.    On August 20, 2014, Morton prepared a "Bond Purchase Blotter," which she then sent to Hirst, Galanis, and Richard Deary by email of the same date to review "for accuracy." The Bond Purchase Blotter identified nine HCM clients that had been selected as the bond purchasers.  Hirst executed the blotter and confirmed its "accuracy."

168.    Between August 22 and 26, 2014, Hirst signed trade tickets purchasing $27,077,436 of Wakpamni Lake Bonds on behalf of nine of HCM's clients, including RHCT and Michelin. The funds were sent by HCM from accounts for the respective bondholders to a trust account at U.S. Bank.

169.    On or about August 25, 2014, $4,073,499 of RHCT's funds were wired from its account in Chicago to U.S. Bank's trust account.

170.    Records produced by U.S. Bank label the "Bank Site" for the WLCC bonds as "Phoenix, Arizona." Further, U.S. Bank records reflecting the WLCC accounts list the account manager as being located in Phoenix, Arizona.

171.    On this information and belief, U.S. Bank's accounts for the WLCC issuance were located in Phoenix, Arizona.

172.    As reflected on U.S. Bank's account statement, the legal "Holder" for the $4,073,499 bond issued on August 25, 2014 is identified as the **"Chicago Transit Auth. Retiree Health Care Tr.**," and not the "Chicago Transit Authority." **Exhibit J**. This was consistent with the instructions Anderson had received from Galanis and Morton the day before.

173.    On August 25, 2014, Anderson emailed Greenberg and U.S. Bank, copying Jason Galanis, to inform the "working group" that the bonds had closed. Galanis responded congratulating the parties and thanking them for their "professionalism."

174.    The statement that the transaction had closed was also misleading.  Despite the fact that the bond proceeds had been wired, the bonds signed, and the trade tickets executed, the Annuity and Investment Management documents had *still* not been executed, and many details relating to the bonds were still being worked out with U.S. Bank.

175.    Anderson and Dilworth knew or should have known that neither the important Annuity Contract nor the PEM Investment Management Agreement had been executed prior to placing the bonds and issuing the opinion letter.

176.    On August 26, 2014, a day after the bonds were issued, Jason Galanis emailed an unsigned copy of the Annuity Contract and PEM Investment Management Agreement to his associate, Francisco Martin, and directed him to execute the documents.  Martin initialed "FM" on the Annuity Contract on behalf of WLCC, which had already been signed by Dunkerley on behalf of WAPCC.  Martin also signed the PEM Investment Management Agreement for PEM.

177.    Although the Annuity Contract was supposed to be with a British Virgin Islands entity called "Wealth Assurance Private Client Corporation," that entity, if it ever existed, was never going to serve as the "Annuity Provider." Nearly two months earlier, on July 7, 2014, Hugh Dunkerley, with the assistance of Gary Hirst, established an entity with an identical name in Florida. Like WAPCC-BVI, WAPCC-Florida had no prior history or experience in annuities or insurance and no corporate existence separate and apart from Dunkerley and Hirst.

178.    Using the newly formed WAPCC-Florida, Jason Galanis, and or Dunkerley at Galanis's direction, opened a bank account at JPMorgan Chase Bank, N.A. in California under the WAPCC name with an address in Santa Monica.

179.    After the bondholders' proceeds were wired to U.S. Bank, U.S. Bank awaited instruction on how to distribute the proceeds. The final Closing Statement had been silent on

where, or to whom, the annuity funds should be wired, despite the fact that this information was supposed to be in the Closing Statement under § 2.12 of the indenture.

180.    Anderson had prepared the Indenture and the Closing Statement, and had reviewed and even commented on the Annuity Contract and Investment Management Agreement, and therefore was aware of the wiring requirements.

181.    Contrary to the Annuity Contract between WAPCC and WLCC, the bond proceeds were not directed to a WAPCC British Virgin Islands account at a bank "without any offices and/or branches in the United States." Nor were the bond proceeds directed by WLCC, as the issuer, pursuant to the Annuity Contract, the Indenture, or the Closing Statement.

182.    Instead, on August 26, 2014, a day after the issuance had purportedly closed, Jason Galanis emailed Anderson with instructions regarding distributions, including wire instructions for the annuity, as well as executed copies of the Annuity Contract and PEM Investment Management Agreement. The email to Anderson was detailed and involved substantive directions on how much funds needed to be wired for the annuity purchase. The file name for the wire instructions attached to Galanis's indicated they were for a "Chase" bank account.

183.    On information and belief, as prudent transactional counsel, Anderson would have reviewed the wire instructions to confirm that all necessary information had been included, before forwarding them on as part of a $22,092,089 transfer.

184.    That same day, Anderson forwarded the wire instructions from Jason Galanis to U.S. Bank, along with an executed copy of the Investment Management Agreement and the Annuity Contract. Galanis's identity and email address (using a burnhamequitypartners.com domain) were disclosed in the email. No representative for the issuer, WLCC, was included on

the communication.  On information and belief, based on public records, Burnham Equity Partners is not, nor ever was, a real company.

185.    Galanis's August 26, 2014 wire instructions attached to Anderson's email called for the bond proceeds to be wired "via domestic wire" to a bank account held at JPMorgan Chase Bank, N.A. in Beverley Hills, California, not the British Virgin Islands, as required by the Annuity Contract.  According to the wire instructions, the Chase account belonged to an entity called "Wealth Assurance Private Client" with a Santa Monica, California address.

186.    Without corroborating instructions from the bond issuer WLCC, as required by the indenture, U.S. Bank wired over $22 million of the bond proceeds, including over $4 million of RHCT retirement funds, to an otherwise unknown entity with a bank account that, because of its U.S. location, was expressly forbidden from acting as the Annuity Provider.

187.    Anderson, and U.S. Bank, also should have been very concerned by the other documents attached to Galanis's email, which reflected several easily recognized abnormalities: (1) the Annuity Contract was never signed by WLCC, but rather initialed by Francisco Martin; (2) the counterpart signature pages on the PEM Investment Management Agreement were different in form, suggesting they had been attached to two different documents; (3) the PEM Investment Management Agreement was electronically signed by "Geneva Lone Hill" and did not match Lone Hill's handwritten signature on the other bond documents U.S. Bank had just signed; and (4) Exhibit C to the PEM Investment Management Agreement, which was a "Letter of Appointment" appointing PEM as the investment manager for the Annuity Contract (which still sometimes referred to WLCDC), on information and belief, was still unsigned.

188.    During the criminal trial, Raines admitted to signing documents on Lone Hill's behalf with an electronic signature. The electronic signature on the PEM Investment

Management Agreement and Closing Statement suggests that Raines, and not Lone Hill, had been the one who appointed PEM as the investment manager.

189.    As part of his opinion letter, Anderson represented that he had reviewed the resolutions and other documents of WLCC approving the transaction. Therefore, Anderson would have known that Raines lacked authority to sign Lone Hill's name.

190.    Despite "closing" on August 25, 2014, HCM and U.S. Bank engaged in a series of communications about finalizing the bonds between August 26, 2014 and August 29, 2014, on which Anderson was copied. In these communications, HCM continued to communicate additional information about the identity of the bondholders that was necessary for U.S. Bank to finalize the issuance.

191.    In an ordinary transaction, this information should have been established prior to closing and issuing the paper bonds, further reflecting that the bond issuance was unusual, and likely unauthorized by the bondholders.

### E.    The Bond Proceeds, None of Which Were Placed in an Annuity, are Almost Immediately Diverted For Unlawful Purposes.

192.    As Dunkerley testified during the criminal trial, there was never an annuity to invest the proceeds of the bonds. Instead, the annuity was "a lie" that was used so that Galanis and his business partners could acquire funds to use however they saw fit.

193.    The bond proceeds used for the Annuity Contract were also never managed by the supposed independent investment management company, PEM.

194.    Instead, and in furtherance of the scheme, Jason Galanis and Dunkerley immediately misappropriated the bond proceeds from the WAPCC-Florida account by authorizing wires to a number of other entities, sometimes based on written instructions from Jason Galanis.

195.    Between August 27, 2014 through October 30, 2015, Dunkerley wired the largest portion of the proceeds to Thorsdale, an entity Jason Galanis controlled, from which proceeds were further misappropriated by Jason Galanis.

196.    Morton's decision to invest RHCT funds in WLCC Bonds was driven in part by her expectation that Jason Galanis would continue to arrange financial backing for HCM, in breach of her fiduciary duty of loyalty to HCM's clients.

197.    At the direction of Jason Galanis, HCM (and later its successor) received at least $655,000 of Wakpamni Lake Bond proceeds: 1) a $350,000 payment on September 8, 2014, that was wired from WAPCC-Florida to Thorsdale to Wealth Assurance Holdings and eventually to HCM; and 2) a $305,000 payment wired to HCM directly from the WAPCC-Florida account on April 23, 2015.

198.    The closing documents that Anderson had prepared for the first tranche listed distributions to the professionals who had assisted in the transaction. However, those documents did not disclose any payments to John Galanis. Nor was WLCC informed by John Galanis, or anyone else, that John Galanis would earn any fees in connection with the WLCC Bonds.

199.    Yet, at Jason Galanis's direction, Dunkerley sent $2.35 million from WAPCC-Florida to an entity controlled by John Galanis called Sovereign Nations Development Corp. From Sovereign Nations Development Corporation's bank account, John Galanis directed several further distributions to another account in his name.

200.    Jason Galanis arranged to have WAPCC-Florida and Thorsdale transfer over $3 million to lenders and others for the mortgage on and maintenance of his estate in Los Angeles, California. He also arranged to have money wired from WAPCC-Florida and Thorsdale to his

criminal defense attorneys ($497,210) and to his mother, wife, and father-in-law (totaling $214,000).

201.    In addition, Jason Galanis used his Thorsdale debit card to spend thousands more of the bond proceeds at restaurants and luxury retailers.

202.    Dunkerley, Hirst, and their accomplices all benefited from their participation in the scheme as well through transfers directed by Jason Galanis out of the Thorsdale Account that they received individually or through entities that they controlled, including, but not limited to: a) $700,513 transfer to Archer between November 2014 and April 2015; b) $4,370,000 transfer to Cooney between August 2014 and April 2015; c) $20,485 to Dunkerley in September 2014; and d) $1,300,000 transfer to Hirst in August 2014.

203.    With the ink barely dry on the first tranche, in October, 2014, Jason Galanis, with Anderson's assistance, caused WLCC to issue an additional $20 million of bonds. Like the first tranche, this issuance was organized and coordinated by Anderson, and required the assistance of Greenberg and U.S. Bank.

204.    $15 million of the bonds issued in the second tranche were purchased by Rosemont Seneca Bohai ("RSB"), an entity controlled by Archer. To coordinate RSB's purchase of the $15 million in WLCC Bonds, Jason Galanis arranged for $15 million to be sent from Thorsdale to RSB. RSB then wired $15 million to US Bank to acquire the bonds. Most of the funds were then sent again to WAPCC-Florida as purchase money for a new annuity.

205.    $5 million of the WLCC Bonds issued in the second tranche were issued to one of Galanis's other accomplices and "best of friends," Bevan Cooney. Between October 2 and 6, 2014, Dunkerley, at Jason Galanis's direction, sent back to Thorsdale a large portion of the funds WAPCC-Florida had just received from WLCC in connection with the $15 million issuance to

RSB. On October 8, 2014, Jason Galanis sent $5 million of the funds that Thorsdale had received to Cooney, who used it to purchase WLCC Bonds.

206.    By this point, the WLCC bonds were a ponzi scheme, with proceeds from the first issuance being recycled through WAPCC-Florida, to Thorsdale, to Archer, back to U.S. Bank, and then back to WAPCC-Florida, to Thorsdale, to Cooney, to U.S. Bank, and eventually back to WAPCC-Florida.

207.    Anderson continued to represent Burnham, and effectively Galanis, in these transactions, which further depleted the pension funds that had been invested by RHCT.

208.    In November, 2014, Anderson traveled to South Dakota to attend a ground breaking ceremony for the proposed tribal town center, which he attended with several representatives of WLCC, its counsel (on information and belief, Greenberg), and other individuals.

209.    In an email dated November 19, 2014, Jason Galanis wrote to Jason Sugarman and Devon Archer, stating: "Our attorney had to fly to South Dakota the other day. We actually break ground in the spring thaw. This was ceremonial for the Indians. Had to be done. I refused to go there. Greeks hate the cold."

210.    The Wakpamni Lake Bond proceeds were further misappropriated to support an initial public offering ("IPO") of a technology company underwritten by Burnham Securities, with Dunkerley taking a lead on the deal. At the direction of Jason Galanis and Hirst, WAPCC-Florida used a significant portion of the proceeds from the sale of the April 2015 (third tranche, discussed below) WLCC Bonds to support the successful initial public offering of a technology company, in which Jason Galanis, Hirst, Archer, Cooney, and Dunkerley all held shares, and for which Jason Galanis served as an "advisor."

211.    The shares issued in the IPO were then sold at a significant mark up in what turned out to be a "pump and dump" scheme. The company that was the subject of the IPO later failed and shares became worthless.

**F.    Galanis Acquires Another Investment Manager to Victimize Yet Another Pension Fund.**

212.    Jason Galanis and his associates needed more unsuspecting victims to provide more capital to be misappropriated. Morton identified Atlantic Asset Management, LLC ("AAM"), an investment manager with $11 billion in assets under management, as a potential target for Hughes Capital.

213.    With the backing of Jason Galanis, Archer, Cooney, and Dunkerley, Morton negotiated to acquire AAM. Morton e-mailed Jason Galanis stating that she had a conversation with AAM's Chief Strategist "about our SRI [Socially Responsible Investing]/ Native American Initiative" and that "he is so on board with this." According to Morton, AAM's Chief Strategist told her that if she made him aware of the details of the Bonds ahead of time, he would do his "damndest [sic] to get it place within a day after the acquisition."

214.    On December 1, 2014, at Jason Galanis's direction or with his knowledge, Dunkerley provided AAM's General Counsel a letter on behalf of a CORFA affiliate, confirming its agreement to provide financing to capitalize the purchase of AAM. On February 2, 2015, Jason Galanis sent Archer and Cooney a "consultant report" directed to the "Board of Valorlife" regarding the financing of the proposed acquisition of AAM. Valorlife was a foreign insurer that Wealth Assurance Holdings had acquired in November 2014. Wealth Assurance Holdings later became Valor Group Ltd. at or near the time of the Valorlife acquisition.

215.    On March 30, 2015, Jason Galanis forwarded copies of the executed copies of the AAM acquisition documents to Cooney, Archer, and Burnham Financial's President. The terms

of the purchase were memorialized in an Amended and Restated Liability Company Agreement for GMT, entered into as of April 2, 2015. Dunkerley signed the agreement on behalf of BFG as its Managing Member.

216.    On April 2, 2015, at the direction of Jason Galanis, Valorlife financed the purchase of AAM through BFG. The financing was guaranteed by Valor Group and the guaranty was signed by Dunkerley as Valor Group's President.

217.    Immediately after the acquisition of AAM was completed, Jason Galanis instructed Morton to identify investors to purchase additional WLCC Bonds.  By that point, Morton was well aware that there was no active market for the Bonds. Since at least November 2014, she had been dealing with client complaints regarding the original Bond investments, and had been unsuccessful in her efforts to arrange for Burnham Securities to liquidate the bonds.

218.    Morton and AAM struggled to find buyers for a third tranche of Wakpamni Lake Bonds. To appease Jason Galanis, Morton arranged for AAM to use funds maintained in one of its managed high-yielding funds (the "HY Fund") for the bond purchase. HY Fund's only investor was a single pension fund, an existing client of AAM's for which AAM managed other investments in addition to its investment in the HY Fund.

219.    In the same way that HCM failed to notify RHCT, AAM did not notify the owners of the pension fund in the HY Fund prior to making the purchase of the Bonds. Morton also failed to notify the owners of the pension fund in the HY Fund that the individuals that owned and controlled the annuity provider and the placement agent were also AAM's financiers.

220.    In April, 2015, Anderson and Dilworth again coordinated, documented and closed the third tranche of WLCC to the unsuspecting HY Fund. As with the prior tranches (August 2014 and October 2014), Dilworth issued an opinion letter stating that the bonds were binding

obligations of the issuer and were being issued in order to finance the purchase of a "certain Annuity Investment (as described in the Indenture)."

221.    Again, this was false, and Dilworth should have known otherwise. There was no Annuity Investment, particularly not one that was described in the 2015 indenture, which again called for the Annuity Provider to be a company that issues annuities in its "regular trade or business."

G.    **Defendants Scramble to Make Interest Payments Due to the Bond Holders so as to Allow Their Fraudulent Scheme to Remain Undiscovered.**

222.    Pursuant to the annuity contracts for the August and October 2014 tranches, WAPCC was obligated to make respective interest payments in September 2015 and in October 2015. Since WAPCC had misappropriated the proceeds from the bonds instead of investing them in annuities, Jason Galanis and Dunkerley scrambled to come up with the funds to make the interest payments.

223.    In September 2015, Dunkerley authorized WAPCC-Florida to forward $1.5 million to US Bank as the indenture trustee as interest due on the August 2014 bonds. That amount covered the interest payments due to the pension funds, but failed to cover an additional $277,182.87 in annual income that WAPCC-BVI was obligated to pay WLCC.

224.    Based on the sources of funds held in WAPCC-Florida's bank account at the time, the $1.5 million payment was funded by a small portion of the sale proceeds of the technology company's stock received from the two IPO participants acting on the directions of Jason Galanis ($1.3 million), amounts contributed by Archer ($250,000), and/or amounts received from another associate of Jason Galanis ($250,000).

225.    After he had been arrested in a separate matter, (*see SEC v. Galanis, et al*, 15 Civ. 7547 (VSB) (S.D.N.Y.); *United States v. Jason Galanis, et al.*, 15 Cr. 0643 (PKC) (S.D.N.Y.))

and using his new legal@colarisventures.com e-mail address, Jason Galanis orchestrated another $1,197,311 interest payment due on the October 2014 WLCC Bonds.

226.    By making these interest payment Dunkerley and Galanis further concealed the fraud from the bondholders, who were unaware there were any issues with the debt service on the bonds.

227.    Behind the scenes, there was panic among the transaction participants. On October 8, 2015, WLCC sent Dunkerley a letter expressing concern regarding information it had recently learned about Burnham Securities and the ongoing difficulty it was experiencing in receiving funds due under the annuity contracts. In the letter, WLCC requested that Dunkerley immediately provide valuations on all three annuity contracts.

228.    On October 15, 2015, at Jason Galanis's direction or with his knowledge, Dunkerley responded to WLCC's letter and attached fabricated annual account statements on WAPCC letterhead (reflecting a false address in the British Virgin Islands) for the annuity contracts purportedly purchased in connection with the first and second tranche.

229.    Eventually, WLCC sought to terminate its investment management agreement with PEM related to the "annuity," based in part on the failure of WAPCC to make the full payment due to WLCC in the fall of 2015.

230.    Despite the fact that Burnham Securities was not a party to either the Annuity Contract or the Investment Management Agreement, Anderson was actively involved in negotiating the release of PEM and addenda to the existing annuity contracts.

231.    In so doing, Anderson was effectively acting on behalf of WAPCC, the annuity provider.

232.    At one point, Anderson's role in the negotiations was so unclear that Greenberg's attorneys referred to WAPCC as Anderson's client. While Anderson denied his representations of WAPCC, it was unclear who Anderson was representing or why Anderson was negotiating addenda to the Annuity Contracts if he did not represent WAPCC.

233.    On November 4, 2015, WLCC entered into three addenda to the Annuity Contracts it had negotiated with WAPCC.

234.    On November 5, 2015, also at Jason Galanis's direction or with his knowledge, Dunkerley provided another fabricated annual account statement for the annuity contract associated with the third tranche of bonds. None of the statements contained any information regarding the underlying investments and each indicated that the value of the accounts had not changed from the initial amount of money that had purportedly been invested in the annuities.

235.    As a result of these actions to conceal their scheme, the bondholders, including RHCT were unaware of the fraudulent actions or omissions by the Defendants throughout 2015 until the federal government filed actions against the Defendants in May, 2016.

236.    Throughout each of the foregoing allegations, the Defendants either knowingly participated in a series of criminally fraudulent transactions, or turned a blind eye to what was an obviously fraudulent scheme, despite a duty to avoid injuring the bondholders.  As a result, RHCT has lost in excess of $4,073,499 in retirement funds, plus lost interest and return on its investment, litigation fees and expenses, and other costs for which it is entitled to reimbursement.

## CAUSES OF ACTION

### FOR A FIRST CAUSE OF ACTION AGAINST BFG, GMT, WEALTH ASSURANCE, WAPCC, BURNHAM SECURITIES, BURNHAM FINANCIAL, THORSDALE, MORTON, DUNKERLEY, JASON GALANIS, JOHN GALANIS
(Civil Conspiracy)

237.    Plaintiff incorporates the relevant and consistent allegations set forth above.

238.    Defendants acted in concert to use their positions in the various entities, which they controlled, to acquire the pieces necessary to misappropriate funds for their own personal gain.

239.    Defendants located WLCC to serve as the bond issuer for their scheme.

240.    Defendants put into place the fictitious annuity provider (WAPCC) and placement agency (Burnham Securities) to facilitate the transaction. In accordance with the fraudulent scheme, once purchasers for the bonds were found, Defendants made sure the revenue would be diverted to the WAPCC-Florida account in accordance with the fraudulent scheme.

241.    Defendants used Valor Group (then Wealth Assurance Holdings) to fund GMT's acquisition of HCM. In return for future capital contributions from Jason Galanis and Galanis controlled entities, Morton promised to invest HCM's clients' funds in the Wakpamni Lake Bonds once GMT's acquisition of HCM was complete.

242.    AAM/HCM purchased Wakpamni Lake Bonds on behalf of many clients. Instead of the bond revenue being placed in an annuity as required by the bond indenture, the bond revenue was sent to an account owned by WAPCC-Florida. From here the money was misappropriated at the direction of Defendants, particularly Jason Galanis.

243.    The purpose of Defendants was to create a reserve of capital, while depleting the accounts of the clients (like RHCT) of AAM/HCM.

244.    Defendants acted willfully, wantonly, and recklessly in carrying out their fraudulent conspiracy.

245.    The concerted actions of Defendants caused substantial and special damages to RHCT.

45

246.   RHCT is entitled to recover actual damages, special damages, and punitive damages.

**FOR A SECOND CAUSE OF ACTION AGAINST BFG, GMT, WEALTH ASSURANCE, WAPCC, BURNHAM SECURITIES, BURNHAM FINANCIAL, THORSDALE, MORTON, DUNKERLEY, JASON GALANIS, JOHN GALANIS**
**(Civil RICO- 18 U.S.C. § 1962)**

247.   Plaintiff incorporates the relevant and consistent allegations set forth above.

248.   Defendants BFG, GMT, Wealth-Assurance, WAPCC, Burnham Securities, Burnham Financial, Thorsdale, and are corporations that constitute enterprises within the meaning of 18 U.S.C. § 1961(4), and that engages in activities which affect interstate commerce.

249.   At all times relevant to this action, Defendants Jason Galanis, John Galanis, Dunkerley, and Morton, were associated with at least one of the various enterprises, yet were separate and distinct from the enterprises. Defendants Jason Galanis, John Galanis, Dunkerley, and Morton are individuals capable of holding a legal or beneficial interest in property and are persons within the meaning of 18 U.S.C. § 1961(3).

250.   Dating back to March 2014, Defendants Jason Galanis, John Galanis, Archer, Cooney, Dunkerley, Morton, and Hirst unlawfully, knowingly, and intentionally conducted and participated, directly and indirectly, in the conduct, management, control, and operation of the various Defendant entities: BFG, GMT, Wealth-Assurance, Valor Group, Burnham Securities, Burnham Financial, CORFA, and Thorsdale which affected interstate commerce through a pattern of racketeering activity consisting of numerous acts of racketeering having effect in the State of South Carolina indictable under 18 U.S.C. § 664 (Theft or embezzlement from employee benefit plan), and including the acts of racketeering alleged in this complaint.

251.   In 2014, Defendants Jason Galanis, John Galanis, Dunkerley, and Morton knowingly and intentionally devised one or more schemes to defraud and obtain monetary

compensation and goods from RHCT by means of material, knowingly false and fraudulent acts, pretenses, representations, and omissions of fact.

252.    As a part of and in furtherance of this scheme, Defendants Jason Galanis, John Galanis, Dunkerley, and Morton committed numerous predicate acts of theft or embezzlement from employee benefit plans. RHCT relied on Defendants' material, knowingly fraudulent pretenses, representations, and omissions of fact. Specifically, Defendants knowingly instigated the scheme with the intent of finding buyers for the Wakpamni Lake Bonds, and instead of investing the bond revenue in an annuity as per the bond indenture, Defendants created a personal fund for themselves, providing vast amounts of liquidity.

253.    Each instance of embezzlement by Defendants occurring since March 2014, in an aggregate amount exceeds $47 million dollars. With regards to RHCT, Defendants embezzled $4,073,499. These instances constitute "predicate acts" under 18 U.S.C. § 1961(1).

254.    Defendant's multi-year scheme and operations involving numerous fraudulent acts and illegal transactions, as described above, constitute a "pattern" of related and continued predicate acts amount to "racketeering activity" under 18 U.S.C. §§ 1961 and 1962. Defendants' schemes indicate ongoing criminal activity of sufficient scope and persistence to pose a special threat to social well-being and continued criminal activity.

255.    As a direct and proximate result of Defendant's elaborate embezzlement scheme and other unlawful actions in violation of 18 U.S.C. § 1962, RHCT has suffered, is suffering, and will continue to suffer monetary loss to its employee retirement investment portfolio.

256.    RHCT is entitled to an award of treble damages, as well as costs, interest, and attorney's fees for violations of 18 U.S.C. § 1962. RHCT also seeks to recover punitive damages as a result of Defendant's willful, fraudulent scheme.

**FOR A THIRD CAUSE OF ACTION AGAINST BFG, GMT, WEALTH ASSURANCE, WAPCC, BURNHAM SECURITIES, BURNHAM FINANCIAL, THORSDALE, MORTON, DUNKERLEY, JASON GALANIS, JOHN GALANIS,**
(Securities Fraud-15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5)

257.    Plaintiff incorporates the relevant and consistent allegations set forth above.

258.    Particular instances of fraud perpetrated against RHCT and similarly situated investors are discussed more fully in the Factual Allegations above. Defendants disseminated or approved the false statements, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

259.    Defendants violated Federal Rule 10b-5 and Section 35-1-501 et seq. in that they:

   a.    Employed devices, schemes, and artifices to defraud;

   b.    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

   c.    Engaged in acts, practices, and a course of business that operated as fraud or deceit upon RHCT, and other similarly situated Plaintiffs, in connection with their purchases of the Bonds.

260.    Defendants' misrepresentations were made to HCM, an agent of RHCT. HCM, acting as an agent of RHCT, relied on the misrepresentations in purchasing Bonds on behalf of RHCT.

261.    Through Defendants' fraudulent misrepresentations in relation to the sale or purchase of the Bonds, RHCT has suffered monetary damages, lost interest that this money could have accrued if invested with due care, and consequential damages.

262.     RHCT is entitled to recover actual damages and costs.

**FOR A FOURTH CAUSE OF ACTION AGAINST BFG, GMT, WAPCC, BURNHAM SECURITIES, BURNHAM FINANCIAL, THORSDALE, MORTON, DUNKERLEY, JASON GALANIS, JOHN GALANIS, DILWORTH, ANDERSON**
**(Tortious Interference with Contract)**

263.     Plaintiff incorporates the relevant and consistent allegations set forth above.

264.     RHCT entered into an RHCT Agreement with HCM/AAM. The RHCT Agreement was in effect at all relevant times mentioned in this Complaint.

265.     Defendants BFG, GMT, Wealth-Assurance, WAPCC, Burnham Securities, Burnham Financial, CORFA, Thorsdale, Morton, Dunkerley, Jason Galanis, John Galanis, Anderson and Dilworth each had knowledge of the RHCT Agreement between RHCT and HCM. The RHCT Agreement was the essential relationship that made acquiring the financial management companies attractive to Defendants. It was Defendants' knowledge of this relationship that allowed RHCT and other similarly situated investors to be exploited. After necessarily acquiring HCM, Defendants furthered the fraudulent scheme by having the financial management companies invest RHCT's employee retirement funds into a WLCC Bond. This investment was in contravention of the RHCT Agreement.

266.     Defendants Anderson and Dilworth were sophisticated and competent counsel and knew that pension funds have management agreements, with investment guidelines, with their investment managers.

267.     Defendants Dilworth and Anderson, with knowledge of the RHCT Agreement, assisted HCM in preparing an unauthorized and unusual "Big Boy" letter purporting to authorize the transaction. Without this letter, the transaction would not have closed as the other participants would not have engaged in a securities offering that may be subject to registration requirements.

268.    Defendants Dilworth and Anderson knew that if HCM approved an unauthorized investment, it would be a breach of the RHCT Agreement

269.    Defendants have no justification for their interference with the RHCT Agreement.

270.    Defendants acted willfully, wantonly, and recklessly in bringing about HCM/AAM's breach of the RHCT Agreement.

271.    RHCT has suffered damages as a result of Defendants' intentional interference with the RHCT Agreement.

272.    RHCT is entitled to recover actual damages and punitive damages as a result of Defendants' tortious interference with the RHCT Agreement.

## FOR A FIFTH CAUSE OF ACTION AGAINST DILWORTH AND ANDERSON
### (Negligence)

273.    Plaintiff incorporates the relevant and consistent allegations set forth above.

274.    At all times relevant, Anderson was acting in the course of his employment as an employee of Dilworth.

275.    As counsel tasked with the primary responsibility of orchestrating, preparing and closing the bond issuance, Defendants Dilworth and Anderson knew that their actions could harm foreseeable plaintiffs, particularly the bondholders, including RHCT and Michelin, who were known to them prior to the bond issuance.

276.    The Rules of Professional Responsibility prohibit lawyers from knowingly assisting a client in criminal conduct. The same rules require lawyers to be diligent and prudent in investigating and identifying conduct that is suspicious or might be criminal

277.    The same rules also require a lawyer who becomes aware of a clients' criminal actions to withdraw from the representation and not continue to assist in the criminal enterprise.

278.     As of March 2014, when Anderson first met John Galanis, Anderson knew or recklessly disregarded Galanis's extensive criminal past, which was publicly reported. He also should have been aware of Jason Galanis's history of trouble with the SEC, which was also reported. Even Dunkerley had learned as early as 2011 that Jason Galanis was a reputed financial fraudster.

279.     The Galanis' prior violations of the law should have caused Anderson to be extra vigilant in determining whether the bond issuances he was helping orchestrate might be unlawful.

280.     As was confirmed during the 2018 criminal trial, neither Jason Galanis nor John Galanis had any actual role or authority to act on behalf of Burnham Securities.  Anderson took direction primarily from John and Jason Galanis and somehow failed to learn that they really had no role with Burnham Securities.

281.     As experienced bond counsel, Dilworth and Anderson knew that in preparing their opinion letters, on which the bond transaction was contingent, they owed a duty of care to foreseeable transaction participants, including but not limited to the bondholders.

282.     The duty of care owed by Dilworth and Anderson included but was not necessarily limited to, the duty to avoid making false, reckless or misleading statements or unsupportable assumptions in the opinion letter.

283.     Defendants Dilworth and Anderson knew, or as experienced legal counsel in such matters, with the exercise of reasonable care, should have known:

     a.     That John and Jason Galanis were reputed financial fraudsters whose actions and statements should have been viewed critically and skeptically.

51

b.  That the proposed annuity was highly speculative, unusual, and risky, such that extra care was needed to ensure that the annuity provider was a legitimate company, had solid financial backing, and was not, as it turned out, a shell for Galanis and Dunkerley;

c.  That WAPCC was not authorized to serve as an Annuity Provider under the Indenture because it did not issue annuities as part of its "regular trade or business."

d.  That WAPCC had no real affiliation with Wealth Assurance AG, which became clear prior to closing when references to Wealth Assurance AG were deliberately removed from the bond transaction documents;

e.  That as a result of the forgoing, there was no "Annuity Investment" as referenced in the Dilworth Opinion letter;

f.  That Morton and HCM had no authority to purchase the bonds on behalf of the bondholders, including RHCT, which should have been revealed by the unusual fact that HCM had executed the investors' "Big Boy" letters on their behalf.

g.  That in an ordinary transaction, a private placement memorandum would have been prepared at the outset which would detail, among other things, the economic development project, including its size and possible uses; the economy of the surrounding region to demonstrate the market for such a project; the terms of the annuity contract; the financial strength of the annuity contract provider; the track record of the annuity contract provider; and the investment parameters allowed for the separate account required by the Annuity Contract; and the identity and track record of the investment manager for that separate account.

h.  That the fact that HCM was able to locate purchasers and sign the "Big Boy" letter on their behalf without a private placement memorandum further indicated that the bondholders had not authorized the purchase of the bonds;

i.  That Anderson and Galanis did not have authority to direct U.S. Bank where to wire the proceeds from the bond issuances;

j.  That the transfer of funds by U.S. Bank was, in fact, a violation of the Bond Indenture, rendering the assumption to the contrary in Dilworth's opinion letter unreasonable;

k.  That the bonds and other transaction documents were not properly authorized by the WLCC;

l.  That the placement agent (Burnham Securities), the manager of the invested funds (HCM), and the recipient of the invested funds (WAPCC-Florida) were all controlled by the same group of people with Dilworth/Anderson's clients, Jason Galanis and Dunkerley, at the center.

284.    As a result of the foregoing, Dilworth and Anderson should have known prior to closing: that the Bonds were not "being issued in order to . . . finance the purchase of a certain Annuity Investment (as described in the Indenture);" that the Bonds would not be "equally and ratably secured by . . . revenues from the Annuity Investment;" that the proceeds of the bonds would not be "expended as required by and described in the Indenture" and other transaction documents; and that each party to the Bond Documents, including Dilworth/Anderson's client, Burnham and Galanis, were not intending to carry out all obligations imposed by the Bond Documents, all as Dilworth/Anderson represented and opined in its letter.

285.    By providing a legal opinion letter necessary to consummate the fraudulent transaction that put over $4 million of RHCT's retirement funds into worthless bonds, Dilworth, and Anderson, jointly and severally caused and allowed the diversion of RHCT's and other bondholders' assets by Jason Galanis and his co-conspirators, to the injury of RHCT and the other bondholders.

286.    Thus, by issuing their opinion letter, Dilworth and Anderson were negligent and failed to exercise due care in connection with their services.

287.    The identity of RHCT and the other Bondholders, as the ultimate purchasers of the Bonds, were known to Dilworth prior to rendering its opinions and therefore were foreseeable plaintiffs.

288.    At no time after closing on August 25, 2014, did Dilworth take steps to alert the bondholders of the fraud, or that the opinions it had rendered were incorrect or false, as to allow the bondholders to take actions to try to secure their funds before they were absconded by the conspirators.

289.    Dilworth, and Tim Anderson acted willfully, wantonly, and recklessly in failing to recognize the numerous indicators of wrongdoing involved in the transaction.

290.    RHCT's investment in the bond has resulted in actual damages.

291.    RHCT is entitled to recover actual damages and punitive damages resulting from Defendants' negligence and breach of the duty of care.

## FOR A SIXTH CAUSE OF ACTION AGAINST DILWORTH AND ANDERSON
### (Aiding and Abetting in a Breach of Fiduciary Duty)

292.    Plaintiff incorporates the relevant and consistent allegations set forth above.

293.    Pursuant to the RHCT Agreement, HCM was acting as a fiduciary to RHCT with respect to the investments it was placing on RHCT's behalf.

294.    As part of HCM's fiduciary obligations, HCM was obligated to follow RHCT's investment guidelines set forth in the RHCT Agreement.

295.    As sophisticated commercial attorneys, with specialization in bonds and public finance, Anderson and Dilworth knew that HCM owed its pension fund clients fiduciary duties with respect to their investments and that part of those duties involved following HCM's investment authority.

296.    Dilworth and Anderson knew that it was unusual HCM would prepare a "Big Boy" letter that was not signed by the pension funds themselves.

297.    However, Dilworth and Anderson assisted HCM in preparing the "Big Boy" letter, which was specifically drafted for HCM's signature, not that of the pension funds.

298.    Anderson and Dilworth therefore knew that the pension funds would not be independently authorizing the private placement letter when they helped to author it.

299.    By preparing the "Big Boy" letter for the bondholders, Anderson and Dilworth's assistance of HCM in the bond placement went above and beyond their role as counsel for Burnham Securities.

300.    Dilworth and Anderson knew that the Bonds were particularly risky investments, in light of the proposed financing arrangement and the narrow limited waiver of sovereign immunity granted by WLCC.

301.    On information and belief, HCM was unrepresented with respect to the bond issuance, and was looking to Anderson and Dilworth's guidance to complete the issuance.

302.    Dilworth and Anderson were willing to assist HCM in closing the bond transaction because, as Anderson noted during the criminal trial, Dilworth would only be paid if the transaction closed.

303.    RHCT was a foreseeable plaintiff. At a minimum, Dilworth and Anderson knew there was a pension fund client named "Chicago Transit Authority" at the time they assisted HCM in completing the "Big Boy" letter.

304.    Dilworth and Anderson certainly knew the identity of the Chicago Transit Authority Retiree Health Care Trust prior to the bond issuance, at the latest, on August 24, 2014, when Galanis emailed him the name of HCM's pension fund clients.

305.    In acquiring the bonds for RHCT, HCM performed a wrongful act which has caused RHCT an injury.

306.    Anderson and Dilworth were regularly aware of the roles they were playing in HCM's breach of its fiduciary duties to RHCT at the time they were assisting in the preparation of the bond transaction documents and the investor "Big Boy" letter.

307.    Without Dilworth's and Anderson's assistance in preparing these documents and carrying out the conditions to closing, the bond transaction would not have closed, RHCT's bond would not have issued, and RHCT would not have suffered the losses it is seeking to recover in this case.

308.    RHCT is entitled to recover in the amount of $4,073,499, plus interest, and consequential damages stemming from WLCC's breach of the Bond Indenture.

## PRAYER FOR RELIEF

WHEREFORE, RHCT having fully complained of Defendants herein, prays for the following:

(a) as it relates to the First cause of action, actual damages, special damages, and punitive damages.

(b) as it relates to the Third, Fourth, Fifth and Sixth cause of action, actual damages, consequential damages, and incidental damages, and if appropriate, punitive damages;

(c) as it relates to the Second cause of action, treble damages, costs and attorneys' fees pursuant to 18 U.S.C. § 1962, and punitive damages; and

(d) for such other relief as the court deems fair and just.

Respectfully submitted,

KENISON, DUDLEY & CRAWFORD, LLC

 /s/ Thomas E. Dudley, III
Thomas E. Dudley, III (District Court Bar #05973)
704 East McBee Avenue
Greenville, SC 29601
Telephone: (864) 242-4899
Facsimile: (864) 242-4844
Email: dudley@conlaw.com


January  28, 2019                         BURKE, WARREN, MACKAY & SERRITELLA, P.C.

Aaron H. Stanton (ARDC: 6244251)
*Pro hac vice*
*astanton@burkelaw.com*
Eric P. VanderPloeg (ARDC: 6310377)
*Pro hac vice*
*evanderploeg@burkelaw.com*
330 N. Wabash Ave., 21st Floor
Chicago, Illinois 60611
Telephone: (312) 840-7000
Facsimile: (312) 840-7900


Attorneys for Intervening Plaintiffs,

Chicago Transit Authority Retiree Health Care Trust and the Board of Trustees of the Chicago Transit Retiree Health Care Trust.