**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| The Michelin Retirement Plan and the Investment Committee of the Michelin Retirement Plan, | |
| and | Case No.: 6:16-cv-03604-BHH-JDA |
| Chicago Transit Authority Retiree Health Care Trust; Board of Trustees for the Chicago Transit Authority Retiree Health Care Trust, | |
| Plaintiffs, | |
| v. | |
| Dilworth Paxson, LLP, et al., | |
| Defendants. | |

**CHICAGO TRANSIT AUTHORITY RETIREE HEALTH CARE TRUST'S RESPONSE
IN OPPOSITION TO DILWORTH PAXSON, LLP'S AND TIMOTHY B. ANDERSON'S
<u>MOTION TO DISMISS THE AMENDED COMPLAINT IN INTERVENTION</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL ALLEGATIONS .................................................................................... 2

ARGUMENT ........................................................................................................ 7

I.     THIS COURT HAS SPECIFIC JURISDICTION OVER THE DP DEFENDANTS. ... 7

   A.     The DP Defendants Purposefully Availed Themselves of the Privilege of Conducting Activities in South Carolina. ........................................................... 8

      1.     The DP Defendants' Activity Satisfies the *Calder* "Effects Test" for Claims Based on Intentional Conduct. ........................................................ 8

      2.     The DP Defendants Also Purposefully Availed Themselves of South Carolina Under Traditional Factors. ......................................................... 12

   B.     The Contacts With South Carolina Gave Rise to RHCT's Injury. ........................... 15

   C.     It is Constitutionally Reasonable for the DP Defendants to Defend Against RHCT's Claims in South Carolina. ......................................................... 16

II.    THE AMENDED COMPLAINT IN INTERVENTION STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED. ...................................................... 18

   A.     Choice of Law. .................................................................................................. 18

   B.     RHCT Pleads a Claim for Aiding and Abetting in a Breach Of Fiduciary Duty. ..... 19

   C.     RHCT Pleads a Claim for Tortious Interference. ................................................. 23

   D.     RHCT Pleads a Claim for Negligence. ................................................................ 26

      1.     RHCT Is Not Required to Attach a "Certificate of Merit." ............................ 26

      2.     The DP Defendants Owed RHCT A Duty of Care in Preparing Their Opinion Letter. .................................................................................................... 27

      3.     The DP Defendants Breached their Duty By Failing to Investigate the Matters Within the Scope of their Opinion Letter. ..................................... 30

      4.     The DP Defendants' Breach of Their Duty Caused RHCT's Losses. .............. 32

CONCLUSION ................................................................................................... 34

Plaintiffs the Chicago Transit Authority Retiree Health Care Trust and its Board of Trustees (collectively, "**RHCT**") respond in opposition to the Motion to Dismiss the Amended Complaint in Intervention filed by Defendants Dilworth Paxson, LLC ("**Dilworth**") and Timothy B. Anderson ("**Anderson**") (Dilworth and Anderson, collectively the "**DP Defendants**") [Doc. 429.]

## PRELIMINARY STATEMENT

"Lawyers cannot stick their head in the sand and blind themselves of their professional obligations." *Matter of Beauregard*, 189 A.3d 1236, 1252 (Del. 2018). This case is not about an ordinary theft that lawyers failed to stop. RHCT's claims arise from a complex and calculated transaction that has led to the conviction or guilty pleas of six individuals, two SEC enforcement actions, *at least* two investment companies being forced out of business (Burnham Securities, Inc. and Hughes Capital Management, Inc./Atlantic Asset Management, LLC), bondholder civil actions in at least three jurisdictions, and the **collective loss of over $43,000,000 in retirement funds** between at least nine pension plans located in several states. In its wake, scores of individuals have had their reputations tarnished, people are going to jail, employees have lost their jobs, and a Native American community has been embarrassed on a national stage.

Though the Magistrate Judge has recommended that related claims against the DP Defendants be dismissed, RHCT's Amended Complaint in Intervention (hereinafter, "**Amended Complaint**") is materially different and warrants fresh consideration.  It contains new material allegations based on facts that were not available to the bondholders until the criminal trial transcripts were publicly released this past November.[1] It also reflects facts first learned from the initial discovery that RHCT conducted in this case (which is ongoing).

---

[1]     *USA v. Galanis et al.*, 1:16-cr-00371-RA, (S.D.N.Y.) Doc. Nos. 569–608. The corrected transcripts were not available until January, 2019. *Id.*, 647–677.

In turn, the Amended Complaint reflects that this case is not *just* about bad wire instructions and "red flags." RHCT's claims arise from Dilworth's decision to facilitate a transaction that it knew breached an investment manager's fiduciary duty to pension funds who were known to Dilworth. RHCT's claims also arise from Dilworth's willful disregard of facts that contradicted statements made in its opinion letter, without which this transaction would not have occurred.

RHCT is not out on a limb. A federal court in South Dakota has already denied a motion to dismiss bondholder claims against the indenture trustee, finding that the bondholders plausibly alleged that U.S. Bank failed to carry out this transaction in "good faith." *Water Works Bd. of City of Birmingham v. U.S. Bank Nat'l Ass'n*, No. 4:17-CV-04113-LLP, 2018 WL 3448347, at *8 (D.S.D. July 17, 2018)[2] ("Again, a fact question remains as to whether Defendant in good faith believed that the instructions arrived at Defendant's door through the proper channels."). While the duties owed by U.S. Bank may arise from different sources, the operative facts are the same and there is ample authority to hold Dilworth liable too. The Motion to Dismiss should be denied.

## FACTUAL ALLEGATIONS

This case began with a meeting between Dilworth partner, Tim Anderson, his former clients, and well-known white-collar criminal John Galanis at a hotel in Las Vegas in the spring of 2014. [Doc. No. 411, ¶¶ 39–45, 60–62, 67.] There, John Galanis explained his plan to generate free money for one of Anderson's former clients, a South Dakota Native American tribal corporation—the Wakpamni Lake Community Corporation ("**WLCC**")—by selling bonds backed by an offshore annuity that would be invested in private equity. [*Id.*, ¶¶ 63–65, 111.] The targeted buyers would be pension funds. [*Id.*, ¶ 68.] Anderson, an experienced bond lawyer and member

---

[2]    Unpublished decisions are attached hereto as **Exhibit 1**.

of the National Association of Bond Lawyers, thought Galanis's annuity concept was "novel" and "something new." [*Id.*, ¶¶ 58, 65.]

John "Yanni" Peter Galanis is one of the most prolific financial criminals in the country, having once been sentenced to a record 27 years in prison for fraud.[3] [*Id.*, ¶¶ 39–44.] Soon, John introduced Anderson to his son, Jason, who, like is father, had high-profile problems with the SEC related to business fraud. [*Id.*, ¶ 45.] An internet search would have disclosed John and Jason's prior financial frauds to Anderson. [*Id.*, ¶¶ 39, 51, 67.] Jason was affiliated with a securities broker in New York, Burnham Securities, Inc. ("**Burnham**"), that would serve as the placement agent for John Galanis's tribal bonds. [*Id.*, ¶ 66.] Anderson had previously represented WLCC but believed working for the Galanises and Burnham would be more lucrative. [*Id.*, ¶ 59, 70.] Anderson was eventually engaged by Burnham. In the engagement letter, Anderson agreed that Dilworth would be paid at closing. [*Id.*, Ex. A, thereto, § 2.] Anderson then began preparing and reviewing critical bond documents, including a bond indenture (the "**Indenture**"), closing statements and agendas, and the bonds themselves. [*Id.*, ¶ 93, 95, 97–98, 121, 127, 142.]

The annuity was the cornerstone of the bonds. [*Id.*, ¶ 103] The final version of the Indenture that Anderson had drafted defined the "**Annuity Contract**" as a contract between WLCC and "a company that provides Annuity Investments as part of its *regular course of trade or business*." [*Id.*, ¶ 98, Ex. B, thereto, § 1.2 (emp. add.).] At first, the annuity was supposed to be provided by a Lichenstein insurance company called Wealth Assurance AG. [*Id.*, ¶ 101; *see also* Ex. D, thereto.] However, by July, 2014, Anderson was receiving drafts of an Annuity Contract not from Wealth Assurance AG, *but from John Galanis* who had no affiliation to Wealth Assurance AG.

---

[3]    *See, e.g.,* https://www.nytimes.com/1988/09/30/business/27-year-term-for-fraud.html (1988); http://articles.latimes.com/1988-09-29/business/fi-6120_1_fraud-convictions (1988); https://www.forbes.com/forbes/2000/0918/6608186a.html#7eec8b8635ee (2000);

[*Id.*, ¶¶ 106–07.] The drafts identified a different company, "Wealth Assurance Private Client Corporation" ("**WAPCC**"). [*Id.*] WAPCC had been established just a few months earlier by Galanis's accomplices and had never issued an annuity. [*Id.*, ¶ 177.] Although Anderson's client, Burnham, was not a party to the Annuity Contract, Anderson began reviewing and providing input on the Annuity Contracts to John Galanis, and one of his other sons, Jared Galanis. [*Id.*, 108.]

WLCC's CEO (Anderson's former contact, Raycen Raines) was dating a partner at the law firm, Greenberg Traurig, LLP, who was eventually engaged to act as counsel to WLCC. [*Id.*, ¶¶ 88–90.] Early in the transaction, Greenberg's bond lawyer informed Anderson that given the "unique" financing (*i.e.* annuity) and the "risk factors" associated with the bonds, a private placement memorandum ("**PPM**") should be disseminated to potential purchasers to disclose these risks. [*Id.* ¶ 119] However, neither Anderson nor Greenberg ever prepared a PPM. [*Id.*] Greenberg also prepared a detailed placement agency agreement between Burnham and WLCC that required a "certificate" from each of the bondholders reflecting that they were accredited investors. [*Id.*, ¶ 94; Doc. No. 309-11, § 7(a)(v).][4] These safeguards would have ensured that the purchasers knew about the risky bonds and had authorized their purchase despite those risks. [*Id.*, ¶¶ 116–34.]

By the end of July, 2014, closing had to be pushed back because Jason was having trouble finding purchasers for the unrated tribal bonds. [*Id.*, ¶ 75.] In August, 2014, with Jason's assistance and financing, Michelin Morton and Gary Hirst, abruptly took control of a small, socially conscious investment manager known as Hughes Capital Management, Inc. ("HCM"). [*Id.*, ¶¶ 76–86.] Within days of taking over HCM, Morton had identified pension plans that would be used to

---

[4]    RHCT's Amended Complaint refers to the placement agency agreement generally, [*Id.*, ¶ 94.], and the document is also in the court record. [Doc. No. 309-11.] Section 7(a)(v) required that WLCC obtain and deliver: "(v) a certificate of ***each*** purchaser of the Bonds certifying that it is a Qualified Investor [defined as "accredited investor"], in form and substance reasonably satisfactory to the Issuer . . . ." [*Id.* at p. 5–6 (emp. add.)] No such certificate was ever obtained from RHCT.

4

acquire tribal bonds. [*Id.*, ¶¶ 124–26.] Among the plans, one was located in South Carolina, Plaintiff Michelin, and another in Chicago, Plaintiff RHCT. [*Id.*, ¶¶ 120, 137–40.] Michelin, alone, was to contribute the largest portion of funds, a staggering $8,102,154 in retirement funds. [*Id.*] RHCT also contributed a substantial amount of $4,073,499. [*Id.*, ¶ 138.]

The closing documents Dilworth prepared also required the parties to obtain an accredited investor "Big Boy" letter from the bondholders prior to closing. [*Id.*, ¶ 121.][5] This letter was necessary to ensure the transaction was exempt from securities registration, without which the issuance could not be completed. [*Id.*, ¶¶ 121–22.] Because HCM did not have its own counsel overseeing the transaction, Anderson prepared a form investor letter for HCM. [*Id.*, ¶ 129.] Instead of HCM having each bondholder sign the "Big Boy" letter, as Anderson admitted under oath would be the "normal course of events," Morton executed a single "Big Boy" letter on behalf of nine different plans, including Michelin and RHCT. [*Id.*, ¶¶ 133–34.] Anderson then prepared the face pages for each of the bonds to be issued. [*Id.*, ¶ 141–42]

On August 25, 2014, "closing day," Anderson helped HCM coordinate the purchase of the bonds. [*Id.*, ¶ 129, 168.] As RHCT now knows, Anderson personally communicated with the plans' custodians to ensure the proceeds were wired, including RHCT's and Michelin's custodian. [**Exhibit 2**, Affidavit of Eric P. VanderPloeg, ¶ 7, Ex. A thereto.][6] Dilworth also issued an opinion

---

[5]    In footnote 16 of its brief, Dilworth states that RHCT acknowledged that such letters are "optional and not mandatory in Paragraph 122 of the Amended Complaint." Paragraph 122 says no such thing. Moreover, RHCT has adequately pleaded that *this* transaction could not have closed without the Big Boy letter. [Doc. No. 411, ¶ 136.] The closing agenda (prepared by Dilworth) attached to the Amended Complaint also reflects on its face that the delivery of the Big Boy letter was a condition of closing. [Doc. No. 411-5, at p. 5, Item. 7; *see also* ¶ 136.]

[6]    Discovery is ongoing and just weeks ago (after filing the amended complaint), RHCT received a substantial production of materials from the SEC which includes communications relevant to RHCT's allegations regarding substantial assistance of HCM. [*See* **Ex. 2**, ¶¶ 2, 6.] Many of these documents are still being reviewed. [**Ex. 2**, ¶ 7.] As reflected herein, RHCT has alleged sufficient facts to give rise to a plausible claim that Anderson provided substantial assistance to HCM in placing the unauthorized bonds,

letter on August 25, 2014 that contained statements, assumptions and opinions about the bond, including the Annuity Investment and WLCC's authority to issue the bonds. [*Id.*, ¶ 144–62.]

Despite "closing" a day earlier, as of August 26, 2014, the Annuity Contract and related investment management agreement, which were required by the Indenture, were still unsigned. [*Id.*, ¶¶ 174–76; Ex. 2, thereto, at § 2.11).] That day, Jason Galanis had two of his accomplices, Dunkerley and Francisco Martin, sign the Annuity Contract on behalf of both WAPCC and WLCC. [*Id.*, ¶ 176.] Galanis then emailed the fully executed documents to his attorney, Anderson, along with wire instructions for the purported annuity. [*Id.*, ¶ 182.] In his email, Galanis instructed Anderson to have U.S. Bank wire in excess of $22,000,000 in bond proceeds to the bank account on the wire instructions. [*Id.*, ¶ 182.] Using this information, Anderson directed U.S. Bank to conduct the wire transfer. [*Id.*, ¶ 183–84.] No direction came from WLCC as required by the bond Indenture and transaction documents that Anderson had drafted. [*Id.*, ¶¶ 180, 186]

Galanis's wire instructions to Anderson were problematic, to say the least. Whereas the Annuity Contract, that Anderson had reviewed several times, called for all funds to be wired offshore to a bank with *no* U.S. branches, Galanis's wire instructions called for the funds to be wired to a JPMorgan Chase account in Beverley Hills, California (where Galanis happened to reside). [*Id.*, ¶¶ 17, 113, 185.] This account turned out to have nothing to do with a real annuity provider but was instead an account over which Galanis and Dunkerley had complete control. [*Id.*, ¶ 177, 192-94.] From the account, Dunkerley and Galanis misused the bond proceeds on other business ventures, family gifts, and lavish personal expenses. [*Id.*, ¶¶ 194–202.]

The DP Defendants' role was not over, however. This transaction was executed twice more, in October 2014 and again in April 2015. [*Id.*, ¶¶ 203–221.] Each issuance was carried out

---

and these new facts are simply evidence of these allegations. However, to the extent the Court believes these additional facts should be pleaded, RHCT requests leave to amend to do so.

in a similar manner by the same general actors, further depleting the original bond proceeds. [*Id.*]

In total, the parties stole a collective $43,000,000 in pension funds. [*Id.*, ¶ 10.]

## ARGUMENT

**I.     THIS COURT HAS SPECIFIC JURISDICTION OVER THE DP DEFENDANTS.[7]**

South Carolina's long arm statute provides in pertinent part:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's:

    (1) transacting **any** business in this State;

    (3) commission of a tortious act in whole **or in part** in this State;

(B) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.

S.C. Code Ann. § 36-2-803 (emp. add.).  Here, RHCT's claims fall within this broad language because part of the same tortious transaction giving rise to its claims also occurred in South Carolina, where Michelin is located and from which its funds came.

The reach of South Carolina's long arm statute extends to the furthest limits imposed by the due process clause. *Atl. Soft Drink Co. of Columbia v. S.C. Nat. Bank*, 336 S.E.2d 876, 878 (1985).  In such cases, the statutory inquiry is merged with the constitutional inquiry. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 397 (4th Cir. 2003).  In *Carefirst of Maryland*, the Fourth Circuit laid out the three-prong test for specific jurisdiction:

If [the Defendants' contacts with the forum state] form the basis for the suit, they may establish "specific jurisdiction." In determining whether specific jurisdiction exists, we consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable."

---

[7]     Where the court decides a personal jurisdiction dismissal motion without an evidentiary hearing, a plaintiff must only establish a prima facie showing of personal jurisdiction and all inferences and facts from the proof must be construed in plaintiffs' favor. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993).

334 F.3d at 397. RHCT has made out a prima facie case for jurisdiction under these factors.

      **A.**     **The DP Defendants Purposefully Availed Themselves of the Privilege of Conducting Activities in South Carolina.**

           **1.**     **The DP Defendants' Activity Satisfies the *Calder* "Effects Test" for Claims Based on Intentional Conduct.**

Under the *Calder* effects test, the plaintiff must establish "(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 280 (4th Cir. 2009); *Calder v. Jones*, 465 U.S. 783, 790, 104 (1984).

*First*, RHCT has alleged intentional torts against the DP Defendants.  Under Illinois law, tortious interference and aiding and abetting in a breach of fiduciary duty are intentional torts.[8] *Sirazi v. Gen. Mediterranean Holding, SA*, No. 12 C 653, 2015 WL 2265907, at *1 (N.D. Ill. May 12, 2015 (tortious interference and aiding and abetting claims both involve a showing of "intentionality").  *Second*, the brunt of Dilworth's actions were felt in many states where the bondholders were located, but significantly in South Carolina where the largest bondholder in the first tranche was located. Indeed, $8,102,154 of employee retirement funds were stolen from this State. In this sense, South Carolina was the focal point of the harm to plaintiff Michelin, which occurred in the **same** transaction and series of events as RHCT's harm. [*See* § I.B, *infra*.]

---

[8]     These claims would also qualify as intentional under Arizona law. *Neonatology Assocs., Ltd. v. Phoenix Perinatal Assocs. Inc.*, 164 P.3d 691, 693 (Ct. App. 2007) (tortious interference requires intentional conduct); *Koss Corp. v. Am. Exp. Co.*, 309 P.3d 898, 917 (Ct. App. 2013), *as amended* (Sept. 3, 2013) (aiding and abetting is an intentional tort).

*Third*, the Amended Complaint reflects that the DP Defendants **expressly aimed** their activities at South Carolina when they targeted plaintiff Michelin.  This is not a case where fraudulent securities were put into the stream of commerce and purchased by fortuitous investors on a national exchange. To the contrary, the pension fund victims were classic "marks:" *i.e.,* victims specifically identified by Jason Galanis and Michelle Morton several days prior to closing. *See Ruston Gas Turbines, Inc. v. Donaldson Co.,* 9 F.3d 415, 420 (5th Cir. 1993) (specific jurisdiction is more likely when defendant knows location where goods are actually sold, as opposed to foreseeability that goods could be sold there).

During the criminal trial in 2018, Anderson admitted that prior to the bonds being issued, he received an email from Jason Galanis and Michelle Morton identifying each of the bondholders, including RHCT and Michelin. [Doc. No. 441 ¶¶ 138–40; *see also* **Exhibit 3**, Testimony of Timothy B. Anderson, May 24, 2018, p. 215, lns. 8–15; p. 218, lns. 6–9.][9] Importantly, the email also reflected that Michelin's bond would be substantially larger than any other bondholder, a total of $8,102,154. *Id.*  Similarly, Anderson knew the identity of the bondholders because he had helped to draft HCM Big Boy letter, which had identified each bondholder. [*Id.*, p. 215.] Additionally, the bonds themselves, which were prepared by Dilworth, identified the bondholders, including RHCT and Michelin. [Doc. No. 301-6 (Michelin's Bond); Doc. No. 311-3 (RHCT's Bond).] As such, Anderson knew in advance of closing that nearly a third of the proceeds for the first tranche of Wakpamni bonds were coming from South Carolina, where Michelin is headquartered.

---

[9]     The Court may take judicial notice of these transcripts, which are publicly available and were prepared by a federal court reporter. *Roberts v. Norton*, No. 17-CV-2547-AJB-BGS, 2018 WL 1470318, at *2 (S.D. Cal. Mar. 26, 2018); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) (The most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records."). Anderson's statements are admissions against a party opponent. FRE 801(d)(2).

RHCT now knows that the DP Defendants' contacts with the bondholders were even more direct. On or about August 25, 2014, Anderson emailed a representative of Northern Trust, the custodian for at least three Wakpamni bondholders, including RHCT and Michelin. [*See* **Ex. 2**, hereto, at Ex. A.] In the email, Anderson appears to be following up a phone conversation by providing his contact information to the representative. Twenty-two minutes later, Anderson emailed the representative again, stating "I just want to confirm you received." [*Id.*] Two hours later, the Northern Trust representative responded to Anderson (copying Hughes) with three wire transfer references, including one in the amount of $8,102,154.00 (Michelin's bond) and $4,073,499 (RHCT's bond). [*Id.*] These communications appear to reflect that Anderson was personally coordinating the transfer of RHCT and Michelin's funds from their custodian, Northern Trust, to U.S. Bank. It also appears that Anderson was personally passing along W-9 information for the bondholders from HCM to U.S. Bank. [**Ex. 2**, hereto, at Exs. B, C, & D.] Anderson would have known from Michelin's W-9 [**Ex. 2**, hereto, at Ex. D] that Michelin was located in South Carolina. Such conduct reflects that Anderson was not only aware of the identity of both RHCT and Michelin prior to their funds being misappropriated, but that he was expressly aiming his activities toward those bondholders in the states where they were located.

In these respects, this case is not materially different than *Calder v. Jones*, 465 U.S. 783, 790, 104 (1984), where the Supreme Court upheld personal jurisdiction against two defendants from Florida who had never stepped foot in California. The defendants claimed they had no power to control where a defamatory story was published and that they were more akin to agents working on a defective boiler put into the stream of commerce. *Id.* at 789. The Supreme Court disagreed, finding that the defendants themselves knew the "brunt of [the] injury would be felt by respondent in the State in which she lives and works . . ." and where the story would be widely published. *Id.*

at 790. The Court went on to state, "[a]n individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly caused the injury in California." *Id.* The Fourth Circuit reached a similar conclusion in *First Am. First, Inc. v. Nat'l Ass'n of Bank Women*, 802 F.2d 1511, 1517 (4th Cir. 1986). There, the defendants authored defamatory letters from Illinois and distributed them throughout the country, but knew that their letters were targeted at residents of Virginia. *Id.*

The Supreme Court's 2014 decision in *Walden v. Fiore*, 571 U.S. 277, 290 (2014), cited by the DP Defendants, does not compel a different result. In *Walden*, the Supreme Court reaffirmed the *Calder* effects test but clarified that the presence of the plaintiff in the forum state cannot be the *only* link to the forum state. *Id.* at 285. In *Walden*, the plaintiff, who resided in Nevada, had gambling winnings seized *in Georgia* as he attempted to board a plane to Nevada. *Id.* at 280. The plaintiff then sued in Nevada and asserted personal jurisdiction under the *Calder* effects test based on his Nevada residence. *Id.* The Supreme Court rightly noted that no conduct was alleged to have been directed to the State of Nevada, because the seizure occurred entirely *in Georgia*. *Id* at 290.

Unlike the plaintiff in *Walden*, plaintiff Michelin was, at all times relevant, located in South Carolina where it is headquartered. Though the bonds emanated from South Dakota, they were directed to the states where the bondholders were located, including South Carolina. Further, the funds used to purchase Michelin's bond ultimately belonged to beneficiaries located in this State. Thus, by taking actions directed toward Michelin and its beneficiaries, the DP Defendants were forming contacts with this state. *See MAG IAS Holdings, Inc. v. Schmuckle,* 854 F.3d 894, 901 (6th Cir. 2017) (rejecting argument that *Walden* precluded *Calder* effects test based on contacts with the plaintiff, where plaintiff was located in the forum state).

**2.    The DP Defendants Also Purposefully Availed Themselves of South Carolina Under Traditional Factors.**

Even if the *Calder* effects test did not apply, the Court can reach the same conclusion under a traditional purposeful availment analysis, which considers the following non-exhaustive factors:

(1) Whether the defendant maintains offices or owns property in the forum state;

(2) Whether the defendant reached into the forum state to solicit or initiate business;

(3) Whether the defendant deliberately engaged in significant business activities in the forum state;

(4) Whether the parties contractually agreed that the law of the forum state would govern disputes;

(5) Whether the defendant made in-person contact with a resident of the forum state regarding the business relationship;

(6) The nature, quality and extent of the parties' communications about the business being transacted; and

(7) Whether the performance of the contract was to occur within the forum.

*Lufthansa Sys. Infratec GmbH v. Wi-SKY Inflight, Inc.*, No. 3:10CV745-JAG, 2011 WL 862314, at *5 (E.D. Va. Mar. 9, 2011) (citing *Consult. Eng. Corp. v. Geometric Ltd.*, 561 F.3d 273 (4th Cir. 2009)). The "strongest factor" is **whether the defendant initiated the business relationship in some way**." *Giannaris v. Cheng*, 219 F. Supp. 2d 687, 692 (D. Md. 2002) (emp. add.).

The Fourth Circuit has clarified that:

[w]e should not "merely ... count the contacts and quantitatively compare this case to other preceding cases." Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of "fair play and substantial justice" is not thereby offended.

*Carefirst of Maryland, Inc.,* 334 F.3d at 397 (4th Cir. 2003); *see also Sheppard v. Jacksonville Marine Supply, Inc.*, 877 F. Supp. 260, 265–66 (D.S.C. 1995) ("a single contact with this state is sufficient to give the forum personal jurisdiction over the defendant when that contact gives rise to, *or figures prominently in*, the cause of action under consideration." (emp. add.)

The fact that a defendant directed more conduct to another forum does not mean that the instant forum lacks specific jurisdiction so long as "enough minimum contacts exist . . . ." *Prod. Grp. Int'l, Inc. v. Goldman*, 337 F. Supp. 2d 788, 798 (E.D. Va. 2004) (personal jurisdiction in Virginia even though greater part of defendants' conduct took place in Florida). Indeed, where the defendant directs its conduct to several states, **several states will have specific jurisdiction**. *See Copeland v. Bieber,* No. 2:13CV246, 2013 WL 12145005, at *5 (E.D. Va. Dec. 17, 2013) ("Where infringement occurs in multiple states, specific jurisdiction can be present in each of those states . . . ."); *Cortina v. Bristol-Myers Squibb Co.*, No. 17-CV-00247-JST, 2017 WL 2793808, at *4 (N.D. Cal. June 27, 2017) (actions causing harm in multiple states may give rise to specific jurisdiction in multiple states); *Gari Media Grp., Inc. v. Next 1 Interactive Media, Inc.*, No. CV1105021GAFMANX, 2011 WL 13220423, at *4 (C.D. Cal. Dec. 27, 2011) ("Nothing in the case law holds that the possibility that specific jurisdiction might be exercised in more than one state precludes its exercise in any state . . . .").

Here, RHTC has made a prima facie showing that the DP Defendants purposefully availed themselves of the privilege of conducting activities in South Carolina. Most importantly, it was the DP Defendants that **reached into the forum state to initiate business with Michelin**. Specifically, it was the DP Defendants who prepared the Big Boy letter, as well as the bonds bearing the bondholders' names, and who contacted their custodians. In turn, it was the DP Defendants who ensured that bonds would be purchased by Michelin in South Carolina and RHCT in Illinois. These actions were taken without any prompting from Michelin or RHCT.

By the same token, the DP Defendants **deliberately engaged in significant business activities (in excess of $8,000,000) in South Carolina**. Among other things, they prepared an illiquid, unrated bond, which was delivered to a major pension fund here. The bond specifically

bore Michelin's name and the amount of funds coming from this State. This deliberate conduct reflects purposeful availment in South Carolina. *See Alltec Lifting Sys., LLC v. Arkansas-Oregon Pneumatics, Inc.*, No. CIV.A. 3-12-218, 2012 WL 5832295, at *4 (S.D. Tex. Nov. 16, 2012) ("courts have typically found sufficient contacts in cases like this one in which a defendant custom designs a product for a particular buyer in the forum state."); *Plastic Fabricating, Inc. v. Electrex Co.*, No. 7:12-CV-00119, 2012 WL 1970237, at *3 (W.D. Va. May 30, 2012) (customization of products for purchaser in Virginia weighed in favor of finding sufficient contacts).

The practice of law by non-resident attorneys can also give rise to specific jurisdiction where the representation causes injury in the forum state. In *Bace Int'l, Inc. v. Brentwood Capital Corp.*, No. 3:04CV145-MU, 2006 WL 2460869, at *2 (W.D.N.C. Aug. 22, 2006), a court exercised specific jurisdiction over a non-resident law firm that had represented defendants in an allegedly fraudulent scheme. The defendant law firm had served in multiple roles and had prepared and executed transactional documents giving rise to the plaintiff's claims. *Id; see also Gracious Living Corp. v. Colucci & Gallaher, PC*, 216 F. Supp. 3d 662, 669 (D.S.C. 2016) (non-resident law firm's representation of a client without a license in South Carolina gave the court personal jurisdiction, even though no lawyer had appeared or advertised in state); *Allen v. James*, 381 F. Supp. 2d 495, 498 (E.D. Va. 2005) (out-of-state attorneys could be sued in Virginia, even though they would have to hire local attorneys to complete the work in the contract). Here, the DP Defendants issued their opinion letter, intended to ultimately influence the bondholders, with full knowledge of who the bondholders were and where they were located.

As such, there is sufficient authority to conclude at this stage that the DP Defendants purposefully availed themselves of the privilege of conducting activities in South Carolina when

they directed a $8,102,154 bond for sale to plaintiff Michelin. As such, the first prong of the test for specific jurisdiction is satisfied.

**B.     The Contacts With South Carolina Gave Rise to RHCT's Injury.**

The second prong of the test for specific jurisdiction requires RHCT's claims to "arise out of" or have a "nexus" with the DP Defendants' activities directed to South Carolina. While some circuits have viewed the "nexus" requirement in terms of legal causation, (*see Tomelleri v. MEDL Mobile, Inc.,* No. 2:14-CV-02113-JAR, 2015 WL 1957801, at *9 (D. Kan. Apr. 29, 2015) (discussing various approaches to the "nexus" requirement for specific jurisdiction), *aff'd,* 657 F. App'x 793 (10th Cir. 2016)), the Fourth Circuit looks to whether the activities directed to the forum have a "substantial connection" with the plaintiff's cause of action. *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945 (4th Cir. 1994).

Tellingly, the DP Defendants cite no authority for the argument that RHCT's injuries do not have a nexus or "substantial connection" to the actions directed toward Michelin in South Carolina. [Doc. 429, at 10.] Instead, they disingenuously argue "[o]bviously, [RHCT's] claims are not related to or arising out of DP's contacts (if any) with South Carolina." [*Id.*]

Yet, nothing could be further from the truth. In fact, the nexus between Michelin's claims and RHCT's claims was part of the reason why the Court allowed RHCT to intervene in the first place.  [Doc. No. 218 at 7 ("RHCT's claims are based upon common questions of law and fact as the Plaintiffs' and granting RHCT's motion will conserve judicial resources.")].  RHCT and Michelin were not injured in two separate transactions.  Instead, RHCT and Michelin's injury occurred on the **same** day, at the **same** time, at the hands of the **same** individuals. RHCT's and Michelin's funds were comingled in the **same** U.S. Bank account immediately after being wired by their custodian (which happens to be the **same** bank) with the assistance of Anderson, as reflected in the **same** email. [*See* **<u>Ex. 1,</u>** at., Ex., A, thereto.] RHCT and Michelin's funds were

then wired, at Anderson's direction, from the **same** indenture trustee to the **same** account as part of the **same** wire transfer. RHCT and Michelin are also beneficiaries of the **same** bond Indenture agreement and both stand in the **same** position vis-à-vis the indenture trustee.

In short, this is not a case where RHCT and Michelin were injured in two similar, but discrete transactions orchestrated by a common group of defendants in two different states. To the contrary, RHCT and Michelin were injured in the same national transaction and through the same conduct by the same defendants. As such, RHCT has established a nexus and "substantial connection" between its injury and the activities directed to the State of South Carolina.

### C.    It is Constitutionally Reasonable for the DP Defendants to Defend Against RHCT's Claims in South Carolina.

The DP Defendants make no serious argument why it would be constitutionally unreasonable to require them—lawyers with a national practice—to defend RHCT's claims in South Carolina. In fact, this argument appears to have been omitted from their brief entirely and therefore should be resolved in RHCT's favor. For the constitutional prong of the specific jurisdiction analysis, "[t]he court's inquiry is guided by the 'burden on the defendant, interests of the forum state, and the plaintiff's interest in obtaining relief[.]'" *Atkins v. Mortara Instrument, Inc.*, No. 2:17-CV-48-DCN, 2017 WL 10754250, at *5 (D.S.C. Sept. 29, 2017) (denying motion to dismiss for lack of personal jurisdiction) (citing *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 303 (4th Cir. 2012)).

There is no burden on the DP Defendants in defending against RHCT's claims in South Carolina, and certainly they have not argued otherwise. To the contrary, the DP Defendants have been aptly defended in this case to date. As the court noted in *Mortara Instrument*, the fact that "defendant has been able to secure counsel to defend in this litigation," was relevant in assessing the constitutional burden. *Mortara Instrument, Inc.*, No. 2:17-CV-48-DCN, 2017 WL 10754250,

at *6 (D.S.C. Sept. 29, 2017).  Moreover, this case is in federal court and the DP Defendants do not face any procedural burden they would not face in federal court in Pennsylvania. Further, Pennsylvania and South Carolina are comparatively close as far as U.S. States go. Certainly, if it was not too burdensome for Anderson to travel to South Dakota as part of this transaction [Doc. 411, ¶¶ 208–09], it is not too burdensome for him to defend in a much closer state.

South Carolina also has an interest in adjudicating bondholder claims—even RHCT's claims.  Here, a pension plan for a major employer in South Carolina had more than $8,000,000 in retirement funds stolen in a transaction effectuated by the DP Defendants. South Carolina has an interest in resolving the claims of any victims arising from that same transaction.

Finally, RHCT has an interest in obtaining relief in this State too.  After all, it is not as if RHCT filed a separate lawsuit in South Carolina without any justification. It intervened by permission in an existing case to conserve resources, including judicial resources, by litigating like factual and legal issues with a co-plaintiff already litigating in this State.  *See Tamburo v. Dworkin*, 601 F.3d 693, 710 (7th Cir. 2010) (single suit against defendants living in multiple jurisdictions in plaintiff's home state provided the most efficient resolution of claims and therefore comported with traditional notions of fair play and substantial justice for specific jurisdiction). While it is unquestioned that RHCT now believes after a year-and-a-half stay that South Dakota is a more convenient forum for its claims, RHCT has been actively prosecuting its case here since the stay was lifted. It has issued and responded to discovery, investigated and prosecuted its case, and prepared pleadings specifically tailored for this forum.  To the extent its claims are not to be transferred, it has an interest in continuing to pursue them here.

As such, there is no constitutional hurdle to exercising specific jurisdiction over RHCT's claims in South Carolina, particularly where this Court has already found personal jurisdiction with respect to Michelin's claims. The Motion to Dismiss should be denied.

## II.    THE AMENDED COMPLAINT IN INTERVENTION STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED.[10]

### A.    Choice of Law.

RHCT's claims against the DP Defendants are governed by Illinois law, where RHCT's injuries occurred.  "Under traditional South Carolina choice of law principles, the substantive law governing a tort action is determined by the state in which the injury occurred." *Id.* (citing *Lister v. NationsBank of Delaware, N.A.*, 494 S.E.2d 449, 454 (Ct. App. 1997)). Known as the *lex loci delicti,* the court looks not to the location where the wrong occurred, but where the plaintiff suffered its loss. *Lister,* 329 S.C. at 141. For example, in *Lister*, it was not law of the state where the misrepresentations were made (*i.e.*, Nevada), but rather the state in which plaintiff's credit card was wrongfully charged. *Id.*

RHCT is conscious that Magistrate Judge Austin noted that Arizona law may apply to Michelin's claims because it appears the bond proceeds were first wired to a U.S. Bank account in Arizona.  While RHCT contends that it could prevail under either state's law, it submits that its "loss" did not occur in Phoenix, Arizona. Instead, it occurred in Chicago from where its retiree funds were initially wired without authorization. [Doc. 411, ¶ 169.] Unlike the plaintiff in *Rogers*

---

[10]    "*Iqbal* and *Twombly* do not require a plaintiff to prove his case in the complaint."  *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 441 (4th Cir. 2015). On a Rule 12(b)(6) motion, the Court "assume[s] the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Such a motion "tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *SD3, LLC*, 801 F.3d at 441, *as amended on reh'g in part* (Oct. 29, 2015) (*citing Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). While the court is not required to accept the legal conclusions in the complaint, it must take the facts in the light most favorable to the plaintiff, *E. Shore Markets, Inc.*, 213 F.3d 175, 180 (4th Cir. 2000).

*v. Lee*, 777 S.E.2d 402, 406 (Ct. App. 2015), RHCT is a pension fund headquartered in Chicago at all times relevant, where RHCT oversees its plan administration and provides its health care benefits to retirees (most of whom reside in Illinois). [*Id.*, ¶¶ 12–14.] It did not leave Illinois to conduct this transaction. As such, Illinois law should govern RHCT's claims.

**B.      RHCT Pleads a Claim for Aiding and Abetting in a Breach Of Fiduciary Duty.**

Illinois recognizes that attorneys can be held liable in tort for aiding and abetting in unlawful transactions. *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767–69 (Ill. App. Ct. 2003), *as modified on denial of reh'g* (Nov. 10, 2003). To plead an aiding and abetting claim, a plaintiff must allege: "(1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Id.*   In *Thornwood,* the Illinois Appellate Court held that a law firm could be held liable for aiding and abetting its client's breach of a fiduciary duty to the client's partner. *Id.* at 768. The law firm had prepared documents and counseled its client in ways that assisted the client in freezing his partner out of the partnership, despite the law firm's knowledge of the relationship. *Id.* The court rejected the argument that the firm owed no duty to the other partner, stating aptly, "[o]ne may not use his license to practice law as a shield to protect himself from the consequences of his participation in an unlawful or illegal conspiracy." *Id.* at 28.

For completeness, Arizona also recognizes cause of action against attorneys for aiding and abetting. In *Facciola v. Greenberg Traurig LLP*, No. CV-10-1025-PHX-FJM, 2011 WL 2268950, at *3 (D. Ariz. June 9, 2011), a district court denied a motion to dismiss aiding and abetting claims brought against Greenberg Traurig, LLP for "substantially participating" in false or misleading

statements about a securities transaction. The court rejected Greenberg's familiar arguments that it owed no duty to the purchasers of the securities. *Id.* at *5.

Arizona courts have also applied aiding and abetting liability in other financial transactions besides securities offerings. *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 26 (2002), *as corrected* (Apr. 9, 2002) (commercial real estate lending); *Sec. Title Agency, Inc. v. Pope*, 200 P.3d 977, 992 (Ct. App. 2008) (solicitation of employees). Arizona courts have held "the knowledge requirement' can be met, 'even though the bank may not have known of all the details of the primary fraud—the misrepresentations, omissions, and other fraudulent practices.'" *Wells Fargo Bank*, 38 P.3d at 26. Even ordinary course transactions can constitute "substantial assistance" under certain circumstances, such as where there is an extraordinary economic motivation to aid in the transaction. *Id.* at 27; *see also Thornwood*, 799 N.E.2d at 768 ("drafting, negotiating, reviewing, and executing" documents contrary to fiduciary obligation were evidence of substantial assistance).[11]

This is relevant here, because Anderson admitted during the criminal trial that he was interested in the future business opportunities the Galanises and Burnham Securities presented, so much so that it was part of the reason he dropped his former client, WLCC, for these other parties. [Doc. No. 411, ¶ 70.] Further, Dilworth was to be paid at closing, and Anderson knew that to get paid, he would need to close the deal. Thus, Anderson was motivated to do whatever was necessary to get HCM's clients to fund the bond issuance.

---

[11]    The DP Defendants' argument rests heavily on *Schatz v. Rosenberg*, 943 F.2d 485, 498 (4th Cir. 1991) [Doc. No. 429-1, at 23] but as the Fourth Circuit notes, that case was limited to federal securities laws, not state law. Indeed, the Fourth Circuit noted that despite the fact that the case presented "troubling legal issues," "the solution to these legal issues cannot be found in the securities laws." *Id.* at 497. In any event, RHCT's allegations reflect that Anderson was more than a "mere scrivener" (*id.* at 497) for HCM. Indeed, it is unclear why he (and not his client) was even assisting HCM in the first place.

Claims for aiding and abetting require proof of "actual knowledge," but it is also well recognized that "actual knowledge," particularly of an unlawful act, is not the kind of fact that is typically proved through direct evidence—*e.g*., the smoking gun email. Instead, the element of actual knowledge is routinely established through circumstantial evidence. *See, e.g., Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 303 (4th Cir. 2004) ("actual knowledge" . . . "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence); *Gibson v. Argus Energy, LLC*, No. CIV.A. 3:10-0725, 2011 WL 1791339, at *3 (S.D.W. Va. May 10, 2011) (actual knowledge requires proof of state of mind, which is ordinarily proved through circumstantial evidence); *Young v. EMCOR Gov't Servs., Inc.*, No. 1:14-CV-1129, 2015 WL 5637571, at *3 (E.D. Va. Sept. 1, 2015) (plaintiff need not offer direct evidence to establish knowledge but may rely on circumstantial evidence). Such evidence may come from many sources, including the credentials and experience of the DP Defendants, actions taken *or not* taken by them (such as the PPM and bondholder certificate), and deposition and expert testimony.

Under either state's law, RHCT's claims against the DP Defendants meet each of the elements. The DP Defendants are alleged to have known (**actual knowledge**) as sophisticated commercial attorneys that HCM owed a fiduciary duty to RHCT and the other bondholders to act in their best interests. [Doc. 411, ¶ 295.] The DP Defendants are also alleged to have known (**actual knowledge**) that the bonds were highly risky investments given the "unique" and "novel" financing arrangement and WLCC's sovereign status (to say nothing of the Galanises' past). The DP Defendants are alleged to have known that the bondholders would be unaware of these risks (because no PPM was prepared) and that they would not be independently authorizing the transaction. [*Id.*, ¶¶ 298–300.] Nevertheless, the DP Defendants prepared the unauthorized Big

Boy letter for Morton to sign on behalf of the bondholders which made it possible for the transaction to close. [*Id.*, ¶ 298–99.]

The DP Defendants suggest that the Big Boy letter was an inconsequential task. [Doc. No 429, at 24.] RHCT disagrees. The Big Boy letter was necessary to document that the bonds were exempt from securities registration under Regulation D of the Securities Exchange Act of 1934. [*Id.*, ¶ 122.]   Only with the delivery of this document could the transaction have closed. [*Id.*] Indeed, one of the opinions of the DP Defendants' was that the bonds were exempt from securities registration, a statement that turned on the Big Boy investor letter. [Doc. 411-9, at 3.] The delivery of the investment letter was also a condition as reflected on the closing agenda. [Doc. 411-5, at 4, Item 7.] The Court can also draw the inference from the very fact that the Big Boy letter was obtained that it was a necessary component of the transaction. Otherwise, there would be no explanation for why the parties needed it in the first place. Thus, preparing the Big Boy letter for HCM presents a plausible claim that Anderson substantially assisted HCM in breaching its fiduciary duties. **This is particularly so where Anderson knew that in the normal course of events, the bondholders would have signed the letter themselves**. [Doc. 411, ¶ 134.]

The emails recently produced by the SEC substantiate Anderson's knowledge that a breach of fiduciary duty was occurring and that he was substantially assisting it. In an email dated, September 11, 2014, Anderson exchanged communications with an HCM employee in which he appears to direct the employee to update the August 21, 2014 Big Boy letter for a bondholder who had acquired a bond on August 27, 2014. [**Ex. 2**, at Ex. E & F, thereto.] In the email, Anderson appears to instruct the employee to date the letter several weeks earlier when the bond was issued. While RHCT has already pleaded that Anderson knew the Big Boy letters were unauthorized [*see*

Doc. 411, ¶¶ 267–68], these communications are further evidence that he knew the bondholders had not approved, let alone were aware, of these letters at the time their bonds were issued.

Moreover, the DP Defendants also knew that Jason Galanis was involved in the Annuity Provider, the Placement Agent, and HCM, something the DP Defendants knew would present a conflict of interest for HCM as a fiduciary. [*Id.*, ¶ 159.] Further, the recently discovered emails between the Anderson and the custodians for the bondholders reflect that he was much more active in assisting HCM than *just* preparing a "Big Boy" letter. [**Ex. 2**, at Ex A., thereto] Given these facts, RHCT has alleged a plausible claim that the DP Defendants were aware of their role in HCM's breach of its fiduciary duty, and knowingly provided substantial assistance in that endeavor. The Motion should be denied.

**C.     RHCT Pleads a Claim for Tortious Interference.**

Illinois follows the Restatement (Second) of Torts § 766 with respect to tortious interference claims. *See The Film & Tape Works, Inc. v. Junetwenty Films, Inc.*, 856 N.E.2d 612, 621 (Ill. App. Ct. 2006); *Roy v. Coyne*, 630 N.E.2d 1024, 1029 (Ill. App. Ct. 1994). Under Illinois law, "to succeed on a claim for tortious interference with contractual rights, plaintiff must plead and prove the following elements: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; (5) and damages." *Douglas Theater Corp. v. Chicago Title & Tr. Co.*, 681 N.E.2d 564, 567 (Ill. App. Ct. 1997). For completeness, Arizona also follows Section 766 of the Restatement. *Wells Fargo Bank*, 38 P.3d at 32 (2002). The DP Defendants do not contest that RHCT has pleaded the existence of a valid and enforceable agreement between HCM and RHCT. Nor do they appear to contest that the agreement was breached by HCM or that RHCT suffered damages as a result.

23

In the Amended Complaint, RHCT pleads that Dilworth and Anderson had knowledge of the agreement between RHCT and HCM. [Doc. 411, ¶ 265.] In their Motion, the DP Defendants do not deny that they were aware of the contractual relationship. Surely, a sophisticated securities lawyer like Anderson knew that an investment manager has a contract governing things like investment authority and compensation, among other things. Instead, the DP Defendants deny that they knew that the Wakpamni bond purchase was unauthorized under RHCT's agreement with HCM, or otherwise a breach of that agreement.

To prevail on its claim, RHCT does not need to establish that Anderson actually picked up its Investment Management Agreement and read it. *See, e.g. Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 828 (Tex. App. 1987), *superseded on other grounds as recognized in Isern v. Ninth Court of Appeals,* 925 S.W.2d 604, 605 (Tex. 1996) (applying Restatement Section 766: "it was not necessary that Texaco have full knowledge of the detailed terms of the contract."). Under Illinois law, RHCT must only establish that Anderson knew about the contractual relationship, generally, and that he "should have known" about its specific terms. *Bolger v. Danley Lumber Co.*, 395 N.E.2d 1066, 1069 (Ill. App. Ct. 1979). In *Bolger*, the Illinois Appellate Court applied Section 766 of the Restatement and found a genuine issue of material fact whether the defendant "should have known" that a real estate listing agreement was *exclusive*, given that the defendant was aware of the listing agreement generally. *Id.* The court held that such issues could not be resolved on summary judgment, particularly since they raised an issue of credibility. *Id.*

Courts applying Section 766 of the Restatement have also noted that there is no precise definition an intentional inducement of a breach. *Wells Fargo Bank*, 38 P.3d at 32 ("There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract."). An inducement can take many forms, and "the Restatement

emphasizes that liability attaches to any intentional interference, whether by inducement *or otherwise*." *Id.* (emp. in original). The Fourth Circuit has also recognized that under Restatement Section 766, "[t]he requisite level of intent also exists if the interferor 'knows that the interference is certain or <u>*substantially certain*</u> to occur as a result of his [or her] actions.'" *Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 212–13 (4th Cir. 2001) (emp. add.)

Here, RHCT has alleged in no unequivocal terms that Anderson was aware that the HCM Big Boy was "unauthorized." [Doc. 411, ¶ 267.] RHCT also alleges that Anderson knew that if the Big Boy letter was unauthorized, it would breach RHCT's agreement with HCM. [*Id.*, ¶ 268.] Assuming this is true, as the court must on a Rule 12(b)(6) motion, the DP Defendants were sufficiently aware that they were inducing a breach by preparing that document for HCM to sign and then carrying out the bond purchase, despite the "unusual" circumstances surrounding the letter.  Again, Anderson testified under oath that in the normal course of events the pension funds would have signed the Big Boy letter themselves. [Doc. No. 411, ¶ 134.] This, alone, pleads a plausible claim that Anderson was aware a breach was occurring.

Yet, this is not the only fact that RHCT has alleged. Read as a whole, the following allegations all reflect that Anderson knew HCM's acquisition of the bonds was likely a breach of its contracts with the pension funds:

- Anderson knew that the tribal bonds were unrated, were based on a "novel" financing source, and carried a high-degree of risk [Doc. No. 411, ¶ 65, 117–19];

- Anderson knew that the bonds were being prepared as "physical delivery" because they could not be placed through an electronic clearing company, like nearly every other modern bond [¶¶ 95–96];

- Anderson was advised by Greenberg that a PPM should be prepared to disclose the risks of the bonds to the purchasers, but no such document was ever prepared [¶ 119–20];

- Anderson knew that the placement agency agreement required a "certificate of ___each___ purchaser of the Bonds certifying that it is a Qualified Investor . . . ," but no such certificates were obtained at closing [*supra*, n. 4 (emp. add.)];

- Anderson knew that HCM did not have independent counsel reviewing the bond purchase and that HCM was relying on him to prepare documents and coordinate communications so that HCM could acquire the bonds [¶ 129];

- Despite representing the placement agent and assisting HCM, Anderson performed no due diligence as to whether any of the pension funds investment guidelines allowed them to acquire millions of dollars in unrated tribal bonds [¶ 135];

- Anderson knew that Jason and John Galanis, financial fraudsters, were controlling the transaction on behalf of Burnham Securities, the Annuity Provider, and directing HCM through Morton [*see* ¶¶ 137, 176].

Despite knowledge of these facts, Anderson intentionally "pushed forward" with the transaction, assisting HCM in coordinating the purchase of the bonds for various investors. Such actions reflect an intentional and unjustified inducement of a breach. The Motion to Dismiss should be denied.

### D.    RHCT Pleads a Claim for Negligence.

"For a plaintiff to state a cause of action for negligence in Illinois, the complaint must allege facts sufficient to establish three elements: (1) the existence of a duty of care owed to the plaintiff by the defendant; (2) a breach of that duty, and (3) an injury proximately caused by that breach." *Guvenoz v. Target Corp.*, 30 N.E.3d 404, 422 (Ill. App. Ct. 2015).

### 1.    RHCT Is Not Required to Attach a "Certificate of Merit."

The DP Defendants argue that RHCT was required to attach a "certificate of merit" to its Amended Complaint in support of its negligence claim. The DP Defendants contend that this requirement is "substantive" and therefore controlled by the substantive law applicable to RHCT's negligence claim (which they urge is Pennsylvania law).

As Magistrate Judge Austin correctly concluded, Pennsylvania substantive law, where Dilworth was located, does not apply under South Carolina's choice of law rules. [Doc. No. 408,

at 20 (citing *Rogers v. Lee,* 777 S.E.2d 402, 406 (Ct. App. 2015)]. Based on those rules, Illinois substantive law applies to RHCT's claims and Illinois has no affidavit of merit requirement for claims against lawyers. *Ayon ex rel. Ayon v. Balanoff*, 721 N.E.2d 719, 721 (Ill. App. Ct. 1999). Even if the Court were to find that Arizona law applies, Arizona also does not appear to have such a requirement for claims against lawyers and surely the DP Defendants do not argue otherwise. As such, assuming that the "affidavit or merit" or "certificate of merit" requirement is "substantive," there would be no such requirement under the substantive law of Illinois or Arizona. RHCT will disclose expert testimony in support of its negligence claim at the appropriate time.

For completeness, S.C. Code § 15-36-100 also does not require the filing of a certificate of merit in this case. The plain language of that section makes clear that it applies only to "professionals licensed by or registered with the State of South Carolina." *Id.* Here, the DP Defendants go out of their way to point out that they are not so licensed or registered, and, consequently, S.C. Code § 15-36-100 does not apply to claims against them.

## 2. The DP Defendants Owed RHCT A Duty of Care in Preparing Their Opinion Letter.

In *Pelham v. Griesheimer*, 440 N.E.2d 96, 99 (1982), the Illinois Supreme Court held that attorneys may owe duties to nonclients in certain circumstances. "[T]o establish a duty owed by the defendant attorney to the nonclient, the nonclient must allege and prove that the intent of the client to benefit the nonclient third party was the primary **or direct purpose of the transaction or relationship**." *Id.* at 20–21 (emp. add.) The "key consideration is the attorney's acting at the direction of or on behalf of the client to benefit **or influence a third party**." *Id.* at 21 (emp. add.)

In *Geaslen v. Berkson, Gorov & Levin, Ltd.*, 581 N.E.2d 138, 144 (Ill. App. Ct. 1991), *aff'd in part, rev'd in part,* 613 N.E.2d 702 (1993), the Illinois appellate court extended *Pelham* to attorneys who prepare opinion letters intended to influence others. *Id.* at 605–06. The scope of the

duty extends to matters within the scope of the opinion letter. *Id*. at 606–07. On further appeal, the Supreme Court reversed dismissal, allowing the plaintiff to establish how that duty had been breached. 613 N.E.2d 702 (1993). Similar claims were also upheld under Illinois law in *Wafra Leasing Corp.1999-A-1 v. Prime Capital Corp.*, 192 F. Supp. 2d 852, 874 (N.D. Ill. 2002).[12]

For completeness, Arizona does not appear to have directly addressed this issue in the context of opinion letters. However, Arizona has held that a lawyer may owe a duty to a nonclient in a commercial setting (*i.e.,* not limited to wills and trusts) where the attorney undertakes services designed to benefit the nonclient, even a potential adversary. *Kremser v. Quarles & Brady, L.L.P.*, 36 P.3d 761, 767 (Ct. App. 2001), *as corrected* (Feb. 14, 2002). In *Kremser*, the Court held that an attorney could be liable for negligently perfecting a security interest for the creditor of the client. *Id.* The Court distinguished between cases where the undertaking is, itself, adverse to the client, in which case there is no duty, and those cases where the undertaking was intended to benefit all parties to the transaction (such as the opinion letter and bond documents here). *Id.* at 767. Given the holding in *Kremser*, it is likely that Arizona would join Illinois and other states in holding that attorneys who prepare opinion letters in commercial transactions *at least* have a duty to investigate the subject matter of the letter and avoid false or misleading statements.

Under *Pelham*, as extended by *Geaslen*, the bondholders were intended beneficiaries of the DP Defendants' opinion letters, even if those letters were not specifically addressed to them. Here,

---

[12]     Illinois is not alone. Several other states have expressly recognized that attorneys engaged in the preparation of opinion letters owe duties to avoid making false and misleading statements. *Remediation Capital Funding LLC v. Noto*, 147 A.D.3d 469, 471 (N.Y. App. Div. 2017) (attorney owed non-client plaintiff duty to avoid misrepresentations in opinion letter); *Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver*, N.A., 892 P.2d 230, 236 (Colo. 1995), *as modified on clarification* (Feb. 21, 1995) (attorneys owed duty to third party to avoid negligent misrepresentations made in opinion letters); *Horizon Fin., F.A. v. Hansen*, 791 F. Supp. 1561, 1574 (N.D. Ga. 1992) (attorney owed non-client duty to avoid making negligent misrepresentations in opinion letter).

RHCT has alleged that the DP Defendants were engaged for the purposes of representing Burnham, whose role was to locate investors and place the bonds with them. [Doc. 411, ¶ 66.] As reflected in the engagement letter, the DP Defendants agreed "to prepare and examine the proposed lending documents necessary to financing [sic] the Standing Rock Sioux project." [Doc. 411-1, § 1.] Among other documents, this included both an Indenture and an opinion letter. [Doc. 411-5.] As such, the Burnham engagement contemplated that Dilworth would be preparing some documents and providing some services intended to benefit, *or at least influence*, the bondholders.

In turn, the bondholders' status as beneficiaries are reflected in the bond documents themselves. The parties to the Indenture are not just U.S. Bank and WLCC, but also importantly, **the bondholders**, who are identified in, and have rights under, the Indenture.[13]  [*See, e.g.,* Doc. No. 411-2, § 2.4 (bonds are evidence that bondholders are entitled to the benefit of the Indenture trust).]  Further, the bonds were sold directly to **the bondholders**, not to the indenture trustee.  As such, the risk associated with the bonds fell on **the bondholders**, not their trustee, and it was the bondholders who needed assurances that the transaction was lawful. *Belluomini v. Stratford Green Condo. Ass'n*, 805 N.E.2d 701, 704 (Ill. App. Ct. 2004) (important considerations in determining whether a duty exists is whether harm is likely or foreseeable).

Thus, the fact that the opinion letters were directed to the bondholder's indenture trustee, and not the individual bondholders themselves, does not establish that the bondholders were not the intended beneficiaries of those letters (after all, it was their money that was "influenced" by the opinion). Accordingly, the duties owed by the DP Defendants to the bondholders were no less different under Illinois law, than if they had each been specifically named in the opinion letter.

---

[13]     Under Illinois law, to have status as an intended third-party beneficiary, it is not necessary to be identified by name. Instead, a "contract may define a third-party by description of a class, and it is sufficient if the plaintiff [like RHCT here] may be identified at the time performance is due as a member of the class intended to be benefited." *Altevogt v. Brinkoetter*, 421 N.E.2d 182, 187 (Ill. 1981).

3.    **The DP Defendants Breached their Duty By Failing to Investigate the Matters Within the Scope of their Opinion Letter.**

RHCT has alleged facts reflecting that Dilworth's opinion letter was materially false or misleading, as to give rise to a "plausible" claim for negligence. Dilworth specifically stated in its opinion letter that the bonds were being purchased to "(a) finance the purchase of a certain Annuity Investment (as described in the Indenture)." [Doc. 411-9.] The letter also stated that Dilworth assumed that "the proceeds of the Bonds will be expended as required by and described in the Indenture, and the other relevant documents, agreements, instruments and certificates executed and delivered in connection with the issuance of the bonds." [*Id.*][14]

These statements were misleading, at best, and false, at worst. The Indenture, which the DP Defendants also drafted, defined the "Annuity Investment" as:

> the contact, in the notional purchase amount of $22,094,089, entered into on the date hereof between [WLCC] and the Annuity Provider, whereby the Annuity Provider shall pay income to the Corporation at stated intervals and amounts, as provided herein.

[Doc. 411-2, § 1.2.] The Indenture also defined "Annuity Provider" as: "a company that provides Annuity Investments **as part of its regular trade and business**." [Doc. 411-2, § 1.2 (emp. add.)] The language "regular trade and business" is not mere surplusage. It reflects intent to require that the Annuity Provider be a company with an established business in such contracts and the resources necessary to stand behind them.

---

[14]    Dilworth attempts to limit its duty to the five specific statements on pages 2 and 3 of its letter. [Doc. 429, at 16.] Yet, Dilworth's opinion letter makes clear in the very first sentence that it was asked to opine on the "legality" of the bonds, generally. [Doc. 411-9.] It cannot be that Dilworth was free to make false or misleading statements about the transaction elsewhere in its letter. In *Gleason*, the court held that the scope of the duty applies "to the matters requested in the agreement and expressed in the opinion letter." *Geaslen.*, 581 N.E.2d at 143 (1991. *Geaslen* said nothing about limiting the duty to only certain "opinions" in the letter. Here, the "Annuity" was one of the "matters" referenced in the letter and should have been investigated and properly disclosed if the opinion had been carefully prepared.

Yet, the DP Defendants knew or should have known prior to closing that there was no such company.[15]  As noted above, it was clear to Anderson by July, 2014 that the Annuity Contract had not emanated from Wealth Assurance AG, but instead, from John Galanis, who had no affiliation with Wealth Assurance AG.  Moreover, the annuity contract was not being negotiated and revised by counsel for Wealth Assurance AG, but rather by Jared Galanis, John's son and Jason's brother. Given that Anderson knew, or should have known in the exercise of due care, about the Galanises' extensive criminal past, Anderson had an obligation to inquire further and ascertain how or why John Galanis had the power to prepare the Annuity Contract.  Likewise, given that Anderson knew the Annuity Provider had to be a company that issues annuities as part of its "regular trade or business," he had an obligation to investigate this new company and ascertain whether it had ever offered annuities or even had the resources to do so. Had Anderson done that, he would have learned that WAPCC was a shell for the Galanises and would not have qualified as an "Annuity Investment (as described in the Indenture)," as he stated in his opinion letter.

In addition, Anderson's "assumption" that the bond proceeds would be expended as required by the "Bond Documents" was unreasonable in light of his knowledge to the contrary. The Annuity Contract, which Anderson had help negotiate, required the bond proceeds to be wired to an offshore account held at a bank with no U.S. branches. This was not a trivial requirement: the offshore nature of the annuity was necessary to receive the tax advantages that would allow the annuity to pay the obligations on the bonds. [Doc. 411, ¶ 114.]

---

[15]      For the purposes of a plausible negligence claim, RHCT need not plead that Anderson had actual knowledge because the standard for negligence is "knew or in the exercise of due care should have known." *See Tsourmas v. Dineff*, 515 N.E.2d 743, 745 (Ill. App. Ct. 1987).

RHCT alleges, however, that Anderson knew or should have known, in the exercise of due care, that the funds would not be wired as required by the Annuity Contract. After all, it was Anderson that received wire instructions for the annuity from Jason Galanis, which called for the funds to be wired not offshore, but to a JPMorgan Chase Bank account in **Beverley Hills, California**. While no one, other than Anderson, may know for sure whether he actually opened these instructions to view them, RHCT has alleged sufficient facts to give rise to the inference that he was aware of their contents. For one, no prudent lawyer would forward wire instructions for a $22,000,000 transfer without reviewing them to make sure they were, at a minimum, complete. [Doc. 411, ¶ 183.] Second, even if Anderson never opened the wire instructions, the attachment to his email identified that they were instructions to a Chase bank account. [*Id.*, ¶ 182.] Anderson would have known that Chase, a bank with branches in the U.S., did not qualify as a recipient bank under the Bond Documents, as he "assumed" in his opinion letter. [*Id.*] These are questions of fact not suited for disposition on a Rule 12(b)(6) Motion.

Opinion letters are significant undertakings. Had Anderson been minimally careful in preparing the opinion letter, he would have investigated the Annuity Provider, Annuity Investment, and the bank to which the funds were being wired. If he had investigated these facts, he would have been obligated to disclose that the Annuity Investment, in fact, did not conform to the Indenture and that the parties intended to deviate significantly from the "Bond Documents."

### 4.    The DP Defendants' Breach of Their Duty Caused RHCT's Losses.

In turn, the transaction would not have closed and the bondholders would not have been injured. In Illinois, "proximate cause encompasses both cause in fact and legal cause." *Suwanski v. Vill. of Lombard*, 794 N.E.2d 1016, 1022 (Ill. App. Ct. 2003) "To satisfy the element of proximate cause, the plaintiff must plead sufficient facts to establish that 'but for' the negligence of the attorney, the plaintiff would not have suffered actual damages." *In re Estate of Powell*, 12

N.E.3d 14, 22 (Ill. App. Ct. 2014). "The key inquiry into cause in fact is whether a defendant's conduct was a material element and a substantial factor in bringing about the injury." *Suwanski*, 794 N.E.2d at 1022. "[W]here injury is caused by the concurrent negligence of two persons and the accident would not have occurred without the negligence of both, the negligence of each is a proximate cause of the injury. It follows, therefore, that there may be more than one legal proximate cause of a plaintiff's injuries." *Id.*

There should be no question that the DP Defendants' opinion letter caused RHCT's injury. [Doc. 411, ¶¶ 285.] Indeed, to have U.S. Bank close the transaction, the parties were required to deliver "[a]n opinion of Bond Counsel to the Placement Agent, addressed to the Trustee, as to the validity of the 2014 Bonds." [Doc. 411-2, § 2.11.] The opinion letters were also required closing documents, as reflected on the closing agenda. [*Id.*, 411-5, at 4.] As such, RHCT has pleaded that its injury, the issuance of the bond, was proximately caused by the opinion letter.

Note, RHTC's negligence claims are not limited to "negligent misrepresentation," of which "reliance" is an element. *See Geaslen*, 581 N.E.2d at 143 (noting that claims were not based on "negligent misrepresentation"). As such, they should be analyzed under a traditional proximate cause analysis for negligence, regardless of whether RHCT itself ever saw the opinion letters. Even then, RHCT has established a plausible claim for negligent misrepresentation too. The Indenture makes clear that U.S. Bank was acting as trustee for the benefit of the bondholders [Doc. 411-2, § 2.4], and Dilworth concedes that the opinion letters were directed at U.S. Bank. [Doc. 429-1 at 15.] RHCT has raised a fair inference that U.S. Bank relied on the opinion letters in closing, even if the bondholders, U.S. Bank's beneficiaries, were unaware of the letters or the bonds. *See ML-Lee Acquisition Fund, L.P. v. Deloitte & Touche,* 327 S.C. 238, 242, 489 S.E.2d 470, 472 (1997) (applying Restatement (Second) of Agency § 315 and finding that agent's reliance on

33

misrepresentation was sufficient for misrepresentation claim); *Chicago Title & Tr. Co. v. First Arlington Nat. Bank*, 454 N.E.2d 723, 728 (Ill App. Ct. 1983) (applying Restatement (Second) Agency § 315). As such, RHCT states a plausible claim for negligence as to the DP Defendants such that the Rule 12(b)(6) motion should be denied.

## **CONCLUSION**

For the forgoing reasons, the DP Defendants' Motion to Dismiss should be denied. In the alternative, RHCT requests that it be given leave to amend to file its Second Amended Complaint consistent with the allegations and arguments in this brief.

Respectfully Submitted,
KENISON, DUDLEY & CRAWFORD, LLC

/s/ Thomas E. Dudley, III
Thomas E. Dudley, III (District Court Bar #05973)
704 East McBee Avenue
Greenville, SC 29601
Telephone: (864) 242-4899
Facsimile:  (864) 242-4844
Email:      dudley@conlaw.com

*Associate Counsel:*
Aaron H. Stanton (ARDC: 6244251)
*Pro hac vice admitted*
astanton@burkelaw.com
Eric P. VanderPloeg (ARDC: 6310377)
*Pro hac vice admitted*
evanderploeg@burkelaw.com
330N. Wabash Ave., 21st Floor
Chicago, Illinois 60611
Telephone: (312) 840-7000
Facsimile:  (312) 840-7900
*Attorneys for Intervening Plaintiff, Chicago Transit Authority Retiree Health Care Trust*

March 18, 2019
Greenville, South Carolina

34